NESENOFF & MILTENBERG, LLP
ANDREW T. MILTENBERG, ESQ. (NY State Bar
No. 2399582; *pro hac vice* admission pending)
amiltenberg@nmllplaw.com
NICHOLAS E. LEWIS, ESQ. (NY State Bar
No. 017292008; *pro hac vice* admission pending)
nlewis@nmllplaw.com
SUSAN STARK, SBN 147283
sstark@nmllplaw.com
4 Palo Alto Square
3000 El Camino Real, Suite 200
Palo Alto, California 94306
Telephone:      (650) 209-7400
Facsimile:      (212) 736-2260

Attorneys for Plaintiffs
Brian Lilly, Sr. and Brenda Lilly, Individually,
and on behalf of the Estate of Brian Lilly, Jr.

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN LILLY, SR., and BRENDA LILLY, individually, and on behalf of the Estate of Brian Lilly, Jr.,<br><br>Plaintiffs,<br><br>v.<br><br>UNIVERSITY OF CALIFORNIA-SAN DIEGO, BOARD OF REGENTS OF UNIVERSITY OF CALIFORNIA, GEOFF BOND, KATIE MCGANN, and EARL W. EDWARDS<br><br>Defendants. | Case No.: **'21 CV1703 TWR MSB**<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**<br>1) **Violation of Title IX (Retaliation);**<br>2) **Violation of Fourteenth Amendment for Denial of Equal Protection under 42 U.S.C. §1983;**<br>3) **Violation of Fourteenth Amendment for Deprivation of Substantive Due Process under 42 U.S.C. §1983;**<br>4) **Wrongful Death (C.C.P. §377.30**);<br>5) **Negligent Hiring; and**<br>6) **Negligent Supervision**<br><br>**JURY TRIAL DEMAND** |

## INTRODUCTION

Plaintiffs BRIAN LILLY, Sr. and BRENDA LILLY, (collectively referred to herein as "Plaintiffs"), individually, and on behalf of the Estate of Brian Lilly, Jr. ("Decedent"), bring this action for (i) retaliation in violation of Title IX of the Educational Amendments of 1972; (ii) violation of equal protection in violation of 42 U.S.C. Section 1983; (iii) deprivation of

1  substantive due process in violation of 42 U.S.C. § 1983; (iv) wrongful death; (v) negligent hiring,
2  and (vi) negligent supervision.

3      This matter concerns the wrongful death of Decedent caused directly by the bullying,
4  harassment and psychological torment perpetrated by the abusive rowing coaches employed by the
5  University of California San Diego ("UCSD") Men's Rowing Team.  Head Coach Geoff Bond
6  ("Bond") subjected his student athletes to abusive and offensive conduct, as his supervisors, Katie
7  McGann ("McGann") and Earl Edwards ("Edwards"), ignored and enabled the illegal behavior.
8  Bond tormented multiple athletes on the men's rowing team, but was particularly abusive toward
9  Decedent, a freshman who challenged Bond's failure to report multiple sexual misconduct
10  allegations lodged against another freshman rower, Z.B.[1]

11      Bond was a 'Responsible Employee' under the school's Title IX policy, required to
12  immediately report any sexual misconduct allegations to UCSD.  Decedent questioned his coach's
13  failure to abide by the policy. In response, Bond subjected Decedent to repeated verbal abuse and
14  hostility, including personal insults, overly arduous workouts to the point of inducing vomiting, and
15  an inexplicable demotion from one of the varsity boats to the noncompetitive (fourth) boat despite
16  Decedent's earning a spot in the top-3, competitive boats.

17      The head coach sought to silence Decedent, and other concerned members of the rowing
18  team.  Defendants' conduct caused a deterioration of Decedent's mental health, including despair,
19  paranoia, and confusion. Decedent experienced mental illness, warranting hospitalization, for the
20  first time in his life. The in-patient treatment helped Decedent cope temporarily but, upon returning
21  to UCSD and being again subject to the coaches' behavior, Decedent tragically took his own life on
22  January 4, 2021.

23      This horrific tragedy is not the sad, but inevitable, result of an "old-school coach"
24  miscalculating the effect of his harsh coaching style on an overly sensitive Generation Z teenager.
25  Decedent was neither overly sensitive nor weak.  He was a focused, strong-willed endurance athlete
26  with no prior history of mental illness.  Decedent enrolled in UCSD, in fall 2019, after a successful
27  run as a varsity athlete in high school.  He was a determined, empathetic teammate who led his high

28

---

[1] Initials are used for privacy purposes.

school rowing club, ran in the New York City marathon, and competed in the Iron Man Triathlon in Lake Placid, New York.

Upon information and belief, immediately before being hired by UCSD, Bond was forced to leave his prior position as rowing coach at University of Pennsylvania ("UPenn") after the rowers threatened to quit in protest of Bond's abusive behavior and ineffective coaching.  Defendants were aware of Bond's prior employment history and knew or should have known that he posed a dangerous risk to every student athlete he "coached."  Defendants negligently failed to ascertain and recognize this risk in their rushed hiring process, which was a breach of their duty to maintain a safe educational environment, free from hostility and abuse.  Decedent's death could, and indeed should, have been avoided. Defendants' misconduct was the proximate cause of Decedent's wrongful death, the tragedy that forms the subject matter of this action.

## JURISDICTION AND VENUE

1.    Jurisdiction of this Court is invoked pursuant to this Court's federal question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331; 1367 respectively because: (i) the federal law claim arises under the Constitution and statutes of the United States; and (ii) the state law claims are so closely related to the federal law claim as to form the same case or controversy under Article III of the United States Constitution.  Further, this Court has diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest.

2.    Plaintiffs bring this action as administrators of the estate of Decedent, as Decedent's parents, the personal representatives of his estate and successors in interest.

3.    This Court has personal jurisdiction over Defendant UCSD on the grounds that it is conducting business within the Southern District of California.

4.    This Court has personal jurisdiction over Defendant Board of Regents of University of California, on the grounds that it is conducting business within the Southern District of California.

5.    This Court has personal jurisdiction over Defendants Bond, McGann and Edwards, on the grounds that they are employed by UCSD, and at all times relevant herein were acting within the course and scope of their employment with UCSD.

6.    Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because UCSD is located in this judicial district and a substantial part of the events and omissions giving rise to the claim occurred within the Southern District of California.

**PARTIES**

7.    Plaintiffs are citizens of the United States and are residents of New York.  Plaintiffs are the parents of Decedent.

8.    Plaintiffs are the successors in interest of Decedent under California law because Decedent died with no surviving issue and Plaintiffs are therefore entitled to the property of the Decedent by intestate succession. Plaintiffs were also appointed Administrators of Decedent's Estate by the Surrogate Court of Westchester County in the State of New York on June 22, 2021.

9.    At all relevant times herein, Plaintiffs were the parents and natural guardians to Decedent, who was a student residing in San Diego and enrolled at the University of California San Diego.

10.    At all times relevant to this Complaint, Defendant UCSD was and is a public university and recipient of federal funds located in San Diego, California where it maintains its principal offices and places of business.

11.    At all times relevant to this Complaint, the Regents of UCSD was and is the governing body of the University of California.

12.    Under Article IX, Section 9 of the California Constitution; the Board has "full powers of organization and governance" of the University of California, including oversight of policy making and enforcement. The Regents of the University of California is the official name of the public corporation that governs and operates the University of California as a public trust through its 26-member board of Regents. UCSD is one of the 10 campuses of the University of California system and is in San Diego, California.

13.    At all times relevant to this Complaint, Defendant Bond was and is employed as head coach of the men's rowing team by the Defendant UCSD.

14.    At all times relevant to this Complaint, Defendant McGann was and is employed as associate athletic director by the Defendant UCSD.

15.     At all times relevant to this Complaint, Defendant Edwards was and is employed as athletic director by the Defendant UCSD.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.     BACKGROUND

#### a.     Bond Comes to UCSD After Rower Protest at the University of Pennsylvania

16.     Bond secured the head coach position at UCSD because the athletic director, Edwards, and his associate athletic director, McGann, conducted a rushed search, lacking proper due diligence.

17.     Coaches possess tremendous power and influence over their athletes, particularly in college where students dedicate a substantial part of their lives to their chosen sport. Freshman athletes, many of whom are one year removed from living at home with their parents, seek security, guidance, encouragement, and reassurance from their coaches.

18.      Athletic directors and other employees who hire coaches, including Defendants Edwards and McGann are or should have been fully aware of the above-described dynamic between coaches and student athletes.

19.     Athletic directors and other employees who hire coaches, including Defendants Edwards and McGann are or should have been fully aware that a hiring process, including background checks, must be diligent.

20.     The vetting process and background check, or lack thereof, in this matter fell well below NCAA and acceptable pedagogical standards.

21.     This insufficient, negligent, and rushed process led to UCSD's hiring a coach, Bond, whose abusive approach to coaching would have been ascertained had due diligence in the hiring process been performed.

22.     While Bond's lengthy resume may have initially looked good on paper, even the most cursory background check would have revealed the coach to be an inappropriate choice.

23.     For example, a mutiny by the student athlete rowers at UPenn was not difficult to uncover.

24.     Decedent, and other members of the UCSD rowing team, were able to uncover Bond's checkered past, limited team success and the UPenn protest within a few minutes and a couple phone calls.

25.     Bond's history of abuse and erratic, anti-social behavior, was a poorly kept secret in the tight-knit, national rowing community.

26.     Bond rowed in college at Brown University in Rhode Island.  He began his career coaching rowing at Berkeley High School in 1993.  Bond's first job coaching in college was associate head coach under the legendary rowing head coach, Steve Gladstone, at University of California Berkeley in 1996.  Bond coached the UC-Berkeley freshmen team for 12 years, mostly benefiting from the halo of Gladstone's success and stellar program.

27.     After Berkeley, and a brief stint training the Chinese National Team, Bond became head coach of Deerfield Academy, a preparatory private high school in New England, in 2014.  He only coached at Deerfield for one year.

28.     Bond left Deerfield to be head coach of UPenn in men's rowing in 2015.  Bond would, again, leave a seemingly prestigious position after a short tenure as coach.  Upon information and belief, Bond lasted three years before being forced out of UPenn when approximately 25 of the rowers he coached threatened to quit unless Bond was removed.

29.     Upon information and belief, the student athletes at UPenn refused to continue to row under Bond due to his verbal abuse. Bond was a known bully within the UPenn rowing program. He regularly made sexually explicit, offensive remarks, and lobbed politically incorrect insults at his rowers.

30.     Upon information and belief, Bond taught outdated technique, discouraged athletes from receiving treatment from their own trainers and prevented the team's lifting coach from strength-building with his rowers.

31.     After allegedly being forced out of UPenn, Bond was hired to be UCSD's men's rowing team head coach to replace Zack Johnson, who left in the summer of 2019, leaving UCSD without a rowing coach as the semester and rowing season began.

32.     McGann, the associate athletic Director for UCSD, was charged with hiring the new coach to resurrect the second-rate rowing program in place at UCSD, with hopes of turning the rowing program into a legitimate Division I program.

33.     Upon information and belief, in September 2019, when she realized the men's rowing team was heading into Fall 2019 without a coach, McGann rushed through the process to find a new coach. As Bond was available, she hired Bond.

34.     McGann's hire was made without the appropriate level of due diligence; she was misled by Bond's lengthy resume, failed to consider a wide range of capable coaches, and did little to no independent research into Bond's background, prior positions, or the reasons he left seemingly prestigious positions.

35.     McGann, for example, failed to uncover the reason Bond was forced out of UPenn, and made no phone calls to his prior employer or members of the rowing community to uncover same.  If she had called, like Decedent and other UCSD rowers, McGann would have discovered Bond's reputation for abuse, and erratic, inappropriate behavior, as were well-known in the rowing community.

36.     McGann and Edwards, as McGann's supervisor, throughout the hiring of Bond, failed to act appropriately in that they failed to consider multiple candidates or properly vet the ones they hired, an integral part of the hiring process for any new coach.

37.     On October 1, 2019, Bond was hired to be the head coach of UCSD men's rowing.

38.     When McGann hired Bond to replace Zach Johnson as head coach in October 2019, she also hired Bond's longtime assistant coach, Dameon Engblom ("Engblom").

39.     This negligent hiring had grave ramifications for Decedent, as detailed below.

40.     The start of Bond's employment coincided with the first semester of Decedent's freshman year, Fall 2019.

**b.      <u>UCSD Has Received Negative Press for the University's Failure to Report Investigate and Address Sexual Misconduct on Its Campus</u>**

41.     While UCSD promotes itself as a university committed to rooting out sexual misconduct among its student population, UCSD's conduct in this matter and failure to act as

required under applicable policies, procedures, regulations and guidelines were done to avoid garnering 'bad press' for the school's insincere commitment to protecting purported victims of sexual assault.

42. UCSD has a well-documented history of insufficient response to complaints of sexual misconduct, particularly when those accused of wrongdoing are employees of the university.

43. In May 2019, *The Triton*, the independent, student-run newspaper of UCSD, reported that five members of the UCSD staff were allowed to resign, without discipline, after they were found to have violated UCSD Title IX sexual misconduct policy. *See* https://triton.news/2019/05/five-staff-resign-without-discipline-after-violating-title-ix-policy/The Triton.

44. According to the article, there were six employees total who violated UCSD policies prohibiting sexual violence and sexual harassment, but only one of the employees faced disciplinary action by the UCSD. *Id.*

45. The sexual misconduct investigations, conducted in 2016 and 2017, revealed repeated instances of sexual harassment by supervisors, nonconsensual sexual touching and inappropriate, discriminatory remarks experienced by subordinates. The misconduct consisted of the following:

    a.    In a June 2016 report, a female employee complained of racism and sexual harassment by her female supervisor, who made sexual remarks about phallic foods, commented on the subordinate's body parts, and mocked her accent. The supervisor was found to have violated the policy and was allowed to resign.

    b.    An August 2016 investigation revealed a nurse manager at the university's hospital was found responsible for sexually harassing her male subordinates, inappropriately groping their 'butts and nipples', snapping their waistbands, inserting her tongue in their ears, and inserting lube in someone's ear. Additionally, the supervisor told a male subordinate it was his job to give massages and reportedly made "too many [sexual comments and gestures] to

count." The nurse manager denied most of the allegations but admitted to groping the nipple of a co-worker she knew "socially" and inserting the lube in a nurse's ear while he treated a patient. The supervisor was found in violation of policy and resigned.

    c.    In March 2017, a nurse resigned after an investigator found him responsible for sexual harassment of a fellow nurse, who alleged the respondent could "not stop talking about sex" and liked "scanning women with his eyes."

    d.    A report of an investigation from November 2017 found a supervisor violated the school's policy against sexual harassment when he made numerous unwelcome comments to a student employee via text message, social media, and email. The supervisor resigned after the investigation.

    e.    In June 2016, the school found a female employee of an undisclosed workplace at UCSD was harassed by a male co-worker who repeatedly made homophobic and sexist remarks to the complainant. The respondent was directed to take online training on sexual harassment by supervisors and told to keep his thoughts on sex and gender to himself. *Id.*

46.    The May 2019 *Triton* article was one of multiple reported sources revealing incidents in which UCSD received negative press for the university's inadequate and slow response to inappropriate sexual harassment by a school employee.

47.    In November 2019, UCSD fired psychology professor Nicholas Christenfeld, over one year after he emailed pornographic material to a student. https://www.voiceofsandiego.org/topics/education/a-ucsd-professor-sent-a-student-porn-heres-why-it-took-a-year-to-fire-him/

48.    Prior to the delayed firing, Christenfeld was the subject of multiple complaints over more than a decade at UCSD, yet the tenured professor received nothing more than a warning for these complaints. *Id.*

49.    The *Voice of San Diego*, a non-profit investigative news outlet covering the San Diego Region, obtained documentation in February 2021, which showed that five people filed

complaints against Christenfeld, for sexual misconduct ranging from inappropriate relationships to sexual harassment. *Id.* The documents uncovered by the site also noted the professor "had a history of dating students." *Id.*

50.     The *Voice of San Diego* article, authored by Ethan Coston on February 17, 2021, detailed the previous complaints which dated back fifteen years before Christenfeld's firing:

      a.    In 2004, a student filed a sexual harassment against Christenfeld because his staring made her uncomfortable, and because there were rumors, he dated students. UCSD gave him a 'warning and education meeting.'

      b.    In 2008, an individual filed an anonymous complaint of Christenfeld dating a student, but the university did not investigate because the psychology professor did not have a supervisory relationship.

      c.    In 2013, UCSD opened an investigation into Christenfeld because two people who worked for his department believed they interrupted intimate activity between the professor and a student.

      d.    In 2014, UCSD investigated Christenfeld but found him not responsible for sexual harassment for conduct vaguely described as complainant's "rejection of respondent's advances."

      e.    In a similarly vague report by the university, in 2017, UCSD implemented "preventative measures" in response to an unidentified individual's complaint that Christenfeld was "inappropriately flirtatious." *Id.*

51.     UCSD has a pattern of enabling university employees' inappropriate behavior.

52.     Most recently, the negative press continued with a snapshot of the UCSD Provost's costly misbehavior and general disrespect of women.

53.     In September 2020, UCSD settled a lawsuit brought by Former UCSD Associate Vice Chancellor Jean E. Ford against the school contending Chancellor Pradeep Khosla ("Khosla") was abusive toward her and other female employees, then retaliated against her for voicing her concerns.   https://www.sandiegouniontribune.com/news/courts/story/2020-09-24/ucsd-chancellor-and-former-exec-reach-settlement-in-discrimination-lawsuit.

54.     The gender and age discrimination suit, settled for an unknown sum, alleged five women, over the age of 40, were targeted by Khosla, and subjected to daily abuse, including demeaning and humiliating comments, from the Chancellor.  *Id.*

55.     Khosla would favor male donors, and respond to their complaints immediately, however if female donors made complaints, he would describe the female donors as "just being difficult." *Id.*

56.     The Chancellor allegedly told his subordinate, when Ford was complaining of her heels hurting her feet at a work event, that the "only reason" for her to wear heels was if she was wearing a skirt so people could see her "taut calves" and that Ford "shouldn't bother" with heels since she wore pants regularly.  *Id.*

57.     In meetings, Ford alleged that Khosla interrupted and spoke over women; peppered them with questions about minute and unimportant details, demeaned and mocked their contributions to conversations and achievements. Males did not suffer the same abuse.  *Id.*

58.     When Ford voiced the above concerns to the Chancellor, Khosla sabotaged her fundraising efforts and made disparaging remarks about her to her co-workers, subordinates, and donors, hurting her reputation during her time at UCSD and after she was fired in August 2018.  *Id.*

59.     The above media coverage of UCSD lays in stark contrast to the image the university attempts to portray to students, employees, community members, potential students, and their parents.

c.     <u>**Relevant Portions of UCSD Policies and Procedures**</u>

60.     The Office for the Prevention of Harassment & Discrimination ("OPHD"), the UCSD Title IX Office, and the university in general, promotes itself as a safe space for people to report incidents like those listed above and in the instant matter.

61.     The school proclaims, "UC San Diego is committed to the highest standards of civility and respect toward all as reflected in the UC San Diego Principles of Community. The university rejects acts of harassment and discrimination, works to resolve concerns, and investigates known facts to determine if university policies have been violated."

Complaint

62.     OPHD directs that "Responsible Employees," i.e., any university employee who is not a confidential resource and who receives, in the course of their employment, information that prohibited conduct or retaliation has occurred, are required to "promptly notify the Title IX Office (OPHD)". https://ophd.ucsd.edu/_files/flyers-handouts/ResponsibleEmployees.pdf.

63.     According to OPHD, "[a]s a Responsible Employee, you must contact OPHD as soon as possible when you learn that any UCSD student, staff, faculty, or patient has potentially experienced an incident of sexual violence or sexual harassment.  Share whatever information you have, including the names of any individuals involved, their contact information, and any details of the incident you have."  https://ophd.ucsd.edu/report-bias/index.html.

64.     OPHD further advises, "[a]s a Responsible Employee, you should report directly to OPHD, even if you are unsure that the incident actually occurred or unsure whether it constitutes sexual harassment or sexual violence. You should not investigate the report and should not try to intervene or resolve the issue."  *Id.*

65.     The individual Defendants in this matter, Bond, Engblom, and McGann, were all Responsible Employees in this matter upon learning of the conduct engaged in by Z.B.

66.     Upon information and belief, Defendant Edwards, as an employee of the university irrespective of his role as the university athletic director, became a Responsible Employee upon learning of Title IX allegations against Z.B.

**d.     <u>Decedent Chose UCSD as a Freshman Scholar-Athlete to Row and Help Build a Division-I Program</u>**

67.     Decedent enrolled at UCSD in the Fall 2019 semester to pursue an undergraduate degree in real estate and development and to continue his passionate pursuit of rowing, as a scholar-athlete of the class of 2023 men's rowing team.

68.     Decedent was drawn to UCSD for its academics and to be a part of the university's commitment to building a Division I program, as pitched by McGann to prospective rowers for Fall 2019 despite the head coach vacancy.  It was understood, however, that a coach of comparable, if not better, skill and style would fill Zack Johnson's former position as rowing coach.

69. Decedent was an accomplished athlete prior to enrolling at UCSD, and he aspired to become a Division I ("D-I") student athlete. He thrived on competition and overcoming challenges, so competitive team rowing became his passion in high school. Decedent was a dedicated, supportive teammate who flourished as a leader of the Pelham Community Rowing Association (PCRA). Decedent won the "most improved" rower award his junior year of high school, then led the boat as team captain his senior year. He earned a bronze medal at the Philly Youth Regatta 8+ in 2018. Decedent was widely regarded as the consummate teammate, always present with words of encouragement and positive reinforcement. Like many young, exceptional athletes, Decedent drew a tremendous amount of his self-worth and confidence from his on-field accomplishments, requiring his consistently overcoming adversity, physical limitations, and challenges.

70. By way of example, Decedent overcame Juvenile Rheumatoid Arthritis to mold himself into a top-shelf athlete, despite gaining over thirty pounds from the condition in middle school, giving rise to an extreme, lasting sensitivity about his weight. He struggled with a new BMI that qualified Decedent as obese, causing him to lose confidence and, sadly, some friends in his early teenaged years. While he was eventually able to lose the weight, and keep it off, Decedent remained susceptible to body shaming throughout his life.[2]

71. To accomplish his remarkable weight loss, Decedent relied on his support system, a loving family, and true friends in his hometown of Scarsdale, New York, as well as his own will power and hard work. Further, he was blessed with multiple real coaches in his life, prior to college, who took their role seriously, serving as mentors, motivators, disciplinarians, confidantes, and guardians all at once. The admirable support system and healthy passions carried Decedent through the awkward struggles of middle school, and led to sustainable weight loss, personal growth, and exceptional success in high school.

72. Despite the health struggles, Decedent completed the New York City Marathon for the Arthritis Foundation in 2018 and the Lake Placid Ironman in 2019, wherein participants swim

---

[2] Decedent shared the pain, and shame, he felt from his childhood obesity with his coaches and friends on the rowing team throughout his freshman year. Though the obesity was in the rearview, Decedent was clearly sensitive to his former unhealthy stature, feeling inferior whenever reminded of same. Unfortunately for Decedent, the reminders came often from Bond, after the relentless bully recognized the pain, he could inflict from this sore spot.

2.4 miles, bike 112 miles and then run 26.2 miles.  The race is widely considered to be one of the most grueling single-day sporting events in the world.

73.     This impressive determination, work ethic and internal strength served Decedent well off the field as well:  he worked hard at multiple jobs, including construction jobs in the summer, an internship in corporate sustainability and a men's streetwear brand, Pyrony, founded by Decedent, himself.  Decedent enjoyed his many interests, hobbies and, above all, his passion for sports.  He worked hard to hone his wide skillset and maintained a joyous passion for life.

74.     Decedent received the Henry David Thoreau Award in high school, given to the senior who marched to the beat of his own drum.  He came to UCSD with a clear, satisfied mind, prepared to begin his journey toward adulthood and a rewarding life.

75.     Decedent was a loving and admired son, brother, grandson, nephew, cousin, friend, and teammate.

76.     Decedent had no mental health issues prior to his enrollment at UCSD.

77.     The emotional pain and suffering he would come to endure was wholly attributable to the Defendants' collective conduct.

78.     Decedent distinguished himself quickly as a freshman leader on the rowing team in the initial quarter of the Fall 2019 semester.  He was quick to make friends and was predictably happy to fully participate in team-building activities.

79.     Bond was hired to be coach in or about October 2019, over a month into the fall season.

80.     Bond's hire by McGann in October was poorly planned and rushed. The flawed process was particularly inexplicable given she had at least two months to plan for the head coaching vacancy created by Zack Johnson's departure in the summer.

81.     The new coaches would soon prove unfit to lead the program into D-I.  Similarly, UCSD failed to fulfill basic team needs, as uniforms were not ordered, and no team photos were taken in Fall 2019 or Spring 2020 seasons.  The program was clearly not ready for D-I competition. The coaches were incapable of performing the basic functions of their jobs.

82.     Bond's treatment of his student-athletes, at first, appeared to be of the run-of-the-mill "tough" variety, including challenges to the teenagers' toughness and sophomoric, sexually tinged insults to push their "manliness."

83.     This culture contravened the express claims of UCSD, which trumpeted to its prospective students its inclusive, safe campuses as being nurturing environments, free from toxicity.

84.     Bond's conduct toward Decedent far exceeded the old-school, standard "tough love" coaching tactics, as the coach targeted the 19-year-old freshman with mean-spirited personal attacks, which increased in intensity after Decedent challenged him.

85.     When Bond first came to coach the team, during the second quarter of the Fall 2019 semester, he appeared to recognize Decedent's value to the rowing team.  The freshman was clearly a hard-working, supportive teammate and vocal leader with erg[3] scores that warranted inclusion on one of the school's varsity boats.

86.     Decedent was no stranger to hard work and sacrifice, and his commitment to the team was apparent.  Decedent did more erg machine work outs, with erg scores that were faster than the bulk of his teammates and nearly all his fellow freshmen.  Decedent's hard work and competitive spirit impressed teammates and coaches alike at UCSD who wanted him for his athleticism and leadership. Decedent's passion for the program and appealing personality appeared to lay the foundation for success as a D-I athlete.  He was focused on, and capable of, making this athletic dream come true.

87.     Bond began the season as an apparent fan of Decedent, who successfully earned and secured his spot in one of the top three varsity boats. (The fourth boat was considered to be a noncompetitive type boat, consisting mainly of freshmen, inexperienced walk-on rowers, who were not "boated" as they did not race as often or practice on water as much).

88.     Bond praised Decedent in front of teammates and placed him in the "2V" (the 2nd Varsity, second best) boat.

---

[3] Erg scores measure rowing speed on the ergometer, the standard rowing machine found in most fitness gyms.  The measure of speed is the time it takes to cover a specific distance, typically 2000 meters.  The lower the erg score the better, for it signifies the rower took less time to cover the same distance.

89.     Still, Bond's issues, i.e., an inability to control his anger, hurling sexual and otherwise, inappropriate insults at his rowers, appeared with increasing frequency as the first semester progressed, and Bond grew more comfortable.

90.     Decedent, and his fellow freshmen rowers, quickly learned what the UPenn rowers had endured under Bond:  Bond was not an effective coach, teacher, leader, or mentor.  He was a sadistic bully; an angry, volatile man whose rage surfaced often and unexpectedly. The rowers were subjected to sexually inappropriate comments, petty insults, and erratic behavior.

91.     In the early days of Bond's tenure, Decedent was treated relatively respectfully, as other rowers drew the coaches' negative attention more frequently.  Unfortunately, Bond's approval of Decedent would quickly wane, when the coach became enraged by what he viewed as Decedent's insubordination. Bond would soon view Decedent as an enemy after the freshman questioned Bond's failure to report multiple sexual misconduct allegations against Z.B., another freshman rower.  Decedent's integrity incensed Bond, causing him to take numerous adverse actions against a brave teenager who stood up for what he believed in.  As time went on, Bond's vitriol towards Decedent became constant, and far more intense than what his teammates experienced.

### e.     **Bond's Abuse Intensifies**

92.     The UCSD rowers gave their new head coach from the Ivy League the benefit of the doubt in Fall 2019. But Bond's limits as a coach, mentor, leader, and human would all soon reveal themselves.  For example, it struck Decedent as quite odd that Bond would chastise his rowers, Decedent and his freshmen teammates, for cheering each other on during intense rowing practices. The alleged coach would direct the student athletes to "shut up" while rowing, rather the express support and encouragement for their teammates.

93.     Bond exhibited a general disregard for his student-athletes' health, taught them outdated rowing techniques, and mocked the rowers who reverted to the modern, effective techniques they learned previously.

94.     In lieu of inspiration, wisdom and leadership, Bond assailed his student athletes with inappropriate insults, regularly using sexual and/or otherwise inappropriate terms, mocking them for their insufficient testosterone, "flaccid" manhood, small "testicles" and/or lack of "manliness,"

in general.  He also would question his rowers' loyalty to the team, which could only be established by their complete submission to the coach.

95.     Bond routinely ridiculed the rowers for not being "man enough," chastised them for their lack of testosterone and labeled them as "pussies," while doing workouts, or "pieces," on the water.  The pointless insults and awkward sexual references were offered instead of professional, thoughtful instruction or constructive criticism that is expected of a university head coach.

96.     In rowing, as in other sports, 'tough love' and aggressive challenges can be the norm, but Bond's conduct in engaging in constant bullying, abuse, and harassment was severe, pervasive, and objectively unreasonable.  It went well beyond the realm of even the most aggressive coaching.

97.     The student athletes lived in fear of Bond's constant, unprovoked rage-filled outbursts that were peppered throughout practices with the above demeaning words.  Bond would intentionally target a single rower, or coxswain, to publicly humiliate the student in front of teammates, among others.

98.     On at least one occasion, he repeatedly screamed at a freshman rower, ridiculing him that he was "flaccid! Your word of the day is flaccid!"  On another occasion, a coxswain made a minor error in setting the timer at practice. Bond shouted in rage, "Maybe if you weren't finger fucking your phone that wouldn't have happened!"

99.     Bond frequently mocked the weight of certain rowers, firing off emotionally intimidating demands that they needed to stop eating because they were too fat, lazy, and unwilling to meet his extreme demands.

100.    Decedent, as described above, had previously struggled with serious weight issues. Decedent's struggled as he was pelted with consistent "fat" jokes from Bond and tried to maintain the narrow weight limits the coach demanded of his rowers.

101.    Bond harassed rowers and mocked them with politically incorrect remarks when they suffered physical injuries, extreme exhaustion, or sickness from workouts.  On at least one occasion, Bond screamed at a freshman walk-on for seeking treatment from a team trainer for an injury, and then screamed again at the walk-on for following the team trainer's instructions.

-16-

102.     Bond pushed Decedent and his teammates past their limits, exhibiting a disregard for the rowers' general well-being.

103.     Bond consistently made team members feel like failures to enforce compliance with his orders. A frequent example was Bond's encouraging Decedent, and others, to vomit during unnecessarily grueling workouts.  Bond first glorified rowers who worked out 'so hard they puked,' then, after successfully inducing vomit, Bond would laugh and dismiss them as 'pussies' for vomiting.

104.     Bond frequently glorified former rowers he allegedly coached at UC Berkeley, as the freshman coach, in the 90's.  The head coach shared tales of a rower who threw up during rowing practice and, according to Bond, 'valiantly' continued to row after vomiting.

105.     On the surface, Bond told this story as an example of dedication and perseverance, yet he simply took pleasure in the unhealthy practice of forcing his student athletes to vomit, then mocking them for being weak.

106.     Decedent worked out on an erg rowing machine until he threw up on November 25, 2019, seeking approval from Bond, after hearing of the rower from Berkeley his coach glorified.

107.     Immediately after Decedent vomited, Bond and Engblom mocked the 19-year-old, derisively laughing while saying "[t]hrowing up is for pussies."

108.     Bond's coaching 'style' was insulting, demeaning, and rooted in a willful disregard for his rowers' health.  His conduct was unacceptable, even by the "tough love" standards of most elite collegiate rowing programs.  Worse still, they were ineffective, as Bond's athletes generally failed to achieve success.

109.     As 2019 ended, Bond's abuse, harassment and bullying grew in severity and frequency.  Bond carefully covered himself, and his abusive harassment, after-the-fact by feigning compassion or concern for his athletes through electronic communications.  This faux compassion only appeared after he engaged in particularly extreme in-person abuse, or when a supervisor, like McGann, came to the boathouse or a practice to observe him.

110.     While the abuse, harassment, and bullying by Bond in the Fall 2019 semester was improper, it paled in comparison to the deplorable conduct by Bond in the Spring 2020 semester,

when he engaged in retaliation against Decedent.

   **f.** **Z.B. Retains Embarrassing Photographs of Other Rowers Including Decedent Taken During "Freshmen Week," and These Photographs Were Used as Leverage Against Decedent**

111.   The Spring 2020 semester started with "Freshmen Week," in which the freshmen rowers were given a list of tasks to complete.  The freshmen were tasked with completing various "team building" tasks, such as scavenger-hunt in which they were required to interact with various members of the UCSD rowing team and community, including upper classmen, McGann and Engblom.

112.   The annual tradition of the UCSD rowing team culminated with an "Initiation Night" for the freshmen, which consisted of drinking and hazing activities.

113.   On January 18, 2020, the freshmen rowers, including Decedent, were told to bring a photo ID, change of clothes, gallon of Jell-O and "goblet" glass for alcohol consumption, to a designated location on the side of the road in La Jolla for their "Initiation Night".

114.   Decedent and his fellow freshman rowers reported to the location where the upper classmen teammates waited. The freshmen were directed to put on blindfolds, zip-tied to one another in groups of two or three and then guided into vehicles.

115.   Once in the cars, the freshmen were forced to consume hard alcohol, syrup, whipped cream, bread, cabbage, hot peppers, and carrots, all while sitting in the car with the heat at full blast. The upper classmen then drove the freshmen, still blindfolded, to a beach in Mission Bay. The teenagers were told they were crossing the border into Tijuana, Mexico, though.

116.   After the beach, the freshmen were brought to the rowing team captain's residence to participate in several binge drinking challenges, including chugging and "shotgunning" beers, combined with physical activities like rowing on the erg machine and spinning around until dizzy. They played trivia games with the losers told to chug beer. The freshmen ate a significant amount of Jell-O laced with hard liquor.  In one game, they were told to retrieve an exact amount of change collecting coins in the Jell-O they consumed.

117. The night continued with some additional hazing, and otherwise embarrassing behavior.

118. The night, like much of "Freshmen Week" activities, was captured via digital pictures which reflected the team building, hazing and binge drinking.

119. The pictures were secured on a Google drive by a member of the freshmen rowing class, "Z.B."

120. Z.B. would use these pictures to protect himself shortly after "Initiation Night."

**g.** **Sexual Assault Allegations Made Against Z.B.**

121. Days later, Decedent learned that Z.B., was accused of sexual misconduct by multiple female students at UCSD.

122. Upon information and belief, the individually named Defendants, among other Responsible Employees at UCSD, were aware of the sexual misconduct allegations made against Z.B. but failed to report same.

123. These Responsible Employees, as designated by UCSD OPHD policy, included, without limitation, Bond, Engblom, McGann and multiple resident advisors.

124. These Defendants failed to comply with their obligations under the OPHD policy, for the Responsible Employees were obligated to act promptly in contacting OPHD immediately upon hearing the allegations against Z.B.

125. On or about January 21, 2020, a teammate approached Decedent and informed him that a freshman girl, who wanted to remain anonymous, alleged she was sexually assaulted, both verbally and physically, on multiple occasions by Z.B, the freshman team member. This startling report was one of several that UCSD agents ignored.

126. Decedent, and his freshmen teammates, learned of multiple reports lodged against Z.B., who was accused of, at a minimum, the following conduct constituting sexual misconduct within the meaning of the UCSD OPHD Title IX Policy in effect at the time:

    a. Groping female students and making sexually inappropriate comments to them in the school library, despite repeated requests for Z.B. to stop the unacceptable behavior.

b.   Sending a sexually inappropriate Snapchat to a fellow female rowing team member, with whom Z.B. had briefly been romantically involved in the fall semester. The female rower repeatedly told Z.B. that she was not interested in continuing the romantic relationship and asked to be left alone. In response, Z.B. sent an inappropriate Snapchat to the girl with a picture of Z.B. and another student the girl was rumored to have been romantically involved with, and the question "Who was better?" superimposed over the boys' pictures.

c.   Two members of the men's rowing team were approached by a resident advisor in Warren College and told that Z.B. needed to be confronted; his repeated sexually inappropriate behavior, including relentless attempts at sexual advancement over objection, was making numerous girls feel uncomfortable.

d.   Decedent was approached by two female students who advised they were each personally victimized by Z.B. with repeated instances of sexually inappropriate behavior, relentless attempts of advancement over their objection and hearing uninvited details of Z.B.'s masturbation habits.

e.   Upon information and belief, a second resident advisor approached the rowing team captains about similar sexually inappropriate behavior by Z.B.

127.   Decedent and his friends on the rowing team were outraged by the allegations, and Decedent personally felt Z.B.'s affiliation with the team, with seemingly no consequences for his sexual misconduct, was an affront to his own integrity and the overall integrity of the team.

128.   In January 2020, Decedent, and his friends, were further incensed when they learned that their coaches, Bond and Engblom, were aware of the above allegations lodged against Z.B.

129.   Bond and Engblom received these reports which dated back to the Fall 2019 semester. These Responsible Employees under the policy failed to follow the protocol directed by OPHD. The coaches inexplicably sought to protect Z.B. and shield him from having to face responsibility for his conduct.

130.    Decedent's moral compass, quality upbringing and brutal honesty, led him to a state in which he could not remain silent about Z.B.'s conduct. He was deeply troubled by the coaches' refusal to take action and their indifference to the allegations of sexual misconduct against his fellow freshman teammate.

131.    Decedent, and his friends, observed similarly inappropriate behavior and found it incredible that the rowing coaches, and the team captains under their control, remained silent, in effect condoning allegations of Z.B.'s serious misconduct. Upset by the coaches' refusal to act, Decedent was the lone rower brave enough to confront the coaches' failure to act and indifference to the Title IX complaints against Z.B.

132.    Decedent also voiced his discomfort with the team's willingness to accept Z.B. on the rowing team to the captains and upperclassmen.

133.    The captains told Decedent that the reason Z.B. was still on the team was because of threats he made to others regarding the pictures he possessed from "Freshmen Week" and "Initiation Night."

**h.    <u>Decedent Speaks to Bond and Engblom Concerning the Allegations Against Z.B.</u>**

134.    On January 31, 2020, Decedent approached Bond and Engblom in the coach's office to seek advice.

135.    Decedent was struggling from a physical perspective, feeling under the weather with flu-like symptoms, coughing and congestion.

136.    He told the coaches that similar colds had never stopped him from practicing before, but these struggles were harder to handle.

137.    Decedent further revealed to his coaches that he was suffering emotionally and from a mental health perspective.

138.    Decedent cited Z.B.'s unchecked misconduct, and the coaches' failure to take action regarding the allegations, as the cause of his deterioration.

139.    Bond coldly told Decedent to take the afternoon off, and dismissively advised Decedent, that he "and [his] homies should act as if nothing is wrong" concerning the matter with Z.B.

140.    Bond acknowledged he was aware of the multitude of Title IX allegations, but assured Decedent, "the coaches were handling the situation."

141.    Bond also warned Decedent about reporting the allegations against Z.B., attempting to further scare him into silence stating, "I've seen him operate, I think he could be dangerous," [to the team].

142.    Bond was referring to Z.B.'s possession of photographic evidence of the "Freshmen Week" hazing.  The evidence could seriously damage the team if the pictures were ever disclosed, as Z.B. allegedly threatened to do.

143.    Decedent continued to raise his concerns to the coaches and captains regarding the coaches' failure to report the matter, and the rowing team's willingness to shield Z.B. from responsibility, despite the mounting allegations of sexual misconduct under UCSD's Title IX Policy.

144.    As a direct response to Decedent's criticism of the team's tolerance of Z.B.'s purported behavior, and his explicitly challenging the coaches' failure to report Z.B.'s conduct to Title IX, Bond, as well as the coaches and captains who served at the head coach's pleasure treated Decedent as an enemy of the rowing program.  The team leaders grew increasingly cold toward Decedent and alternated between treating him with outward hostility and cold ostracism.

145.    As a consequence of Decedent challenging the coaches and team leaders about Z.B., Bond retaliated against Decedent.

146.    Throughout the school year, Decedent consistently placed in the top 24 for UCSD rowers during his freshman year, based on his erg scores and ability on the water. Decedent was often outworking many teammates, and most of his freshmen classmates.  His dedication earned him a prominent position in the second or third boats at regattas. (Note: of the four boats on the team, the top three boats, with eight rowers in each boat, were considered the competitive rowers). Decedent took tremendous pride in excelling as a freshman at the rowing program he chose to continue his passion, competitive team rowing.  This hard work, leadership and performance

1    continued the entire time Decedent was rowing at UCSD, so he, objectively, should have had a spot

2    on one of the top three varsity boats through March 2020 and beyond.

3    147.    In late January 2020, however, immediately after Decedent raised his Z.B.-related

4    concerns to Bond and Engblom, Decedent was inexplicably and without notice placed for the first

5    time, in the fourth, bottom boat with rowers who had higher (worse) erg scores and far worse race

6    performance than Decedent.

7    148.    Decedent, ever the solid teammate, responded to the demotion by taking it as a

8    challenge, without complaint, and attempted to inspire fellow members of the fourth boat.

9    149.    Decedent understood Bond was punishing him for his encouraging the Responsible

10   Employees to report the sexual misconduct allegations against Z.B., and then questioning the

11   coaches' failure to do so.

12   150.    Decedent's team-first attitude was openly mocked by Bond.  Bond attacked Decedent

13   with consistent insults: calling him a "pussy"; doubting Decedent's "manliness," "testicular"

14   fortitude or "testosterone levels"; claiming Decedent was weak, immature, and questioning

15   Decedent's dedication to the rowing team.

16   151.    Bond repeatedly mocked and harped on Decedent's weight, preying on the 19-year-

17   old's extreme sensitivity about his weight. Though Decedent overcame his weight struggles and

18   obesity from middle school, and presented as a physically fit, Iron Man, Bond often referred to him

19   as "Fat [Decedent's name]" hurt and humiliate Decedent.

20   152.    When Bond was not mocking Decedent, or trying to make him vomit in workouts,

21   he was intentionally cold and dismissive to the freshman, often suggesting he should leave the team

22   activity or sending him away from a practice or a meeting.  For an athlete who worked exceedingly

23   hard to gain the acceptance, trust and praise of his coaches, the emotional banishment, ostracism,

24   and general disregard from Bond, as well as the coaches and captains under his control, had a

25   severely detrimental impact on Decedent.

26   153.    On February 22, 2020, Decedent could no longer take the adversarial conduct.  He

27   and Z.B. got into a heated exchange during the fourth boat practice.

28

154.    Later that day, Decedent reached out to Engblom, and had a phone conversation in which he discussed Z.B. soiling the reputation and morale of the rowing team with the mounting sexual misconduct allegations and the team's ignoring of same. He also asked Engblom whether there was a Title IX investigation into Z.B., but Engblom stated he did not know what was going on.

155.    Engblom said he and Bond had been given information on the situation, and, allegedly, reported the sexual misconduct to their superiors.

156.    Decedent told Engblom that he felt Z.B. was a liability to the team and their collective integrity.  Decedent became emotional, and cried while speaking to his coach, but Engblom merely dismissed Decedent.

157.    The conversation with Engblom concluded when Decedent asked him why they could not cut Z.B., and Engblom said "that is a question for your head coach."

158.    Still later February 22, 2020, at approximately 4:16 PM, Decedent texted Bond to ask if he could speak with the head coach, despite fully expecting Bond's wrath.

159.    Bond called Decedent approximately one hour later. Decedent boldly cut to the chase and asked, "Why is Z.B. still on the team?"  Decedent recalled Bond's response sounded like a prepared statement.

160.    Bond said, in sum and substance, "Z.B. is still on the team because an investigation was conducted in which I reported information that was brought to my attention. It was concluded that there was no evidence of his wrongdoing.  The school is on high alert of this behavior and if he has another infraction he will be removed from the team and likely the school."

161.    Decedent, not satisfied with this coach's response, replied, "I don't think it would reflect well on us if it were discovered that [Z.B.] were still on the team after all this."

162.    In response to the Decedent's concerns, Bond responded, "As a son of an attorney that sounds like a threat.  I would be extremely careful with your next few words. I am willing to work with you but don't communicate with me in that way."

-24-

163.    Decedent, again growing emotional, informed Bond that "this feels like psychological abuse and the team is suffering from the dynamic" created by Bond and Z.B.

164.    Bond ended the conversation by informing Decedent if he had a problem with "any of this" he should "take it up with the ethics department of the school."  Bond then hung up on Decedent.

165.    Immediately after his call with Bond, Decedent received a call from McGann. He told her of the initial report against Z.B. from a teammate, and all the aforementioned allegations. McGann's response was, "these things take time to investigate," indicating the investigation had not been concluded despite Bond's assertion just minutes earlier that it had concluded with no finding of responsibility.

166.    McGann then suspiciously told Decedent, "[n]ot to conduct his own investigation" into the matter.

167.    On February 24, 2020, Engblom approached Decedent and, in referenced to the February 22nd call, stated, "[y]ou o.k.? That was some pretty embarrassing shit you were saying there."

168.    That day at practice, to further alienate Decedent from the team, Bond berated a coxswain for misstating a call the coach wanted. The furious coach shouted, "[w]ho the fuck said that?  Whoever said that is a fat coxswain--someone who goes over the coaches like [Decedent]! We already have a fat [Decedent]!  Don't be a fat [Decedent]! Fat [Decedent] goes above his coach's head and talks shit!"  This was one of many examples of Bond's pointed attacks aimed at Decedent's sensitivity regarding his weight. Bond berated the student athlete by insulting Decedent, to deter Decedent from further mention of Z.B.'s alleged misconduct or the coaches' failure to report same.

169.    In late February 2020, the rowing team captains asked to speak with Decedent and two of his freshmen rowing friends after a morning practice. The captains implored Decedent to "lay off the situation with [Z.B.]" because, they claimed, they would handle the "situation" as elected captains and leaders of the team.

170.     The captains, like Bond and Engblom before them, claimed they had the Z.B. situation under control. Decedent and his friends were directed to maintain a "professional working relationship" with Z.B., and to "stay away from and ignore him."

171.     Decedent questioned whether the captains had "the situation" under control. Decedent informed them that he believed they did not but wanted to 'fit in' with the team.

172.     Decedent agreed he would try to steer clear of Z.B. and ignore him.

173.     Decedent also noted that Bond and Engblom were in earshot of the conversation with the captains, and that the captains were speaking to Decedent at the head coach's behest.

174.     Later that week, on February 27, 2020, Decedent was still rowing in the fourth boat with the less-competitive rowers when he and Z.B. got into another verbal altercation regarding the boat lineups. Decedent attempted to "stay away" from Z.B. and aimed to row in a different boat for that practice, in accordance with the coaches' directives. Z.B. eventually won the argument and rowed in the same boat as Decedent.

175.     Toward the end of the contentious practice on February 27, 2020, Bond ordered Decedent and Z.B. to stand together in front of the team. Bond berated Decedent in front of the team, along with Z.B., and treated them as equally detrimental to the team. The head coach shouted, "Front and center! This is it! If the two of you can't get along, you'll both be kicked off the team. Do I make myself clear?!" Decedent responded in the affirmative, but the coach's grouping him with the accused sex offender and threatening to throw him off the team took its toll.

176.     Decedent's mental health continued to deteriorate as Bond continued to berate him in this fashion and kept Decedent in the fourth boat despite his rowing abilities and erg scores warranting his placement in one of the top three varsity boats.

177.     After being berated by Bond at the February 27, 2020, practice, Decedent met with a counselor who worked for CAPS, a mental health clinic at UCSD.

178.     Decedent was suffering immensely from a mental health perspective; he was constantly thinking about the "situation" on the rowing team and doubting his decisions. He stated he would have quit Bond's team by that point, but rowing meant too much to him and he did not want to let the "situation" with Z.B., and Bond get in the way of his own aspirations. Decedent

-26-

decided to avoid Z.B. and continue on the rowing team, despite the negative effect it was having on his well-being.

179. On March 3, 2020, Decedent received an email from Bond, with McGann copied, regarding Decedent and Z.B.'s conflicts at practice and Decedent's subsequent conversation with Bond. The coach implored Decedent to "play nice" with Z.B., and that "any further conflict with [Decedent] would result in removal of both of you from the team. I am sure you can bring courtesy and professionalism to any necessary interactions with [Z.B.] and expect you to do so."

180. The adverse conduct persisted through the final month of in-person learning at UCSD.

181. On or about March 4, 2020, the rowers participated in a 2k meter erg test on the rowing machines. Decedent was unhappy with his erg score and was speaking to his good friend, and roommate ("P.K"), in the snack room at the Spanos Training Facility.

182. Decedent, speaking privately to P.K., stated he was unhappy with his rowing time, but felt he would do better next time since, Decedent posited, he had not been able to do an accurate 2k predictor session prior to the March 4th test.

183. Decedent was clearly taking accountability for his failure to practice the 2k prior to March 4, 2020. Bond appeared suddenly and abruptly asked Decedent, "So it's the training plan you're saying?!"

184. Bond then stormed off. Decedent followed to explain himself and appease Bond.

185. After Decedent left the snack room, Bond returned, stared right at P.K. and snarled, "I would be very careful who you associate with at this point in the process. You get that?! That kid has one foot out the fucking door!" The coach then stormed out.

186. Bond was aware that P.K. and Decedent were extremely close roommates, so the message would obviously get back to Decedent as intended. Further, Bond was aware that P.K., like other freshmen "homies" of Decedent, had concerns about Z.B. and the allegations against him. The coach was therefore attempting to intimidate P.K., and any other rowers, who might be inclined to question the coaches' failure to report the allegations as Responsible Employees of UCSD.

187.    Bond's indifference to the well-being of his rowers would continue thru the Covid-19 pandemic.  On March 12, 2020, for example, after the great majority of schools, NCAA programs and professional sports teams were shutting down for the pandemic, Bond sent a threatening email to have his rowers meet the following morning March 13, 2020, for practice.

188.    Shortly after Bond's email to his team, the NCAA suspended activities across all sports programs until further notice.

189.    Decedent returned home to New York in March 2020.

190.     Decedent told his close friends and former coaches of the abuse he suffered from his coaches, but largely kept the pain, confusion, and shame he was experiencing to himself, opting to avoid "bothering" his friends and family with the problems that, he felt, paled in comparison to the devastation wrought by the global pandemic.

191.    In April of 2020, Decedent filled out an allegedly anonymous UCSD survey upon McGann's request, to receive feedback from the men's rowing team members.  Decedent responded with twenty-three pages outlining Bond's misconduct and referencing the blatant mishandling of the Title IX complaints against Z.B., namely Bond's failure to report the allegations to Title IX as Responsible Employees as required by UCSD policy. Decedent's survey response reiterated the concerns he shared on the phone with McGann weeks earlier.

192.    Neither McGann, nor Edwards, nor any other supervisor at Defendant UCSD addressed the coaches' failure to report the sexual misconduct allegations to Title IX, or their abuse, bullying, and harassment, including sexual harassment, by Bond, at any point in time.

193.    Decedent was not the only member of the men's rowing team to fill out the allegedly anonymous survey honestly.  McGann was aware of the abuse by Bond and the mishandling of the Title IX allegations against Z.B., particularly the coaches' failure to report same to Title IX office.

194.     Similarly, Decedent was not the only member of the men's rowing team to suffer from mental health issues as a result of being subjected to Bond's abuse.

195.    When he returned home to New York, Decedent struggled with his emotional well-being and, eventually, experienced mental illness.  The struggles emerged as a direct result of being subjected to Bond's severe, pervasive, objectively unreasonable harassment and abuse.

196.    After Decedent returned home to New York in mid-March, his mental health deteriorated and worsened in the months following as a direct result of Bond's abuse.

197.    Between March and July 2020, Decedent suffered from immense sadness, paranoia, and disorientation.  Decedent was not enjoying his many interests, or life in general.  Decedent brooded over the coaches' protection of Z.B. and, conversely, their punishment of him for speaking out against this choice.

198.    As these confusing, painful thoughts, and the effects of the coaches' mistreatment, continued to weigh on Decedent, he failed to take care of himself and spiraled out of control.  The recent Iron Man neglected to care for himself, skipping meals, workouts, and sleep.  He self-medicated with drugs to escape as his mental health worsened.

199.    On July 21, 2020, after several days without sleep and minimal food, Decedent's fear, paranoia, and delusions reached dangerous levels.

200.    Prior to attending UCSD, Decedent was a healthy, happy young man.  Less than one year with Bond caused Decedent's mental health to deteriorate to the point of schizophrenia and a psychotic episode, necessitating hospitalization for in-patient mental health treatment.

201.    Decedent underwent intensive therapy and drug treatment, including medication to control the symptoms, emotional pain, psychosis, and schizophrenia caused by the abuse he suffered at UCSD.

202.    Decedent extensively discussed Bond, the "abusive" coach who was "fired from Penn," as well as the team's harboring a "sexual predator" rowing teammate.

203.    With the help of treatment providers and his family, Decedent reached a stable place toward the end of 2020, with his mental health struggles seemingly under control.

204.    As such, Decedent returned to UCSD in late December 2020, with plans to continue therapy on an outpatient basis.  Armed with this therapy, Decedent felt he was prepared to deal with the issues created by Bond and all the Defendants. Tragically, Decedent was mistaken.

205.    After Decedent returned to campus in December 2020, Bond continued to act in a retaliatory manner against Decedent. It was the last month of his young life.

Complaint

206.    On or about December 16, 2020, the coach emailed Decedent to ask if he was committed to the UCSD rowing team or, alternatively, whether he was opting out for the upcoming Spring 2021 season.

207.    One week later, on or about December 23, 2020, Decedent informed the coach that he was opting out of the upcoming rowing season, citing Covid-19 restrictions. Decedent's choice to take care of himself, and avoid the intense stress of rowing for UCSD, was difficult for him to make. He waited for a reassuring response from Bond, but decedent never received one. Bond continued his emotional exile of Decedent, as the familiar stress returned to haunt Decedent.

208.    Bond continued to ignore Decedent as 2020 ended. The coach was aware Decedent was still overcoming severe mental health issues they themselves created. The emotional exile, and resultant loneliness, enveloped Decedent as he entered 2021.

209.    On January 4, 2021, Decedent took his own life.

### PLAINTIFF'S DAMAGES

210.    As a direct and proximate result of Defendants' unconstitutional, illegal, and improper retaliatory conduct, Decedent suffered the worst possible fate, a wrongful death by his own hands, caused by Defendants.

211.    As a direct and proximate result of Defendants' conduct Decedent suffered from immense sadness, paranoia, and disorientation, as well as related psychosis, self-medication, sleeplessness, low appetite, fear, paranoia, and delusions, fear of persecution, suicidal ideation, extreme emotional distress for which he required in-patient treatment and medication, and unthinkable anguish which eventually caused Decedent to tragically take his own life.

212.    As a direct and proximate result of the above unlawful and retaliatory conduct by Defendants, Plaintiff sustained damages, including, without limitation, pain, suffering and extreme emotional distress as described above, as well as loss of enjoyment of life, loss of companionship and related economic injuries and other direct and consequential damages.

**CLAIMS FOR RELIEF**

**AS AND FOR A FIRST CAUSE OF ACTION**

**Violation of Title IX of the Education Amendments of 1972 Retaliation**

**(Against Board of Regents of University of California)**

213.    Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

214.    Title IX of the Education Amendments of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. §1681(a).

215.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including UCSD.

216.    On information and belief, UCSD receives federal funding, including in the form of federal student loans given to students and is subject to the provisions of Title IX.

217.    Title IX is enforceable through a private right of action.

218.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018).

219.    As reflected in such grievance procedures, and the law pertaining to Title IX, Retaliation against a person because they are asserting their rights under Title IX, or otherwise reporting sexual misconduct, is also prohibited.

220.    Retaliation is any adverse action against a person based on their report or other disclosure of alleged prohibited conduct under the UCSD sexual misconduct policy to a university employee, or their participation in, refusal to participate in, or assistance with the investigation, reporting, remedial, or disciplinary processes provided for in the policy.

221. An adverse action is conduct that would discourage a reasonable person from reporting prohibited sexual misconduct or participating in a process provided for in the UCSD sexual misconduct policy, such as threats, intimidation, harassment, discrimination, and coercion.

222. Bond engaged in a series of adverse actions against Decedent for his repeated disclosure of Z.B.'s prohibited conduct against UCSD students, including members of the female rowing team, to the coaches, university employees, and for Decedent's questioning the Responsible Employees' failure to report to encourage them to do so.

223. The adverse actions undertaken by Bond were made in direct response to Decedent disclosing sexual misconduct allegations to the coaches and urging them to report said allegations to the OPHD Title IX Office at UCSD. The adverse actions were done to expressly discourage Decedent, Decedent's 'homies' on the rowing team and other reasonable people from formally reporting, or otherwise disclosing the allegations against Z.B. The adverse actions included without limitation:

    a.   Subjecting Decedent, and other rowing team members, to more frequent and severe bullying, and verbal abuse consisting of personal attacks, sexually charged insults and mind games that were detrimental to the student athlete's well-being. The targeted bullying and verbal abuse of Decedent by Bond included sexually inappropriate insults lodged at Decedent, calling him a "pussy," as well as loudly questioning Decedent's "manliness," "testicular" fortitude, and insufficient "testosterone levels;" Bond attacked Decedent's integrity, character, and mental make-up, as he called the teenager weak, untrustworthy, and immature, then unfairly challenged Decedent's dedication to the rowing team. Bond considered Decedent's legitimate concerns with the head coach's indifference to the mounting allegations against Z.B. as insubordination and treason, so the challenges were mounted to tarnish Decedent's reputation with the team.

b.     Bond made frequent "fat" jokes at Decedent's expense, like publicly chastising a coxswain for being "a fat coxswain--someone who goes over the coaches like [Decedent]!  We already have a fat [Decedent]!  Don't be a fat [Decedent]! Fat [Decedent] goes above his coach's head and talks shit!"  Bond often called Decedent fat, mocking his childhood obesity, and focusing on Decedent's weight as problematic, in general, because he knew Decedent was sensitive about his weight from middle school when he gained thirty plus pounds due to Juvenile Rheumatoid Arthritis.

c.     Bond explicitly told Decedent he should not report the sexual misconduct allegations against Z.B.  He derisively told Decedent he "and his homies should act as if nothing is wrong" with Z.B., claiming the coaches were handling it.  Bond also attempted to scare Decedent into silence, claiming Z.B. was "dangerous" and had the ability to seriously hurt the rowing team with the pictures of hazing he possessed from "Freshmen Week."

d.     Decedent, and his homies (fellow concerned freshmen rowers), were directed to "stay away" from Z.B., ignore Z.B. and treat him with professional courtesy.  They received these directives from Bond, Engblom, and the team captains at the head coach's urging, in response to Decedent's disclosing the increasing number of sexual misconduct allegations and Decedent's bravely questioning the coaches', and captains', failure to report said allegations against Z.B.

e.     After Decedent persisted in his disclosing, and encouraging reporting of, the mounting allegations of sexual misconduct by Z.B., Bond and Engblom lied to him to appear compliant as Responsible Employees after months of mounting allegations went unreported; Bond told Decedent the coaches' reported the sexual misconduct allegations to the appropriate channels and, again, warned Decedent to stay away from Z.B.

f.     Shortly after Bond lied to Decedent, McGann called Decedent and told him not to investigate the claims against Z.B. himself.  The Assistant Athletic Director then told Decedent an investigation was in progress, which belied Bond's false claims of reporting the Title IX allegations to the appropriate channels at UCSD.

g.     Bond also threatened to kick Decedent off the team if he could not treat Z.B. with respect and professional courtesy. Similarly, Bond lumped Decedent and Z.B. together when the tension caused by Z.B.'s multiple allegations of sexual misconduct, Bond's unjustly relegating Decedent to the fourth boat and Decedent's repeated disclosure of the allegations to his coaches, as Responsible Employees at UCSD, resulted in heated disputes between Decedent and Z.B.  Bond treated Decedent and Z.B. as equally detrimental to the rowing team and berated them publicly in front of the entire rowing team.

h.     Bond threatened the 19-year-old teenager Decedent with his "attorney" father, suggesting Decedent could be sued if he continued to question Bond's failure to report Z.B.'s alleged misconduct and the teams' collective lack of integrity for condoning the sexual misconduct.

i.     Bond directed a temper tantrum at Decedent, and stormed off in mock outrage, at a perceived criticism of the training program.  This childish drama was immediately followed by Bond screaming at Decedent's dear friend and teammate, P.K., in the training center snack room after practice. Bond shouted angrily at PK, in front of other rowers, threatening PK should be careful who he associated with because "[Decedent] had one foot out the fucking door!"

j.     Decedent was treated as if he was heading "out the door" when the coaches physically banished him from the varsity team boats (boats 1-3).  Decedent was forced to practice with the fourth boat, the less competitive group, whom

1        Bond paid little to no attention to. Decedent was stuck with the weaker

2        rowers, including Z.B., in their fourth boat, despite frequent warnings to "stay

3        away" from Z.B.  Bond's relegation of Decedent to the noncompetitive boat

4        was punishment for disclosing the mounting sexual misconduct allegations

5        against Z.B. and raising his concerns of the coaches' failure to report same.

6        By downgrading Decedent's boat position and inexplicably moving

7        Decedent to the fourth boat, when his erg scores and other factors merited, he

8        remain in one of the top three varsity boats, the Coaches were dissuading

9        Decedent, and his homies, from reporting the allegations against Z.B. The

10       physical banishment was only part of the exile inflicted upon Decedent.

11      k.    Decent experienced frequent emotional exile, by Bond, as well as the

12        coaches, captains, and upper classmen he controlled; he was also called a

13        traitor and treated as a pariah, because he spoke out against the team's failure

14        to report the Title IX allegations against Z.B. Bond poisoned the student

15        athletes' perception of Decedent, accusing him of disloyalty and

16        insubordinate conduct detrimental to the team. The social ostracism wore

17        greatly on Decedent and would continue through the covid-19 pandemic

18        through Decedent's returning to UCSD, post-hospitalization and in-patient

19        treatment, in December 2020.  Decedent emailed Bond to advise he would be

20        opting out for the Spring 2021 semester due to health concerns (citing covid-

21        19).  Decedent did not receive a response from Bond, as the continued radio

22        silence and deliberate cold shoulder of the head coach served as the final

23        indignity to the vulnerable Decedent.

24    224.   As a direct and proximate result of Defendants' conduct Decedent suffered from

25  immense sadness, paranoia, and disorientation, as well as related schizophrenia, psychosis, self-

26  medication, sleeplessness, low appetite, fear, paranoia, and delusions, fear of persecution, suicidal

27  ideation, extreme emotional distress for which he required in-patient treatment and medication, and

28  unthinkable anguish which eventually caused Decedent to tragically take his own life.

225.     As a direct and proximate result of the above unlawful and retaliatory conduct by Defendants, Plaintiff sustained damages, including, without limitation, pain, suffering and extreme emotional distress as described above, as well as loss of enjoyment of life, loss of companionship and related economic injuries and other direct and consequential damages.

226.     The adversarial conduct towards Decedent, by Bond, as well as the rowing team coaches, captains and upper classmen under his control, was done in retaliation for his pushing the team leaders to report allegations of Z.B.'s prohibited sexual misconduct and Decedent's questioning Defendants' lack of response for same.

227.     Said adversarial conduct, the frequent mean-spirited insults, mind games, unfair relegation of Decedent off the varsity boats and the emotional exile, caused Decedent to experience severe deterioration of his mental health over months culminating in a psychotic episode and diagnosis of schizophrenia, which necessitated intensive, in-patient mental health treatment.  The targeted abuse and retaliation launched by Bond ultimately caused Decedent to tragically take his own life.

228.     As a result of Defendants' retaliation in violation of Title IX, Plaintiffs continue to suffer ongoing harm, including pain, suffering and emotional anguish as well as other non-economic and economic damages.

229.     As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UCSD.

## AS AND FOR A SECOND CAUSE OF ACTION

### 42 U.S.C. §1983: Violation of Fourteenth Amendment–Denial of Equal Protection

### Hostile Education Environment

### (Against All Defendants)

230.     Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

231.     In addition to the rights and protected interests discussed herein, a person has an equal protection right to an educational environment free of hostility. A hostile education

environment is present when a person subjectively perceives the environment as hostile or abusive, and the environment is objectively hostile and abusive, permeated with discriminatory intimidation, ridicule, and insult…that is sufficiently severe or pervasive to alter the conditions of the person's educational environment.  *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65 (1986).

232.   Decedent reasonably perceived the above-described environment at UCSD as hostile and abusive from October 2019, until he tragically took his own life at UCSD on January 4, 2021, as a result of the hostility.

233.   The hostility and abuse originated from Bond, and certain coaches and team members under the bully coaches' charge, including team captains and other upper classmen rowers.

234.   The hostility and abuse increased dramatically, in severity and frequency, after Decedent reported and commented on the Title IX complaints lodged against Z.B., as Bond took adverse actions directly against Decedent as described in the First Cause of Action.

235.   The hostility and abuse described herein included, but was not limited to, the following:

        a.  Subjecting Decedent, and other rowing team members, to more frequent and severe bullying and verbal abuse consisting of personal attacks, sexually charged insults and mind games that were detrimental to the student athlete's well-being.  The targeted bullying and verbal abuse of Decedent by Bond included sexually inappropriate insults lodged at Decedent, calling him a "pussy," as well as loudly questioning Decedent's "manliness", "testicular" fortitude, and insufficient "testosterone levels;" Bond attacked Decedent's integrity, character, and mental make-up, as he called the teenager weak, untrustworthy and immature, then unfairly challenged Decedent's dedication to the rowing team. Bond considered Decedent's legitimate concerns with the head coach's indifference to the mounting allegations against Z.B. as insubordination and treason, so the challenges were mounted to tarnish Decedent's reputation with the team.

b.  Bond made frequent "fat" jokes at Decedent's expense, like publicly chastising a coxswain for being "a fat coxswain--someone who goes over the coaches like [Decedent]!  We already have a fat [Decedent]!  Don't be a fat [Decedent]! Fat [Decedent] goes above his coach's head and talks shit!" Bond often called Decedent fat, mocking his childhood obesity, and focusing on Decedent's weight as problematic, in general, because he knew Decedent was sensitive about his weight from middle school when he gained thirty plus pounds due to Juvenile Rheumatoid Arthritis.

c.  Bond played frequent mind games with Decedent, purposely confusing him, and causing him physical pain. The coaches encouraged Decedent to train hard, to excess and past the point of exhaustion, until he vomited on multiple occasions. Then, after glorifying the unhealthy practice and deliberately enticing the eager-to-please teenager to vomit to prove himself to his coaches, Bond and Engblom laughed at Decedent informing him "puking was for pussies."

d.  Bond explicitly told Decedent he should not report the sexual misconduct allegations against Z.B. He derisively told Decedent he "and his homies should act as if nothing is wrong" with Z.B., claiming the coaches were handling it.  Bond also attempted to scare Decedent into silence, claiming Z.B. was "dangerous" and had the ability to seriously hurt the rowing team with the pictures of hazing he possessed from "Freshmen Week."

e.  Decedent, and his homies (fellow concerned freshmen rowers), were directed to "stay away" from Z.B., ignore Z.B. and treat him with professional courtesy.  They received these directives from Bond, Engblom, and the team captains at the coaches' urging, in response to Decedent's disclosing the increasing number of sexual misconduct allegations and Decedent's bravely questioning the coaches', and captains', failure to report said allegations against Z.B.

f. After Decedent persisted in his disclosing, and encouraging reporting of, the mounting allegations of sexual misconduct by Z.B., Bond lied to him to appear compliant as Responsible Employees after months of mounting allegations went unreported; Bond told Decedent the coaches' reported the sexual misconduct allegations to the appropriate channels and, again, warned Decedent to stay away from Z.B.

g. Shortly after Bond lied to Decedent, McGann called Decedent and told him not to investigate the claims against Z.B. himself.  The Assistant Athletic Director then told Decedent an investigation was in progress, which belied Bond's false claims of reporting the Title IX allegations to the appropriate channels at UCSD.

h. Bond also threatened to kick Decedent off the team if he could not treat Z.B. with respect and professional courtesy. Similarly, Bond lumped Decedent and Z.B. together when the tension caused by Z.B.'s multiple allegations of sexual misconduct, Bond's unjustly relegating Decedent to the fourth boat and Decedent's repeated disclosure of the allegations to his coaches, as Responsible Employees at UCSD, resulted in heated disputes between Decedent and Z.B.  Bond treated Decedent and Z.B as equally detrimental to the rowing team and berated them publicly in front of the entire rowing team.

i. Bond threatened the 19-year-old teenager Decedent with his "attorney" father, suggesting Decedent could be sued if he continued to question Bond's failure to report Z.B.'s alleged misconduct and the teams' collective lack of integrity for condoning the sexual misconduct.

j. Bond directed a temper tantrum at Decedent, and stormed off in mock outrage, at a perceived criticism of the training program. This childish drama was immediately followed by Bond screaming at Decedent's dear friend and teammate, P.K., in the training center snack room after practice. Bond shouted angrily at P.K., in front of other rowers, threatening P.K. should be

careful who he associated with because "[Decedent] had one foot out the fucking door!"

k.   Decedent was treated as if he was heading "out the door" when the coaches physically banished him from the varsity team boats (boats 1-3). Decedent was forced to practice with the fourth boat, the less competitive group, whom Bond paid little to no attention to. Decedent was stuck with the weaker rowers, including Z.B., in their fourth boat, despite frequent warnings to "stay away" from Z.B. Bond's relegation of Decedent to the noncompetitive boat was clearly punishment for disclosing the mounting sexual misconduct allegations against Z.B. and raising his concerns of the coaches' failure to report same. By downgrading Decedent's boat position and inexplicably moving Decedent to the fourth boat, when his erg scores and other factors merited, he remains in one of the top three varsity boats where he had belonged since he started rowing for UCSD, the Coaches were dissuading Decedent, and his homies, from reporting the allegations against Z.B. The physical banishment was only part of the exile inflicted upon Decedent.

l.   Decent experienced frequent emotional exile, by Bond, as well as the coaches, captains, and upper classmen he controlled; he was also called a traitor and treated as a pariah, because he spoke out against the team's failure to report the Title IX allegations against Z.B. Bond poisoned the student athletes' perception of Decedent, accusing him of disloyalty and insubordinate conduct detrimental to the team. The social ostracism wore greatly on Decedent and would continue through the covid-19 pandemic through Decedent's returning to UCSD, post-hospitalization and in-patient treatment, in December 2020.  Decedent emailed Bond to advise he would be opting out for the Spring 2021 semester due to health concerns (citing covid-19).  Decedent did not receive a response from Bond, as the continued silence

1    and deliberate cold shoulder of the head coach served as the final indignity to

2    the vulnerable Decedent.

3         236.    The constant abuse and hostility, on the part Bond, and those under his control,

4    caused Decedent to suffer severe mental health struggles, seek intensive, inpatient mental health

5    treatment, as described in detail herein, and ultimately caused Decedent to tragically take his own

6    life.

7         237.    The hostile environment at UCSD affected Decedent to the point that it caused him

8    to tragically take his own life upon returning to campus.

9         238.    Defendants failed to provide Decedent with the equal protection and freedom from a

10   hostile educational environment that they were required to provide students at their state university.

11        239.    Defendants, as well as other agents, representatives, and employees of UCSD were

12   acting under color of state law when they showed intentional, outrageous, and reckless disregard for

13   the constitutional rights of the Plaintiffs and Plaintiffs' Decedent.

14        240.    As a result of these due process and equal protection violations, Plaintiffs continue

15   to suffer ongoing harm, including pain, suffering and emotional anguish as well as other non-

16   economic and economic damages.

17        241.    As a direct and proximate result of Defendants' conduct Decedent suffered from

18   immense sadness, paranoia, and disorientation, as well as related schizophrenia, psychosis, self-

19   medication, sleeplessness, low appetite, fear, and delusions, fear of persecution, suicidal ideation,

20   extreme emotional distress for which he required in-patient treatment and medication, and

21   unthinkable anguish which eventually caused Decedent to tragically take his own life.

22        242.    As a direct and proximate result of the above unlawful and retaliatory conduct by

23   Defendants, Plaintiffs sustained damages, including, without limitation, pain, suffering and

24   extreme emotional distress as described above, as well as loss of enjoyment of life, loss of

25   companionship and related economic injuries and other direct and consequential damages.

26        243.    Decedent was entitled to equal protection, freedom from discrimination and an

27   educational environment free of hostility and abuse. Decedent was deprived of such equal

28   protection, and freedom from the hostile educational environment that was and is UCSD.

### AS AND FOR A THIRD CAUSE OF ACTION

### 42 U.S.C. §1983: Violation of Fourteenth Amendment– Denial of Substantive Due Process

### (Against All Defendants)

244.    Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

245.    In addition to the rights and protected interests stated above, a person has a protected liberty interest in his bodily integrity.  "Every violation of a person's bodily integrity is an invasion of his or her liberty."  *Washington v. Harper*, 494 U.S. 210, 237 (1990).  There are both "physical and intellectual" dimensions to that liberty.  *Id.*  "The invasion is particularly intrusive if it creates a substantial risk of permanent injury and premature death."  *Id*.

246.    A decedent's parents generally have the right to assert substantive due process claims under the Fourteenth Amendment, including for loss of companionship claims.  *See Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1057 (9th Cir. 2018).

247.    The judicially enforceable Fourteenth Amendment interests "stem [] from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promoting a way of life through the instruction of children."  *Wheeler* 894 F.3d at 1058 quoting *Lehr v. Robertson*, 463 U.S. 248, 256-61 (1983).

248.    Decedent had such a relationship with his parents, the Plaintiffs.  Plaintiffs certainly developed the emotional attachments that derive from the intimacy of parenting and promoting a way of life through their instruction of Decedent.

249.    Plaintiffs therefore assert a substantive due process claim for loss of companionship under the Fourteenth Amendment.

250.    The constant abuse and hostility, on the part of Bond, and those acting at his direction and under his control, caused Decedent to suffer severe mental health struggles, seek intensive mental health treatment, as described herein, and ultimately caused Decedent to tragically take his own life.

251.    The hostile environment at UCSD affected Decedent to the point that it caused him to tragically take his own life upon returning to campus.

252.    Defendants failed to provide Decedent with the due process, and freedom from a hostile educational environment, that they were required to provide Decedent as a student at their state university. In doing so, Defendants also deprived Plaintiffs due process, as parents of Decedent.

253.    Defendants, as well as other agents, representatives, and employees of UCSD were acting under color of state law when they showed intentional, outrageous, and reckless disregard for the constitutional rights of Plaintiffs and Plaintiffs' Decedent.

254.    As a result of these due process and equal protection violations, Plaintiffs continue to suffer ongoing harm, including loss of companionship, pain, suffering and emotional anguish as well as other non-economic and economic damages.

255.    As a direct and proximate result of Defendants' conduct Decedent suffered from immense sadness, paranoia, and disorientation, as well as related schizophrenia, psychosis, self-medication, sleeplessness, low appetite, fear, and delusions, fear of persecution, suicidal ideation, extreme emotional distress for which he required in-patient treatment and medication, and unthinkable anguish which eventually caused Decedent to tragically take his own life.

256.    As a direct and proximate result of the above unlawful and retaliatory conduct by Defendants, Plaintiff sustained damages, including, without limitation, pain, suffering and extreme emotional distress as described above, as well as loss of enjoyment of life, loss of companionship and related economic injuries and other direct and consequential damages.

### AS AND FOR A FOURTH CAUSE OF ACTION

### Wrongful Death

### (Against All Defendants)

257.    Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

258.    Bond bullied, harassed, and psychologically abused Decedent so thoroughly that Decedent, who never suffered from mental health issues before his freshman year, suffered from the worsening mental health, requiring treatment and medication, described herein.  Decedent was unable to recover from these mental health issues and sadly took his own life upon returning to UCSD in January 2021.

259.   Bond's conduct, and the hostile environment they created with their enablers, the remaining Defendants, directly caused the wrongful death of Decedent.

260.   As a direct and proximate result of Defendants' conduct, Decedent suffered from immense sadness, paranoia, and disorientation, as well as related schizophrenia, psychosis, self-medication, sleeplessness, low appetite, fear, delusions, fear of persecution, suicidal ideation, extreme emotional distress for which he required in-patient treatment and medication, and unthinkable anguish which eventually caused Decedent to tragically take his own life.

261.   As a direct and proximate result of the above unlawful and retaliatory conduct by Defendants, Plaintiff sustained damages, including, without limitation, pain, suffering and extreme emotional distress as described above, as well as loss of enjoyment of life, loss of companionship and related economic injuries and other direct and consequential damages.

262.   The constant abuse and hostility, on the part of Defendants, especially Bond, and those under his control, caused Decedent to suffer severe mental health issues, seek intensive mental health treatment, as described herein, and ultimately caused Decedent to tragically take his own life.

263.   As a result of Defendants' unlawful, unconstitutional misconduct in causing Decedent's wrongful death, Plaintiffs continue to suffer ongoing harm, including loss of companionship, pain, suffering and emotional anguish as well as other non-economic and economic damages.

264.   As a direct and proximate result of Defendants' conduct Decedent suffered from immense sadness, paranoia, and disorientation, as well as related schizophrenia, psychosis, self-medication, sleeplessness, low appetite, fear, paranoia, and delusions, fear of persecution, suicidal ideation, extreme emotional distress for which he required in-patient treatment and medication, and unthinkable anguish which eventually caused Decedent to tragically take his own life.

265.   As a direct and proximate result of the above unlawful and retaliatory conduct by Defendants, Plaintiff sustained damages, including, without limitation, pain, suffering and extreme emotional distress as described above, as well as loss of enjoyment of life, loss of companionship and related economic injuries and other direct and consequential damages.

## AS AND FOR A FIFTH CAUSE OF ACTION

### Negligent Hiring

### (Against UCSD, Board of Regents of University of California, McGann, and Edwards)

266.   Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

267.   Upon information and belief, McGann led the process that resulted in the hiring of Bond.

268.   Upon information and belief, McGann, as Associate Athletic Director, worked for and was supervised by Athletic Director Earl W. Edwards, who is responsible for the hiring of each employee, agent and coach working in UCSD athletics.

269.   McGann, upon information and belief, performed an insufficient background check into Bond and thus failed to uncover his abusive, inappropriate bullying of student-athletes who rowed for him at previous educational institutions.

270.   McGann either failed to uncover the rowers' protest of Bond at UPenn which, upon information and belief, caused Bond to leave the coaching position at UPenn, or, alternatively, knew of the rowers' protest and ignored same, before hiring Bond.

271.   In either instance, McGann did not obtain or utilize readily accessible information regarding Bond's, prior abuse, bullying and harassment of rowers they 'coached' at previous destinations. Said information was easily accessible as Decedent, and many of his freshman teammates, were able to uncover the UPenn protest, and Bond's inappropriate, unhealthy, and mentally unstable behavior, from associates across the country in the close-knit rowing community.

272.   McGann, and her supervisor Edwards, were therefore negligent in their hiring of Bond.

273.   Upon information and belief, McGann was a direct supervisor of Bond.

274.   Edwards, as Athletic Director, is McGann's supervisor and responsible for all employees within the Athletic Department at UCSD.

275.   McGann and Edwards were aware of the abuse, bullying, and harassment described herein, as well as the coaches' failure to follow UCSD OPHD's Title IX reporting protocols as

1   Responsible Employees.

2   276.   McGann and Edwards failed to discipline Bond and otherwise permitted the coach to

3   terrorize and abuse the student athletes at UCSD.

4   277.   The negligent hiring, and supervision, of Bond, by McGann, Edwards and

5   Defendants, resulted in the constant abuse and bullying of Decedent, and other rowing team

6   members, by Bond and those under his control. This failure was a direct and proximate cause of

7   Decedent's newfound, severe mental health struggles, which caused Decedent to seek intensive

8   mental health treatment, as described herein, and further caused Decedent to tragically take his own

9   life.

10   278.   Defendants failed to perform a sufficient search for an appropriate coach of UCSD

11   men's rowing program and, instead, hired Bond without recognizing the clear, and obvious danger

12   to which he exposed their student athletes.

13   279.   Defendants compounded the hiring failure by failing to appropriately supervise Bond,

14   particularly McGann and Edwards as the coaches' supervisors, as described further below.

15   280.   Defendants, including McGann and Edwards, owed Decedent, and all students, a duty

16   to maintain a safe environment, free from the hostility, abuse, bullying, psychological warfare and

17   retaliation described herein.

18   281.   Defendants owed UCSD students a safe environment, and had a duty to hire

19   employees, agents, and coaches, who would maintain said safe environment as well.

20   282.   The negligence of Defendants, including McGann and Edwards, therefore contributed

21   to the hostile educational environment described herein.

22   283.    As a result of Defendants', including McGann's and Edwards' negligence, negligent

23   hiring and negligent supervision of Bond, Plaintiffs continue to suffer ongoing harm, including loss

24   of companionship, pain, suffering and emotional anguish as well as other non-economic and

25   economic damages.

26   284.   As a direct and proximate result of Defendants' conduct, Decedent suffered from

27   immense sadness, paranoia, and disorientation, as well as related psychosis, self-medication,

28   sleeplessness, low appetite, fear, and delusions, fear of persecution, suicidal ideation, extreme

-46-

emotional distress for which he required in-patient treatment and medication, and unthinkable anguish which eventually caused Decedent to tragically take his own life.

285.   As a direct and proximate result of the above negligent, unlawful, and retaliatory conduct by Defendants, Plaintiff sustained damages, including, without limitation, pain, suffering and extreme emotional distress as described above, as well as loss of enjoyment of life, loss of companionship and related economic injuries and other direct and consequential damages.

### AS AND FOR A SIXTH CAUSE OF ACTION

### Negligent Supervision

### (Against UCSD, Board of Regents of University of California, McGann, and Edwards)

286.   Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

287.   Upon information and belief, McGann led the process that resulted in the hiring of Bond.

288.   Upon information and belief, McGann, as Associate Athletic Director, worked for and was supervised by Athletic Director Earl W. Edwards.

289.   Upon information and belief, McGann was a direct supervisor of Bond.

290.   Upon information and belief, Edwards, as Athletic Director, was McGann's supervisor and responsible for all employees within the Athletic Department at UCSD.

291.   McGann and Edwards were aware of the abuse, bullying, and harassment described herein, as well as the coaches' failure to file UCSD OPHD's Title IX reporting protocols as Responsible Employees.

292.   McGann and Edwards failed to discipline Bond and otherwise permitted the coach to terrorize and abuse the student athletes at UCSD, including Decedent.

293.   The negligent supervision of Bond, by McGann, Edwards and remaining Defendants, resulted in the constant abuse and bullying of Decedent, and other rowing team members, by Bond, and those under his control.  This failure was a direct and proximate cause of Decedent's newfound, severe mental health struggles, which caused Decedent to seek intensive mental health treatment, as described herein, and, further, caused Decedent to tragically take his own life.

294.   Defendants failed to perform a sufficient search for an appropriate coach of UCSD men's rowing program and, instead, hired Bond without recognizing the clear, and obvious danger to which they exposed their student athletes.

295.   Defendants compounded the hiring failure by failing to appropriately supervise Bond. McGann and Edwards, as the coaches' supervisors, willfully ignored Bond's abusive tactics, harassment and bullying as well as both coaches' ignoring their duties as Responsible Employees who were required to report the allegations of sexual misconduct against Z.B.

296.   Defendants, including McGann and Edwards, owed Decedent, and all students, a duty to maintain a safe environment, free from the hostility, abuse, bullying, psychological warfare and retaliation described herein.  Defendants owed UCSD students a safe environment, and had a duty to supervise UCSD employees, agents, and coaches, to ensure the employees, agents and coaches maintain said safe environment as well.

297.   The negligence of Defendants, including McGann and Edwards, therefore contributed to the hostile educational environment described herein.

298.   As a result of Defendants', including McGann's and Edwards' negligence, negligent hiring and negligent supervision of Bond, Plaintiffs continue to suffer ongoing harm, including loss of companionship, pain, suffering and emotional anguish as well as other non-economic and economic damages.

299.   As a direct and proximate result of Defendants' conduct, Decedent suffered from immense sadness, paranoia, and disorientation, as well as related psychosis, self-medication, sleeplessness, low appetite, fear, paranoia, and delusions, fear of persecution, suicidal ideation, extreme emotional distress for which he required in-patient treatment and medication, and unthinkable anguish which eventually caused Decedent to tragically take his own life.

300.   As a direct and proximate result of the above negligent, unlawful, and retaliatory conduct by Defendants, Plaintiff sustained damages, including, without limitation, pain, suffering and extreme emotional distress as described above, as well as loss of enjoyment of life, loss of companionship and related economic injuries and other direct and consequential damages.

## **PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons, Plaintiff's demand judgment against Defendants as follows:

(i)    On the first cause of action for Violation of Title IX of the Education Amendments of 1972 Retaliation, *et. al*., a judgment against University of California San Diego, Board of Regents of University of California, Geoff Bond, Katie McGann and Earl W. Edwards, awarding Plaintiffs damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing University of California San Diego, Board of Regents of University of California, Geoff Bond, Katie McGann and Earl W. Edwards to terminate Geoff Bond, Katie McGann and Earl W. Edwards and prevent them from employment within the University of California system and declare all the individual defendants as a danger to the University of California students and community;

(ii)    On the second cause of action for Violation of 42 U.S.C. § 1983 Equal Protection Clause Hostile Education Environment, *et al*., a judgment against University of California San Diego, Board of Regents of University of California, Geoff Bond, Katie McGann and Earl W. Edwards, awarding Plaintiffs damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing University of California San Diego, Board of Regents of University of California, Geoff Bond, Katie McGann and Earl W. Edwards to terminate Geoff Bond, Katie McGann and Earl W. Edwards and prevent them from employment within the University of California system and declare all the individual defendants as a danger to the University of California students and community;

Complaint

(iii)   On the third cause of action for Violation of 42 U.S.C. § 1983 Substantive Due Process, *et. al.*, a judgment against University of California San Diego, Board of Regents of University of California, Geoff Bond, Katie McGann and Earl W. Edwards, awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing University of California San Diego, Board of Regents of University of California, Geoff Bond, Katie McGann and Earl W. Edwards to terminate Geoff Bond, Katie McGann and Earl W. Edwards and prevent them from employment within the University of California system and declare all the individual defendants as a danger to the University of California students and community;

(iv)   On the fourth cause of action for Wrongful Death, et. al., a judgment against University of California San Diego, Board of Regents of University of California, Geoff Bond, Katie McGann and Earl W. Edwards, awarding Plaintiffs damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing University of California San Diego, Board of Regents of University of California, Geoff Bond, Katie McGann and Earl W. Edwards to fire Geoff Bond, Katie McGann and Earl W. Edwards and prevent them from employment within the University of California system and declare all the individual defendants as a danger to the University of California students and community;

(v)   On the fifth cause of action for Negligent Hiring, et. al., a judgment against University of California San Diego, Board of Regents of University of California, Geoff Bond, Katie McGann and Earl W. Edwards, awarding Plaintiffs damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and

disbursements, as well as injunctive relief directing University of California San Diego, Board of Regents of University of California, Geoff Bond, Katie McGann and Earl W. Edwards to terminate Geoff Bond, Katie McGann and Earl W. Edwards and prevent them from employment within the University of California system and declare all the individual defendants as a danger to the University of California students and community;

(vi)   On the sixth cause of action for Negligent Supervision, et. al., a judgment against University of California San Diego, Board of Regents of University of California, Geoff Bond, Katie McGann and Earl W. Edwards, awarding Plaintiffs damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing University of California San Diego, Board of Regents of University of California, Geoff Bond, Katie McGann and Earl W. Edwards to fire Geoff Bond, Katie McGann and Earl W. Edwards and prevent them from employment within the University of California system and declare all the individual defendants as a danger to the University of California students and community; and

(vii)   Such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiffs request a jury trial on all questions of fact raised by their Complaint.

**Dated: September 30, 2021**

**Respectfully Submitted,**

**NESENOFF & MILTENBERG, LLP**


**By:** _/s/ Susan Stark_

**Andrew T. Miltenberg, Esq.**
**(AM7006; _pro hac vice_ admission pending)**
**amiltenberg@nmllplaw.com**
**Nicholas Lewis, Esq.**
**(_pro hac vice_ admission pending)**
**nlewis@nmllplaw.com**
**Susan Stark, Esq.**
**sstark@nmllplaw.com**
**Nesenoff & Miltenberg, LLP**
**4 Palo Alto Square**
**3000 El Camino Real**
**Suite 200**
**Palo Alto, CA 94306**
**Tel: (650) 209-7400**