1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17
18
19
20

BRIAN LILLY, SR., and BRENDA
LILLY, individually, and on behalf of the
Estate of Brian Lilly, Jr.,

Plaintiffs,

v.

UNIVERSITY OF CALIFORNIA-SAN
DIEGO, BOARD OF REGENTS OF
UNIVERSITY OF CALIFORNIA,
GEOFF BOND, KATIE MCGANN, and
EARL W. EDWARDS,

Defendants.

Case No.:  21-CV-1703 TWR (MSB)

**ORDER (1) GRANTING BOND'S
MOTION TO DISMISS;
(2) GRANTING BOARD OF
REGENTS, MCGANN, AND
EDWARDS' MOTION TO DISMISS;
AND (3) DENYING DEFENDANTS'
MOTION TO STRIKE**

(ECF Nos. 17, 18, 28)

21
22
23
24
25
26
27
28

Presently before the Court are Defendant Geoff Bond's Motion to Dismiss First
Amended Complaint (ECF No. 17 ("Bond Mot.")) and Defendants The Regents of the
University of California ("Regents"), Earl Edwards, and Katie McGann's (collectively
"REM") Motion to Dismiss Portions of Plaintiff's First Amended Complaint (ECF No. 18
("REM Mot.")).  Plaintiffs Brian Lilly, Sr. and Brenda Lilly, proceeding individually and
on behalf of the estate of their son, Brian Lilly, Jr., filed an Opposition to REM's Motion
(ECF No. 22), and an Opposition to Bond's Motion (ECF No. 23 ("Opp'n Bond")).
Plaintiffs subsequently filed a Corrected Opposition to replace ECF No. 22.  (ECF No. 25

1

("Opp'n REM").)  REM filed a Reply in support of their Motion to Dismiss (ECF No. 26 ("REM Reply")), as well as a Motion to Strike the Corrected Opposition (ECF No. 28 ("MTS")).  Bond filed a Reply in support of his Motion to Dismiss (ECF No. 27 ("Bond Reply")).  The Court held a hearing on the Motions on June 30, 2022.  Having carefully considered the Plaintiffs' First Amended Complaint, the Parties' arguments, and the relevant law, the Court **GRANTS** Bond's Motion to Dismiss, **GRANTS** REM's Motion to Dismiss, and **DENIES** REM's Motion to Strike.

## BACKGROUND

Plaintiffs initiated this action by filing their original Complaint on September 30, 2021.  (*See* ECF No. 1.)  On February 16, 2022, they filed their operative First Amended Complaint (ECF No. 14 ("FAC")) alleging: (1) Violation of Title IX (Retaliation) against the Regents; (2) Violation of Fourteenth Amendment for Denial of Equal Protection under 42 U.S.C. § 1983 against Individual Defendants Bond, McGann, and Edwards; (3) Violation of Fourteenth Amendment for Deprivation of Substantive Due Process under 42 U.S.C. § 1983 against the Individual Defendants; (4) Wrongful Death (C.C.P. § 377.30) against the Individual Defendants; (5) Negligent Hiring against McGann and Edwards; and (6) Negligent Supervision against McGann and Edwards.  (*See generally* FAC.)

Plaintiffs allege that Coach Geoff Bond was hired by the University of California San Diego ("UCSD") by athletic director Edwards and associate athletic director McGann following "a rushed search, lacking in due diligence."  (*Id.* ¶ 16.)  Plaintiffs contend that Bond had a history of "abuse and erratic, anti-social behavior," which was a "poorly kept secret in the tight-knit, national rowing community."  (*Id.* ¶ 25.)

Prior to his hiring at UCSD, Bond coached at the University of Pennsylvania ("UPenn").  (*Id.* ¶ 28.)  He was "ousted from UPenn after [a] mutiny, when approximately 25 rowers from the Men's Heavyweight Crew team threatened to quit unless Bond was removed."  (*Id.*)  The mutiny allegedly stemmed from "his mentally abusive coaching methods, unfair selection process, politically incorrect insults, old and ineffective training methods," and acting as a "barrier" between student athletes and other members of the

coaching staff.  (*Id.* ¶ 29.)  In June 2016, senior rowers at UPenn allegedly communicated to UPenn's athletic department that Bond "exhibited a disregard for responsible oversight of the mental health of the rowers and created an abusive environment by the repeated use of belittling nicknames and hostile language threatening rowers."  (*Id.* ¶ 30.)  The seniors referred to Bond as "unstable and abusive" and "mentioned student suicide as a potential cost of keeping Bond on as coach."  (*Id.* ¶ 30.)  While at UPenn, Bond would "publicly humiliate[] rowers who sought mental health counseling" and "play mind games with his rowers[,] confusing them intentionally so he could chastise them when they erred and target rowers he viewed as weak."  (*Id.* ¶ 31.)

With McGann in charge of his hiring, UCSD hired Bond to be the men's rowing team head coach on October 1, 2019.  (*Id.* ¶¶ 33, 38.)  McGann allegedly rushed the process and "did little to no independent research into Bond's background, prior positions, or the reasons he left seemingly prestigious positions."  (*Id.* ¶¶ 34–35.)

Decedent Brian Lilly, Jr. "enrolled at UCSD in the Fall 2019 semester to pursue an undergraduate degree in real estate and development and to continue his passionate pursuit of rowing, as a scholar-athlete of the class of 2023 men's rowing team."  (*Id.* ¶ 67.)  Decedent was "widely regarded as the consummate teammate, always present with words of encouragement and positive reinforcement."  (*Id.* ¶ 69.)  Throughout his life, he was "susceptible to body shaming" after a diagnosis of Juvenile Rheumatoid Arthritis, which caused him to gain thirty pounds in middle school.  (*Id.* ¶ 70.)  He shared the "pain[] and shame[] he felt from his childhood obesity with his coaches and friends on the rowing team throughout his freshman year."  (*Id.* ¶ 70 n.2.)  Plaintiffs state that "Decedent had no mental health issues prior to his enrollment at UCSD."  (*Id.* ¶ 76.)

Initially, Bond's treatment appeared to be "the run-of-the-mill tough variety, including challenges to the teenagers' toughness and sophomoric, sexually inappropriate insults to challenge their manliness."  (*Id.* ¶ 82.)  Plaintiffs assert that "[t]his culture contravened the express claims of UCSD, which trumpeted to its prospective students its inclusive, safe campuses as being nurturing environments, free from toxicity."  (*Id.* ¶ 83.)

Bond initially "appeared to recognize Decedent's value to the rowing team." (*Id.* ¶ 85.) Decedent "did more erg machine work outs, with erg scores that were faster than the bulk of his teammates and nearly all his fellow freshmen." (*Id.* ¶ 86.) His "hard work and competitive spirit impressed teammates and coaches alike at UCSD who wanted him for his athleticism and leadership." (*Id.* ¶ 86.) His work "earned and secured his spot in one of the top three varsity boats," specifically, "2V," the second-best boat. (*Id.* ¶¶ 87–88.) Decedent and his teammates "quickly learned" that Bond was a "sadistic bully; an angry, volatile man whose rage surfaced often and unexpectedly." (*Id.* ¶ 90.) The rowers were "subjected to sexually inappropriate comments, petty insults, and erratic behavior." (*Id.* ¶ 90.)

As a coach, "Bond exhibited a general disregard for his student-athletes' health and well-being." (*Id.* ¶ 93.) He "chastised rowers who sought independent medical treatment, taught them outdated rowing techniques, and mocked the rowers who reverted to the modern, effective techniques they learned previously." (*Id.*) He would mock the rowers "for their insufficient testosterone, 'flaccid' manhood, small 'testicles' and/or lack of 'manliness,' in general." (*Id.* ¶ 94.) Plaintiffs contend that "Bond's conduct in engaging in constant bullying, abuse, and harassment was severe, pervasive, and objectively unreasonable." (*Id.* ¶ 96.) He "frequently mocked the weight of certain rowers," stating that "they needed to stop eating because they were too fat, lazy, and unwilling to meet his extreme demands." (*Id.* ¶ 99.) "Bond first glorified rowers who worked out 'so hard they puked,' then, after successfully inducing vomit, Bond would laugh and dismiss them as 'pussies' for vomiting." (*Id.* ¶ 103.) Bond allegedly "covered himself, and his abusive harassment, after-the-fact by feigning compassion or concern for his athletes through electronic communications." (*Id.* ¶ 109.)

On January 18, 2020, the rowing team hosted an "Initiation Night" for freshman. (*Id.* ¶¶ 112–13.) Initiation Night included, consuming "hard alcohol, syrup, whipped cream, bread, cabbage, hot peppers, and carrots, all while sitting in [a] car with the heat at full blast," binge drinking challenges, and "physical activities like rowing on the erg

machine and spinning around until dizzy." (*Id.* ¶¶ 115–16.) The night was "captured via digital pictures," and the pictures were saved by one of Decedent's teammates, Z.B. (*Id.* ¶¶ 118–19.) Decedent subsequently learned that Z.B. was accused of sexual misconduct by multiple female UCSD students. (*Id.* ¶ 121.) Plaintiffs contend that the individually named Defendants, as well as others, were aware of the allegations, yet failed to comply with their obligations under the Office for the Prevention of Harassment & Discrimination ("OPHD") policy. (*Id.* ¶¶ 122, 124.) Decedent and his teammates learned "of multiple reports lodged against Z.B.," who was accused of misconduct such as groping female students, sending inappropriate Snapchat photos, and attempting sexual advances despite objections. (*Id.* ¶ 126.) Decedent was "incensed" to learn that the Coach Bond had received the reports yet failed to follow OPHD protocol. (*Id.* ¶ 129.)

On January 31, 2020, Decedent met with Coach Bond and Assistant Coach Engblom to tell them he was feeling sick with flu-like symptoms and that he was "suffering emotionally and from a mental health perspective." (*Id.* ¶¶ 134, 137.) Decedent told the coaches that "Z.B.'s unchecked misconduct, and [their] failure to take action regarding the allegations" was causing his "deterioration." (*Id.* ¶ 138.) Bond "told Decedent to take the afternoon off" and "acknowledged he was aware of the multitude of Title IX allegations but assured Decedent, 'the coaches were handling the situation.'" (*Id.* ¶¶ 139–40.)

As a result of Decedent speaking up, Bond and the captains retaliated against Decedent, treating him with hostility and ostracism. (*Id.* ¶ 144.) Bond, for example, "attacked Decedent" with insults such as "calling him a 'pussy[;]' doubting Decedent's 'manliness,' 'testicular fortitude' or 'testosterone levels[;]'" and making fun of Decedent's weight. (*Id.* ¶¶ 150–51.) Additionally, the coaches demoted Decedent to the bottom boat "immediately after" he raised his concerns. (*Id.* ¶ 147.)

Decedent got into a "heated exchange" with Z.B. on February 22, 2020, during practice. (*Id.* ¶ 153.) Subsequently, Decedent spoke with Coach Engblom to voice his concerns about Z.B.'s impact on the team and inquired whether there was a Title IX investigation into Z.B. (*Id.* ¶ 154.) Coach Engblom informed Decedent that he and Bond

were "given information on the situation" and that they had "reported the sexual misconduct to their superiors." (*Id.* ¶ 155.)  When Bond and Decedent spoke later that same day, Bond informed Decedent that Z.B. was still on the team because an investigation had concluded that there was "no evidence of his wrongdoing." (*Id.* ¶¶ 159–60.) Decedent told Bond that "this feels like psychological abuse and the team is suffering from the dynamic" of Bond and Z.B. (*Id.* ¶ 163.)  Bond recommended that Decedent "calm down and speak with a therapist." (*Id.* ¶ 164.)

Following his call with Bond, McGann called Decedent. (*Id.* ¶ 165.)  Decedent told McGann about the allegations against Z.B. and said he felt "as if he 'was being psychologically abused' by Z.B. and the rowing coaches, and that this was ruining his experience as a student athlete at UCSD." (*Id.* ¶ 165.)  McGann told Decedent that "these things take time to investigate" and "not to conduct his own investigation." (*Id.* ¶¶ 165–66.)

Decedent and Z.B. got into another "verbal altercation" at practice on February 27, 2020. (*Id.* ¶ 174.)  Afterwards, Bond "berated" Decedent and Z.B. for their conduct and told them, "[i]f the two of you can't get along, you'll both be kicked off the team." (*Id.* ¶ 175.)  Following the practice, "Decedent met with a counselor who worked for CAPS, a mental health clinic at UCSD." (*Id.* ¶ 177.)

Due to the COVID-19 pandemic, and the suspension of all NCAA sports, Decedent returned home to New York in March 2020. (*Id.* ¶¶ 188–89.)  In April 2020, in response to an anonymous UCSD survey, Decedent provided twenty-three pages of feedback regarding Bond's misconduct and the mishandling of Title IX complaints against Z.B. (*Id.* ¶ 191.)  Decedent included the statement, "I had a few fleeting thoughts of suicide throughout the process but decided not to mention them because they didn't seem like a major threat to me and I was afraid of the implications of revealing them." (*Id.* ¶ 193.)

Once home, Decedent's mental health "deteriorated and worsened in the months following as a direct result of Bond's abuse." (*Id.* ¶ 198.)  He "suffered from immense sadness, paranoia, and disorientation." (*Id.* ¶ 199.)  He began "skipping meals, workouts,

and sleep" and "self-medicated with drugs to escape." (*Id.* ¶ 200.) "On July 21, 2020, after several days without sleep and minimal food, Decedent's fear, paranoia, and delusions reached dangerous levels." (*Id.* ¶ 201.)  He had a "schizophrenic and psychotic episode, necessitating hospitalization for in-patient mental health treatment." (*Id.* ¶ 202.) Decedent began "intensive therapy and drug treatment to control his symptoms, emotional pain, psychosis, and schizophrenia caused by the abuse he suffered at UCSD." (*Id.* ¶ 203.)

After reaching a "stable place" towards the end of 2020, he returned to UCSD in late December 2020.  (*Id.* ¶¶ 205–06.)  Around December 23, 2020, Plaintiffs allege that Decedent informed Bond that he would be opting out of the Spring 2021 rowing season due to COVID-19 restrictions; however, he did not receive any response. (*Id.* ¶ 209.)  On January 4, 2021, Decedent took his life.  (*Id.* ¶ 211.)

## LEGAL STANDARD[1]

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).  "A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Id.* at 1242 (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).  "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands

---

[1]   Defendant Bond states that his Motion to Dismiss is pursuant to FRCP 12(b)(1) and 12(b)(6). Bond appears to conflate the two subsections, (*see* Bond Mot. at 7), as 12(b)(1) is a Motion to Dismiss for Lack of Subject-Matter Jurisdiction, yet Bond does not include any arguments relevant to subject-matter jurisdiction.

more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

"If a complaint is dismissed for failure to state a claim, leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)). "A district court does not err in denying leave to amend where the amendment would be futile." *Id.* (citing *Reddy v. Litton Indus.*, 912 F.2d 291, 296 (9th Cir. 1990), *cert. denied*, 502 U.S. 921 (1991)).

## ANALYSIS

## I.   **Title IX (Retaliation)**

"Title IX prohibits sex discrimination by recipients of federal education funding." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). Actionable "sex discrimination" includes retaliation "against a person *because* he complains of sex discrimination." *Id.* at 174, 178 (emphasis in original); *see also Emeldi v. Univ. of Oregon*, 698 F.3d 715, 725 (9th Cir. 2012) (speaking out against sex discrimination is a protected activity). To prevail on a retaliation claim under Title IX, a plaintiff lacking "direct

8

evidence of retaliation must first make out a prima facie case of retaliation by showing (a) that he or she was engaged in protected activity, (b) that he or she suffered an adverse action, and (c) that there was a causal link between the two."[2]  *Emeldi*, 698 F.3d at 724.  A prima facie case requires a "minimal showing of retaliation."  *Id.*

An adverse action exists when "a reasonable [person] would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable [person] from making or supporting a charge of discrimination." *Emeldi*, 698 F.3d at 726 (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006)).  The causal link between this adverse action and the protected activity is "construed broadly," and a plaintiff only has to prove that the protected activity and the adverse action were not "completely unrelated."  *Id.* (quoting *Poland v. Chertoff*, 494 F.3d 1174, 1181 (9th Cir. 2007)).  As in Title VII cases, "causation 'may be inferred from circumstantial evidence, such as the [defendant's] knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory' conduct."  *Ollier*, 768 F.3d at 869 (quoting *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)).

The Regents move to dismiss the Title IX claim as there is "no official university policy at issue" and, therefore, "the university must have actual notice of the offending conduct," which the First Amended Complaint fails sufficiently to allege.  (REM Mot. 18–19.)  Plaintiffs contend that the Regents apply the incorrect standard for deliberate indifference to their Title IX claim.  The Regents apply *Karasek v. Regents of Univ. of California*, 956 F.3d 1093 (9th Cir. 2020), pursuant to which

> A plaintiff alleging a Title IX claim against a school must additionally establish five elements: (1) "the school must have exercised substantial control over both the harasser and the context in which the known harassment occurred[;]" (2) "the plaintiff must have suffered harassment that is so severe, pervasive, and

---

[2]      The Ninth Circuit adopts this framework from the Title VII context.  *See Emeldi*, 698 F.3d at 724; *see also Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 867 (9th Cir. 2014).

objectively offensive that it can be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school[;]" (3) "a school official with authority to address the alleged discrimination and to institute corrective measures on the school's behalf must have had actual knowledge of the harassment[;]" (4) "the school must have acted with deliberate indifference to the harassment, such that the school's response to the harassment or lack thereof was clearly unreasonable in light of the known circumstances[;]" and (5) "the school's deliberate indifference must have subjected the plaintiff to harassment."

*See id.* at 1105. These five elements apply when a plaintiff alleges a "Title IX claim against a school that arises from student-on-student or faculty-on-student sexual harassment or assault." *Id.*

Plaintiffs contend that they "plead a prima facie retaliation claim." (Opp'n REM at 14.) The retaliation alleged, however, was perpetuated by Coach Bond, not the Regents. Schools can only be liable for their own misconduct. *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). The Regents, therefore, cannot be liable for a Title IX retaliation on any basis aside from deliberate indifference. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) (holding that damages remedy is only available under Title IX if an official, who has authority to "address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge" and acts with deliberate indifference).

Here, the only sufficient allegation that an authority figure knew about the alleged retaliation was when Decedent described Bond's "psychological abuse of him" as "seemingly out of retaliation" in the April 2020 survey. (*See* FAC ¶ 192.) But even if Plaintiffs were to properly allege—in a nonconclusory manner— that McGann violated the OPHD Title IX policies by not reporting the alleged retaliation, that would not constitute deliberate indifference sufficient to sustain a Title IX claim against The Regents. *See Karasek*, 956 F.3d at 1107 (a "school's violation of its own policies" does not typically establish deliberate indifference); *see also Davis*, 526 U.S. 629 at 645 ("[T]he deliberate indifference must, at a minimum, cause students to undergo harassment or make them

liable or vulnerable to it."). Because Plaintiffs fail sufficiently to allege that the Regents retaliated against Decedent, the Court **GRANTS** REM's Motion to Dismiss Plaintiffs' Title IX claim against the Regents.[3]

## II.   42 U.S.C. § 1983

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C.A. § 1983. Here, Plaintiffs allege violations of § 1983 under equal protection and substantive due process.

### A.   *Fourteenth Amendment Denial of Equal Protection*

To establish a § 1983 equal protection violation, a plaintiff "must show that the defendants, acting under color of state law, discriminated against them as members of an identifiable class and that the discrimination was intentional" or that the defendants "acted with deliberate indifference." *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134–35 (9th Cir. 2003). "Liability under § 1983 must be based on the personal involvement of the defendant," *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998), meaning that "[s]upervisory personnel . . . cannot be held liable under § 1983 for the actions of their employees under the theory of *respondeat superior*." *Walsh v. Tehachapi Unified Sch. Dist.*, 827 F. Supp. 2d 1107, 1116 (E.D. Cal. 2011).

Personal involvement can be established by causing a person to be subjected to a constitutional deprivation. *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). For example, a causal connection can be established by setting in motion a series of acts by

---

[3]   "Plaintiffs respectfully request the opportunity to amend the pleadings to add the additional Title IX deliberate indifference cause of action." (Opp'n REM at 16.) The Court **DENIES AS MOOT** this request because Plaintiffs are granted leave to amend their complaint. (*See infra* Conclusion.)

others "which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* at 743–44. The Ninth Circuit has noted that the causation standard is very similar to the foreseeability standard of proximate cause, *i.e.*, more than simply causation in fact. *See Arnold v. Int'l Bus. Machines Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981).

### 1. Bond

Bond asserts that the Plaintiffs' allegations of Bond "berat[ing] and mock[ing]" Decedent occurred more than nine months prior to Decedent's death and nonetheless do not constitute a constitutional violation as his conduct was not "general discrimination or any type of discrimination and the Equal Protection clause does not apply to retaliation claims." (Bond MTD at 10–11.) Further, Bond points out there are no allegations that Bond "knew or should have known of any suicidal ideation or impulses of [Decedent] to commit suicide" and, thus, Plaintiffs cannot establish proximate cause. (*Id.* at 15.) Plaintiffs oppose, asserting that the statements Bond made to Decedent constitute sexual harassment, and that harassment, in addition to Bond's retaliation, "qualifies as intentional sex discrimination" in violation of the Equal Protection Clause. (Opp'n Bond at 19.) Alternatively, Plaintiffs contend that Bond was "deliberately indifferent to Z.B.'s alleged sexual misconduct, as he repeatedly ignored the mounting complaints and allegations," which creates an "additional theory of liability for Bond." (*Id.*)

Plaintiffs have not properly alleged that Decedent was a member of an identifiable class.[4] Even assuming that his "class" consists of the UCSD Men's Varsity Rowing team members, Plaintiffs do not allege that Decedent was treated differently than his similarly situated teammates. (*See generally* FAC.) Instead, allegations prior to the claims of

---

[4] Plaintiffs allege that Decedent was a member of a protected class and was the subject of gender discrimination in the form of sexual harassment. (*See* FAC ¶ 233.) It is not clear, however, with which protected class Decedent identified. A class "must be comprised of similarly situated persons so that the factor motivating the alleged discrimination can be identified." *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) (quoting *Thornton v. City of St. Helens,* 425 F.3d 1158, 1166 (9th Cir.2005)).

retaliation reference Bond's treatment of "teammates." For example, "Bond would chastise his rowers, Decedent and his freshmen teammates, for cheering each other on during intense rowing practices"; Bond "would direct the student athletes to 'shut up' while rowing, rather the express support and encouragement for their teammates"; and "Bond exhibited a general disregard for his student-athletes' health and well-being, chastised rowers who sought independent medical treatment, taught them outdated rowing techniques, and mocked the rowers who reverted to the modern, effective techniques they learned previously." (*Id.* ¶¶ 92–93.) Similar teamwide allegations continue in additional paragraphs in the First Amended Complaint. (*Id.* ¶¶ 94–105.)

The allegations of differential treatment only begin with the "deplorable conduct by Bond in the Spring 2020 semester, when he engaged in retaliation against Decedent." (*Id.* ¶ 110.) These allegations allegedly stem from Decedent's first meeting with Bond on January 31, 2020, when he informed Bond of his mental health and emotional struggles due to Z.B.'s "unchecked misconduct." (*Id.* ¶¶ 134–42.) Additionally, as discussed *infra* in Section II.A.ii., it is not clear whether retaliation can form the basis of a § 1983 claim.[5]

Finally, Plaintiffs do not allege "deliberate indifference" by Bond in their First Amended Complaint. Instead, Plaintiffs improperly assert deliberate indifference in their Opposition as a backstop theory of liability to hold up their § 1983 equal protection claim. *See Gerritsen v. Warner Bros. Entmt. Inc.*, 116 F. Supp. 3d 1104, 1126 (C.D. Cal. 2015) ("[I]t is improper for a plaintiff to assert an unpled theory of liability in opposition to a defendant's Rule 12(b)(6) motion to dismiss."). Due to Plaintiffs' failure properly to allege

---

[5]     While the Ninth Circuit has not spoken clearly on the issue, other circuits have declined to recognize an equal protection right to be free from retaliation. *See e.g.*, *Thompson v. City of Starkville,* 901 F.2d 456, 468 (5th Cir.1990) (dismissing plaintiff's equal protection claim in retaliation case because it "amounts to no more than a restatement of his first amendment claim"); *Vukadinovich v. Bartels,* 853 F.2d 1387, 1391–92 (7th Cir.1988) (finding that the plaintiff's equal protection retaliation claim, based on allegation that "he was treated differently because he exercised his right to free speech," "is best characterized as a mere rewording of [his] First Amendment-retaliation claim"); *Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997) ("A pure or generic retaliation claim, however, simply does not implicate the Equal Protection Clause.").

that Decedent was a member of an identifiable class and that he was treated differently than his similarly situated teammates, the Court **GRANTS** Bond's Motion to Dismiss Plaintiffs' § 1983 Equal Protection claim.

### 2. *McGann and Edwards*

McGann contends that the "allegations against [her] do not reflect intentional conduct necessary to state a Section 1983 claim against her for constitutional violations." (REM Mot. at 25.)  Plaintiffs alleged two instances of contact between McGann and Decedent.  (FAC ¶¶ 159, 164–65.)  First, McGann called the Decedent following his phone call conversation with Bond.  (*Id.* ¶ 165.)  Second, Bond copied McGann on an email sent to Decedent and Z.B. regarding their conflict at practice.  (*Id.* ¶ 179.)  McGann informed the Decedent that an investigation into Z.B.'s conduct was underway, and McGann contends that "agreeing to investigate a student's report of vague 'abuse' is not indicative of intentional discrimination on the basis of a protected characteristic."  (REM Mot. at 26.) McGann notes that the First Amended Complaint does not allege that "Edwards, McGann, or other employees other than the alleged harasser were aware that decedent was allegedly subjected to different treatment . . . by Bond."  (*Id.* at 24.)  Rather, the First Amended Complaint "states that Bond covered up his behavior with 'faux compassion' whenever his supervisors, like McGann, observed him at practice."  (*Id.*; *see also* FAC ¶ 109.) Additionally, Plaintiffs do not allege that McGann "personally participated in any further sexually inappropriate conduct" after allegedly learning about Bond's conduct through the anonymous April 2020 survey.  (REM Mot. at 24.)  McGann contends that Plaintiffs argue that she was deliberately indifferent in an attempt to plead around her lack of personal participation.  (REM Reply at 7.)  McGann asserts that because there was no personal participation in an equal protection violation, this cause of action against her should be dismissed.  (*Id.*)

Edwards states that the "FAC states insufficient facts reflecting [his] personal participation in violation of decedent's constitutional rights" because it "merely alleges in conclusory fashion that Edwards was somehow made aware of the decedent's anonymous

response to the April 2020 survey, and Edwards somehow allowed Bond to 'harass' students (not the decedent) between April 2020 and December 2020." (REM Mot. at 26.) Like McGann, Edwards asserts that because there was no personal participation in an equal protection violation, this cause of action should be dismissed against him. (*Id.* at 24.)

McGann and Edwards both rely on *Wilcox v. Lyons*, 970 F.3d 452, 460 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2754 (2021), for the premise that the "Equal Protection Clause does not recognize pure retaliation claims." (*See* REM Mot. at 23). This reliance is misplaced for two reasons. First, as against McGann and Edwards, Plaintiffs do not primarily ground their § 1983 Equal Protection claim in retaliation (unlike the retaliation allegations against Bond described *supra* in Section II.A.1). (*See* FAC ¶ 233.) Instead, Plaintiffs allege that Decedent was "the subject of gender discrimination in the form of sexual harassment, and reasonably perceived the environment at UCSD as hostile and abusive." (*Id.*) Two paragraphs later, Plaintiffs reference an increase in "hostility and abuse" after he "reported and commented on the Title IX complaints;" however, Plaintiffs' primary focus is on Bond's initial alleged harassment of Decedent. (*See id.* ¶ 235.) Plaintiffs then allege that McGann knew about the "abuse and hostility" and the "sexually inappropriate attacks" but make no reference to any retaliatory behavior by McGann. (*Id.* ¶ 237.) Plaintiffs finally allege that Edwards was "made aware" of Decedent's "troubling responses" in the April 2020 survey but, again, make no allegations of any retaliatory behavior by Edwards. (*Id.* ¶ 239.)

Second, *Wilcox* was decided by the Fourth Circuit and thus is not binding on this Court. Further, unlike the Fourth Circuit, the Ninth Circuit appears to have recognized that such a claim may in fact exist. *See Thomas v. City of Beaverton*, 379 F.3d 802, 812–13 (9th Cir. 2004) (affirming summary judgment in favor of defendants because, "although there is evidence that the defendants retaliated against Plaintiff for opposing retaliation . . . [,] there is insufficient evidence that any of the retaliation . . . was motivated by racial animus"); *contra Garrett v. Governing Bd. of Oakland Unified Sch. Dist.*, No. 21-CV-03323-HSG, 2022 WL 344971, at *7 (N.D. Cal. Feb. 4, 2022) ("[I]t is undisputed that

1   neither the U.S. Supreme Court nor the Ninth Circuit has recognized an Equal Protection

2   Claim as viable under a retaliation theory like the one in this case.").

3       Although *Wilcox* is inapposite, Plaintiffs fail properly to allege § 1983 equal

4   protection claims against McGann and Edwards.  First, as discussed *supra* in Section

5   II.A.1, Plaintiffs do not properly allege Decedent is a member of a class.  Second, there are

6   no allegations that McGann or Edwards treated Decedent any differently than any of his

7   similarly situated teammates.  Third, there are no allegations of "deliberate indifference"

8   sufficient to support an equal protection claim.  Deliberate indifference is a "response to

9   the harassment or lack thereof [that was] clearly unreasonable in light of the known

10  circumstances."  *Karasek*, 956 F.3d at 1105.  Plaintiffs, however, have not alleged that

11  McGann's or Edwards' behavior was "clearly unreasonable."  Instead, the allegations

12  against McGann and Edwards are conclusory, stem from "presum[ptions]," and are based

13  on "information and belief."  (FAC ¶¶ 194, 239.)  *See Marks v. U.S. (Dep't of Just.)*, 578

14  F.2d 261, 263 (9th Cir. 1978) ("Conclusory allegations unsupported by factual data will

15  not create a triable issue of fact.").  Because Plaintiffs fail properly to allege equal

16  protection violations by McGann and Edwards, the Court **GRANTS** McGann and

17  Edwards' Motion to Dismiss Plaintiffs' § 1983 Equal Protection claims.

18      ### B.   *Fourteenth Amendment for Deprivation of Substantive Due Process*

19      "To establish a substantive due process claim, a plaintiff must, as a threshold matter,

20  show a government deprivation of life, liberty, or property."  *Nunez v. City of Los Angeles*,

21  147 F.3d 867, 871 (9th Cir. 1998).  That deprivation must have a causal connection to the

22  resulting adverse action.  *See id.* at 874.  Parents have a constitutionally protected right to

23  associate with their children.  *Porter v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008).  Thus,

24  a claim for loss of association is properly stated as a violation of the Fourteenth

25  Amendment right to substantive due process.  *Id.*

26      Official conduct that "shocks the conscience" constitutes a due process violation.

27  *Id.* at 1137.  "What state of mind shocks the conscience depends on the circumstances of a

28  particular case."  *Walsh v. Tehachapi Unified Sch. Dist.*, 827 F. Supp. 2d 1107, 1119 (E.D.

Cal. 2011) (quoting *Provencio v. Vazquez,* 258 F.R.D. 626, 640 (E.D.Cal.2009)).  "Mere negligence" is not enough to shock the conscience.  *Id.*

### 1.   Bond

Bond contends that his conduct does not shock the conscience, as the comments alleged as verbal harassment are not sufficient to constitute a constitutional violation. (Bond Mot. at 10.)  Plaintiffs counter that "Bond's bullying, mind games, psychological abuse, retaliation, social ostracism and sexual harassment, particularly given the power he wielded over Decedent and his other teenaged, student-athlete rowers," shocks the conscience.  (Bond Opp'n at 23.)  But verbal abuse or harassment, without more, are not sufficient to state a claim for constitutional deprivation.  *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987).  While Bond's conduct may not be the coaching style Decedent or his teammates desired, it cannot be said to shock the conscience such that it rises to a deprivation of a constitutional right.  The Court therefore **GRANTS** Bond's Motion to Dismiss Plaintiffs' § 1983 Substantive Due Process claim.

### 2.   McGann and Edwards

McGann and Edwards assert that their conduct does not "shock the conscience" and thus Plaintiffs' § 1983 claim for denial of substantive due process fails.  (REM Mot. at 24.) Plaintiffs allege that "Bond (but not Edwards or McGann) subjected the decedent to verbal harassment and abuse" but fail to allege that Edwards or McGann "allowed Bond to engage in conscience-shocking behavior, much less engaged in conscience-shocking behavior themselves."  (*Id.* at 25.)  Plaintiffs oppose, stating that they "allege that Decedent made McGann and, by reasonable inference, Edwards, aware" of Bond's "relentless, abusive, harassing, and retaliatory conduct" as early as February 2020.  (REM Opp'n at 31.) Further, Plaintiffs note that Decedent "referenced his suicidal ideation in the April 2020 anonymous survey response," yet McGann and Edwards "took no action to protect Decedent, redress the effects of the harassment, or prevent Bond from inflicting further harm on Decedent and/or his friends and teammates."  (*Id.*)

/ / /

McGann's conduct cannot be said to shock the conscience. There are no allegations that McGann witnessed Bond's alleged misconduct. The only allegation of her firsthand experience with Bond suggests that she saw his "faux compassion." (FAC ¶ 109.) Further, the only allegation of interaction between McGann and Decedent occurred when she called Decedent following his phone call with Bond. (*Id.* ¶ 165.) Plaintiff told her that "he felt as if he 'was being psychologically abused' by Z.B. and the rowing coaches, and that this was ruining his experience as a student athlete at UCSD." (*Id.*) McGann's response, indicating that there was an ongoing investigation without further details, is not conscience shocking. Indeed, it would be more "shocking" for an athletic director to inform a student-athlete of details regarding an incomplete and ongoing investigation into a peer. In April 2020, McGann "request[ed]" that Decedent fill out an "allegedly anonymous UCSD survey" to give feedback about the men's rowing team. (*Id.* ¶ 191.) Although Decedent stated that he "had a few fleeting thoughts of suicide throughout the process," he also notably said that those thoughts "didn't seem like a major threat to [him]." (*Id.* ¶ 193.) While McGann was perhaps negligent in her lack of response, neither McGann's lack of response, nor her conversation with Decedent rose to the level of being conscience-shocking. Thus, the Court **GRANTS** McGann's Motion to Dismiss Plaintiffs' § 1983 Substantive Due Process claim.

As discussed *supra* in Section II.A.2, the allegations against Edwards are conclusory, stem from "presum[ptions]," and are based on "information and belief." (FAC ¶¶ 194, 239); *see also Marks*, 578 F.2d at 263. Thus, the Court also **GRANTS** Edwards' Motion to Dismiss Plaintiffs' § 1983 Substantive Due Process claim.

## III.  Negligence

McGann and Edwards request in their "Notice of Motion" that, "should the Court dismiss the second and third causes of action . . . [,] the Court [should] decline to exercise supplemental jurisdiction over the pendant state law claims against Defendants Edwards and McGann pursuant to 28 U.S.C. § 1367." (REM Mot. 3.) Despite that request, they

/ / /

fail to brief any of the negligence claims. Defendant Bond moves to dismiss Plaintiffs' negligence claim for wrongful death. (Bond Mot. at 8.)

The Court is granting Plaintiffs leave to amend their Complaint (*see infra* Conclusion). It is therefore premature for the Court to decide whether the exercise of supplemental jurisdiction over Plaintiffs' California state law claims is appropriate. The jurisdictional challenge to the wrongful death, negligent hiring, and negligent supervision claims is **DENIED WITHOUT PREJUDICE**.

## IV.    Punitive Damages

McGann and Edwards move to dismiss Plaintiffs' request for punitive damages. (REM Mot. at 28.) Plaintiffs assert that is it premature to determine punitive damages because the evaluation requires a factual analysis. (Opp'n REM at 33.) "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). As Plaintiffs' § 1983 claims are dismissed with leave to amend, (*see infra* Conclusion), it is premature to determine whether punitive damages would be appropriate. McGann and Edwards' Motion to Dismiss Punitive Damages is **DENIED WITHOUT PREJUDICE**.

## V.    Qualified Immunity

The applicability of qualified immunity should be decided as early as possible in litigation—preferably before discovery—as it is a complete immunity from suit, not solely a defense to liability. *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009). In consideration of this preference, and notwithstanding the above analysis, the Court finds that Defendants Bond, McGann, and Edwards are entitled to qualified immunity—providing an independent basis for the Court to dismiss Plaintiffs' § 1983 claims.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 231 (quoting *Harlow v.*

*Fitzgerald,* 457 U.S. 800, 818 (1982)).   Qualified immunity applies to a government official's error—whether it is a mistake of law, mistake of fact, or mixed question of law and fact.   *Id.*   A right is "clearly established" when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards,* 566 U.S. 658, 664 (2012)).   Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."   *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

In *Saucier v. Katz*, the Supreme Court provided a two-step inquiry to determine whether an official is entitled to qualified immunity.   *See* 533 U.S. 194 (2001).   First, a court must determine whether the facts that the plaintiff has alleged would be a violation of a constitutional right.   *Pearson*, 555 U.S. at 232.   Second, a court must determine whether the constitutional right was clearly established at the time of the official's alleged misconduct.   *Id.*   In *Pearson*, though acknowledging the *Saucier* steps are "beneficial," the Supreme Court recognized that a court has discretion to decide which prong of the "analysis should be addressed first in light of the circumstances in the particular case at hand."   *Id.* at 236.

Here, the Court begins and ends with the first prong.   As discussed *supra* Section II, Plaintiffs do not properly allege any § 1983 violations by Defendants.   Therefore, the facts, as alleged, could not be a violation of a constitutional right.   Accordingly, Defendants Bond, McGann, and Edwards are entitled to qualified immunity and the Court **DISMISSES WITHOUT PREJUDICE** Plaintiffs' § 1983 claims.   The Court recognizes that should Plaintiffs choose to amend their Complaint, this analysis may change, and the Court will reconsider the issue if appropriate.

/ / /

/ / /

/ / /

/ / /

### V.      Motion to Strike Plaintiffs' Corrected Opposition

REM move to strike and object to Plaintiffs' "Corrected Opposition" pursuant to FRCP 12(f) and/or FRCP 11."[6]   (*See generally* MTS.)   Plaintiffs' opposition to REM's Motion to Dismiss was due on June 2, 2022.   (*Id.* at 2.)   Plaintiffs filed an opposition on June 2, 2022, (*see* ECF No. 22), but subsequently filed a "Corrected Opposition" on June 10, 2022.   (*See* ECF No. 25.)   REM contend that ECF No. 25 "unreasonably prejudiced Defendants, who already spent substantial time preparing the Reply to Plaintiffs' original Opposition." (MTS at 2.)   A redline of the two oppositions confirms that most edits simply created a more succinct pleading, as opposed to adding new arguments.   Therefore, the Court **DENIES** the Motion to Strike.   Plaintiffs' operative Opposition against REM's Motion to Dismiss is ECF No. 25.

## CONCLUSION

In light of the foregoing, the Court **GRANTS** Bond's Motion to Dismiss and **DISMISSES WITHOUT PREJUDICE** all § 1983 claims against Bond.   The Court also **GRANTS** the Regents, McGann, and Edwards' Motion to Dismiss and **DISMISSES WITHOUT PREJUDICE** the Title XI claim against the Regents and the § 1983 causes of action against McGann and Edwards.   The Court **DENIES WITHOUT PREJUDICE** the challenge to supplemental jurisdiction over the state law negligence claims against Bond, McGann, and Edwards.   The Court also **DENIES WITHOUT PREJUDICE** the motion to dismiss Plaintiffs' claim for punitive damages and **DENIES WITHOUT PREJUDICE** Defendants' qualified immunity motion.   Finally, the Court **DENIES** REM's Motion to Strike.   (ECF No. 28.)

---

[6]      Pursuant to Federal Rule of Civil Procedure 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act . . . on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading."   Federal Rule of Civil Procedure 11 allows the court to "strike an unsigned paper," *see* Fed. R. Civ. P. 11(a), or impose sanctions on grounds that do not appear to apply here.   *See* Fed. R. Civ. P. 11(c).

21-CV-1703 TWR (MSB)

Plaintiff **MAY FILE** an amended complaint curing the deficiencies outlined in this Order within <u>fourteen (14) days</u> of the electronic docketing of this Order. *Should Plaintiff elect not to file a timely amended complaint, this action will be dismissed without prejudice without further Order of the Court.*

**IT IS SO ORDERED.**

Dated:  October 19, 2022

Honorable Todd W. Robinson
United States District Judge

21-CV-1703 TWR (MSB)