1    NESENOFF & MILTENBERG, LLP
     ANDREW T. MILTENBERG, ESQ. (NY State Bar
2    No. 2399582; admitted *pro hac vice*)
     amiltenberg@nmllplaw.com
3    NICHOLAS E. LEWIS, ESQ. (NY State Bar
     No. 017292008; admitted *pro hac vice*)
4    nlewis@nmllplaw.com
     SUSAN STARK, SBN 147283
5    sstark@nmllplaw.com
     4 Palo Alto Square
6    3000 El Camino Real, Suite 200
     Palo Alto, California 94306
7    Telephone:    (650) 209-7400
     Facsimile:    (212) 736-2260
8
     Attorneys for Plaintiffs
9    Brian Lilly, Sr. and Brenda Lilly, Individually,
     and on behalf of the Estate of Brian Lilly, Jr.
10

11                 UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF CALIFORNIA
12

13   BRIAN LILLY, SR., and BRENDA LILLY,      Case No.: 3:21-cv-01703 (TWR) (MSB)
     individually, and on behalf of the Estate of
14   Brian Lilly, Jr.,
                                              ~~SECOND~~FIRST AMENDED
15                    Plaintiffs,             COMPLAINT FOR DAMAGES AND
                                              INJUNCTIVE RELIEF FOR:
16         v.                                   1)  Violation of Title IX (Retaliation);
                                                2)  Violation of Title IX (Deliberate
17   ~~BOARD OF~~ REGENTS OF THE                     Indifference)
     UNIVERSITY OF CALIFORNIA, GEOFF           ~~2)~~3)    Violation of Fourteenth
18   BOND, individually, KATIE MCGANN,               Amendment for Denial of Equal
     individually and EARL W. EDWARDS,                Protection under 42 U.S.C. §1983;
19   individually                             ~~3)~~4)    Violation of Fourteenth
                                                     Amendment for Deprivation of
20                    Defendants.                    Substantive Due Process under 42
                                                     U.S.C. §1983;
21                                            ~~4)~~5)    Wrongful Death (C.C.P.
                                                     §377.30);
22                                            ~~5)~~6)    Negligent Hiring; and
                                              ~~6)~~7)    Negligent Supervision
23

24

25

26                                            JURY TRIAL DEMAND

27                          INTRODUCTION

28         Plaintiffs BRIAN LILLY, Sr. and BRENDA LILLY, (collectively referred to herein as
     "Plaintiffs"), individually, and on behalf of the Estate of Brian Lilly, Jr. ("Decedent"), bring this

     _____
     *Draft for Settlement Purposes Only*                                    Complaint

action for (i) retaliation in violation of Title IX of the Educational Amendments of 1972; (ii) deliberate indifference in violation of Title IX of the Educational Amendments of 1972 (iii (ii) violation of equal protection in violation of 42 U.S.C. Section 1983; (iviii) deprivation of substantive due process in violation of 42 U.S.C. § 1983; (viv) wrongful death; (viv) negligent hiring, and (viivi) negligent supervision.

     This matter concerns the wrongful death of Decedent caused directly by the bullying, harassment and psychological torment perpetrated by the abusive head coach employed by the Regents of the University of California -San Diego ("UCSD") Men's Rowing Team.  Head Coach Geoff Bond ("Bond") subjected his student athletes to abusive and offensive conduct, as his supervisors, Katie McGann ("McGann") and Earl Edwards ("Edwards"), ignored and enabled the illegal behavior. McGann was aware of Bond's improper and retaliatory treatment of Decedent, as well as the Coach's abuse of other student rowers, yet did nothing to protect the students or prevent future abuse.  She also learned of Bond's history of abusing rowers at his previous head coaching post at the University of Pennsylvania, but again did nothing.  Bond tormented multiple athletes on the men's rowing team, but was particularly abusive toward Decedent, a freshman who challenged Bond's failure to report multiple sexual misconduct allegations lodged against another rower, Z.B.[1]

     Bond was a 'Responsible Employee' under the school's Title IX policy, required to immediately report any sexual misconduct allegations to UCSD.  Decedent questioned his coach's failure to abide by the policy. In response, Bond subjected Decedent to repeated verbal abuse and hostility, including personal insults, sexually inappropriate comments, overly arduous workouts to the point of inducing vomiting, psychologically abusive mind games and both social and emotional exile as well as an inexplicable demotion from one of the varsity boats to the noncompetitive (fourth) boat despite Decedent's earning a spot in the top-3, competitive boats.

     The head coach sought to silence Decedent, and other concerned members of the rowing team.  Defendants' conduct caused a deterioration of Decedent's mental health, including despair, paranoia, and confusion. Decedent experienced mental illness, warranting hospitalization, for the

---

[1] Initials are used for students' privacy purposes.

first time in his life. The in-patient treatment helped Decedent cope temporarily but, upon returning to UCSD and being again subject to the coaches' behavior, Decedent tragically took his own life on January 4, 2021.

This horrific tragedy is not the sad, but inevitable, result of an "old-school coach" miscalculating the effect of his harsh coaching style on an overly sensitive Generation Z teenager. Decedent was neither overly sensitive nor weak.  He was a focused, strong-willed endurance athlete with no prior history of mental illness or need for treatment.  Decedent enrolled in UCSD, in fall 2019, after a successful run as a varsity athlete in high school.  He was a determined, empathetic teammate who led his high school rowing club, ran in the New York City marathon, and competed in the Iron Man Triathlon in Lake Placid, New York.

Upon information and belief, immediately before being hired by UCSD, Bond was forced to leave his prior position as rowing coach at University of Pennsylvania ("UPenn") after the rowers threatened to quit in protest of Bond's abusive behavior and ineffective coaching.  Defendants were made aware of Bond's prior employment history and knew or should have known that he posed a dangerous risk to every student athlete he "coached."  Defendants negligently failed to ascertain and recognize this risk in their unnecessarily rushed hiring process, and throughout the time Bond was employed as head coach of the rowing team, which was a breach of their duty to maintain a safe educational environment, free from hostility and abuse.  Decedent's death could, and indeed should, have been avoided. Defendants' misconduct was the proximate cause of Decedent's wrongful death, the tragedy that forms the subject matter of this action.

## JURISDICTION AND VENUE

1.     Jurisdiction of this Court is invoked pursuant to this Court's federal question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331; 1367 respectively because: (i) the federal law claim arises under the Constitution and statutes of the United States; and (ii) the state law claims are so closely related to the federal law claim as to form the same case or controversy under Article III of the United States Constitution.  Further, this Court has diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest.

-2-

SecondFirst Amended Complaint

1   2.   Plaintiffs bring this action as administrators of the estate of Decedent, as Decedent's

2   parents, the personal representatives of his estate and successors in interest.

3   3.   The events described herein occurred at the University of California San Diego.

4   UCSD is part of the University of California system; UCSD is located, and conducts business within,

5   the Southern District of California.

6   4.   This Court has personal jurisdiction over Defendant the~~Board of~~ Regents of the

7   University of California, on the grounds that the Board of the Regents~~it~~ is the governing body of the

8   University of California, including UCSD.

9   5.   This Court has personal jurisdiction over Defendants Bond, McGann and Edwards,

10   (collectively referred to as the "Individual Defendants") on the grounds that they were employed by

11   UCSD during the relevant times described herein, and both the acts they committed which form the

12   basis for this action as well as the Individual Defendants, themselves, were located in the Southern

13   District of California.

14   6.   Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391

15   because UCSD is located in this judicial district and a substantial part of the events and omissions

16   giving rise to the claim occurred within the Southern District of California.

17   **PARTIES**

18   7.   Plaintiffs are citizens of the United States and are residents of New York.  Plaintiffs

19   are the parents of Decedent.

20   8.   Plaintiffs are the successors in interest of Decedent under California law because

21   Decedent died with no surviving issue and Plaintiffs are therefore entitled to the property of the

22   Decedent by intestate succession. Plaintiffs were also appointed Administrators of Decedent's

23   Estate by the Surrogate Court of Westchester County in the State of New York on June 22, 2021.

24   9.   At all relevant times herein, Plaintiffs were the parents and natural guardians to

25   Decedent, who was a male student and member of a protected class.  Prior to his tragic death,

26   Decedent resided~~student residing~~ in San Diego and enrolled at the University of California San

27   Diego.

28

-3-

Second~~First~~ Amended Complaint

1    10.    At all times relevant to this Complaint, UCSD was and is a public university and

2    recipient of federal funds located in San Diego, California where it maintains its principal offices

3    and places of business.

4    11.    At all times relevant to this Complaint, the ~~Board of~~ Regents, or Board, was and is

5    the governing body of the University of California, which includes UCSD.

6    12.    Under Article IX, Section 9 of the California Constitution; the Board has "full powers

7    of organization and governance" of the University of California, including oversight of policy

8    making and enforcement. The Regents of the University of California is the official name of the

9    public corporation that governs and operates the University of California as a public trust through

10   its 26-member Board of Regents. UCSD is one of the 10 campuses of the University of California

11   system and is in San Diego, California.

12   13.    At all times relevant to this Complaint, Defendant Bond was employed as head coach

13   of the men's rowing team by UCSD.  Bond is being sued in his individual capacity.

14   14.    At all times relevant to this Complaint, Defendant McGann was employed as

15   associate athletic director by UCSD.  McGann is being sued in her individual capacity.

16   15.    At all times relevant to this Complaint, Defendant Edwards was employed as athletic

17   director by UCSD.  Edwards is being sued in his individual capacity.

18   **FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

19   **I.    BACKGROUND**

20   **a.    Bond Comes to UCSD After Rower Protest at the University of Pennsylvania**

21   16.    Bond secured the head coach position at UCSD because the athletic director,

22   Edwards, and his associate athletic director, McGann, conducted an unnecessarily rushed search,

23   lacking in due diligence.  The rushed search was unnecessary in that the vacancy was created months

24   earlier when the prior men's rowing coach was fired, and Defendant's search lacked basic due

25   diligence because they failed to uncover the UPenn rower protest which led to Bond's availability

26   in the first place. ~~a rushed search, lacking in due diligence.~~

27   17.    Coaches possess tremendous power and influence over their athletes, particularly in

28   college where students dedicate a substantial part of their lives to their chosen sport. Freshmen

-4-

1 athletes, many of whom are one year removed from living at home with their parents, are often most
2 reliant on coaches as they seek security, guidance, encouragement, and acceptance.

3      18.    Athletic directors, and those who hire coaches, like Defendants Edwards and
4 McGann, are or should have been fully aware of the above-described dynamic between coaches and
5 student athletes, as well as the risk for abuse of this power.

6      19.    Athletic directors, and those who hire coaches, including Defendants Edwards and
7 McGann, are or should have been fully aware that a hiring process, including background checks,
8 must be diligent in order to protect student athletes.

9      20.    The vetting process and background check, or lack thereof, in this matter fell well
10 below NCAA and acceptable pedagogical standards.

11      21.    This insufficient, negligent, and rushed process led to UCSD's hiring a head coach,
12 Bond, whose abusive approach to coaching would have been easily ascertained had the hiring
13 process been performed with the appropriate diligence due.

14      22.    While Bond's lengthy resume may have initially looked good on paper, even the
15 most cursory background check would have revealed the coach to be an inappropriate choice and a
16 danger to student athletes.

17      23.    Most importantlyFor example, the reason Bond was no longer the head coach of
18 UPenn men's rowing was the aforementioned protest, a mutiny by the student athlete rowers who
19 refused to row if Bond received another contract from UPenn.  The mutiny was in response to
20 Bond's mistreatment which, as described below, is eerily similar to the treatment received by
21 Decedent and others at UCSD.  Bond's unceremonious exit from UPenn occurred shortly before he
22 was hired at UCSD, a matter of weeks, and the details were wasnot difficult to uncover.

23      24.    Decedent, and other members of the UCSD rowing team, were able to uncover said
24 UPenn rower protest, as well as other troubling details of Bond's checkered past and limited team
25 success, within a matter of minutes and a couple phone calls.  In addition to the below details of
26 Bond's abusive tenure at UPenn, they learn that Bond applied to be the coach of UCLA men's
27 rowing club in response to a student-led coaching search and the college students' background
28 search of Bond uncovered the sordid details that somehow escaped McGann and Edwards.

25. Bond's history of abuse and erratic, anti-social behavior, were~~was~~ a poorly kept secret in the tight-knit, national rowing community, but McGann and Edwards did not care to ask.

26. Bond began his career coaching rowing at Berkeley High School in 1993. Bond's first job coaching in college was associate head coach under the legendary rowing head coach, Steve Gladstone, at University of California Berkeley in 1996. Bond coached the UC-Berkeley freshmen team for 12 years.

~~26.~~27. For a portion of ~~and received~~ the time at Berkeley, Bond coached along Mike Teti, who resigned~~reputational benefits~~ from his position as coach of U.S. Rowing in October 2021 amid nine rowers reporting Teti's physically threatening athletes or verbally attacking them if they challenged him in any way. ~~affiliation with Gladstone's success and UC's stellar program.~~ When Gladstone retired from UC-Berkeley, it ~~however, Bond~~ was Teti, not Bond, who was entrusted with stewardship of the men's rowing program. Bond~~and~~ left UC-Berkeley shortly thereafter.

~~27.~~28. After Berkeley, and a brief stint training the Chinese National Team, Bond became head coach of Deerfield Academy, a preparatory private high school in New England, in 2014. He only coached at Deerfield for one year.

~~28.~~29. Bond left Deerfield to be head coach of UPenn men's heavyweight crew team in 2015. Bond had just left a seemingly prestigious position after a short tenure as coach. The pattern would continue as Bond would not last beyond his fourth year as head coach before being forced out of UPenn. Bond was ousted from UPenn after the aforementioned mutiny, when approximately 25 rowers from the Men's Heavyweight Crew team threatened to quit unless Bond was removed from his coaching position and the program, in general.

~~29.~~30. The~~Upon information and belief, the~~ student athletes at UPenn refused to continue to row under Bond due to his mentally abusive coaching methods, unfair selection process, politically incorrect insults, old and ineffective training methods and the head coach's acting as a barrier between the student athletes and their trainers, lifting coach and assistant coaches, among other reasons. While these reasons were cited by the rowers to support their mutiny on or about June 2019, a group of precocious seniors recognized the danger Bond posed to these student athletes three years earlier, in June 2016, at~~by~~ the end of Bond's first year coaching there.

-6-

31.   In June 2016, members of the graduating senior class of the UPenn Men's Heavyweight Crew team spoke up out of fear for the safety of their younger teammates.   The upperclassmen communicated with UPenn's athletic director, and associate athletic director, as well as the undergraduate rowers' parents, to inform them all that Bond exhibited a disregard for responsible oversight of the mental health of the rowers.  The graduating seniors reported Bond had and created an abusive environment by the repeated use of belittling nicknames and hostile language threatening rowers including: "If you talk to me again, I swear I will fucking cap you," "I will fucking kill you," and "I will break through you."

30.32.   -Additionally, the senior rowers revealed, Bond stigmatized the use of appropriate resources for managing stress by publicly shaming rowers that utilized UPenn's psychological services.   The graduating members of the teamHeavyweight Crew Team raised these concerns specifically because they worried the lower classmen rowers were particularly susceptible to the "unstable and abusive coach" *and mentioned student suicide as a potential cost of keeping Bond on as coach*.   They shared these concerns with theirthe athletic director and associate athletic director.   Unfortunately, thesethe UPenn administrators ignored the senior rowers' warnings in 2016, much like UCSD's administrators, McGann and Edwards, would later ignore Decedent's and other rowers' similar complaints aboutagainst Bond., so the upperclassmen contacted the parents of the young rowers to warn them as an additional safeguard.  Sadly, the prophetic warnings of the class of 2016 Men's Heavyweight Rowers' fell on deaf ears, and Bond engaged in the same abuse and mind games at both UPenn and later at UCSD.

33.   Approximately one month later, in July 2016, UPenn's A.D., Dr. Grace Calhoun, informed the outgoing graduates that Bond was interviewed, and the aforementioned concerns were raised to Bond to provide an opportunity for professional growth.  The events described herein, from UPenn to UCSD, reveal a complete, willful, lack of growth on the part of Bond.

34.   Sadly, the warnings of the class of 2016 Men's Heavyweight Rowers' fell on deaf ears and proved painfully prophetic. Upon information and belief, during Bond's UPenn tenure, a student athlete who was on the men's rowing team struggled with addiction and tragically died from

-7-

Formatted: Font: Bold, Italic

1  an overdose.  While the former UPenn rower's death differed from Decedent's demise, both were

2  untimely, tragic and, ultimately, a predictable product of an abusive environment.

3      35.   As early as 2016, Bond was explicitly informed of the grave, if not potentially fatal,

4  risks inherent in his aggressive, mean-spirited abuse of rowers, including the aforementioned hostile

5  language, belittling, sexually explicit nicknames (like calling rowers "flaccid") and his stigmatizing

6  the use of psychological services.  He was made aware of same by A.D. Calhoun, the complaints of

7  his rowers, many of whom required years of therapy to combat mental health issues including PTSD,

8  depression, anxiety or substance abuse, and he even received further warning from members of his

9  own coaching and training staff.

10      36.   After the UPenn rower mutiny in June 2019, but before he began his next reign of

11  terror at UCSD, an assistant coach suggested Bond take a different, less drastic, approach with his

12  rowers to avoid another UPenn-like-catastrophe.  In the wake of significant emotional pain, realized

13  warnings of self-harm, and a "Him or Us" protest by roughly two dozen student athletes, Bond

14  displayed his lack of growth and empathy by responding, in sum and substance, "Well, my response

15  to that is, 'If you can't take the heat…'"

16      31.37.  Bond, ~~Bond was~~ a known bully within the UPenn rowing program, did not change

17  his aggressive, abusive style despite having to move across the country for his next job, at UCSD.

18  At UPenn, in ~~during his tenure as head coach.  In~~ addition to the constant stream of sexually explicit,

19  offensive remarks and politically incorrect insults, Bond ~~he~~ would relish playing ~~play~~ mind games

20  with his rowers, like confusing them intentionally so he could chastise them when they erred and

21  targeting ~~target~~ rowers he viewed as 'weak'.  Bond publicly humiliated rowers who sought mental

22  health counseling, and actively made the student athletes feel uncomfortable at every turn, including

23  placing rowers in the same boat as teammates they had conflict with to increase tension. ~~Much of~~

24  ~~Bond's abusive behavior would continue unabated at UCSD, where~~as he stepped into a new head

25  coaching vacancy shortly ~~position almost immediately~~ after the UPenn mutiny.

26      32.38.  After being forced out of UPenn after the Spring 2019 semester, Bond was hired to

27  be UCSD's men's rowing team head coach the following Fall 2019 semester.  He ~~Bond~~ was hired to

28  replace Zack Johnson, who vacated ~~left in~~ the position in July ~~summer of~~ 2019.  Bond was not hired

until October 2019, so, leaving UCSD had no head men's without a rowing coach as the semester and rowing season began.

33.39.  McGann, the associate athletic director for UCSD, who worked under A.D. Edwards, was charged with hiring the new coach to resurrect the second-rate rowing program in place at UCSD, with hopes of turning the rowing program into a legitimate Division I program.

34.40.  Upon information and belief, in September 2019, when she realized the men's rowing team was heading into Fall 2019 without a coach, McGann rushed through the process to find a new coach. As Bond was available, she hired Bond without concern for why he was available. It is unclear why McGann started her search in September, after the season started, despite knowing the prior coach would not be returning no later than July.

35.41.  McGann's hire was made without the appropriate level of due diligence; whether she was likely misled by Bond's lengthy resume, failed to consider a wide range of capable coaches, and/or did little to no independent research into Bond's background, prior positions, or the reasons he left seemingly prestigious positions, her process was severely flawed.

36.42.  McGann, for example, failed to uncover the aforementioned reasons Bond was forced out of UPenn, and clearly made no phone calls to his prior employer or members of the rowing community to uncover same.  If she had called, like Decedent, the and other UCSD rowers, or the UCLA students who conducted the coaching search for their club team, McGann would have discovered Bond's reputation for abuse, and erratic, inappropriate behavior, as the issues were well-known to many in the close-knit national rowing community.

37.43.  McGann and Edwards, as McGann's supervisor, throughout the hiring of Bond, failed to act appropriately in that they failed to consider multiple candidates or properly vet the ones they hired, an integral part of the hiring process for any new coach.

38.44.  On October 1, 2019, Bond was hired to be the head coach of UCSD men's rowing.

39.45.  When McGann hired Bond to replace Zach Johnson as head coach in October 2019, she also hired Bond's longtime assistant coach, Dameon Engblom ("Engblom").

40.46.  The start of Bond's employment, unfortunately, coincided with the first semester of Decedent's freshman year, Fall 2019.  Decedent was excited to begin his studies and college athletic

career but was unaware of his chosen university's problematic history of mishandling sexual misconduct complaints.

**b.** **UCSD Has Received Negative Press for the University's Failure to Report, Investigate, and Address Sexual Misconduct on Its Campus**

41.47. While UCSD promotes itself as a university committed to rooting out sexual misconduct among its student population, UCSD's conduct in this matter and failure to act as required under applicable policies, procedures, regulations and guidelines were done to avoid garnering 'bad press' for the school's insincere commitment to protecting purported victims of sexual assault.

42.48. UCSD has a well-documented history of insufficient response to complaints of sexual misconduct, particularly when those accused of wrongdoing are employees of the university.

43.49. In May 2019, *The Triton*, the independent, student-run newspaper of UCSD, reported that five members of the UCSD staff were allowed to resign, without discipline, after they were found to have violated UCSD Title IX sexual misconduct policy. *See* https://triton.news/2019/05/five-staff-resign-without-discipline-after-violating-title-ix-policy/The Triton.

44.50. According to the article, there were six employees total who violated UCSD policies prohibiting sexual violence and sexual harassment, but only one of the employees faced disciplinary action by the UCSD. *Id.*

45.51. The sexual misconduct investigations, conducted in 2016 and 2017, revealed repeated instances of sexual harassment by supervisors, nonconsensual sexual touching and inappropriate, discriminatory remarks experienced by subordinates. The misconduct consisted of the following:

a.   In a June 2016 report, a female employee complained of racism and sexual harassment by her female supervisor, who made sexual remarks about phallic foods, commented on the subordinate's body parts, and mocked her accent. The supervisor was found to have violated the policy and was allowed to resign.

b.   An August 2016 investigation revealed a nurse manager at the university's hospital

-10-

was found responsible for sexually harassing her male subordinates, inappropriately groping their 'butts and nipples', snapping their waistbands, inserting her tongue in their ears, and inserting lube in someone's ear.  Additionally, the supervisor told a male subordinate it was his job to give massages and reportedly made "too many [sexual comments and gestures] to count." The nurse manager denied most of the allegations but admitted to groping the nipple of a co-worker she knew "socially" and inserting the lube in a nurse's ear while he treated a patient. The supervisor was found in violation of policy and resigned.

c.    In March 2017, a nurse resigned after an investigator found him responsible for sexual harassment of a fellow nurse, who alleged the respondent could "not stop talking about sex" and liked "scanning women with his eyes."

d.    A report of an investigation from November 2017 found a supervisor violated the school's policy against sexual harassment when he made numerous unwelcome comments to a student employee via text message, social media, and email. The supervisor resigned after the investigation.

e.    In June 2016, the school found a female employee of an undisclosed workplace at UCSD was harassed by a male co-worker who repeatedly made homophobic and sexist remarks to the complainant. The respondent was directed to take online training on sexual harassment by supervisors and told to keep his thoughts on sex and gender to himself.  *Id.*

46.52.  The May 2019 *Triton* article was one of multiple reported sources revealing incidents of the university's inadequate and slow response to inappropriate sexual harassment by a school employee.

47.53.  In November 2019, UCSD fired psychology professor Nicholas Christenfeld, over one year after he emailed pornographic material to a student. https://www.voiceofsandiego.org/topics/education/a-ucsd-professor-sent-a-student-porn-heres-why-it-took-a-year-to-fire-him/

-11-

1    ~~48.~~54.  Prior to the delayed firing, Christenfeld was the subject of multiple complaints over

2    more than a decade at UCSD, yet the tenured professor received nothing more than a warning for

3    these complaints.  *Id.*

4    ~~49.~~55.  The *Voice of San Diego*, a non-profit investigative news outlet covering the San

5    Diego Region, obtained documentation in February 2021, which showed that five people filed

6    complaints against Christenfeld, for sexual misconduct ranging from inappropriate relationships to

7    sexual harassment.  *Id.*  The documents uncovered by the site also noted the professor "had a history

8    of dating students."  *Id.*

9    ~~50.~~56.  The *Voice of San Diego* article, authored by Ethan Coston on February 17, 2021,

10   detailed the previous complaints which dated back fifteen years before Christenfeld's firing:

11        a.   In 2004, a student filed a sexual harassment against Christenfeld because his staring

12             made her uncomfortable, and because there were rumors, he dated students.  UCSD

13             gave him a 'warning and education meeting.'

14        b.   In 2008, an individual filed an anonymous complaint of Christenfeld dating a student,

15             but the university did not investigate because the psychology professor did not have

16             a supervisory relationship.

17        c.   In 2013, UCSD opened an investigation into Christenfeld because two people who

18             worked for his department believed they interrupted intimate activity between the

19             professor and a student.

20        d.   In 2014, UCSD investigated Christenfeld but found him not responsible for sexual

21             harassment for conduct vaguely described as complainant's "rejection of

22             respondent's advances."

23        e.   In a similarly vague report by the university, in 2017, UCSD implemented

24             "preventative measures" in response to an unidentified individual's complaint that

25             Christenfeld was "inappropriately flirtatious." *Id.*

26   ~~51.~~57.  UCSD has a pattern of enabling university employees' inappropriate behavior.

27   ~~52.~~58.  Most recently, the negative press continued with a snapshot of the UCSD Provost's

28   costly misbehavior and general disrespect of women.

-12-

53.59.  In September 2020, UCSD settled a lawsuit brought by Former UCSD Associate Vice Chancellor Jean E. Ford against the school contending Chancellor Pradeep Khosla ("Khosla") was abusive toward her and other female employees, then retaliated against her for voicing her concerns.  https://www.sandiegouniontribune.com/news/courts/story/2020-09-24/ucsd-chancellor-and-former-exec-reach-settlement-in-discrimination-lawsuit.

54.60.  The gender and age discrimination suit, settled for an unknown sum, alleged five women, over the age of 40, were targeted by Khosla, and subjected to daily abuse, including demeaning and humiliating comments, from the Chancellor.  *Id.*

55.61.  Khosla would favor male donors, and respond to their complaints immediately, however if female donors made complaints, he would describe the female donors as "just being difficult." *Id.*

56.62.   The Chancellor allegedly told his subordinate, when Ford was complaining of her heels hurting her feet at a work event, that the "only reason" for her to wear heels was if she was wearing a skirt so people could see her "taut calves" and that Ford "shouldn't bother" with heels since she wore pants regularly. *Id.*

57.63.  In meetings, Ford alleged that Khosla interrupted and spoke over women; peppered them with questions about minute and unimportant details, demeaned and mocked their contributions to conversations and achievements. Males did not suffer the same abuse. *Id.*

58.64.  When Ford voiced the above concerns to the Chancellor, Khosla sabotaged her fundraising efforts and made disparaging remarks about her to her co-workers, subordinates, and donors, hurting her reputation during her time at UCSD and after she was fired in August 2018. *Id.*

59.65.  The above media coverage of UCSD lays in stark contrast to the image the university attempts to portray to students, employees, community members, potential students, and their parents.

c.     **Relevant Portions of UCSD Policies and Procedures**

-13-

60.66.  The Office for the Prevention of Harassment & Discrimination ("OPHD"), the UCSD Title IX Office, and the university in general, promotes itself as a safe space for people to report incidents like those listed above and in the instant matter.

61.67.  The school proclaims, "UC San Diego is committed to the highest standards of civility and respect toward all as reflected in the UC San Diego Principles of Community. The university rejects acts of harassment and discrimination, works to resolve concerns, and investigates known facts to determine if university policies have been violated."

62.68.  OPHD directs that "Responsible Employees," i.e., any university employee who is not a confidential resource and who receives, in the course of their employment, information that prohibited conduct or retaliation has occurred, are required to "promptly notify the Title IX Office (OPHD)". https://ophd.ucsd.edu/_files/flyers-handouts/ResponsibleEmployees.pdf.

63.69.  According to OPHD, "[a]s a Responsible Employee, you must contact OPHD as soon as possible when you learn that any UCSD student, staff, faculty, or patient has potentially experienced an incident of sexual violence or sexual harassment.  Share whatever information you have, including the names of any individuals involved, their contact information, and any details of the incident you have."  https://ophd.ucsd.edu/report-bias/index.html.

64.70.  OPHD further advises, "[a]s a Responsible Employee, you should report directly to OPHD, even if you are unsure that the incident actually occurred or unsure whether it constitutes sexual harassment or sexual violence. You should not investigate the report and should not try to intervene or resolve the issue." *Id.*

65.71.  The individual Defendants in this matter, Bond, and McGann, were all Responsible Employees in this matter upon learning of the conduct engaged in by Z.B.

66.72.  Upon information and belief, Defendant Edwards, as an employee of the university irrespective of his role as the university athletic director, became a Responsible Employee upon learning of Title IX allegations against Z.B.

    **d.**    **Decedent Chose UCSD as a Freshman Scholar-Athlete to Row and Help Build a Division-I Program**

67.73.  Decedent enrolled at UCSD in the Fall 2019 semester to pursue an undergraduate

-14-

Second~~First~~ Amended Complaint

degree in real estate and development and to continue his passionate pursuit of rowing, as a scholar-athlete of the class of 2023 men's rowing team.

68.74.  Decedent was drawn to UCSD for its academics and to be a part of the university's commitment to building a Division I program, as pitched by McGann to prospective rowers for Fall 2019 despite the head coach vacancy.  It was understood, however, that a coach of comparable, if not better, skill and style would fill Zack Johnson's former position as rowing coach.

69.75.  Decedent was an accomplished athlete prior to enrolling at UCSD, and he aspired to become a Division I ("D-I") student athlete.  He thrived on competition and overcoming challenges, so competitive team rowing became his passion in high school. Decedent was a dedicated, supportive teammate who flourished as a leader of the Pelham Community Rowing Association (PCRA).  Decedent won the "most improved" rower award his junior year of high school, then led the boat as team captain his senior year.  He earned a bronze medal at the Philly Youth Regatta 8+ in 2018.  Decedent was widely regarded as the consummate teammate, always present with words of encouragement and positive reinforcement. Like many young, exceptional athletes, Decedent drew a tremendous amount of his self-worth and confidence from his on-field accomplishments, requiring his consistently overcoming adversity, physical limitations, and challenges.

70.76.  By way of example, Decedent overcame Juvenile Rheumatoid Arthritis to mold himself into a top-shelf athlete, despite gaining over thirty pounds from the condition in middle school, giving rise to an extreme, lasting sensitivity about his weight.  He struggled with a new BMI that qualified Decedent as obese, causing him to lose confidence and, sadly, some friends in his early teenaged years.  While he was eventually able to lose the weight, and keep it off, Decedent remained susceptible to body shaming throughout his life.[2]

71.77.  To accomplish his remarkable weight loss, Decedent relied on his support system, a loving family, and true friends in his hometown of Scarsdale, New York, as well as his own will power and hard work.  Further, he was blessed with multiple real coaches in his life, prior to college, who took their role seriously, serving as mentors, motivators, disciplinarians, confidantes, and

---

[2] Decedent shared the pain, and shame, he felt from his childhood obesity with his coaches and friends on the rowing team throughout his freshman year.  Though the obesity was in the rearview, Decedent was clearly sensitive to his former unhealthy stature, feeling inferior whenever reminded of same.  Unfortunately for Decedent, the reminders came often from Bond, after the relentless bully recognized the pain, he could inflict from this sore spot.

guardians all at once.  The admirable support system and healthy passions carried Decedent through the awkward struggles of middle school, and led to sustainable weight loss, personal growth, and exceptional success in high school.

72.78.  Despite the health struggles, Decedent completed the New York City Marathon for the Arthritis Foundation in 2018 and the Lake Placid Ironman in 2019, wherein participants swim 2.4 miles, bike 112 miles and then run 26.2 miles.  The race is widely considered to be one of the most grueling single-day sporting events in the world.

73.79.  This impressive determination, work ethic and internal strength served Decedent well off the field as well:  he worked hard at multiple jobs, including construction jobs in the summer, an internship in corporate sustainability and a men's streetwear brand, Pyrony, founded by Decedent, himself.  Decedent enjoyed his many interests, hobbies and, above all, his passion for sports.  He worked hard to hone his wide skillset and maintained a joyous passion for life.

74.80.  Decedent received the Henry David Thoreau Award in high school, given to the senior who marched to the beat of his own drum.  He came to UCSD with a clear, satisfied mind, prepared to begin his journey toward adulthood and a rewarding life.

75.81.  Decedent was a loving and admired son, brother, grandson, nephew, cousin, friend, and teammate.

76.82.  Decedent had no mental health issues prior to his enrollment at UCSD.

77.83.  The emotional pain and suffering he would come to endure was wholly attributable to the Defendants' collective conduct.

78.84.  Decedent distinguished himself quickly as a freshman leader on the rowing team in the initial quarter of the Fall 2019 semester.  He was quick to make friends and was predictably happy to fully participate in team-building activities.

79.85.  Bond was hired to be coach in or about October 2019, over a month into the fall season.

80.86.  Bond's hire by McGann in October was poorly planned and rushed. The flawed process was particularly inexplicable given she had at least two months to plan for the head coaching vacancy created by Zack Johnson's departure in the summer.

-16-

1    81.87.  The new head coach would soon prove unfit to lead the program into D-I.  Similarly,

2    UCSD failed to fulfill basic team needs, as uniforms were not ordered, and no team photos were

3    taken in Fall 2019 or Spring 2020 seasons.  The program was clearly not ready for D-I competition.

4    The head coach was incapable of performing the basic functions of his job.

5    82.88.  Bond's treatment of his student-athletes, at first, appeared to be of the run-of-the-mill

6    "tough" variety, including challenges to the teenagers' toughness and sophomoric, sexually

7    inappropriate insults to challenge their "manliness."

8    89.    The challenges and inappropriate insults quickly grew darker, more personal and

9    biting as Bond's anger raged more each month.  Decedent, other members of the rowing team and

10   coaches noticed Bond would appear to seek out reasons to explode and scream at student athletes.

11   90.    The head coach's tactics mirrored those employed at UPenn, including intentionally

12   confusing rowers so he could yell at them when they did not follow his convoluted directions,

13   humiliating rowers by challenging their manhood or displaying aggravation at a rower's seeking

14   treatment from the trainers.  Like at UPenn, multiple student athletes and coaches note Bond's

15   apparent rage issues, and some rowers quit due to Bond's attacks.

16   83.91.  This culture contravened the express claims of UCSD, which trumpeted to its

17   prospective students its inclusive, safe campuses as being nurturing environments, free from

18   toxicity.

19   84.92.  Bond's conduct toward Decedent far exceeded the old-school, standard "tough love"

20   coaching tactics, as the coach targeted the 19-year-old freshman with mean-spirited personal attacks,

21   which increased in intensity after Decedent challenged him.

22   85.93.  When Bond first came to coach the team, during the second quarter of the Fall 2019

23   semester, he appeared to recognize Decedent's value to the rowing team.  The freshman was clearly

24   a hard-working, supportive teammate and vocal leader with erg[3] scores that warranted inclusion on

25   one of the school's varsity boats.

26   86.94.  Decedent was no stranger to hard work and sacrifice, and his commitment to the team

27

28   _____
[3] Erg scores measure rowing speed on the ergometer, the standard rowing machine found in most fitness gyms.  The measure of speed is the time it takes to cover a specific distance, typically 2000 meters.  The lower the erg score the better, for it signifies the rower took less time to cover the same distance.

was apparent. Decedent did more erg machine work outs, with erg scores that were faster than the bulk of his teammates and nearly all his fellow freshmen. Decedent's hard work and competitive spirit impressed teammates and coaches alike at UCSD who wanted him for his athleticism and leadership. Decedent's passion for the program and appealing personality appeared to lay the foundation for success as a D-I athlete. He was focused on, and capable of, making this athletic dream come true.

87.95.  Bond began the season as an apparent fan of Decedent, who successfully earned and secured his spot in one of the top three varsity boats. (The fourth boat was considered to be a noncompetitive type boat, consisting mainly of freshmen, inexperienced walk-on rowers, who were not "boated" as they did not race as often or practice on water as much).

88.96.  Bond praised Decedent in front of teammates and placed him in the "2V" (the 2nd Varsity, second best) boat.

89.97.  Still, Bond's issues, i.e., an inability to control his anger, hurling sexual and otherwise profane or, inappropriate insults at his rowers, appeared with increasing frequency as the first semester progressed, and Bond grew more comfortable.

90.98.  Decedent, and his fellow freshmen rowers, quickly learned what the UPenn rowers had endured under Bond: Bond was not an effective coach, teacher, leader, or mentor. He was a sadistic bully; an angry, volatile man whose rage surfaced often and unexpectedly. The rowers were subjected to sexually inappropriate comments, mocking their "testicular" insufficiencies and/or labeling them as "flaccid" and weak, as well as the petty insults, and erratic behavior.

91.99.  In the early days of Bond's tenure, Decedent was treated relatively respectfully, as other rowers drew the coaches' negative attention more frequently. Unfortunately, Bond's approval of Decedent would quickly wane, when the coach became enraged by what he viewed as Decedent's insubordination. Bond would soon view Decedent as an enemy after the freshman questioned Bond's failure to report multiple sexual misconduct allegations against Z.B., another rower. Decedent's integrity incensed Bond, causing him to take numerous adverse actions against the brave teenager who stood up for what he believed in. As time went on, Bond's vitriol towards Decedent became constant, and far more intense than what his teammates experienced.

-18-

### e.   **Bond's Abuse Intensifies**

~~92.~~100.      The UCSD rowers gave their new head coach from the Ivy League the benefit of the doubt in Fall 2019, much like the UPenn rowers had in the Fall 2016 semester. But Bond's limits as a coach, mentor, leader, and human would all soon reveal themselves.  For example, it struck Decedent as quite odd that Bond would chastise his rowers, Decedent and his freshmen teammates, for cheering each other on during intense rowing practices.  The alleged coach would direct the student athletes to "shut up" while rowing, rather the express support and encouragement for their teammates.

~~93.~~101.      Bond exhibited a general disregard for his student-athletes' health and well-being, chastised rowers who sought independent medical treatment, taught them outdated rowing techniques, and mocked the rowers who reverted to the modern, effective techniques they learned previously.

~~94.~~102.      In lieu of inspiration, wisdom and leadership, Bond assailed his student athletes with inappropriate insults, regularly using sexual and/or otherwise inappropriate terms, mocking them for their insufficient testosterone, "flaccid" manhood, small "testicles" and/or lack of "manliness," in general.  He also would question his rowers' loyalty to the team, which could only be established by their complete submission to the coach.

~~95.~~103.      Bond routinely ridiculed the rowers for not being "man enough," chastised them for their lack of testosterone, "testicular" problems or being "flaccid" and labeled them as "pussies," while doing workouts, or "pieces," on the water.  The pointless insults and awkward, inappropriate sexual references were offered instead of professional, thoughtful instruction or constructive criticism that is expected of a university DI head coach.

~~96.~~104.      In rowing, as in other sports, 'tough love' and aggressive challenges can be the norm, but Bond's conduct in engaging in constant bullying, abuse, and harassment was severe, pervasive, and objectively unreasonable.  It went well beyond the realm of even the most aggressive, or "old school" coaching style, for the indignities were not used to teach or help the athletes improve so much as a tool to permit Bond to scream at, bully and abuse the rowers.

~~97.~~105.      The student athletes lived in fear of Bond's constant, unprovoked rage-filled

outbursts that were peppered throughout practices with the above demeaning words.  Bond would intentionally target a single rower, or coxswain, to publicly humiliate the student in front of teammates, among others.

98. 106.      On at least one occasion, he repeatedly screamed at a freshman rower, ridiculing him that he was "flaccid! Your word of the day is flaccid!"  On another occasion, a coxswain made a minor error in setting the timer at practice. Bond shouted in rage, "Maybe if you weren't finger fucking your phone that wouldn't have happened!"

99. 107.      Bond frequently mocked the weight of certain rowers, firing off emotionally intimidating demands that they needed to stop eating because they were too fat, lazy, and unwilling to meet his extreme demands.

100. 108.      Decedent, as described above, had previously struggled with serious weight issues.  Decedent struggled as he was pelted with consistent "fat" jokes from Bond and tried to maintain the narrow weight limits the coach demanded of his rowers.

101. 109.      Bond harassed rowers and mocked them with politically incorrect remarks when they suffered physical injuries, extreme exhaustion, or sickness from workouts.  On at least one occasion, Bond screamed at a freshman walk-on for seeking treatment from a team trainer for an injury, and then screamed again at the walk-on for following the team trainer's instructions.

102. 110.      Bond pushed Decedent and his teammates past their limits, exhibiting a disregard for the rowers' general well-being.

103. 111.      Bond consistently made team members feel like failures to enforce compliance with his orders. A frequent example was Bond's encouraging Decedent, and others, to vomit during unnecessarily grueling workouts.  Bond first glorified rowers who worked out 'so hard they puked,' then, after successfully inducing vomit, Bond would laugh and dismiss them as 'pussies' for vomiting.  Again, the purpose of inducing vomit was not to improve rowers' performance, but to entertain Bond at the student athlete's expense.

104. 112.      Bond frequently glorified former rowers he allegedly coached at UC Berkeley, as the freshman coach, in the 90's.  The head coach shared tales of a rower who threw up during rowing practice and, according to Bond, 'valiantly' continued to row after vomiting.

1    105.113.    On the surface, Bond told this story as an example of dedication and
2    perseverance, yet he simply took pleasure in the unhealthy practice of forcing his student athletes to
3    vomit, then mocking them for being weak.

4    106.114.    Decedent worked out on an erg rowing machine until he threw up on
5    November 25, 2019, seeking approval from Bond, after hearing of the rower from Berkeley his
6    coach glorified.

7    107.115.    Immediately after Decedent vomited, Bond and Engblom mocked the 19-
8    year-old, derisively laughing while saying "[t]hrowing up is for pussies."

9    108.116.    Bond's coaching 'style' was insulting, demeaning, and rooted in a willful
10   disregard for his rowers' health.  His conduct was unacceptable, even by the "tough love" standards
11   of most elite collegiate rowing programs.  Worse still, they were ineffective, as Bond's athletes
12   generally failed to achieve success.

13   109.117.    As 2019 ended, Bond's abuse, harassment and bullying grew in severity and
14   frequency.  Bond carefully covered himself, and his abusive harassment, after-the-fact by feigning
15   compassion or concern for his athletes through electronic communications.  This faux compassion
16   only appeared after he engaged in particularly extreme in-person abuse, or when a supervisor, like
17   McGann, came to the boathouse or a practice to observe him.  As described below, however,
18   McGann was present for a typically confrontational practice in which Bond berated an entire boat
19   in February 2020.  Upon information and belief, this behavior was consistent with Bond's conduct
20   at UPenn.

21   110.118.    While the abuse, harassment, and bullying by Bond in the Fall 2019 semester
22   was improper, it paled in comparison to the deplorable conduct by Bond in the Spring 2020
23   semester, when he engaged in retaliation against Decedent.

24        f.    **Z.B. Retains Embarrassing Photographs of Other Rowers Including Decedent**
25             **Taken During "Freshmen Week," and These Photographs Were Used as**
26             **Leverage Against Decedent**

27   111.119.    The Spring 2020 semester started with "Freshmen Week," in which the
28   freshmen rowers were given a list of tasks to complete.  The freshmen were tasked with completing

-21-

various "team building" tasks, such as scavenger-hunt in which they were required to interact with various members of the UCSD rowing team and community, including upper classmen, McGann and Engblom.

112.120.       The annual tradition of the UCSD rowing team culminated with an "Initiation Night" for the freshmen, which consisted of drinking and hazing activities.

113.121.       On January 18, 2020, the freshmen rowers, including Decedent, were told to report to a designated location on the side of the road in La Jolla for their "Initiation Night", and were then driven to a beach in Mission Bay after being blindfolded and zip-tied to one another".

114.   After some initial hazing activities by Decedent and his fellow freshman rowers reported to the Mission Bay beach, including consuming location where the upper classmen teammates waited. The freshmen were directed to put on blindfolds, zip-tied to one another in groups of two or three and then guided into vehicles.

115.   Once in the cars, the freshmen were forced to consume hard alcohol, syrup, whipped cream and , bread, cabbage, hot peppers in a heated car , and carrots, all while sitting in the car with the heat at full blast. The upper classmen then drove the freshmen, still blindfolded, to a beach in Mission Bay. The teenagers were told they were crossing the border into Tijuana, Mexico.

116.122.       After the beach, the freshmen were brought to the rowing team captain's residence to participate in several binge drinking challenges, including chugging and "shotgunning" beers, combined with physical activities like rowing on the erg machine and spinning around until dizzy.  They played trivia games with the losers told to chug beer. The freshmen ate a significant amount of Jell-O laced with hard liquor

117.123.       The night continued with some additional hazing, and otherwise embarrassing behavior.

118.124.       The night, like much of "Freshmen Week" activities, was captured via digital pictures which reflected the team building, hazing and binge drinking.

119.125.       The pictures were secured on a Google drive by a member of the rowing team, "Z.B."

120.126.       Decedent and other freshmen rowers would later learn that Z.B. would use

-22-

these pictures to protect himself shortly after "Initiation Night."

**g.   Sexual Assault Allegations Made Against Z.B.**

~~121.~~127.      Days later, Decedent learned that Z.B., was accused of sexual misconduct by multiple female students at UCSD.

~~122.~~128.      Upon information and belief, the individually named Defendants, among other Responsible Employees at UCSD, were aware of the sexual misconduct allegations made against Z.B. but failed to report same.

~~123.~~129.      These Responsible Employees, as designated by UCSD OPHD policy, included, without limitation, Bond, Engblom, McGann and multiple resident advisors.

~~124.~~130.      These Defendants failed to comply with their obligations under the OPHD policy, for the Responsible Employees were obligated to act promptly in contacting OPHD immediately upon hearing the allegations against Z.B.

~~125.~~131.      On or about January 21, 2020, a teammate approached Decedent and informed him that a freshman girl, who wanted to remain anonymous, alleged she was sexually assaulted, both verbally and physically, on multiple occasions by Z.B. This startling report was one of several that UCSD agents ignored.

~~126.~~132.      Decedent, and his teammates, learned of multiple reports lodged against Z.B., who was accused of, at a minimum, the following conduct constituting sexual misconduct within the meaning of the UCSD OPHD Title IX Policy in effect at the time:

a.   Groping female students and making sexually inappropriate comments to them in the school library, despite repeated requests for Z.B. to stop the unacceptable behavior.

b.   Sending a sexually inappropriate Snapchat to a fellow female rowing team member, with whom Z.B. had briefly been romantically involved in the fall semester. The female rower repeatedly told Z.B. that she was not interested in continuing the romantic relationship and asked to be left alone. In response, Z.B. sent an inappropriate Snapchat to the girl with a picture of Z.B. and another student the girl was rumored to have been romantically involved

-23-

with, and the question "Who was better?" superimposed over the boys'
pictures.

   c.    Two members of the men's rowing team were approached by a resident
advisor in Warren College and told that Z.B. needed to be confronted; his
repeated sexually inappropriate behavior, including relentless attempts at
sexual advancement over objection, was making numerous girls feel
uncomfortable.

   d.    Decedent was approached by two female students who advised they were
each personally victimized by Z.B. with repeated instances of sexually
inappropriate behavior, relentless attempts of advancement over their
objection and hearing uninvited details of Z.B.'s masturbation habits.

   e.    Upon information and belief, a second resident advisor approached the
rowing team captains about similar sexually inappropriate behavior by Z.B.

127.133.    Decedent and his friends on the rowing team were outraged by the
allegations, and Decedent personally felt Z.B.'s affiliation with the team, with seemingly no
consequences for his sexual misconduct, was an affront to his own integrity and the overall integrity
of the team.

128.134.    In January 2020, Decedent, and his friends, were further incensed when they
learned that their coaches, Bond and Engblom, were aware of the above allegations lodged against
Z.B.

129.135.    Bond and Engblom received these reports which dated back to the Fall 2019
semester. These Responsible Employees ~~under the policy~~ failed to follow the protocol directed by
the school policy, which was to report the allegations promptly to OPHD, directly. - The coaches
did not do this and inexplicably sought to protect Z.B. and shield him from having to face
responsibility for his conduct.

136.    Bond would later acknowledge he did not report the allegations against Z.B. to
OPHD directly, but claimed he attempted to report Z.B.to McGann in late January. He further
claimed that he finally spoke to McGann after a delay of several days allegedly due to McGann's

1   schedule.  It is unclear which, if any, of the above complaints were allegedly relayed to McGann

2   after several days, or when, if ever, McGann spoke with Bond or OPHD.  It is clear that, as Decedent

3   suspected, Bond did not report any of the Z.B. allegations to OPHD.

4          130.137.      Decedent's moral compass, quality upbringing and brutal honesty, led him to

5   a state in which he could not remain silent about Z.B.'s conduct.  The allegations mounted in January

6   and February of 2020, but Decedent noted the coaches failed to take the serious sexual misconduct

7   reports seriously and failed to fulfill their duties as Responsible Employees by reporting to OPHD

8   directly.  He was deeply troubled by the coaches' refusal to take action and their indifference to

9   thesethe allegations of sexual misconduct against his rowing teammate.

10         131.138.      Decedent, and his friends, observed similarly inappropriate behavior by Z.B.

11  and found it incredible that the rowing coaches, and the team captains under their control, remained

12  silent, in effect condoning Z.B.'s serious alleged misconduct. Upset by the coaches' refusal to act,

13  Decedent was the lone rower brave enough to confront the coaches' failure to act and indifference

14  to the Title IX complaints against Z.B.

15         132.139.      Decedent also voiced his discomfort with the team's willingness to accept

16  Z.B. on the rowing team to the captains and upperclassmen.

17         133.140.      The captains told Decedent that the reason Z.B. was still on the team was

18  because of threats he made to others regarding the pictures he possessed from "Freshmen Week"

19  and "Initiation Night."

20         **h.      Decedent Speaks to Bond and Engblom Concerning the Allegations Against**

21         **Z.B.**

22         134.141.      On January 31, 2020, Decedent approached Bond and Engblom in the

23  coach's office to seek advice.

24         135.142.      Decedent was struggling from a physical perspective, feeling under the

25  weather with flu-like symptoms, coughing and congestion.

26         136.143.      He told the coaches that similar colds had never stopped him from practicing

27  before, but these struggles were harder to handle.

28         137.144.      Decedent further revealed to his coaches that he was suffering emotionally

-25-

1   and from a mental health perspective.

2   138.145.   Decedent cited Z.B.'s unchecked misconduct, and the coaches' failure to take

3   action regarding the allegations, as the cause of his physical and mental health deterioration.

4   139.146.   Bond coldly told Decedent to take the afternoon off, and dismissively advised

5   Decedent, that he "and [his] homies should act as if nothing is wrong" concerning the matter with

6   Z.B.

7   140.147.   Bond acknowledged he was aware of the multitude of Title IX allegations,

8   but assured Decedent, "the coaches were handling the situation."

9   141.148.   Bond also warned Decedent about reporting the allegations against Z.B.,

10   attempting to further scare him into silence stating, "I've seen him operate, I think he could be

11   dangerous," [to the team].

12   142.149.   Bond was referring to Z.B.'s possession of photographic evidence of the

13   "Freshmen Week" hazing, as confirmed shortly thereafter by the rowing captains.  The fear was

14   apparently the evidence Z.B. possessed.  The evidence could seriously damage the team if the

15   pictures were ever disclosed, as Z.B. allegedly threatened to do.

16   143.150.   Decedent continued to raise his concerns to the coaches and captains

17   regarding the coaches' failure to report the matter, and the rowing team's willingness to shield Z.B.

18   from responsibility, despite the mounting allegations of sexual misconduct under UCSD's Title IX

19   Policy.  Bond warned Decedent about reporting the allegations at this time for the above-stated

20   reasons.

21   144.151.   As a direct response to Decedent's criticism of the team's tolerance of Z.B.'s

22   purported behavior, and his explicitly challenging the coaches' failure to report Z.B.'s conduct to

23   Title IX, Bond, as well as the coaches and captains who served at the head coach's pleasure treated

24   Decedent as an enemy of the rowing program from late January 2020 on.  The team leaders grew

25   increasingly cold toward Decedent throughout 2020 and alternated between treating him with

26   outward hostility and cold ostracism, ignoring Decedent and his concerns.

27   145.152.   As a consequence of Decedent challenging the coaches and team leaders

28   about Z.B., Bond retaliated against Decedent by tormenting Decedent at practices, angrily deterring

-26-

Decedent's friend, and other rowers, from associating with Decedent and shutting Decedent out, along with the captains, for his discussing the sexual misconduct allegations and Bond's refusal to report same to OPHD.  Bond also clearly demoted Decedent from his earned rowing position in direct response to Decedent's discussing Z.B.'s sexual misconduct allegations.

146.153.     Throughout the school year, Decedent consistently placed in the top 24 for UCSD rowers during his freshman year, based on his erg scores and ability on the water. Decedent was often outworking many teammates, and most of his freshmen classmates.  His dedication earned him a prominent position in the second or third boats at regattas. (Note: of the four boats on the team, the top three boats, with eight rowers in each boat, were considered the competitive rowers). Decedent took tremendous pride in excelling as a freshman at the rowing program he chose to continue his passion, competitive team rowing.  This hard work, leadership and performance continued the entire time Decedent was rowing at UCSD, so, objectively, should have had a spot on one of the top three varsity boats through March 2020 and beyond.

147.154.     In approximately late January to early February of 2020, however, immediately after Decedent raised his Z.B.-related concerns to Bond and Engblom, Decedent was inexplicably and without notice placed for the first time, in the fourth, bottom boat with rowers who had higher (worse/slower) erg scores and far worse race performance than Decedent.

148.155.     Decedent, ever the solid teammate, responded to the demotion by taking it as a challenge, without complaint, and attempted to inspire fellow members of the fourth boat.

149.156.     Decedent understood Bond was punishing him for his encouraging the Responsible Employees to report the sexual misconduct allegations against Z.B., and then questioning the coaches' failure to do so.

150.157.     Decedent's team-first attitude was openly mocked by Bond.  Bond attacked Decedent with consistent insults: calling him a "pussy"; doubting Decedent's "manliness," "testicular" fortitude or "testosterone levels"; claiming Decedent was weak, immature, and questioning Decedent's dedication to the rowing team.

151.158.     Bond repeatedly mocked and harped on Decedent's weight, preying on the 19-year-old's extreme sensitivity about his weight. Though Decedent overcame his weight struggles

-27-

1  and obesity from middle school, and presented as a physically fit, Iron Man, Bond often referred to

2  him as "Fat [Decedent's name]" to hurt and humiliate Decedent.  Bond also angrily yelled at

3  Decedent's teammates, calling them "Fat [Decedent's name]" whenever he felt the rowers were

4  challenging the coach or going over his head with complaints.

5  152.159.     When Bond was not furiously mocking Decedent, or trying to make him

6  vomit in workouts, he was intentionally cold and dismissive to the freshman, often suggesting he

7  should leave the team activity or sending him away from a practice or a meeting.  For an athlete

8  who worked exceedingly hard to gain the acceptance, trust and praise of his coaches, the emotional

9  banishment, ostracism, and general disregard from Bond, as well as the coaches and captains under

10  his control, had a severely detrimental impact on Decedent.  Bond was, again, also documented

11  dissuading fellow rowers from associating with Decedent.

12  160.  Upon information and belief, on or about and between February 20, 2020, to

13  February 22, 2020, McGann was present at a practice observing the varsity boats practice while

14  standing on the launch.  Bond was particularly enraged and hostile towards the second varsity boat

15  and launched into a tirade screaming at the second boat's rowers.  Bond singled out specific rowers

16  and berated them individually with profanity-laced insults.

17  153.161.     On February 22, 2020, Decedent could no longer take the adversarial conduct

18  as Bond's orchestrated psychological abuse continued to take its toll on Decedent's mental health

19  and emotional well-being.  He and Z.B. got into a heated exchange during the fourth boat practice.

20  154.162.     Later that day, Decedent reached out to Engblom, and had a phone

21  conversation in which he discussed Z.B. soiling the reputation and morale of the rowing team with

22  the mounting sexual misconduct allegations and the team's ignoring of same. He also asked

23  Engblom whether there was a Title IX investigation into Z.B., but Engblom stated he did not know

24  what was going on.

25  155.163.     Engblom said he and Bond had been given information on the situation, and,

26  allegedly, reported the sexual misconduct to their superiors.

27  156.164.     Decedent told Engblom that he felt Z.B. was a liability to the team and their

28  collective integrity.  Decedent became emotional, and cried while speaking to his coach, but

-28-

Engblom merely dismissed Decedent.

157.165.    The conversation with Engblom concluded when Decedent asked him why they could not cut Z.B., and Engblom said "that is a question for your head coach."

158.166.    Still later February 22, 2020, at approximately 4:16 PM, Decedent texted Bond to ask if he could speak with the head coach, despite fully expecting Bond's wrath.

159.167.    Bond called Decedent approximately one hour later. Decedent boldly cut to the chase and asked, "Why is Z.B. still on the team?"  Decedent recalled Bond's response sounded like a prepared statement.

160.168.    Bond said, in sum and substance, "Z.B. is still on the team because an investigation was conducted in which I reported information that was brought to my attention. It was concluded that there was no evidence of his wrongdoing.  The school is on high alert of this behavior and if he has another infraction he will be removed from the team and likely the school."

161.169.    Decedent, not satisfied with this coach's response, replied, "I don't think it would reflect well on us if it were discovered that [Z.B.] were still on the team after all this."

162.170.    In response to the Decedent's concerns, Bond responded, "As a son of an attorney that sounds like a threat.  I would be extremely careful with your next few words. I am willing to work with you but don't communicate with me in that way."

163.171.    Decedent, again growing emotional, informed Bond that "this feels like psychological abuse and the team is suffering from the dynamic" created by Bond and Z.B.

164.172.    Bond ended the conversation by informing Decedent if he had a problem with "any of this" he should "take it up with the ethics department of the school," and further dismissed Decedent's legitimate concerns by derisively telling him to "calm down and speak with a therapist." Like the UPenn rowers before him, Decedent felt extremely uncomfortable by Bond's attitude towards and mockery of athletes seeking treatment, including mental health treatment.  Bond then hung up on Decedent.

173.    After the coaches spoke with Decedent, Bond called McGann and informed her of his and Engblom's conversations with Decedent,  described above.  Bond claims he told McGann he had concerns that Decedent was acting erratically.  McGann's response was not to consider

1  potential treatment or counseling for Decedent's acting erratically, but she allegedly told Bond to

2  document any violations of the rowing team rules or student code of conduct in case Bond needed

3  to remove Decedent from the team.  McGann then told Bond she would call Decedent.

4  ~~165.~~174.      Shortly ~~Immediately~~ after his call with Bond, Decedent received a call from

5  McGann. He told her of the initial report against Z.B. from a teammate, and all the aforementioned

6  allegations.  Decedent also told McGann that he felt as if he "was being psychologically abused" by

7  Z.B. and the rowing coaches, and that this was ruining his experience as a student athlete at UCSD.

8  He further informed the associate athletic director that the rowing team captains told him the only

9  reason Z.B. had not been kicked off the team was because of direct or implied threats against them.

10  McGann's response was, "these things take time to investigate," indicating the investigation had not

11  been concluded despite Bond's assertion just minutes earlier that it had concluded with no finding

12  of responsibility.

13  ~~166.~~175.      McGann then suspiciously told Decedent, "[n]ot to conduct his own

14  investigation" into the matter.

15       176.      Bond would later claim that McGann told him she forwarded the Z.B. complaints to

16  OPHD but the complainants allegedly did not want to pursue the matter.  The different versions of

17  the OPHD process among Bond and McGann were unconvincing and Decedent was not confident

18  that there actually were reports submitted to OPHD.  In his Anonymous Survey, described below,

19  Decedent noted that known witnesses to Z.B.'s alleged sexual misconduct were never contacted or

20  interviewed by OPHD.

21       177.      McGann and Bond appeared to be more concerned with silencing Decedent's

22  complaining of sexual misconduct allegations against Z.B., than holding Z.B. accountable for the

23  alleged sexual misconduct.

24       178.      According to Bond, in addition to informing Bond on how to create a paper trail to

25  kick Decedent off the team for rule violations, if necessary, McGann also advised Bond to let both

26  Decedent and Z.B. know that any 'further behavior' would cause them to be expelled from the team.

27  For Z.B., any further sexual misconduct allegations would cause him to be kicked off the rowing

28  team. So, for Decedent, that means any further complaints of Z.B.'s alleged misconduct or the

-30-

team's failure to handle the same would lead to his expulsion.

167.179.    On February 24, 2020, Engblom approached Decedent and, in reference to the February 22nd call, stated, "[y]ou o.k.? That was some pretty embarrassing shit you were saying there."

168.180.    That day at practice, to further alienate Decedent from the team, Bond berated a coxswain for misstating a call the coach wanted. The furious coach shouted, "[w]ho the fuck said that?  Whoever said that is a fat coxswain--someone who goes over the coaches like [Decedent]! We already have a fat [Decedent]!  Don't be a fat [Decedent]! Fat [Decedent] goes above his coach's head and talks shit!"  This was one of many examples of Bond's pointed attacks aimed at Decedent's sensitivity regarding his weight. Bond berated the student athlete by likening her to Decedent, mocking the students' weight and deriding Decedent's "going over the coach's head."  Bond's abusive tirade was done to specifically deter Decedent, and other rowers, from further mentioning Z.B.'s alleged misconduct or the coaches' failure to report same.

169.181.    In late February 2020, the rowing team captains asked to speak with Decedent and two of his freshmen rowing friends after a morning practice. The captains implored Decedent to "lay off the situation with [Z.B.]" because, they claimed, they would handle the "situation" as elected captains and leaders of the team.

170.182.    The captains, like Bond and Engblom before them, claimed they had the Z.B. situation under control. Decedent and his friends were directed to maintain a "professional working relationship" with Z.B., and to "stay away from and ignore him."

171.183.    Decedent questioned whether the captains had "the situation" under control. Decedent informed them that he believed they did not but wanted to 'fit in' with the team.

172.184.    Decedent agreed he would try to steer clear of Z.B. and ignore him.

173.185.    Decedent also noted that Bond and Engblom were in earshot of the conversation with the captains, and that the captains were speaking to Decedent at the head coach's behest.

174.186.    Later that week, on February 27, 2020, Decedent was still rowing in the fourth boat with the less-competitive rowers when he and Z.B. got into another verbal altercation

-31-

regarding the boat lineups.  Decedent attempted to "stay away" from Z.B. and aimed to row in a different boat for that practice, in accordance with the coaches' directives.  Z.B. eventually won the argument and rowed in the same boat as Decedent.

175.187.      Toward the end of the contentious practice on February 27, 2020, Bond ordered Decedent and Z.B. to stand together in front of the team.  Bond berated Decedent in front of the team, along with Z.B., and treated them as equally detrimental to the team.  The head coach shouted, "Front and center!  This is it!  If the two of you can't get along, you'll both be kicked off the team.  Do I make myself clear?!"  Decedent responded in the affirmative, but the coach's grouping him with the accused sex offender and threatening to throw him off the team took its toll and his mental health worsened.

176.188.      Decedent's mental health continued to deteriorate as Bond continued to berate him in this fashion and kept Decedent in the fourth boat despite his rowing abilities and erg scores warranting his placement in one of the top three varsity boats.

177.189.      After being berated by Bond at the February 27, 2020, practice, Decedent met with a counselor who worked for CAPS, a mental health clinic at UCSD.

178.190.      Decedent was suffering immensely from a mental health perspective; he was constantly thinking about the "situation" on the rowing team and doubting his decisions.  He stated he would have quit Bond's team by that point, but rowing meant too much to him and he did not want to let the "situation" with Z.B., and Bond get in the way of his own aspirations.  Decedent decided to avoid Z.B. and continue on the rowing team, despite the negative effect it was having on his well-being.

179.191.      On March 3, 2020, Decedent received an email from Bond, with McGann copied, regarding Decedent and Z.B.'s conflicts at practice and Decedent's subsequent conversation with Bond.  The coach implored Decedent to "play nice" with Z.B., and that "any further conflict with [Z.B.] would result in removal of both of you from the team.  I am sure you can bring courtesy and professionalism to any necessary interactions with [Z.B.] and expect you to do so."

180.192.      The adverse conduct persisted through the final month of in-person learning at UCSD.

-32-

181.193.   On or about March 2, 2020, the rowers participated in a 2k meter erg test on the rowing machines.  Decedent was unhappy with his erg score and was speaking to his good friend, and roommate ("P.K"), in the snack room at the Spanos Training Facility.

182.194.   Decedent, speaking privately to P.K., stated he was unhappy with his rowing time, but felt he would do better next time since, Decedent posited, he had not been able to do an accurate 2k predictor session prior to the March 2nd test.

183.195.   Decedent was clearly taking accountability for his failure to practice the 2k prior to March 2, 2020. Bond appeared suddenly and abruptly asked Decedent, "So it's the training plan you're saying?"  Decedent answered, "Not at all."

184.196.   Bond then stormed off.  Decedent followed to explain himself and appease Bond.

185.197.   After Decedent left the snack room, Bond returned, stared right at P.K. and stated, "In this selection process I would be very careful who you are associating with…that kid is one foot out the fucking door!"  The coach then stormed out.

186.198.   Bond was aware that P.K. and Decedent were extremely close roommates, so the message would obviously get back to Decedent as intended.  Further, Bond was aware that P.K., like other freshmen "homies" of Decedent, had concerns about Z.B. and the allegations against him. The coach was therefore attempting to intimidate P.K., and any other rowers, who might be inclined to question the coaches' failure to report the allegations as Responsible Employees of UCSD.  Bond was utilizing the "selection process," of placing rowers in varsity boats, to deter rowers from challenging the head coach's decision to not report the allegations against Z.B. or from associating with Decedent.  The retaliation was aimed at Decedent, and in this instance, P.K., directly, as well asand the other rowers, generally.

199.   P.K. was also suffering from a mental health perspective due to Bond's berating him and attempting to isolate him from his best friend and roommate.  P.K. took Bond's comment to be a threat that if he associated with Decedent, he would not be in one of the varsity boat spots he earned.  P.K. was also fearful of reporting Z.B. based on the treatment Decedent received in the Spring 2020 semester.

-33-

200.   Later that week, A.G., a freshman walk-on rower of limited strength and size was receiving treatment for an injury and listening to the trainer's instructions. Bond mocked A.G. as he walked away from the trainer room in a blatant attempt to make him feel badly for receiving medical treatment, as Bond had previously done to UPenn rowers prior to the mutiny. Bond screamed in the small freshman's direction, "Can you fucking believe this kid?! God!" Bond previously accused a sophomore with a chronic hip injury of 'faking it.' Bond continually displayed a genuine disinterest in the health and well-being of his rowers.

187.201.      Bond's indifference to the well-being of his rowers would continue through the Covid-19 pandemic. On March 12, 2020, for example, after the great majority of schools, NCAA programs and professional sports teams were shutting down for the pandemic, Bond sent a threatening email to have his rowers meet the following morning March 13, 2020, for practice.

188.202.      Shortly after Bond's email to his team, the NCAA suspended activities across all sports programs until further notice.

189.203.      Decedent returned home to New York in March 2020.

204.   Although the rowing season, and in-school classes, were suspended for the rest of the Spring 2020 semester, Bond organized team Zoom meetings weekly from April through June, that were allegedly for the purpose of keeping the team communication going. Many of the rowers, however, including Decedent and his friends on the team dreaded the interactions as it was more of the same. Bond would grow aggravated easily and yell at the rowers for the slightest (manufactured) issue. Bond yelled at the student athletes for not speaking enough, or for not wearing appropriate attire, or participating in the Zoom video conference from bed. Multiple Zoom meetings over the remaining months of the Spring 2020 semester ended with Bond manufacturing rage, his favorite pastime, yelling at the rowers and then signing off abruptly. Decedent continued to be treated as an enemy of the team for questioning Bond, and his mental health continued to deteriorate as a result.

190.205.      Decedent told his close friends and former coaches of the abuse he suffered from his coaches, but largely kept the pain, confusion, and shame he was experiencing to himself, opting to avoid "bothering" his friends and family with the problems that, he felt, paled in comparison to the devastation wrought by the global pandemic.

-34-

1    191.206.    In April of 2020, Decedent filled out an allegedly anonymous UCSD survey
2  upon McGann's request, to receive feedback from the men's rowing team members.  Decedent
3  responded with twenty-three pages outlining Bond's misconduct and referencing the blatant
4  mishandling of the Title IX complaints against Z.B., namely Bond's failure to report the allegations
5  to Title IX as Responsible Employees as required by UCSD policy. Decedent's survey response
6  reiterated the aforementioned concerns he shared on the phone with McGann weeks earlier, the
7  aforementioned retaliation by Bond and Bond's repeated use of sexually inappropriate comments,
8  including telling rowers their boat had "a testicular problem", their word of the day was "flaccid"
9  and yelling at a student-athlete for "finger-fucking" her phone.

10    192.207.    In the April 2020 survey to the Athletic Department, Decedent also shared
11  his decision to forego medical treatment for a suspected concussion for fear of how Bond would
12  react, his belief that Bond's psychological abuse of him was "seemingly out of retaliation," and the
13  fact Decedent "was suffering immensely from a mental perspective" as a result of the psychological
14  abuse by Bond and the Z.B. situation, which had been created by Bond.

15    193.208.    Decedent further revealed, in the April 2020 survey, "I had a few fleeting
16  thoughts of suicide throughout the process but decided not to mention them because they didn't
17  seem like a major threat to me and I was afraid of the implications of revealing them."

18    194.209.    Decedent also described Bond's unceremonious exit from UPenn, the
19  aforementioned mutiny, as described by a member of the UPenn men's rowing team, and further
20  noted Bond's enumerated misconduct at UPenn caused Decedent to "notice a pattern!" referring to
21  Bond's tenure at UCSD.  McGann, and presumably Edwards, were therefore on notice of the end of
22  Bond's run as head coach at UPenn no later than the April 2020 survey.

23    195.210.    Neither McGann, nor Edwards, nor any other supervisor at Defendant UCSD
24  addressed the coaches' failure to report the sexual misconduct allegations to Title IX, or their abuse,
25  bullying, and harassment, including sexual harassment, by Bond, at any point in time McGann was
26  aware of the inappropriate insults and psychological abuse by Bond, as well as the mishandling of
27  the Title IX allegations against Z.B., particularly the coaches' failure to report same to Title IX
28  office, Bond's unceremonious exit from UPenn and Decedent's mental health struggles and suicidal

-35-

SecondFirst Amended Complaint

ideation no later than April 2020 survey.

196.211.   Decedent was not the only member of the men's rowing team to fill out the allegedly anonymous survey honestly.  Multiple rowers complained of Bond's mistreatment and abuse, as well as the negative effects they experienced as a result asSimilarly, Decedent was not the only member of the men's rowing team to suffer from mental health issues as a result of being subjected to Bond's abuse.

212.   McGann reviewed the Anonymous April 2020 surveys, including Decedent's, in which he discusses Bond's abusive behavior, the fact he felt at least some of said behavior was retaliatory in nature and, of course, the statements about the UPenn rower mutiny in 2019.

213.   According to Bond, however, he was not informed of the substance of the surveys, or Decedent's allegations about him, until after the filing of the instant suit in September 2021.

214.   Earlier that summer, in June of 2021, when Bond joined a Zoom meeting with McGann to discuss a contract extension for the upcoming year, he claims McGann apologized to him for the delay in discussing the contract extension and McGann further told Bond that she was investigating Bond's time at UPenn.  Bond claims this was the first time he had heard of any investigation into his prior employment at UPenn, which ended with the rower mutiny nearly two years earlier.

215.   McGann did, in fact, offer Bond the contract extension on June 18, 2021, despite reviewing the April 2020 Anonymous surveys, finally investigating Bond's time at UPenn no later than June of 2021, and, of course, Decedent's tragic passing.

197.216.   Back in Spring of 2020, when Decedent returned home to New York, heWhen he returned home to New York, Decedent struggled with his emotional well-being and, eventually, experienced mental illness.  The struggles emerged as a direct result of being subjected to Bond's severe, pervasive, objectively unreasonable harassment and abuse.

198.217.   After Decedent returned home to New York in mid-March, his mental health deteriorated and worsened in the months following as a direct result of Bond's abuse.  The awkward Zoom meetings with an angry Bond certainly did not help.

199.218.   Between March and July 2020, Decedent suffered from immense sadness,

-36-

paranoia, and disorientation.  Decedent was not enjoying his many interests, or life in general. Decedent brooded over the coaches' protection of Z.B. and, conversely, their punishment of him for speaking out against this choice.

200.219.    As these confusing, painful thoughts, and the effects of the coaches' mistreatment, continued to weigh on Decedent, he failed to take care of himself and spiraled out of control.  The recent Iron Man neglected to care for himself, skipping meals, workouts, and sleep. He self-medicated with drugs to escape as his mental health worsened.

201.220.    On July 21, 2020, after several days without sleep and minimal food, Decedent's fear, paranoia, and delusions reached dangerous levels.

202.221.    Prior to attending UCSD, Decedent was a healthy, happy young man.  Less than one year with Bond caused Decedent's mental health to deteriorate to the point of a schizophrenic and psychotic episode, necessitating hospitalization for in-patient mental health treatment.

203.222.    Decedent underwent intensive therapy and drug treatment, including medication to control the symptoms, emotional pain, psychosis, and schizophrenia caused by the abuse he suffered at UCSD.

204.223.    Decedent extensively discussed Bond, the "abusive" coach who was "fired from Penn," as well as the team's harboring a "sexual predator" rowing teammate.

205.224.    With the help of treatment providers and his family, Decedent reached a stable place toward the end of 2020, with his mental health struggles seemingly under control.

206.225.    As such, Decedent returned to UCSD in late December 2020, with plans to continue therapy on an outpatient basis.  Armed with this therapy, Decedent felt he was prepared to deal with the issues created by Bond and all the Defendants. Tragically, Decedent was mistaken.

207.226.    After Decedent returned to campus in December 2020, Bond continued to act in a retaliatory manner against Decedent. It was the last month of his young life.

208.227.    On or about December 16, 2020, Bond emailed Decedent to ask if he was committed to the UCSD rowing team or, alternatively, whether he was opting out for the upcoming Spring 2021 season.

-37-

209.228.    One week later, on or about December 23, 2020, Decedent informed the head coach that he was opting out of the upcoming rowing season, citing Covid-19 restrictions. Decedent's choice to take care of himself, to choose his health over the team and avoid the intense stress of rowing for UCSD, was difficult for him to make. He waited for a reassuring response from Bond, but decedent never received one. Bond continued his emotional exile of Decedent, much like the previous year where Bond encouraged Decedent's teammates to view him as an enemy of the rowing program, avoid associating with him and ignore him, in general.  Bond's well-honed psychological abuse and mind games had the desired effect, as the familiar stress and mental anguish returned to haunt Decedent.

210.229.    Bond continued to ignore Decedent as 2020 ended. The coach was aware Decedent was still overcoming severe mental health issues they themselves created. The emotional exile, and resultant loneliness, enveloped Decedent as he entered 2021.  The mental anguish and overwhelming sadness generated by Bond's psychological abuse and mind games created an uncontrollable impulse in Decedent to commit suicide.

211.230.    On January 4, 2021, Decedent took his own life.

231.    In the month immediately following Decedent's tragic death, Decedent's father, Brian Lilly, Sr., found the Anonymous April 2020 Survey in Decedent's bedroom at home.  He was taken aback to read about the treatment his son received, as well as his explicit mention of suicidal ideation and the circumstances of Bond's exit from UPenn.  Decedent's father forwarded the survey to Defendants, including  Provost Chilukuri on February 1, 2021.  The Provost assured Mr. Lilly that Defendants will follow up on the survey.

232.    Bond would continue to coach the UCSD men's rowing team for over another year after Decedent's passing and, according to him, did not discuss Decedent's survey answers with McGann or anyone else from UCSD until the following September of 2021.

233.    Bond was eventually fired on January 13, 2022, on a Zoom call with Edwards. Edwards allegedly told Bond, "I'm going to get right to the point.  I'm terminating your employment immediately.  I'd like to take the rowing program in a different direction."

**PLAINTIFFS' DAMAGES**

-38-

212.234.    As a direct and proximate result of Defendants' unconstitutional, illegal, and improper retaliatory conduct, Decedent suffered the worst possible fate, a wrongful death by his own hands, caused by Defendants.

213.235.    As a direct and proximate result of Defendants' conduct Decedent suffered from immense sadness, paranoia, and disorientation, as well as related psychosis, self-medication, sleeplessness, low appetite, fear, and delusions, fear of persecution, suicidal ideation, extreme emotional distress for which he required in-patient treatment and medication, and unthinkable anguish which eventually caused Decedent to experience an uncontrollable impulse to tragically take his own life.

214.236.    As a direct and proximate result of the above unlawful and retaliatory conduct by Defendants, Plaintiffs sustained damages, including, without limitation, pain, suffering and extreme emotional distress as described above, as well as loss of enjoyment of life, loss of companionship and related economic injuries and other direct and consequential damages.

**CLAIMS FOR RELIEF**

**AS AND FOR A FIRST CAUSE OF ACTION**

**Violation of Title IX of the Education Amendments of 1972 - Retaliation**

**(The Estate of Brian Lilly, Jr., Against Board of Regents of University of California)**

215.237.    Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

216.238.    Title IX of the Education Amendments of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. §1681(a).

217.239.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including UCSD.

218.240.    On information and belief, UCSD receives federal funding, including in the form of federal student loans given to students and is subject to the provisions of Title IX.

219.241.    Title IX is enforceable through a private right of action.

Formatted: Thick underline

220.242.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018).

221.243.   As reflected in such grievance procedures, and the law pertaining to Title IX, Retaliation against a person because they are asserting their rights under Title IX, or otherwise reporting sexual misconduct, is also prohibited.

222.244.   Retaliation is any adverse action against a person based on their report or other disclosure of alleged prohibited conduct under the UCSD sexual misconduct policy to a university employee, or their participation in, refusal to participate in, or assistance with the investigation, reporting, remedial, or disciplinary processes provided for in the policy.

223.245.   An adverse action is conduct that would discourage a reasonable person from reporting prohibited sexual misconduct or participating in a process provided for in the UCSD sexual misconduct policy, such as threats, intimidation, harassment, discrimination, and coercion.

224.246.   Bond engaged in a series of adverse actions against Decedent for his repeated disclosure of reports of Z.B.'s alleged sexual misconduct against UCSD students, including members of the female rowing team, to the coaches, Responsible Employees, and for Decedent's questioning the Responsible Employees' failure to report, to encourage them to do so.

225.247.   The adverse actions undertaken by Bond were made in direct response to Decedent's protected activity, disclosing sexual misconduct allegations to the coaches and urging them to report said allegations to the OPHD Title IX Office at UCSD. The adverse actions were done to expressly discourage Decedent, Decedent's 'homies' on the rowing team and other reasonable people from formally reporting, or otherwise disclosing the allegations against Z.B. The adverse actions included without limitation:

    a.   Subjecting Decedent, and other rowing team members, to more frequent and severe bullying, and verbal abuse consisting of personal attacks, sexually charged insults and mind games that were detrimental to the student athlete's well-being.  The

1  targeted bullying and verbal abuse of Decedent by Bond included sexually
2  inappropriate insults lodged at Decedent, calling him a "pussy," loudly questioning
3  Decedent's "manliness," "testicular" fortitude, and insufficient "testosterone levels,"
4  as well as pointed attacks at Decedent's weight described further below. Bond
5  attacked Decedent's integrity, character, and mental make-up, as he called the
6  teenager weak, untrustworthy, and immature, then unfairly challenged Decedent's
7  dedication to the rowing team. Bond considered Decedent's legitimate concerns with
8  the head coach's indifference to the mounting allegations against Z.B. as
9  insubordination and treason, so the challenges were mounted to tarnish Decedent's
10  reputation with the team and turn the other members of the rowing team against
11  Decedent.

12  b.  Bond made frequent "fat" jokes at Decedent's expense, like publicly chastising a
13  coxswain for being "a fat coxswain--someone who goes over the coaches like
14  [Decedent]!  We already have a fat [Decedent]!  Don't be a fat [Decedent]! Fat
15  [Decedent] goes above his coach's head and talks shit!"  Bond often called Decedent
16  fat, mocking his childhood obesity, and focusing on Decedent's weight as
17  problematic, in general, because he knew Decedent was sensitive about his weight
18  from middle school when he gained thirty plus pounds due to Juvenile Rheumatoid
19  Arthritis.  Further, the above abuse of the coxswain specifically refers to Decedent's
20  going "above his coach's head" to talk[s] shit", indicating both the motivation behind
21  Bond's increased attacks and an interest in deterring both Decedent and Decedent's
22  rowing teammates from reporting Z.B.'s allegations or Bond's failure to report same.

23  c.  Bond explicitly told Decedent he should not report the sexual misconduct allegations
24  against Z.B. He derisively told Decedent he "and his homies should act as if nothing
25  is wrong" with Z.B., claiming the coaches were handling it.  Bond also attempted to
26  scare Decedent into silence, claiming Z.B. was "dangerous" and had the ability to
27  seriously hurt the rowing team with the pictures of hazing he possessed from
28  "Freshmen Week."

-41-

d.   Decedent, and his homies (fellow concerned freshmen rowers), were also directed to "stay away" from Z.B., ignore Z.B. and treat him with professional courtesy.  They received these directives from Bond, Engblom, and the team captains at the head coach's urging, in response to Decedent's disclosing the increasing number of sexual misconduct allegations and Decedent's bravely questioning the coaches', and captains', failure to report said allegations against Z.B.

e.   After Decedent persisted in his disclosing, and encouraging reporting of, the mounting allegations of sexual misconduct by Z.B., Bond and Engblom lied to him to appear compliant as Responsible Employees after months of mounting allegations went unreported; Bond told Decedent the coaches' reported the sexual misconduct allegations to the appropriate channels and, again, warned Decedent to stay away from Z.B., with increasing intensity and adversarial spite.

f.   Shortly after Bond lied to Decedent, McGann called Decedent and told him not to investigate the claims against Z.B. himself.  The Assistant Athletic Director then told Decedent an investigation was in progress, which belied Bond's false claims of reporting the Title IX allegations to the appropriate channels at UCSD and that the investigation was closed with a finding of no misconduct.

g.   Bond also threatened to kick Decedent off the team if he could not treat Z.B. with respect and professional courtesy, both in-person and via e-mail with McGann cc'd.  Bond allegedly received advice to do same from McGann who told Bond how to either document team or student conduct violations, or to simply warn Decedent if he continues in his behavior (harping on mounting allegations against Z.B.) then he would be expelled from the team.  Similarly, Bond lumped Decedent and Z.B. together when the tension caused by Z.B.'s multiple allegations, Bond's unjustly relegating Decedent to the fourth boat and Decedent's repeated disclosure of the allegations to his coaches, as Responsible Employees at UCSD, resulted in heated disputes between Decedent and Z.B.   Bond treated Decedent and Z.B. as equally detrimental to the rowing team and berated them publicly in front of the entire rowing

-42-

team.

h.   Bond threatened the 19-year-old teenager Decedent with his "attorney" father, suggesting Decedent could be sued if he continued to question Bond's failure to report Z.B.'s alleged misconduct and the teams' collective lack of integrity for condoning the sexual misconduct.  Bond disingenuously deemed Decedent's genuine concerns with the unreported allegations, and potential effect on the rowing team, as a "threat."

i.   Bond directed a temper tantrum at Decedent, and stormed off in mock outrage, at a perceived criticism of the training program.  This childish drama was immediately followed by Bond screaming at Decedent's friend and roommate, P.K., in the training center snack room after practice. Bond shouted angrily at PK, in front of other rowers, and threatened, "In this selection process I would be very careful who you are associating with…that kid is one foot out the fucking door".  The 'selection process' referred to by Bond was the selection of rowers for the top 3, varsity boats. The threat was made to deter PK, and other rowers, from reporting Z.B.'s allegations, and/or the coaches failure to report, to Title IX.  It was also made to dissuade P.K., and other rowers from, befriending Decedent.  This is further evidence of Bond's successful efforts to ostracize Decedent as punishment for Decedent's reporting the allegations against Z.B. to Bond and questioning Bond's failure to report same.

j.   In addition to Bond's concerted efforts to turn the team against Decedent, and treat him as a pariah, Decedent was treated as if he was heading "out the door" in his banishment to the 4th, noncompetitive boat.  Bond and his subordinate coaches physically banished Decedent from the varsity team boats (boats 1-3), despite Decedent's performance (erg scores) qualifying him for placement in one of the top 3 varsity boats.  Decedent was forced to practice with the fourth boat, the less competitive group, whom Bond paid little to no attention to as further retaliation and efforts to punish Decedent. Decedent was stuck with the weaker rowers, including Z.B., in their fourth boat, despite frequent warnings to "stay away" from Z.B.  Upon

SecondFirst Amended Complaint

information and belief, this was a practice of Bond's which he engaged in at UPenn as well. Bond's relegation of Decedent to the noncompetitive boat, like his suggestion to leave practice and get medical treatment (which Bond openly despised) were punishment for Decedent's disclosing the mounting sexual misconduct allegations against Z.B. to Bond and raising his concerns of the coaches' failure to report same to Title IX. The adverse consequences suffered by Decedent in his pursuit of rowing in a DI program, were engineered by Bond specifically to dissuade Decedent, and the other student athletes on the rowing team, from reporting the allegations against Z.B. The physical banishment was one of many examples of the exile inflicted upon Decedent as retaliatory punishment orchestrated by Bond.

k.   Decent experienced frequent emotional exile, by Bond, as well as the coaches, captains, and upper classmen Bond controlled; he was also called a traitor and treated as a pariah, because he spoke out against the coaches' failure to report the Title IX allegations against Z.B. Bond poisoned the student athletes' perception of Decedent, accusing him of disloyalty and insubordinate conduct detrimental to the team. There was no greater insult to a loyal teammate like Decedent, than accusing him of conduct detrimental to the team.  As such, the social ostracism wore greatly on Decedent and would continue through the covid-19 pandemic through Decedent's returning to UCSD, post-hospitalization and in-patient treatment, in December 2020.  Decedent emailed Bond to advise he would be opting out for the Spring 2021 semester due to health concerns (citing covid-19).  Decedent did not receive a response from Bond, as the continued radio silence and deliberate cold shoulder of the head coach served as the final indignity to the vulnerable Decedent.

248.   McGann, according to Bond, not only had knowledge of Bond's retaliation, but she advised him on how to retaliate against Decedent, threatening to kick him off the team if he did not stop reporting Z.B.'s mounting allegations in February 2020.  She also allegedly told Decedent to stop looking into the sexual assault claims against Z.B.

249.   McGann failed to respond to, or intervene, in Bond's constant abuse of Decedent

-44-

SecondFirst Amended Complaint

even after observing Bond in action in February 2020, reviewing Decedent's Anonymous April 2020 survey outlining Bond's retaliatory conduct and abuse as well as Decedent's suicidal ideation and the details of the UPenn mutiny; yet McGann did nothing to protect Decedent and/or the other rowers from Bond.  According to Bond, McGann did not even discuss the survey answers with Bond until September 2021.

226.250.     As a direct and proximate result of Defendants' conduct Decedent suffered from immense sadness, paranoia, and disorientation, as well as related episodes of schizophrenia and psychosis, self-medication, sleeplessness, low appetite, fear, paranoia, and delusions, fear of persecution, suicidal ideation, extreme emotional distress for which he required in-patient treatment and medication, and unthinkable anguish which eventually caused an uncontrollable impulse in Decedent to tragically take his own life.

227.251.     As a direct and proximate result of the above unlawful and retaliatory conduct by Defendants, Plaintiff Decedent sustained damages, including, without limitation, pain, suffering and extreme emotional distress as described above, as well as loss of enjoyment of life, loss of companionship and related economic injuries and other direct and consequential damages.

228.252.     The adversarial conduct towards Decedent, by Bond, as well as the rowing team coaches, captains and upper classmen under his control, was done in retaliation for his pushing the team leaders to report allegations of Z.B.'s prohibited sexual misconduct and Decedent's questioning Defendants' lack of response for same.

229.253.     Said adversarial conduct, the frequent mean-spirited insults, mind games, unfair relegation of Decedent off the varsity boats and the emotional exile, caused Decedent to experience severe deterioration of his mental health over months culminating in a psychotic episode and diagnosis of schizophrenia, which necessitated intensive, in-patient mental health treatment. The targeted abuse and retaliation launched by Bond ultimately caused Decedent to experience an uncontrollable impulse to tragically take his own life.

230.254.     As a result, Decedent's Estate, is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UCSD to remedy the effects of Bond's abuse, retaliation and the

hostile education environment and take steps to ensure same shall not happen again.

**AS AND FOR A SECOND CAUSE OF ACTION**

**Violation of Title IX of the Education Amendments of 1972 – Deliberate Indifference**

**(The Estate of Brian Lilly, Jr., Against Board of Regents of University of California)**

255.   Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

256.   Title IX of the Education Amendments of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. §1681(a).

257.   Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including UCSD.

258.   On information and belief, UCSD receives federal funding, including in the form of federal student loans given to students and is subject to the provisions of Title IX.

259.   Title IX is enforceable through a private right of action.

260.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018).

261.   As reflected in such grievance procedures, and the law pertaining to Title IX, where a school is deliberately indifferent to student on student, or teacher on student, sexual harassment or assault, it forms an independent basis for a Title IX claim.

262.   A plaintiff alleging a Title IX deliberate indifference claim against a school must establish five elements: (1) the school exercised substantial control over both the harasser and the context in which the known harassment occurred; (2) the plaintiff must have suffered harassment that is so severe, pervasive and objectively offensive that it can be said to deprive the plaintiff of

-46-

1    access to the educational opportunities or benefits provided by the school; (3) a school official with

2    authority to address the alleged discrimination and to institute corrective measure on the school's

3    behalf must have had actual knowledge of the harassment; (4) the school must have acted with

4    deliberate indifference to the harassment, so that the school's response to the harassment or lack

5    thereof was clearly unreasonable in light of the known circumstances; and (5) the school's deliberate

6    indifference must have subjected the plaintiff to harassment.

7        263.    Bond harassed Decedent, and other rowers, incessantly throughout the Spring 2020

8    semester.  In addition to the retaliatory abuse above, Bond made frequent comments about Decedent

9    and his teammate's insufficient testicles, 'flaccid' body parts, lack of testosterone and the other

10   aforementioned macho male stereotypes, or lack thereof.

11       264.    McGann, and her direct boss A.D. Edwards, were made aware of the inappropriate

12   comments no later than the April 2020 surveys, however Decedent clearly spoke with her about

13   Bonds' abuses in February 2020 as well.

14       265.    McGann's failure to respond or address the survey responses with Bond, or his use

15   of sexual language to harass the men's rowing team, is much like her failure to investigate the

16   circumstances surrounding Bond's exit from his previous employer, UPenn, as they all reflect a

17   deliberate indifference to the effects of Bond's abuse and the well-being of Decedent and his

18   teammates.

19       266.    The deliberate indifference was clearly unreasonable in light of the known

20   circumstances—the out of control, abusive rowing coach terrorizing Decedent and other rowers.

21       267.    Since McGann knew of Bond's harassment as early as February 2020, her

22   indifference subjected Decedent and his teammates to additional harassment through the next year

23   (including the uncomfortable Zoom conferences from March 2020 to June 2020).

24       268.    Even if the Honorable Court finds McGann learned of the aforementioned abuses

25   with the April 2020 Survey, then Bond still harassed Decedent and his rowing teammates on the

26   post-March 2020 Zoom conferences.

27       269.    As a direct and proximate result of Defendants' deliberate indifference to Bond's

28   harassment, Decedent suffered from immense sadness, paranoia, and disorientation, as well as

-47-

1  related episodes of schizophrenia and psychosis, self-medication, sleeplessness, low appetite, fear,

2  paranoia, and delusions, fear of persecution, suicidal ideation, extreme emotional distress for which

3  he required in-patient treatment and medication, and unthinkable anguish which eventually caused

4  an uncontrollable impulse in Decedent to tragically take his own life.

5       270.    As a direct and proximate result of the above unlawful deliberate indifference by

6  Defendants, Plaintiff Decedent sustained damages, including, without limitation, pain, suffering

7  and extreme emotional distress as described above, as well as loss of enjoyment of life, loss of

8  companionship and related economic injuries and other direct and consequential damages.

9       271.    The deliberate indifference by McGann and Edwards, regarding Bond's harassment

10  of Decedent, as well as harassment of Decedent by Bond's acolytes, the rowing team coaches,

11  captains and upper classmen under his control.

12       272.    Additionally, Bond (and to a lesser extent McGann) could also be said to be

13  deliberately indifferent to Z.B.'s sexual harassment and abuses, of the subject female students and

14  Decedent.

15       273.    Defendant's deliberate indifference caused Decedent to experience severe

16  deterioration of his mental health over months culminating in a psychotic episode and diagnosis of

17  schizophrenia, which necessitated intensive, in-patient mental health treatment.  The targeted abuse

18  and retaliation launched by Bond ultimately caused Decedent to experience an uncontrollable

19  impulse to tragically take his own life.

20       274.    As a result, Decedent's Estate, is entitled to damages in an amount to be determined

21  at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as

22  injunctive relief directing UCSD to remedy the effects of Bond's abuse, retaliation and the hostile

23  education environment and take steps to ensure same shall not happen again.

24       275.

25  **AS AND FOR A THIRD CAUSE OF ACTION**

26  **42 U.S.C. §1983: Violation of Fourteenth Amendment–Denial of Equal Protection**

27  **Sexual Harassment/Hostile Education Environment**

28  **(The Estate of Brian Lilly, Jr., Against the Individual Defendants Bond, McGann and**

-48-

**Edwards, in their Individual Capacities)**

231.276.    Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

232.277.    In addition to the rights and protected interests discussed herein, a person has an equal protection right to an educational environment free of hostility. A hostile education environment is present when a person subjectively perceives the environment as hostile or abusive, and the environment is objectively hostile and abusive, permeated with discriminatory intimidation, ridicule, and insult…that is sufficiently severe or pervasive to alter the conditions of the person's educational environment. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65 (1986).

233.278.    Decedent was a male student rower, a member of a protected class, and was the subject of gender discrimination in the form of sexual harassment by Bond as described above, and reasonably perceived the environment at UCSD as hostile and abusive from October 2019, until he tragically took his own life at UCSD on January 4, 2021, as a result of the hostility.

234.279.    The hostility and abuse originated from Bond, and certain coaches and team members under the bully coaches' charge.  Bond, however, was the main perpetrator of sexual harassment in his repeated use of explicit, sexually inappropriate language uttered specifically to make Decedent, and his rowing teammates, feel uncomfortable.   The repeated challenges to Decedent, and his teammates, manhood, described herein and below, were indicative of Bond's pattern of abuse, mind games and bullying used to instill fear and insecurity in the student athletes, a practice Bond brought from prior coaching positions, including UPenn. The insults, psychological abuse and mind games, are particularly deplorable as the head coach's behavior was contrived, honed over many years and student athletes.

235.280.    The hostility and abuse increased dramatically, in severity and frequency, towards Decedent after he reported and commented on the Title IX complaints lodged against Z.B., as Bond took adverse actions directly against Decedent as described in the First Cause of Action.

281.    The harassment Decedent received was differential treatment than the lesser abuses suffered by certain members of the rowing team.

236.282.    The hostility and abuse described herein included, but was not limited to, the

-49-

following:

a.   Subjecting Decedent, and other rowing team members, to severe bullying and verbal abuse consisting of personal attacks, sexually charged insults and mind games that were detrimental to the student athlete's well-being.  The targeted bullying and verbal abuse of Decedent and his fellow rowers by Bond included sexually inappropriate insults lodged at the student athletes, often calling Decedent a "pussy," as well as loudly questioning Decedent's "manliness", mocking Decedent and his teammate's "testicular problem", insufficient "testosterone levels," and ridiculing the freshman rowers for being "flaccid."  Bond would further harass the rowers by creepily standing over them and screaming "Who's your daddy?!" in a manner which made the students feel uncomfortable.  Bond chastised a teammate of Decedent's, a coxswain after a minor timing error by shouting, "Maybe if you weren't finger fucking your phone that wouldn't have happened!"

b.   Bond frequently mocked the weight of certain rowers, but he was particularly focused on launching "fat" jokes at Decedent for the head coach knew Decedent was particularly sensitive about his weight from childhood obesity. Bond made frequent "fat" jokes at Decedent's expense, like publicly chastising a coxswain for being "a fat coxswain--someone who goes over the coaches like [Decedent]! We already have a fat [Decedent]!  Don't be a fat [Decedent]! Fat [Decedent] goes above his coach's head and talks shit!"  The body shaming, like the sexually inappropriate insults above, were made by Bond specifically to antagonize Decedent and his rowing teammates.  The insults were all part of a well-practiced plan by the head coach to control, intimidate and psychologically abuse the student athletes he was paid to coach.

c.   Bond played frequent mind games with Decedent, along with the above insults and demeaning harassment, with the clear purpose of causing Decedent physical pain and mental anguish. The coaches encouraged Decedent to train hard, to excess and past the point of exhaustion, until he vomited on multiple occasions. Then, after

SecondFirst Amended Complaint

glorifying the unhealthy practice and deliberately enticing the eager-to-please teenager to vomit to prove himself to his coaches, Bond and Engblom laughed at Decedent informing him "puking was for pussies." The despicable harassment by Bond increased in intensity after Decedent began to question the coaches' response, or lack thereof, to sexual misconduct allegations against Z.B.

d.    Decent experienced frequent emotional exile, by Bond, as well as the coaches, captains, and upper classmen he controlled; he was also called a traitor and treated as a pariah, because he spoke out against the team's failure to report the Title IX allegations against Z.B. The intentional ostracism was part of a larger plan to abuse Decedent for Bond's twisted pleasure and addiction to rage.

237.283.    The above abuse and hostility, and sexually inappropriate attacks, were known by McGann who was present for certain practices and rowing team events. McGann was advised of at least some of the hostility and abuse by Decedent in January to February 2020, and made aware of all of the hostility, abuse and sexually inappropriate attacks no later than the "anonymous" April 2020 surveys submitted to the Athletic Department by Decedent and at least some of his rowing teammates.

238.284.    McGann reviewed Decedent's responses to the survey questions, including the specific sexually inappropriate comments, Bond's failure to report allegations of sexual misconduct against Z.B., Bond's retaliation against Decedent, Bond's unceremonious exit from UPenn as well as Decedent's struggling from a mental health perspective, including suicidal ideation, as a direct result of the psychological abuse and harassment by Bond.

239.285.    Upon information and belief, Edwards, as McGann's direct boss, was made aware of these troubling responses from Decedent in the April 2020 survey, and from other members of the rowing team. Edwards and McGann had actual knowledge of Decedent's responses, yet Bond remained in his head coaching position, with unchecked access to student athletes and the ability to continue to abuse and harass said students from, at a minimum, April 2020 through December 2021.

240.286.    McGann and Edwards, administrative officials with authority to take action against Bond, had actual knowledge of and failed to fire or punish Bond for the misconduct

-51-

described herein and thereby allowed Bond's sexual harassment, psychological abuse and retaliatory conduct, to continue unchecked.  McGann and Edwards' response to Bond's misbehavior was so inadequate as to show deliberate indifference, at a minimum, if not tacit authorization of the offensive practices by the head coach they hired.

241.287.    The constant abuse and hostility, on the part of Bond, and those under his control, as well as McGann and Edwards' deliberate lack of response to same, caused Decedent to suffer severe mental health struggles, seek intensive, inpatient mental health treatment, as described in detail herein, and ultimately created an uncontrollable impulse in Decedent to tragically take his own life.

242.288.    The hostile environment at UCSD affected Decedent to the point that it caused him to tragically take his own life upon returning to campus and experiencing further psychological abuse from Bond.

289.   McGann and Edwards, as described further above, were deliberately indifferent to the plight of Decedent, subjecting him to further harassment after February, but not later than April, of 2020.

243.290.    The Individual Defendants failed to provide Decedent with the equal protection and freedom from a hostile educational environment that they were required to provide students at their state university.

244.291.    Defendants, as well as other agents, representatives, and employees of UCSD were acting under color of state law when they showed intentional, outrageous, and reckless disregard for the constitutional rights of the Plaintiffs' Decedent.

245.292.    As a result of these equal protection violations, Plaintiff's Decedent suffered from immense pain, suffering and emotional anguish, which caused Decedent to experience an uncontrollable impulse to commit suicide, as well as other non-economic and economic damages.

246.293.    As a direct and proximate result of Defendants' conduct Decedent suffered from immense sadness, paranoia, and disorientation, as well as related schizophrenia, psychosis, self-medication, sleeplessness, low appetite, fear, and delusions, fear of persecution, suicidal ideation, extreme emotional distress for which he required in-patient treatment and medication, and

unthinkable anguish which eventually caused Decedent to tragically take his own life.

247.294.    As a direct and proximate result of the above unlawful conduct by Defendants, Plaintiff Decedent sustained damages, including, without limitation, pain, suffering and extreme emotional distress as described above, as well as loss of enjoyment of life, loss of companionship and related economic injuries and other direct and consequential damages.

248.295.    Decedent was entitled to equal protection, freedom from discrimination and an educational environment free of hostility and abuse. Decedent was deprived of such equal protection, and freedom from the hostile educational environment that was and is UCSD.

249.296.    As a result, Decedent's Estate, is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UCSD to remedy the effects of Bond's abuse, retaliation and the hostile education environment and take steps to ensure same shall not happen again.

**AS AND FOR A FOURTH CAUSE OF ACTION**

~~AS AND FOR A THIRD CAUSE OF ACTION~~

**42 U.S.C. §1983: Violation of Fourteenth Amendment– Denial of Substantive Due Process**

**(Plaintiffs Brian Lilly Sr., and Brenda Lilly, Individually Against the Individual Defendants Bond, McGann and Edwards, in their Individual Capacities)**

250.297.    Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

251.298.    In addition to the rights and protected interests stated above, a person has a protected liberty interest in his bodily integrity. "Every violation of a person's bodily integrity is an invasion of his or her liberty." *Washington v. Harper*, 494 U.S. 210, 237 (1990). There are both "physical and intellectual" dimensions to that liberty. *Id.* "The invasion is particularly intrusive if it creates a substantial risk of permanent injury and premature death." *Id.*

252.299.    A decedent's parents generally have the right to assert substantive due process claims under the Fourteenth Amendment, including for loss of companionship and society of their child. *See Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1057 (9th Cir. 2018).

253.300.    The judicially enforceable Fourteenth Amendment interests "stem [] from the

-53-

emotional attachments that derive from the intimacy of daily association, and from the role it plays in promoting a way of life through the instruction of children." *Wheeler* 894 F.3d at 1058 (quoting *Lehr v. Robertson*, 463 U.S. 248, 256-61 (1983)).

254.301.    Decedent had such a relationship with his parents, the Plaintiffs.  Plaintiffs certainly developed the emotional attachments that derive from the intimacy of parenting and promoting a way of life through their instruction and raising of Decedent, with whom they were extremely close throughout his life.

255.302.    Plaintiffs therefore assert a substantive due process claim for loss of companionship of their son, the decedent, under the Fourteenth Amendment.

256.303.    The constant abuse and hostility, on the part of Bond, and those acting at his direction and under his control, as well as McGann and Edwards' deliberately indifferent failure to respond to same in a meaningful manner to remove the threat of Bond, caused Decedent to suffer severe mental health struggles, seek intensive mental health treatment, as described herein, and ultimately caused Decedent to experience an uncontrollable impulse to tragically take his own life.

257.304.    The relentless, abusive, harassing and retaliatory conduct, including the constant psychological abuse, by Bond against Decedent, as well as McGann and Edwards' failure to respond to same despite being fully apprised of both the psychological abuse of Decedent by Bond and Decedent's deteriorating mental health as a result (including suicidal ideation),affected Decedent to the point that it caused him to experience an uncontrollable impulse to tragically take his own life upon returning to campus.

258.305.    Defendants failed to provide Decedent with the safety, well-being, and freedom from a hostile educational environment, that they were required to provide Decedent as a student at their state university. In doing so, Defendants also deprived Plaintiffs of substantive due process, as parents of Decedent.

259.306.    Defendants, as well as other agents, representatives, and employees of UCSD were acting under color of state law when they showed intentional, outrageous, and reckless disregard for the constitutional rights of Plaintiffs and Plaintiffs' Decedent.

260.307.    As a result of these due process and equal protection violations, Plaintiffs

-54-

continue to suffer ongoing harm, including loss of companionship, pain, suffering and emotional anguish as well as other non-economic and economic damages.

261.308.    As a direct and proximate result of Defendants' conduct Decedent suffered from immense sadness, paranoia, and disorientation, as well as related schizophrenia, psychosis, self-medication, sleeplessness, low appetite, fear, and delusions, fear of persecution, suicidal ideation, extreme emotional distress for which he required in-patient treatment and medication, and unthinkable anguish which eventually caused Decedent to tragically take his own life.

262.309.    As a direct and proximate result of the above unlawful and retaliatory conduct by Defendants, Plaintiffs sustained damages, including, without limitation, pain, suffering and extreme emotional distress as described above, as well as loss of enjoyment of life, loss of companionship and related economic injuries and other direct and consequential damages.

263.310.    As a result, Plaintiffs are entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A FIFTHFOURTH CAUSE OF ACTION**

**Wrongful Death**

**(Plaintiffs, Individually and on behalf of The Estate of Brian Lilly, Jr., Against the Individual Defendants Bond, McGann and Edwards, in their Individual Capacities)**

264.311.    Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

265.312.    Bond bullied, harassed, and psychologically abused Decedent so thoroughly that Decedent, who never suffered from mental health issues before his freshman year, suffered from the worsening mental health, requiring treatment and medication, described herein.  Decedent was unable to recover from these mental health issues and sadly took his own life upon returning to UCSD in January 2021.

266.313.    McGann and Edwards, administrative officials with authority to take action against Bond, had actual knowledge of and failed to fire or punish Bond for the intentional misconduct described herein and thereby allowed Bond's sexual harassment, psychological abuse and retaliatory conduct toward Decedent, to continue unchecked.  McGann and Edwards' response

-55-

to Bond's misbehavior was so inadequate as to show deliberate indifference, at a minimum, if not tacit authorization of the offensive practices by the head coach they hired and then failed to appropriately supervise. McGann and Edwards' failure to respond to Bond's intentional misconduct, including the failure to fire or even investigate Bond after reviewing the April 2020 "anonymous" surveys, contributed to Decedent's experiencing an uncontrollable impulse to tragically take his own life when he returned to UCSD and Bond's psychological abuse in December 2020 and January 2021.

267.314.    Bond's intentional, wrongful conduct aimed at Decedent, and McGann and Edwards deliberately indifferent response to same, directly caused the wrongful death of Decedent.

268.315.    As a direct and proximate result of the Individual Defendants' conduct, Decedent suffered from immense sadness, paranoia, and disorientation, as well as related schizophrenia, psychosis, self-medication, sleeplessness, low appetite, fear, delusions, fear of persecution, suicidal ideation, extreme emotional distress for which he required in-patient treatment and medication, and unthinkable anguish which eventually caused Decedent to tragically take his own life, upon returning to UCSD and Bond's psychological abuse in December 2020 and January 2021.

269.316.    As a direct and proximate result of the above unlawful and retaliatory conduct by Defendants, Plaintiffs sustained damages, including, without limitation, pain, suffering and extreme emotional distress as described above, as well as loss of enjoyment of life, loss of companionship and related economic injuries and other direct and consequential damages.

270.317.    The constant abuse and hostility, on the part of Defendants, especially Bond, and those under his control, caused Decedent to suffer severe mental health issues, seek intensive mental health treatment, as described herein, and ultimately caused Decedent to develop an irresistible impulse to tragically take his own life.

271.318.    As a result of Defendants' unlawful, unconstitutional misconduct in causing Decedent's wrongful death, Plaintiffs continue to suffer ongoing harm, including loss of companionship, pain, suffering and emotional anguish as well as other non-economic and economic damages.

272.319.   As a direct and proximate result of Defendants' conduct Decedent suffered from immense sadness, paranoia, and disorientation, as well as related schizophrenia, psychosis, self-medication, sleeplessness, low appetite, fear, paranoia, and delusions, fear of persecution, suicidal ideation, extreme emotional distress for which he required in-patient treatment and medication, and unthinkable anguish which eventually caused Decedent to tragically take his own life.

273.320.   As a direct and proximate result of the above unlawful and retaliatory conduct by Defendants, Plaintiffs sustained damages, including, without limitation, pain, suffering and extreme emotional distress as described above, as well as loss of enjoyment of life, loss of companionship and related economic injuries and other direct and consequential damages.

274.321.   As a result, Plaintiffs are entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A SIXTHFIFTH CAUSE OF ACTION**

**Negligent Hiring**

**(The Estate of Brian Lilly, Jr., Against the Individual Defendants McGann and Edwards, in their Individual Capacities)**

275.322.   Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

276.323.   Upon information and belief, McGann led the process that resulted in the hiring of Bond.

277.324.   Upon information and belief, McGann, as Associate Athletic Director, worked for and was supervised by Athletic Director Earl W. Edwards, who is responsible for the hiring of each employee, agent and coach working in UCSD athletics.

278.325.   McGann, upon information and belief, performed an insufficient background check into Bond and thus failed to uncover his abusive, inappropriate bullying of student-athletes who rowed for him at previous educational institutions.

279.326.   McGann either failed to uncover the rowers' protest of Bond at UPenn which, upon information and belief, caused Bond to leave the coaching position at UPenn, or, alternatively,

-57-

knew of the rowers' protest and ignored same, before hiring Bond.

280.327.    In either instance, McGann did not obtain or utilize readily accessible information regarding Bond's prior abuse, bullying and harassment of rowers he 'coached' at previous institutions. Said information was easily accessible as Decedent, and many of his freshman teammates, were easily able to uncover the UPenn protest, and Bond's inappropriate, unhealthy, and mentally unstable behavior, from associates across the country in the close-knit rowing community.

281.328.    McGann, and her supervisor Edwards, were therefore negligent in their hiring of Bond.

282.329.    Upon information and belief, McGann was a direct supervisor of Bond.

283.330.    Edwards, as Athletic Director, is McGann's supervisor and responsible for all employees within the Athletic Department at UCSD.

284.331.    McGann and Edwards were aware of the abuse, bullying, and harassment described herein, as well as the coaches' failure to follow UCSD OPHD's Title IX reporting protocols as Responsible Employees.

285.332.    McGann and Edwards failed to discipline Bond and otherwise permitted the coach to terrorize and abuse the student athletes at UCSD.

286.333.    The negligent hiring, and supervision, of Bond, by McGann and Edwards, resulted in the constant abuse and bullying of Decedent, and other rowing team members, by Bond and those under his control. This failure was a direct and proximate cause of Decedent's newfound, severe mental health struggles, which caused Decedent to seek intensive mental health treatment, as described herein, and further caused Decedent to tragically take his own life.

287.334.    Defendants failed to perform a sufficient search for an appropriate coach of UCSD men's rowing program and, instead, hired Bond without recognizing the clear, and obvious danger to which he exposed their student athletes.

288.335.    Defendants compounded the hiring failure by failing to appropriately supervise Bond, particularly McGann and Edwards as the coaches' supervisors, as described further below.

289.336.    Defendants McGann and Edwards, owed Decedent, and all students, a duty

-58-

1    to maintain a safe environment, free from the hostility, abuse, bullying, psychological warfare and

2    retaliation described herein.

3       290.337.       Defendants owed UCSD students a safe environment, and had a duty to hire

4    employees, agents, and coaches, who would maintain said safe environment as well.

5       291.338.       The negligence of Defendants McGann and Edwards, therefore contributed

6    to the hostile educational environment described herein.

7       292.339.       As a result of Defendants', McGann's and Edwards' negligence, negligent

8    hiring and negligent supervision of Bond, Decedent suffered tremendous harm, including loss of

9    companionship, pain, suffering and emotional anguish as well as other non-economic and economic

10    damages.

11       293.340.       As a direct and proximate result of Defendants' conduct, Decedent suffered

12    from immense sadness, paranoia, and disorientation, as well as related psychosis, self-medication,

13    sleeplessness, low appetite, fear, and delusions, fear of persecution, suicidal ideation, extreme

14    emotional distress for which he required in-patient treatment and medication, and unthinkable

15    anguish which eventually caused Decedent to tragically take his own life.

16       294.341.       As a direct and proximate result of the above negligent, unlawful, and

17    retaliatory conduct by Defendants, Decedent sustained damages, including, without limitation,

18    pain, suffering and extreme emotional distress as described above, as well as loss of enjoyment of

19    life, loss of companionship and related economic injuries and other direct and consequential

20    damages.

21       295.342.       As a result, Decedent's Estate, is entitled to damages in an amount to be

22    determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

23                 **AS AND FOR A SEVENTHSIXTH CAUSE OF ACTION**

24                         **Negligent Supervision**

25    **(The Estate of Brian Lilly, Jr., Against the Individual Defendants McGann and Edwards, in**

26                          **their Individual Capacities)**

27       296.343.       Plaintiffs repeat and reallege each and every allegation hereinabove as if

28    fully set forth herein.

1    297.344.    Upon information and belief, McGann led the process that resulted in the

2    hiring of Bond.

3    298.345.    Upon information and belief, McGann, as Associate Athletic Director,

4    worked for and was supervised by Athletic Director Earl W. Edwards.

5    299.346.    Upon information and belief, McGann was a direct supervisor of Bond.

6    300.347.    Upon information and belief, Edwards, as Athletic Director, was McGann's

7    supervisor and responsible for all employees within the Athletic Department at UCSD.

8    301.348.    McGann and Edwards were aware of the abuse, bullying, and harassment

9    described herein, as well as the coaches' failure to follow UCSD OPHD's Title IX reporting

10   protocols as Responsible Employees.  McGann and Edwards were made aware of Bond's abuse,

11   bullying and harassment of Decedent, including the sexually inappropriate insults and retaliatory

12   conduct, as well as Bond's unceremonious exit from UPenn, Bond's failure to report Z.B.'s

13   allegations of sexual misconduct to Title IX, Bond's retaliatory conduct toward Decedent for

14   reporting same and questioning Bond's failure to do so, and Decedent's mental health struggles (and

15   suicidal ideation) no later than April of 2020 upon reviewing Decedent's responses to the

16   "anonymous" survey.

17   302.349.    McGann and Edwards failed to discipline Bond and otherwise permitted the

18   coach to terrorize and abuse the student athletes at UCSD, including Decedent.

19   303.350.    The negligent supervision of Bond, by McGann, Edwards and remaining

20   Defendants, resulted in the constant abuse and bullying of Decedent, and other rowing team

21   members, by Bond, and those under his control.  This failure was a direct and proximate cause of

22   Decedent's newfound, severe mental health struggles, which caused Decedent to seek intensive

23   mental health treatment, as described herein, and, further, caused Decedent to experience an

24   uncontrollable impulse to tragically take his own life.

25   304.351.    Defendants McGann and Edwards failed to perform a sufficient search for an

26   appropriate coach of UCSD men's rowing program and, instead, hired Bond despite the clear, and

27   obvious danger to which they exposed their student athletes.

28   305.352.    Defendants McGann and Edwards compounded the hiring failure by failing

-60-

to appropriately supervise Bond or fire him upon reviewing Decedent's response to the April 2020 "anonymous" survey. McGann and Edwards, as the coaches' supervisors, willfully ignored Bond's abusive tactics, harassment and bullying as well as both coaches' ignoring their duties as Responsible Employees who were required to report the allegations of sexual misconduct against Z.B.

306.353.   Defendants McGann and Edwards, owed Decedent, and all students, a duty to maintain a safe environment, free from the hostility, abuse, bullying, psychological warfare and retaliation described herein.  Defendants owed UCSD students a safe environment, and had a duty to supervise UCSD employees, agents, and coaches, to ensure the employees, agents and coaches maintain said safe environment as well.

307.354.   The negligence of Defendants McGann and Edwards, therefore acted as tacit approval of Bond's intentional wrongful conduct towards Decedent and contributed to the hostile educational environment described herein.

308.355.   As a result of Defendants McGann and Edwards' negligence, negligent hiring and negligent supervision of Bond, Plaintiff's Decedent experienced extreme pain, suffering and emotional anguish as well as other non-economic and economic damages.

309.356.   As a direct and proximate result of Defendants' conduct, Decedent suffered from immense sadness, paranoia, and disorientation, as well as related psychosis, self-medication, sleeplessness, low appetite, fear, paranoia, and delusions, fear of persecution, suicidal ideation, extreme emotional distress for which he required in-patient treatment and medication, and unthinkable anguish which eventually caused Decedent to experience an uncontrollable impulse to tragically take his own life.

310.357.   As a direct and proximate result of the above negligent, unlawful, and retaliatory conduct by Defendants, Decedent sustained damages, including, without limitation, pain, suffering and extreme emotional distress as described above, as well as loss of enjoyment of life, loss of companionship and related economic injuries and other direct and consequential damages.

311.358.   As a result, Decedent's Estate, is entitled to damages in an amount to be

determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons, Plaintiffs demand judgment against Defendants as follows:

(i)    On the first cause of action for Violation of Title IX of the Education Amendments of 1972 (Retaliation), a judgment against Board of Regents of University of California, awarding Plaintiffs damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Board of Regents of University of California to terminate Geoff Bond, Katie McGann and Earl W. Edwards and prevent them from employment within the University of California system and declare all the individual defendants as a danger to the University of California students and community; and retain a third-party monitor independent from the University of California system to field anonymous calls from athletes who seek to complain of abuse by coaches and/or school officials and to take further steps to expose and prevent abuse of students;

(ii)    On the second cause of action for Violation of Title IX of the Education Amendments of 1972 (deliberate indifference), a judgment against Board of Regents of University of California, awarding Plaintiffs damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Board of Regents of University of California to terminate Geoff Bond, Katie McGann and Earl W. Edwards and prevent them from employment within the University of California system and declare all the individual defendants as a danger to the University of California students and community; and retain a third-party monitor independent from the University of California system to field anonymous calls from athletes who seek to complain of abuse by coaches and/or school officials and to take further steps to expose and prevent abuse of students;

(iii) On the third(ii)    On the second cause of action for Violation of 42 U.S.C. §

---

-62-

SecondFirst Amended Complaint

Formatted: Indent: First line:  0"

1983 Equal Protection Clause Hostile Education Environment, a judgment against Geoff Bond, Katie McGann and Earl W. Edwards, awarding Plaintiffs damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Board of Regents of University of California to terminate Geoff Bond, Katie McGann and Earl W. Edwards and prevent them from employment within the University of California system and declare all the individual defendants as a danger to the University of California students and community and retain a third-party monitor independent from the University of California system to field anonymous calls from athletes who seek to complain of abuse by coaches and/or school officials and to take further steps to expose and prevent abuse of students;

(iii)     On the fourththird cause of action for Violation of 42 U.S.C. § 1983 Substantive Due Process, *et. al*., a judgment against Geoff Bond, Katie McGann and Earl W. Edwards, awarding Plaintiffs damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)     On the fifthfourth cause of action for Wrongful Death, et. al., a judgment against Geoff Bond, Katie McGann and Earl W. Edwards, awarding Plaintiffs damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)     On the sixthfifth cause of action for Negligent Hiring, et. al., a judgment against Katie McGann and Earl W. Edwards, awarding Plaintiffs damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)     On the seventhsixth cause of action for Negligent Supervision, et. al., a judgment against Katie McGann and Earl W. Edwards, awarding Plaintiffs damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(vii)      Such other and further relief as the Court deems just and proper.

-63-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY TRIAL DEMAND

Plaintiffs request a jury trial on all questions of fact raised by their Complaint.

Dated: November 23February 16, 2022

            **Respectfully Submitted,**

            **NESENOFF & MILTENBERG, LLP**

            **By:** */s/ Andrew T. Miltenberg*

                 **Andrew T. Miltenberg, Esq.**
                 **(admitted *pro hac vice*)**
                 **amiltenberg@nmllplaw.com**
                 **Nicholas Lewis, Esq.**
                 **(admitted *pro hac vice*)**
                 **nlewis@nmllplaw.com**
                 **Susan Stark, Esq.**
                 **sstark@nmllplaw.com**
                 **Nesenoff & Miltenberg, LLP**
                 **4 Palo Alto Square**
                 **3000 El Camino Real**
                 **Suite 200**
                 **Palo Alto, CA 94306**
                 **Tel: (650) 209-7400**