1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17
18
19
20

BRIAN LILLY, Sr., and BRENDA LILLY, individually, and on behalf of the Estate of Brian Lilly, Jr.,

Plaintiffs,

v.

UNIVERSITY OF CALIFORNIA-SAN DIEGO, BOARD OF REGENTS OF UNIVERSITY OF CALIFORNIA, GEOFF BOND, KATIE MCGANN, and EARL W. EDWARDS,

Defendants.

Case No.:  21-CV-1703 TWR (MSB)

**ORDER (1) DENYING DEFENDANT BOND'S REQUEST FOR JUDICIAL NOTICE, (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS, AND (3) DENYING DEFENDANTS MCGANN AND EDWARDS' MOTION TO STRIKE PLAINTIFFS' REQUEST FOR PUNITIVE DAMAGES**

(ECF Nos. 46, 47)

21
22
23
24
25
26
27
28

Presently before the Court are Defendant Geoff Bond's (1) Motion to Dismiss Second Amended Complaint (ECF No. 46, "Bond Mot.") and (2) Request for Judicial Notice (ECF No. 46-2, "RJN") as well as the (1) Motion to Dismiss Plaintiffs' Second Amended Complaint and (2) Motion to Dismiss/Strike Request for Punitive Damages (ECF No. 47, "REM Mot.") filed by Defendants The Regents of the University of California ("The Regents"), Earl W. Edwards, and Katie McGann.  Also before the Court are Plaintiffs Brian Lilly, Sr., and Brenda Lilly's Oppositions to (ECF No. 49, "Opp'n Bond"; ECF No. 50, "Opp'n REM") and Defendants' Replies in support of (ECF No. 53,

"Bond Reply"; ECF No. 54, "REM Reply") the respective Motions.  The Court held a hearing on June 22, 2023.  (ECF No. 58.)  Having carefully considered the Second Amended Complaint (ECF No. 41, "SAC"), the Parties' arguments, and the relevant law, the Court **DENIES** Defendant Bond's Request for Judicial Notice; **GRANTS IN PART AND DENIES IN PART** Bond's Motion; and **GRANTS IN PART AND DENIES IN PART** The Regents, McGann, and Edwards' Motion, as follows.

**BACKGROUND**

**I.     Factual Background[1]**

    **A.     *Bond's Coaching at the University of Pennsylvania***

Before coaching at the University of California San Diego ("UCSD"), Bond was a rowing coach at the University of Pennsylvania ("UPenn").  (SAC ¶¶ 29, 38.)  During his time at UPenn in June 2016, senior rowers communicated to UPenn's athletic department that Bond "exhibited a disregard for responsible oversight of the mental health of the rowers" and "created an abusive environment by the repeated use of belittling nicknames and hostile language threatening rowers[, including the following statements:] 'If you talk to me again, I swear I will fucking cap you,' 'I will fucking kill you,' and 'I will break through you.'"  (*Id.* ¶ 31.)  The seniors referred to Bond as "unstable and abusive" and "mentioned student suicide as a potential cost of keeping Bond on as coach."  (*Id.* ¶ 32 (emphasis omitted).)  In fact, "during Bond's UPenn tenure, a student athlete who was on the men's rowing team struggled with addiction and tragically died from an overdose." (*Id.* ¶ 34.)  Further, while at UPenn, Bond would "publicly humiliate[] rowers who sought mental health counseling," play "mind games with his rowers, like confusing them intentionally so he could chastise them when they erred[,] and target[] rowers he viewed as 'weak.'"  (*Id.* ¶¶ 32, 37.)  In July 2016, UPenn's athletic director raised these concerns with Bond.  (*Id.* ¶ 33.)

---

[1]    For purposes of Defendants' Motions to Dismiss, the facts alleged in Plaintiffs' Second Amended Complaint are accepted as true.  *See Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007).

2

Then in June 2019, Bond was "ousted from UPenn after . . . approximately 25 rowers from the Men's Heavyweight Crew team threatened to quit unless Bond was removed." (*Id.* ¶¶ 29–30.)  This protest stemmed from Bond's "mentally abusive coaching methods, unfair selection process, politically incorrect insults, old and ineffective training methods," and acting as a "barrier" between student athletes and their trainers and other members of the coaching staff.  (*Id.* ¶ 30.)  After this June 2019 "mutiny," an assistant coach at UPenn "suggested Bond take a different, less drastic approach with his rowers to avoid another UPenn-like-catastrophe."  (*Id.* ¶ 36.)  Bond responded, "'If you can't take the heat . . . .'" (*Id.*)

### B.    Bond's Coaching at the University of California San Diego

After Bond left UPenn, and with associate athletic director Katie McGann in charge of his hiring, UCSD hired Bond as the men's rowing team head coach on October 1, 2019. (*Id.* ¶¶ 39, 44.)  McGann, and athletic director Earl W. Edwards, allegedly rushed the process, "did little to no independent research into Bond's background, prior positions[,] or the reasons he left [a number of] seemingly prestigious positions," and "failed to uncover the aforementioned reasons Bond was forced out of UPenn."  (*Id.* ¶¶ 16, 41–42.)  Indeed, Bond had a history of "abuse and erratic, anti-social behavior," which was a "poorly kept secret in the tight-knit, national rowing community, but McGann and Edwards did not care to ask [about it]."  (*Id.* ¶ 25.)

As a result, while coaching at UCSD, "Bond exhibited a general disregard for his student-athletes' health and well-being."  (*Id.* ¶ 101.)  He "chastised rowers who sought independent medical treatment, taught them outdated rowing techniques, and mocked the rowers who reverted to the modern, effective techniques they learned previously."  (*Id.*) He would mock the rowers "for their insufficient testosterone, 'flaccid' manhood, small 'testicles' and/or lack of 'manliness,' in general."  (*Id.* ¶ 102.)  He also labelled the rowers as "pussies" during their workouts.  (*Id.* ¶103.)  Further, Bond "would intentionally target a single rower . . . to publicly humiliate the student in front of teammates."  (*Id.* ¶ 105.)  On one occasion, Bond "repeatedly screamed at a freshman rower, ridiculing him that he was

'flaccid'" and stating, "Your word of the day is flaccid!" (*Id.* ¶ 106.)  On another occasion, a rower made a mistake setting the timer at practice and Bond shouted, "Maybe if you weren't finger fucking your phone that wouldn't have happened!" (*Id.*)  He "frequently mocked the weight of certain rowers," stating that "they needed to stop eating because they were too fat, lazy, and unwilling to meet his extreme demands." (*Id.* ¶ 107.)  "Bond first glorified rowers who worked out 'so hard they puked,' then, after successfully inducing vomit, Bond would laugh and dismiss them as 'pussies' for vomiting." (*Id.* ¶ 111.)  Plaintiffs contend that "Bond's conduct in engaging in constant bullying, abuse, and harassment was severe, pervasive, and objectively unreasonable." (*Id.* ¶ 104.)  But Bond allegedly "covered himself, and his abusive harassment, after-the-fact by feigning compassion or concern for his athletes through electronic communications." (*Id.* ¶ 117.)

Initially, Bond's treatment of the student-athletes appeared to be "the run-of-the-mill tough variety, including challenges to the teenagers' toughness and sophomoric, sexually inappropriate insults to challenge their manliness." (*Id.* ¶ 88 (internal quotation marks omitted).)  But Bond's "challenges" and "insults" quickly became "more personal and biting." (*Id.* ¶ 89.)  Plaintiffs allege Bond's "tactics mirrored those employed at UPenn, including confusing rowers so he could yell at them when they did not follow his convoluted directions, humiliating rowers by challenging their manhood or displaying aggravation at [rowers] seeking treatment from the trainers." (*Id.* ¶ 90.)  For example, Bond once mocked a freshman rower as he walked away from the training room, accusing that rower of faking an injury. (*Id.* ¶ 200.)  Plaintiffs state that some rowers quit because of Bond's behavior. (*Id.* ¶ 90.)  Plaintiffs further assert that the culture Bond created "contravened the express claims of UCSD, which trumpeted to its prospective students its inclusive, safe campuses as being nurturing environments, free from toxicity." (*Id.* ¶ 91.)

Between February 20 and 22, 2020, McGann was present at a rowing team practice, "observing the varsity boats practice while standing on the launch." (*Id.* ¶ 160.)  While McGann was observing, "Bond was particularly enraged and hostile towards the second

/ / /

4

varsity boat and launched into a tirade screaming at the second boat's rowers," singling out specific rowers, and berating "them individually with profanity-laced insults." (*Id*.)

### C.   Bond's Coaching of Brian Lilly, Jr.

Decedent Brian Lilly, Jr., "enrolled at UCSD in the Fall 2019 semester to pursue an undergraduate degree in real estate and development and to continue his passionate pursuit of rowing, as a scholar-athlete of the class of 2023 men's rowing team." (*Id*. ¶ 73.) Decedent was "widely regarded as the consummate teammate, always present with words of encouragement and positive reinforcement." (*Id*. ¶ 75.) He also "drew a tremendous amount of his self-worth and confidence from his on-field accomplishments." (*Id*.)

Decedent was also "susceptible to body shaming throughout his life" after a diagnosis of Juvenile Rheumatoid Arthritis, which caused him to gain thirty pounds in middle school. (*Id*. ¶ 76.) He shared the "pain[] and shame[] he felt from his childhood obesity with his coaches and friends on the rowing team throughout his freshman year." (*Id*. ¶ 76 n.2.) He lost weight with the help of his support system including his family and friends in New York but remained sensitive to his "former unhealthy stature." (*Id*. ¶¶ 76 n.2, 77.) Despite his health struggles, Decedent completed a marathon in 2018 and an Ironman in 2019. (*Id*. ¶ 78.) "Decedent had no mental health issues prior to his enrollment at UCSD." (*Id*. ¶ 82.)

In his first semester at UCSD, "Decedent distinguished himself quickly as a freshman leader on the rowing team" and he made friends quickly. (*Id*. ¶ 84.) Bond initially "appeared to recognize Decedent's value to the rowing team." (*Id*. ¶ 93.) Decedent "did more erg machine work outs, with erg scores that were faster than the bulk of his teammates and nearly all his fellow freshmen."[2] (*Id*. ¶ 94.) His "hard work and competitive spirit impressed teammates and coaches alike at UCSD who wanted him for his athleticism and leadership." (*Id*.) His work "earned and secured his spot in one of the top three varsity

---

[2]   "Erg scores measure rowing speed on the ergometer, the standard rowing machine found in most fitness gyms." (SAC ¶ 93 n.3.)

boats," specifically, "2V," the second-best boat.  (*Id.* ¶¶ 95–96.)  Bond initially "praised Decedent in front of teammates," (*id.* ¶ 96), but Decedent and his teammates "quickly learned" that Bond was a "sadistic bully; an angry, volatile man whose rage surfaced often and unexpectedly," (*id.* ¶ 98).  The rowers were "subjected to sexually inappropriate comments, mocking their 'testicular' insufficiencies and/or labeling them as 'flaccid' and weak, as well as [] petty insults, and erratic behavior." (*Id.*)  In November 2019, Decedent worked out on a rowing machine until he threw up and then Bond mocked him saying, "[t]hrowing up is for pussies."  (*Id.* ¶¶ 114–15.)  "As time went on, Bond's vitriol towards Decedent became constant, and far more intense than what his teammates experienced." (*Id.* ¶ 99.)

### 1. Initiation Night and Allegations Against Z.B.

On January 18, 2020, the rowing team hosted an "Initiation Night" for freshman. (*Id.* ¶¶ 120–21.)  For Initiation Night, the freshman rowers were driven to Mission Beach after being blindfolded and zip-tied to one another.  (*Id.* ¶ 121.)  The night included consuming "hard alcohol, syrup, whipped cream[,] and hot peppers in a heated car while still blindfolded," binge drinking challenges, and "physical activities like rowing on the erg machine and spinning around until dizzy."  (*Id.* ¶ 122.)  The night was "captured via digital pictures," and the pictures were saved by Z.B., another member of the men's rowing team.  (*Id.* ¶¶ 124–25.)

Decedent subsequently learned that Z.B. had been accused of sexual misconduct by multiple female UCSD students.  (*Id.* ¶ 127.)  Decedent and his teammates learned that Z.B. had been accused of groping female students, sending inappropriate Snapchat photos, and attempting sexual advances despite objections.  (*Id.* ¶ 132.)  Plaintiffs contend that the individually named Defendants, as well as others, were aware of the allegations, yet failed to comply with their obligations under UCSD's Office for the Prevention of Harassment and Discrimination ("OPHD") policy.  (*Id.* ¶¶ 128–30.)  Decedent and his friends on the rowing team were "incensed" to learn that the coaches (Bond and assistant coach Dameon Engblom) had received the reports yet failed to follow OPHD protocol by promptly

contacting OPHD upon hearing of these allegations.  (*Id.* ¶¶ 45, 130, 134–35.)  Bond later acknowledged that he did not report the allegations against Z.B. to the OPHD directly but attempted to report them to McGann in January 2020.  (*Id*. ¶ 136.)  Plaintiffs note that "[i]t is unclear which, if any, of the [complaints about Z.B.] were . . . relayed to McGann."  (*Id.*)  "Decedent was deeply troubled by the coaches' refusal to take action" and "to take the serious sexual misconduct reports seriously."  (*Id*. ¶ 137.)  In response to Decedent voicing his discomfort that Z.B. was still an accepted member of the rowing team, the team captains said it was due to "threats [Z.B.] made to others regarding the pictures" from the Initiation Night.  (*Id.* ¶¶ 139–40.)

On January 31, 2020, Decedent met with Bond and Engblom in Bond's office to tell them he was feeling sick with flu-like symptoms, coughing, and congestion and that he was "suffering emotionally and from a mental health perspective."  (*Id.* ¶¶ 141–42, 144.)  Decedent told the coaches that "Z.B.'s unchecked misconduct, and [their] failure to take action regarding the allegations," were causing his "physical and mental deterioration."  (*Id.* ¶ 145.)  Bond "told Decedent to take the afternoon off" and "that he 'and [his] homies should act as if nothing [was] wrong' concerning the matter with Z.B."  (*Id.* ¶ 146.)  Bond "acknowledged he was aware of the multitude of Title IX allegations, but assured Decedent, 'the coaches were handling the situation.'"  (*Id.* ¶ 147.)  Plaintiffs also allege that Bond warned Decedent about reporting the allegations against Z.B., seeking to scare Decedent into silence, by stating Z.B. "could be dangerous" to the team since Z.B. possessed photos that could seriously damage the team.  (*Id.* ¶¶ 148–49.)

As a result of Decedent speaking up and questioning Bond's failure to report the multiple sexual misconduct allegations against Z.B., Bond became enraged and began treating Decedent with hostility and ostracism from late January 2020 on.  (*Id.* ¶¶ 99, 151.)  Bond, for example, "angrily deter[ed] Decedent's friend, and other rowers, from associating with Decedent" and "attacked Decedent" with insults such as "calling him a 'pussy'; doubting Decedent's 'manliness,' 'testicular fortitude' or 'testosterone levels'"; and making fun of Decedent's weight.  (*Id.* ¶¶ 152, 157–58.)  Bond often referred to him

7

as "Fat [Decedent's name]" and would call other rowers "'Fat [Decedent's name]' whenever he felt the rowers were challenging the coach or going over his head with complaints." (*Id.* ¶¶ 158, 180.)  Additionally, in late January to early February of 2020, Decedent was demoted to the fourth (bottom) boat "immediately after" he raised his concerns to the coaches. (*Id.* ¶ 154.)

Decedent got into a "heated exchange" with Z.B. on February 22, 2020, during the fourth boat practice. (*Id.* ¶ 161.)  Later that day, Decedent spoke with Coach Engblom to voice his concerns about Z.B.'s impact on the team and inquired whether there was a Title IX investigation. (*Id.* ¶ 162.)  Coach Engblom informed Decedent that he and Bond were "given information on the situation" and that they had "reported the sexual misconduct to their superiors." (*Id.* ¶ 163.)  Decedent told Engblom that he thought Z.B. was a liability to the team and began crying while speaking with Engblom. (*Id.* ¶ 164.)

Decedent then reached out to Bond to speak to him. (*Id.* ¶ 166.)  When Bond and Decedent spoke later that same day, Bond informed Decedent that Z.B. was still on the team because an investigation had concluded that there was "no evidence of his wrongdoing." (*Id.* ¶¶ 166–68.)  Dissatisfied, Decedent stated it would not reflect well on the team if Z.B. remained on the team. (*Id.* ¶ 169.)  Bond responded, "As a son of an attorney that sounds like a threat.  I would be extremely careful with your next few words. I am willing to work with you but don't communicate with me in that way." (*Id.* ¶ 170.)  Decedent told Bond that "this feels like psychological abuse and the team is suffering from the dynamic" of Bond and Z.B. (*Id.* ¶ 171.)  Bond recommended that Decedent "calm down and speak with a therapist." (*Id.* ¶ 172.)

Afterwards, Bond called McGann and "informed her of his and Engblom's conversations with Decedent." (*Id.* ¶ 173.)  "Bond claims he told McGann he had concerns that Decedent was acting erratically." (*Id.*)  McGann "allegedly told Bond to document any violations of the rowing team rules or student code of conduct in case Bond needed to remove Decedent from the team," "to let both Decedent and Z.B. know that any 'further

/ / /

behavior' would cause them to be expelled from the team," and that she would call Decedent. (*Id.* ¶¶ 173, 178.)

Thereafter, McGann called Decedent. (*Id.* ¶ 174.) Decedent told McGann about the allegations against Z.B. and said he felt "as if he 'was being psychologically abused' by Z.B. and the rowing coaches, and that this was ruining his experience as a student athlete at UCSD." (*Id.*) McGann told Decedent that "these things take time to investigate" and "[n]ot to conduct his own investigation." (*Id.* ¶¶ 174–75.) Bond later claimed that McGann had told Bond that she forwarded the complaints about Z.B. to the OPHD but the complainants allegedly did not want to pursue the matter. (*Id.* ¶ 176.) Decedent was unconvinced that the complaints had been sent to the OPHD. (*Id.*)

Decedent and Z.B. got into another "verbal altercation" regarding the boat line-ups on February 27, 2020. (*Id.* ¶ 186.) At the end of practice, Bond "berated" Decedent and Z.B. in front of the team for their conduct and told them, "If the two of you can't get along, you'll both be kicked off the team." (*Id.* ¶ 187.) Plaintiffs allege that being grouped with an "accused sex offender" took its toll on Decedent and his mental health. (*Id.*) Following that practice, "Decedent met with a counselor who worked for CAPS, a mental health clinic at UCSD." (*Id.* ¶ 189.) On March 3, 2020, Bond then emailed Decedent, copying McGann, regarding Decedent and Z.B.'s conflicts and telling Decedent to "play nice" with Z.B. and that any further conflict would result in both of their removals from the team. (*Id.* ¶ 191.)

Plaintiffs explain that Bond also sought to alienate Decedent from his teammates. (*Id.* ¶¶ 197–99.) For example, Bond told Decedent's good friend and roommate, P.K., who was also on the rowing team, "In this selection process[, referring to placement of rowers in boats,] I would be very careful who you are associating with . . . that kid [(decedent)] is one foot out the fucking door!" (*Id.* ¶¶ 197–98.) P.K also suffered from a mental health perspective due to Bond's conduct. (*Id.* ¶ 199.)

### 2. The COVID-19 Pandemic and UCSD Survey

Due to the COVID-19 pandemic, and the suspension of all NCAA sports, Decedent returned home to New York in March 2020. (*Id.* ¶¶ 202–03.) Between April and June of

2020, the rowing season and all in-person classes were suspended, but Bond organized weekly team Zoom meetings in which he continued yelling at the team for the slightest issues.  (*Id.* ¶ 204.)

"Decedent told his close friends and former coaches of the abuse he suffered from his coaches, but largely kept the pain, confusion, and shame he was experiencing to himself, opting to avoid 'bothering' his friends and family with the problems that, he felt, paled in comparison to the devastation wrought by the global pandemic."  (*Id.* ¶ 205.)  In April 2020, however, Decedent filled out an "allegedly" anonymous UCSD survey, providing twenty-three pages of feedback regarding Bond's misconduct and the mishandling of Title IX complaints against Z.B.  (*Id.* ¶ 206.)  He included information about Bond's sexually inappropriate comments and that he was suffering immensely with his mental health because of Bond's "psychological abuse."  (*Id.* ¶¶ 206–07.)  Decedent also stated in the survey, "I had a few fleeting thoughts of suicide throughout the process but decided not to mention them because they didn't seem like a major threat to me and I was afraid of the implications of revealing them."  (*Id.* ¶ 208.)  Decedent additionally described the circumstances surrounding Bond's exit from UPenn, stating he noticed a pattern of behavior from Bond's time at UPenn and UCSD.  (*Id.* ¶ 209.)

Plaintiffs allege that, once home, Decedent's mental health "deteriorated and worsened in the months following as a direct result of Bond's abuse."  (*Id.* ¶ 217.)  He "suffered from immense sadness, paranoia, and disorientation."  (*Id.* ¶ 218.)  He began "skipping meals, workouts, and sleep" and "self-medicated with drugs to escape as his mental health worsened."  (*Id.* ¶ 219.)

"On July 21, 2020, after several days without sleep and minimal food, Decedent's fear, paranoia, and delusions reached dangerous levels."  (*Id.* ¶ 220.)  He had a "schizophrenic and psychotic episode, necessitating hospitalization for in-patient mental health treatment."  (*Id.* ¶ 202.)  Decedent began "intensive therapy and drug treatment, including medication to control the symptoms, emotional pain, psychosis, and schizophrenia caused by the abuse he suffered at UCSD."  (*Id.* ¶ 222.)

After reaching a "stable place" towards the end of 2020, and "with his mental health struggles seemingly under control," he returned to UCSD in late December 2020.  (*Id.* ¶¶ 224–25.)  That month, Bond emailed Decedent asking if he would be participating on the rowing team for the Spring 2021 season. (*Id.* ¶ 227.)  Decedent responded and informed Bond that he would be opting out of the upcoming rowing season. (*Id.* ¶ 228.)  He did not receive any response from Bond as Bond "continued his emotional exile of Decedent." (*Id.*)  As a result, the "stress and mental anguish returned to haunt Decedent." (*Id.*)

Plaintiffs allege that the "mental anguish and overwhelming sadness generated by Bond's psychological abuse and mind games created an uncontrollable impulse in Decedent to commit suicide." (*Id.* ¶ 229.)  On January 4, 2021, Decedent took his own life.  (*Id.* ¶ 230.)

Other rowing team members had also filled out the survey noting Bond's mistreatment and the negative effects they experienced.  (*Id.* ¶ 211.)  McGann reviewed the anonymous April 2020 survey responses, including Decedent's, but Bond was not informed of the surveys or Decedent's allegations against him until the filing of this lawsuit.  (*Id.* ¶¶ 212–13.)

McGann offered a contract extension to Bond in June 2021.  (*Id.* ¶¶ 214–15.)  Edwards then fired Bond on January 13, 2022.  (*Id.* ¶ 233.)

## II.   Procedural History

Plaintiffs initiated this action by filing their original Complaint on September 30, 2021.  (*See* ECF No. 1.)  Plaintiffs later filed a First Amended Complaint.  (*See* ECF No. 14.)  Defendants The Regents, Edwards, McGann, and Bond then moved to dismiss Plaintiffs' First Amended Complaint. (ECF Nos. 17, 18.)  The Court granted both motions to dismiss, finding Plaintiffs (1) failed to state a Title IX retaliation claim against The Regents; (2) failed to properly allege equal protection violations against Bond, McGann, and Edwards; and (3) failed to properly allege substantive due process violations against the individual Defendants.  (ECF No. 36 at 8–18.)  The Court also found that it was premature to rule on whether it should exercise supplemental jurisdiction over Plaintiffs'

state law claims involving negligence, and whether it should dismiss Plaintiffs' claims for punitive damages.  (*Id*. at 18–19.)  The Court then gave Plaintiffs leave to file an amended complaint.  (*Id*. at 22.)

Plaintiffs filed a timely Second Amended Complaint, (*see* SAC), alleging the following causes of action: (1) retaliation in violation of Title IX (against The Regents); (2) deliberate indifference in violation of Title IX (against The Regents); (3) violation of the Fourteenth Amendment for denial of equal protection under 42 U.S.C. § 1983 (against Bond, McGann, and Edwards); (4) violation of the Fourteenth Amendment for deprivation of substantive due process under § 1983 (against Bond, McGann, and Edwards); (5) wrongful death under California Code of Civil Procedure § 377.30 (against Bond, McGann, and Edwards); (6) negligent hiring (against McGann and Edwards); and (7) negligent supervision (against McGann and Edwards).  (SAC ¶¶ 237–358.)  Defendants The Regents, McGann, Edwards, and Bond subsequently filed Motions to Dismiss.  (*See* REM Mot.; Bond Mot.)  Defendant Bond also filed a Request for Judicial Notice.  (*See* RJN.)

## REQUEST FOR JUDICIAL NOTICE

"Judicial notice under Rule 201 permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'"  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quoting Fed. R. Evid. 201(b)).  "A fact is 'not subject to reasonable dispute' if it is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"  *Id.* (quoting Fed. R. Evid. 201(b)(1)–(2)).

"Unlike rule-established judicial notice, incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself."  *Khoja*, 899 F.3d at 1002.  "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims."  *Id.* (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *superseded by statute on other grounds as recognized in*

*Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 681–82 (9th Cir. 2006)). Consequently, "a defendant may seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'" *Id.* (quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)). "However, if the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint." *Id.*

Defendant Bond requests that the Court take judicial notice of the email Decedent sent to Bond in December 2020 because the email is a fact not subject to reasonable dispute since it is an email obtained directly from Bond. (*See* RJN at 1.) Bond also explains that under federal law, a plaintiff incorporates a document by reference where the complaint refers extensively to the document. (*Id.* at 2.) Bond seems to conflate the rules for judicial notice under Federal Rule of Civil Procedure 201 with the incorporation by reference doctrine. Under the incorporation by reference doctrine, "courts may take into account 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'" *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012). Here, the Court declines to resolve whether Decedent's email is the appropriate subject of judicial notice, and instead finds that the email is incorporated by reference into Plaintiffs' Second Amended Complaint because (1) Plaintiffs do not dispute the authenticity of the email, (2) Plaintiffs refer to the email throughout the Second Amended Complaint, and (3) the email forms part of the basis of Plaintiffs' claims. (*See* SAC ¶¶ 227–28, 247(k).) The Court thus **DENIES** Bond's request for judicial notice but incorporates by reference the email attached to Bond's Request for Judicial Notice. (*See* RJN at 4.)

## MOTIONS TO DISMISS

### I.   Legal Standard

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro*

*v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).  "A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'"  *Id.* at 1242 (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).  "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In other words, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Id.* at 679 (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

"If a complaint is dismissed for failure to state a claim, leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'"  *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).  "A district court does not err in denying leave to amend where the amendment would be futile."  *Id.*

/ / /

1   **II.   Analysis**

2   Defendants The Regents, McGann, Edwards, and Bond move to dismiss each claim

3   against them pursuant to Federal Rule of Civil Procedure 12(b)(6).[3]  (REM Mot. at 2; Bond

4   Mot. at 1–2.)  Defendants McGann and Edwards also move to dismiss Plaintiffs' claim for

5   punitive damages under Federal Rule of Civil Procedure 12(b)(6) and 12(f).  (REM Mot.

6   at 3.)

7   **A.   *Title IX***

8   ***1.   Retaliation***

9   "Title IX prohibits sex discrimination by recipients of federal education funding."

10  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).   Actionable "sex

11  discrimination" includes "when a funding recipient retaliates against a person *because* he

12  complains of sex discrimination."  *Id.* at 174, 178; *see also Emeldi v. Univ. of Oregon*, 698

13  F.3d 715, 725 (9th Cir. 2012) (speaking out against sex discrimination is a protected

14  activity).  To prevail on a Title IX retaliation claim, a plaintiff lacking "direct evidence of

15  retaliation must first make out a prima facie case of retaliation by showing (a) that he or

16  she was engaged in protected activity, (b) that he or she suffered an adverse action, and

17  (c) that there was a causal link between the two."  *Emeldi*, 698 F.3d at 724.  A prima facie

18  case requires a "minimal threshold showing of retaliation."  *Id.*  An adverse action exists

19  when "a reasonable [person] would have found the challenged action materially adverse,

20  which in this context means it well might have dissuaded a reasonable [person] from

21  making or supporting a charge of discrimination."  *Id.* at 726 (quoting *Burlington N. &*

22  *Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006)).  The causal link between the adverse

23  action and the protected activity is "construed broadly," and a plaintiff only has to prove

24  that the protected activity and the adverse action were not "completely unrelated."  *Id.*

25

26

27  [3]     Defendant Bond states that his Motion is pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (*See* Bond Mot. at 1–2.)  Bond appears to conflate the two subsections.  Rule 12(b)(1)

28  involves a motion to dismiss for lack of subject-matter jurisdiction, but Bond does not include any arguments relevant to subject-matter jurisdiction.

(quoting *Poland v. Chertoff*, 494 F.3d 1174, 1181 (9th Cir. 2007)).  As in Title VII cases, "causation 'may be inferred from circumstantial evidence, such as the [defendant's] knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory' conduct."  *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 869 (9th Cir. 2014) (quoting *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)).

The Parties disagree about what standard applies when a plaintiff seeks to bring a Title IX retaliation claim against a university when the allegations focus on a coach's conduct.  (*Compare* ECF No. 47-1 ("REM Mem.") at 14–15, *with* Opp'n REM at 10–13.) The Regents argue that "the same legal elements apply" for a Title IX retaliation claim and for a deliberate indifference claim when the alleged harm was perpetrated by a coach rather than by the school/The Regents.  (REM Mem. at 14.)  The Regents further explain that the school is not liable for Title IX retaliation unless they had actual notice of the offending conduct and are then deliberately indifferent in response.  (*Id*.)  They add that the elements outlined in *Karasek v. Regents of University of California*, 956 F.3d 1093, 1105 (9th Cir. 2020), apply to Plaintiffs' retaliation claim.  (*Id*. at 15.)  Plaintiffs, on the other hand, state that the deliberate indifference test and the elements outlined in *Karasek* do not apply to retaliation claims—only the *Emeldi* elements are at issue.  (Opp'n REM at 10–13.)

The Supreme Court has stated that "in cases . . . that do not involve official policy of the recipient entity, . . . a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond."  *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 290 (1998).  Further, "the response must amount to deliberate indifference." *Id*.  In other words, a school cannot be liable under Title IX based on respondeat superior or constructive notice theories.  *Id*. at 285; *see Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999) ("[A] recipient of federal funds may be liable in damages under Title IX only for its own misconduct.").

1         While the Court is not aware of any binding precedent applying these concepts to

2   Title IX retaliation claims, several courts agree that a plaintiff must do more than allege

3   that an individual employee of a school retaliated against him.  *See Tanjaya v. Regents of*

4   *Univ. of Cal.*, 830 F. App'x 526, 527 (9th Cir. 2020) ("[Plaintiff failed to] allege sufficient

5   facts to establish that the University itself retaliated against her or had notice of the alleged

6   retaliation after she filed her Title IX claim."); *Davis v. Folsom Cordova Unified Sch. Dist.*,

7   674 F. App'x 699, 702 (9th Cir. 2017) ("Although a plaintiff need not be the subject of the

8   original Title IX complaint to bring a subsequent retaliation claim, [the plaintiff] failed to

9   allege that the District, as opposed to an individual, retaliated against him."); *Sherman v.*

10  *Regents of Univ. of Cal.*, 20-cv-06441-VKD, 2022 WL 1137090, at *13 (N.D. Cal. Apr. 18,

11  2022) ("In order to prevail on a Title IX retaliation claim, a plaintiff must show that the

12  *funding recipient* retaliated against him because he complained of sex discrimination.");

13  *id.* ("[To survive summary judgment, the plaintiff] must do more than produce evidence

14  that individual employees of the University retaliated against him.  He must show that the

15  University itself was deliberately indifferent to the misconduct of its employees.").  The

16  Court finds these cases persuasive.  Accordingly, Plaintiffs must allege that appropriate

17  officials at UCSD had actual notice of Bond's alleged retaliation against Decedent and

18  were then deliberately indifferent to that retaliation.[4]

19  / / /

20

21  _____

22  [4]    As for the first of these requirements, the Parties agree that McGann had the authority to address
the alleged discrimination and institute corrective measures.  (*See* ECF No. 58.)  Regarding the second

23  requirement, The Regents also state that the elements outlined in *Karasek*, 956 F.3d at 1105 apply to
Plaintiffs' retaliation claim. (REM Mem. at 15.)  The Ninth Circuit in *Karasek* established five elements

24  for "a Title IX claim against a school that arises from student-on-student or faculty-on-student sexual
harassment or assault."  *Karasek*, 956 F.3d at 1105.  In doing so, the Ninth Circuit explained how to apply

25  the deliberate indifference standard specifically to sexual harassment and assault claims.  *Id.*  It did not
mention retaliation claims.  The Court is unaware of any legal authority that has directly applied the

26  *Karasek* elements to retaliation claims and the Court declines to address that issue because it is not
dispositive here.  Whether couched as part of the *Karasek* elements or otherwise, for a university to be

27  liable for its employee's retaliatory misconduct, an appropriate official at the university must have actual
notice of the misconduct and act with deliberate indifference once on notice.

28

Deliberate indifference in this context is established when the funding recipient's response or lack thereof "is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. "[A] negligent or careless response does not rise to the level of deliberate indifference." *Sherman*, 2022 WL 1137090, at *12.

Here, Plaintiffs argue their Second Amended Complaint sufficiently establishes that Bond retaliated against Decedent because Decedent engaged in the protected activity of complaining about the sexual harassment claims against Z.B. and, as a result, Bond took adverse actions against him, including demoting him to the fourth boat. (Opp'n REM at 8–10.) Plaintiffs further contend that the Second Amended Complaint sufficiently alleges that Defendant McGann and, by extension, Defendant Edwards were on notice of Bond's retaliation as early as Decedent's phone call with McGann in February 2020 and by the latest in April 2020 when Decedent filled out the survey. (*Id*. at 14–16.) Plaintiffs also argue the facts alleged show McGann was deliberately indifferent because she took no action in response to Decedent's complaint of harassment and retaliation which, is "clearly unreasonable." (*Id*. at 16.)

The Regents counter that "complaints that [Decedent] felt 'psychological abuse' from his coaches or Z.B., or complaints that Bond yelled at others, are insufficient to put UCSD on actual notice that [Decedent] believed Bond had retaliated against him for making a discrimination complaint about Z.B." (REM Mem. at 16.) The Regents also argue that there are no allegations in the Second Amended Complaint establishing that UCSD, through McGann or otherwise, was deliberately indifferent. (*Id*. at 16–17.)

Plaintiffs' Second Amended Complaint alleges that in February 2020, Decedent and Z.B. had gotten into a "heated altercation," after which Decedent spoke on the phone with Engblom and Bond. (SAC ¶¶ 161–72.) Bond called McGann and informed her of the conversations he and Engblom had with Decedent and told McGann that he had concerns about Decedent "acting erratically." (*Id*. ¶ 173.) McGann responded by telling Bond to document any violations of the rowing team rules or student code of conduct in case Bond needed to remove Decedent from the team. (*Id*.) McGann then called Decedent, and

Decedent told her about the allegations against Z.B., stating he felt "as if he 'was being psychologically abused' by Z.B. and the rowing coaches, and that this was ruining his experience as a student athlete at UCSD." (*Id.* ¶ 174.)  McGann told Decedent that "these things take time to investigate" and "[n]ot to conduct his own investigation." (*Id.* ¶¶ 174–75.)  At some point, McGann also allegedly advised Bond "to let both Decedent and Z.B. know that any 'further behavior' would cause them to be expelled from the team." (*Id.* ¶ 178.)  Plaintiffs explain that, for Z.B., this meant that "any further sexual misconduct allegations would cause him to be kicked off the rowing team" and, for Decedent, this meant "any further complaints of Z.B.'s alleged misconduct or the team's failure to handle the same would lead to his expulsion." (*Id.*)

In addition, after Decedent had returned home due to the global pandemic, he filled out an anonymous survey in April 2020 in which he reiterated the concerns he had shared on the phone with McGann. (*Id.* ¶¶ 203, 206.)  In his survey, he also noted his belief that "Bond's psychological abuse of him was 'seemingly out of retaliation.'" (*Id.* ¶¶ 206–07.) Plaintiffs allege that "McGann reviewed the Anonymous April 2020 surveys, including Decedent's, in which he discusses Bond's abusive behavior, [and] the fact he felt at least some of said behavior was retaliatory in nature." (*Id.* ¶ 212.)  Plaintiffs further allege that "McGann failed to respond to, or intervene, in Bond's constant abuse of Decedent even after . . . reviewing Decedent's Anonymous April 2020 survey outlining Bond's retaliatory conduct." (*Id.* ¶ 249.)

Plaintiffs sufficiently allege that Bond retaliated against Decedent: the Second Amended Complaint alleges that Bond took an adverse action (*e.g.*, demoting Decedent to the fourth boat with rowers who had performed much worse than Decedent, verbally abusing Decedent, and treating him with hostility) immediately after Decedent complained to Bond and Engblom about the sexual harassment claims against Z.B and their failure to report the matter. (*Id.* ¶¶ 141, 145, 147–48, 150, 152, 154); *see Emeldi*, 698 F.3d at 725 (speaking out against sex discrimination is protected conduct); *id.* at 725–26 (stating that an adverse action includes an action that "well might have dissuaded a reasonable [person]

from making or supporting a charge of discrimination"); *see also Jackson*, 544 U.S. at 178 (sexual harassment is a form of sex discrimination).

The Second Amended Complaint, however, does not sufficiently allege facts for the Court to plausibly infer that UCSD had actual notice of the retaliation and acted with deliberate indifference thereafter.  There are no facts alleged that during Decedent's phone call with McGann in February 2020, Decedent discussed any of Bond's retaliatory conduct with McGann.  (*See* SAC ¶¶ 174–75.)  Decedent noted he felt like he was being psychologically abused by all the coaches, but that statement does not tie the alleged abuse to retaliation or explain that the abuse was a result of Decedent's complaints about Z.B.'s conduct.  (*See id.* ¶ 174.)  As such, UCSD was not on notice of any retaliation as of February 2020.[5]

The only allegation that an appropriate UCSD official knew about the alleged retaliation was when Decedent, through an *anonymous* survey, described Bond's alleged abuse as "seemingly out of retaliation."  (*Id.* ¶ 207.)  Because the surveys were anonymous and the Second Amended Complaint does not provide facts alleging that McGann knew Decedent was the one complaining about being retaliated against, the Second Amended Complaint fails to allege that Defendant McGann had actual notice of Bond's alleged retaliation.  More importantly, the Second Amended Complaint does not allege when McGann reviewed the April 2020 surveys—it only states that Decedent filled out an April 2020 survey and that at some point McGann reviewed them.  (*Id.* ¶ 212.)  This missing information is fatal to Plaintiffs' Second Amended Complaint because, without knowing

---

[5]  Plaintiffs argued at the hearing that McGann advised Bond on how to retaliate against Decedent— by threatening to kick him off the team if he engaged in any "further behavior."  (*See* ECF No. 58; SAC ¶¶ 173, 248.)  It is not clear to the Court if Plaintiffs are arguing that McGann was therefore the person retaliating or whether they contend McGann's own advice put her on notice of Bond's retaliation. McGann's advice says nothing about what she knew leading up to the February 2020 call with Decedent and whether the information Decedent presented on that call put McGann on notice.  And Plaintiffs' entire retaliation argument centers on Bond's behavior and alleged retaliation, not on any alleged retaliatory conduct by McGann.

21-CV-1703 TWR (MSB)

when McGann was potentially on notice, Plaintiffs cannot show she was deliberately indifferent.[6]  Without more, Plaintiffs' allegations are insufficient to allege that McGann was on notice of Decedent's complaint of retaliation and Plaintiffs fail to state a Title IX retaliation claim.  The Court therefore **GRANTS** the Regents' Motion and **DISMISSES** Plaintiffs' Title IX retaliation claim **WITHOUT PREJUDICE**.

## B.   Deliberate Indifference to Sexual Harassment

In addition to their Title IX retaliation claim, Plaintiffs seek to bring a Title IX deliberate indifference to sexual harassment claim against The Regents.  (*See* SAC ¶¶ 255–74.)  "To ensure that a funding recipient is liable 'only for its own misconduct,' a plaintiff alleging a Title IX claim against a school that arises from student-on-student or faculty-on-student sexual harassment or assault must establish five elements."  *Karasek*, 956 F.3d at 1105 (quoting *Davis*, 526 U.S. at 640).

> First, the school must have "exercise[d] substantial control over both the harasser and the context in which the known harassment occur[red]."  Second, the plaintiff must have suffered harassment "that is so severe, pervasive, and objectively offensive that it can be said to deprive the [plaintiff] of access to the educational opportunities or benefits provided by the school."  Third, a school official with "authority to address the alleged discrimination and to institute corrective measures on the [school's] behalf" must have had "actual knowledge" of the harassment.  Fourth, the school must have acted with "deliberate indifference" to the harassment, such that the school's "response to the harassment or lack thereof [was] clearly unreasonable in light of the known circumstances."  This is a fairly high standard—a "negligent, lazy, or careless" response will not suffice.  Instead, the plaintiff must demonstrate that the school's actions amounted to "an official decision . . . not to remedy" the discrimination.  And fifth, the school's deliberate indifference must have "subject[ed the plaintiff] to harassment."  Put differently, the school must have "cause[d the plaintiff] to undergo harassment or ma[d]e [the plaintiff] liable or vulnerable to it."[7]

---

[6]   At the hearing, in response to a question from the Court, Plaintiffs agreed that the date of notice is significant to the analysis here.  (*See* ECF No. 58.)

[7]   There is a circuit split regarding whether "a plaintiff may satisfy the fifth element . . . by pleading and proving that the educational institution's deliberate indifference has made him or her *vulnerable to*

*Id.* (citation omitted).

The Regents contend that Plaintiffs' Second Amended Complaint fails to plead "actual notice of severe sex-based harassment and resulting deliberate indifference in response." (REM Mem. at 18.) Plaintiffs counter that "Bond engaged in severe, pervasive, and objectively offensive sexual harassment of [D]ecedent, including persistent sexually themed remarks designed to denigrate and humiliate Decedent, and other rowers, by implying that they were not conforming to the gender stereotype of what 'a man' should be." (Opp'n REM at 17.) Plaintiffs also contend that McGann was on notice of this severe sexual harassment—at the latest—once she reviewed the April 2020 surveys and that she acted with deliberate indifference by doing nothing in response to the surveys. (*Id.*) Finally, Plaintiffs argue Decedent was further subjected to harassment from Bond since he had to endure team Zoom meetings during May and June of 2020 and had an email interaction with Bond in which Decedent had to tell the coach he would be opting out of training for the upcoming season. (*Id.* at 16–18; SAC ¶ 227.)

With no argument from The Regents one way or the other, (*see* REM Mot. at 18–19), the Court assumes that a coach's routine use of sexually inappropriate comments

/ / /

---

further harassment or assault, even if he or she did not experience an additional incident of sexual misconduct." *Barnett v. Kapla*, No. 20-CV-03748-JCS, 2020 WL 6737381, at *9 (N.D. Cal. Sept. 28, 2020). The Sixth Circuit has held that the deliberate indifference must cause the plaintiff to experience an additional incident of sexual misconduct that is independently actionable. *See Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 622 (6th Cir. 2019). The First, Tenth, and Eleventh Circuits, on the other hand, have held that is it sufficient for the deliberate indifference to make the plaintiff vulnerable to further harassment or assault. *See Farmer v. Kan. State Univ.*, 918 F.3d 1094, 1103–04 (10th Cir. 2019); *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 173 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009); *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1297 (11th Cir. 2007). The Ninth Circuit has not decided one way or another, *see Karasek*, 956 F.3d at 1093, n.2, but at least two district courts in California have agreed with the First, Tenth, and Eleventh Circuits. *See Barnett*, 2020 WL 6737381, *9; *Takla v. Regents of the Univ. of Cal.*, No. 2:15-cv-04418-CAS (SHx), 2015 WL 6755190, at *4–5 (C.D. Cal. Nov. 2, 2015). The reasoning of these courts is persuasive, and the Court finds that Plaintiffs may satisfy the fifth element by pleading that the educational institution's deliberate indifference made Decedent *vulnerable to* further harassment.

aimed largely at male members of the team constitutes sexual harassment.[8]  Further, at this stage in the proceedings, the Court finds that Plaintiffs sufficiently allege severe and pervasive sexual harassment such that it could be said to deprive Decedent of the benefits of UCSD, namely participating on the rowing team.  Plaintiffs' allegations that Bond "regularly" and "routinely" ridiculed rowers for not being "man enough," for their "lack of testosterone," their "testicular" problems, and being "flaccid" are sufficient to meet that standard.  (SAC ¶¶ 102–03.)

The Second Amended Complaint, however, does not sufficiently allege facts for the Court to plausibly infer that UCSD had actual notice of the sexual harassment and acted with deliberate indifference thereafter.  There are no facts alleged that during Decedent's phone call with McGann in February 2020, Decedent discussed any sexually inappropriate comments or that when McGann observed a rowing practice that same month that she overheard any sexually inappropriate comments.  (*See id*. ¶¶ 160, 174–75.)  As such, the Second Amended Complaint fails to allege that UCSD was on notice of any sexual harassment as of February 2020.  The only allegation that an appropriate UCSD official knew about the alleged sexual harassment was when Decedent, through an *anonymous* survey, documented "Bond's repeated use of sexually inappropriate comments, including telling rowers their boat had 'a testicular problem[,]' their word of the days was 'flaccid[,]' and yelling at a student-athlete for 'finger-fucking' her phone." (*Id*. ¶ 206.)  But the Second Amended Complaint does not allege when McGann reviewed the April 2020 surveys—it only states that Decedent filled out an April 2020 survey and that at some point McGann reviewed it.  (*Id*. ¶ 212.)  This missing information is fatal to Plaintiffs' Second Amended Complaint because without knowing when McGann was potentially on notice, Plaintiffs cannot show she was deliberately indifferent after being on notice and that any deliberate

---

[8]    *See, e.g.*, *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) ("Sexual harassment occurs when the victim is subjected to sex-specific language that is aimed to humiliate, ridicule, or intimidate.  A coach's sexually charged comments in a team setting, even if not directed specifically to the plaintiff, are relevant to determining whether the plaintiff was subjected to sex-based harassment." (citations omitted)).

indifference left Decedent vulnerable to further sexual harassment.   Without more, Plaintiffs' allegations are insufficient to allege that McGann was on notice of the alleged sexual harassment/discrimination and Plaintiffs fail to state a Title IX deliberate indifference claim.   The Court therefore **GRANTS** the Regents' Motion to dismiss Plaintiffs' Title IX deliberate indifference claim and **DISMISSES** that claim **WITHOUT PREJUDICE.**

### B.    *42 U.S.C. § 1983*

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.  Here, Plaintiffs seek to bring § 1983 claims against Defendants Bond, McGann, and Edwards for violations of the Fourteenth Amendment's equal protection and substantive due process clauses.  (*See* SAC ¶¶ 276–310.)

#### 1.    *Denial of Equal Protection*

To establish a § 1983 equal protection violation, a plaintiff must show that the defendant, acting under color of state law, discriminated against him or her as a member of an identifiable class and that the discrimination was intentional or done with deliberate indifference. *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134–35 (9th Cir. 2003).  The first step in determining whether a state actor violated a plaintiff's "right to equal protection is to identify the relevant class to which he belonged." *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013).  The class "must be comprised of similarly situated persons so that the factor motivating the alleged discrimination can be identified." *Id.*  Next, in the context of a school official's "failure to investigate or discipline harassment at school," the Court determines whether the defendant acted intentionally or with deliberate indifference, meaning "he or she respond[ed] to known harassment in a manner

that [was] clearly unreasonable." *Walsh v. Tehachapi Unified Sch. Dist.*, 827 F. Supp. 2d 1107, 1116 (E.D. Cal. 2011).

Critical to this case, "[v]erbal harassment or abuse . . . is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983." *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987), *overruled in part on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008); *see Patrick v. Martin*, 402 F. App'x 284, 285 (9th Cir. 2010) ("The district court properly dismissed the sexual harassment claim based on defendant's comments to [the plaintiff], because verbal harassment is insufficient to state a section 1983 claim."); *Whatley v. Gray*, No. 3:17-cv-01591-DMS-NLS, 2017 WL 4842408, at *3 (S.D. Cal. Oct. 26, 2017) ("Verbal harassment alone, however, is not enough to constitute a discriminatory act or a violation of the Fourteenth Amendment's requirement of equal protection under the law."); *see also Patterson v. Tidd*, No. 2:19-CV-08139-DOC-PD, 2021 WL 1191999, at *6 (C.D. Cal. Feb. 8, 2021) (same).

Further, "[l]iability under § 1983 must be based on the personal involvement of the defendant," *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998), meaning that "[s]upervisory personnel . . . cannot be held liable under § 1983 for the actions of their employees under the theory of *respondeat superior*," *Walsh*, 827 F. Supp. 2d at 1116. Personal involvement can be established by causing a person to be subjected to a constitutional deprivation. *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). For example, a causal connection can be established by setting in motion a series of acts by others "which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* at 743–44. The Ninth Circuit has noted that the causation standard is very similar to the foreseeability standard of proximate cause, *i.e.*, more than simply causation-in-fact. *See Arnold v. Int'l Bus. Machines Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981).

a.    Bond

Plaintiffs allege Bond discriminated against Decedent as a member of a protected class of male rowers, stating Decedent was the subject of gender discrimination in the form

of sexual harassment that created a hostile and abusive educational environment that ultimately led to Decedent taking his own life.  (SAC ¶¶ 278, 288.)  Plaintiffs explain that the sexual harassment consisted of verbal abuse including "sexually charged insults and mind games" such as calling Decedent a "pussy," questioning his "manliness," mocking Decedent and his teammates' "testicular problem" and "insufficient testosterone," calling the freshman rowers "flaccid," and chastising a rower for a timing error by shouting, "[m]aybe if you weren't finger fucking your phone that wouldn't have happened."[9]  (*Id.* ¶ 282; *see* ECF No. 58 (during the hearing on Bond's Motion, Plaintiffs confirmed their equal protection claim is based solely on verbal abuse).

Bond moves to dismiss Plaintiffs' equal protection claim against him arguing Plaintiffs only added two paragraphs to their Second Amended Complaint regarding their equal protection claim and neither paragraph fixes the deficiencies the Court found in the First Amended Complaint.  (Bond Mem. at 15 (citing SAC ¶¶ 281, 289).)  Indeed, one of the added paragraphs in the Second Amended Complaint applies only to McGann and Edwards.  (*Id.* (citing SAC ¶ 289).)  Bond contends the operative Complaint does not allege Decedent was part of a protected class or explain how Decedent's membership in a protected class led to any of Bond's actions.  (*Id.* at 14–15.)  Bond also argues that the operative Complaint explains that Bond took a team-wide approach of mocking and chastising the rowers as opposed to discriminating against Decedent based on his gender.  (*Id.*)  Finally, Bond states that Plaintiffs' claims of verbal harassment involving the

/ / /

/ / /

---

[9]     Plaintiffs also describe the other alleged abuse Decedent suffered such as Bond mocking the weight of certain rowers, making "fat" jokes at Decedent's expense, subjecting Decedent to emotional exile, and encouraging rowers to train past the point of vomiting and then mocking Decedent after he vomited by stating, "puking [is] for pussies."  (*Id.* ¶ 282.)  Plaintiffs, however, do not explain how this abuse is harassment *because* of Decedent's membership in a protected class as required to state an equal protection claim.  Nothing in the Second Amended Complaint suggests that this abuse was based on Decedent's status as a male rower.

manhood of the male rowers does not reach the level of a constitutional violation under § 1983.[10]  (Bond Reply at 4.)

Plaintiffs counter that the Second Amended Complaint adequately alleges that Decedent was discriminated against as a male.  (Opp'n Bond at 12.)  They note that sexual harassment violates the Equal Protection Clause because it is, by definition, motivated by gender.  (*Id.*)  They contend that Bond's "[p]ersistent insults and verbal abuse based on male genitalia and archaic concepts of 'manliness' clearly constitute harassment based on Decedent's male gender," which is a protected class, and that the female rowers were not subject to that harassment.  (*Id.* at 13.)  Plaintiffs further argue they have shown that Bond's discrimination against Decedent was intentional and part of a pattern and practice that Bond employed.  (*Id.*)  They analogize, (*see* Opp'n Bond at 13–14), to *Doe v. Los Angeles Unified School District*, No. 2:16-cv-00305-CAS (JEMx), 2017 WL 797152, at *18–19 (C.D. Cal. Feb. 27, 2017), where the court found evidence of a teacher's racial, public denigration of

---

[10]    Defendant Bond further contends that Plaintiffs cannot bring an equal protection claim for alleged retaliation.  (Bond Mem. at 14.)  While the Second Amended Complaint is not entirely clear on the issue, from the Court's reading of Plaintiffs' arguments in opposition to Defendants' Motions, Plaintiffs are not seeking to bring an equal protection claim against Defendants based on Bond's alleged retaliation.  The Court noted in its prior Order that while the Ninth Circuit has not spoken clearly on the issue, other circuits have declined to recognize an equal protection right to be free from retaliation.  *See e.g.*, *Thompson v. City of Starkville*, 901 F.2d 456, 468 (5th Cir. 1990) (dismissing plaintiff's equal protection claim in retaliation case because it "amounts to no more than a restatement of his first amendment claim"); *Vukadinovich v. Bartels*, 853 F.2d 1387, 1391–92 (7th Cir. 1988) (finding that the plaintiff's equal protection retaliation claim, based on allegation that "he was treated differently because he exercised his right to free speech," "is best characterized as a mere rewording of [his] First Amendment-retaliation claim"); *Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997) ("A pure or generic retaliation claim, however, simply does not implicate the Equal Protection Clause."); *Garrett v. Governing Bd. of Oakland Unified Sch. Dist.*, 583 F. Supp. 3d 1267, 1278 (N.D. Cal. 2022) ("[I]t is undisputed that neither the U.S. Supreme Court nor the Ninth Circuit has recognized an Equal Protection Claim as viable under a retaliation theory.").  Plaintiffs make no argument about the propriety of basing an equal protection claim on facts involving retaliation.  (*See* Opp'n Bond at 11–14; Opp'n REM at 18–20.)  The Court therefore assumes Plaintiffs are not seeking to bring such a claim.  And even if Plaintiffs were seeking to bring such a claim, Defendants would be entitled to qualified immunity on that claim since it is not a clearly established constitutional right.  *See Garrett*, 583 F. Supp. 3d at 1278 ("The constitutional question at issue here thus cannot be said to be 'beyond debate,' as reflected in disparate decisions as to whether a retaliation claim can ever be stated under the Fourteenth Amendment.").

a thirteen-year-old black female student sufficient to survive summary judgment because the facts—including racial insults, throwing a note at the student, and leaning in very close to the student while using a racial slur—showed the teacher's intent to discriminate based on race.

Plaintiffs have sufficiently alleged that Decedent was a member of a protected class. *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 723–24 (1982) (discrimination based on gender is subject to intermediate scrutiny under the Equal Protection Clause).  Further, the Court notes the inappropriateness of Bond's sexually charged comments and recognizes the negative impact such language can have on a college athlete.  As the law currently stands, however, verbal harassment or abuse, standing alone, is insufficient to establish a constitutional violation under § 1983.  *See Oltarzewski*, 830 F.2d at 139; *Patrick*, 402 F. App'x at 285; *Whatley*, 2017 WL 4842408, at *3; *Patterson*, 2021 WL 1191999, at *6.[11] While the case Plaintiffs rely on largely involved verbal race discrimination, the Court highlighted the particularly egregious nature of the situation given the teacher's position in the classroom, the age of the student, and the public denigration that resulted.  *See Doe*, 2017 WL 797152, at *18–19.  Plaintiffs have neither explained why *Doe*, the sole case they cite to support their argument, is analogous here, nor have they provided any binding precedent to establish that verbal sexual harassment alone is sufficient to state a constitutional violation.  The Court therefore **GRANTS** Bond's Motion and **DISMISSES** Plaintiffs' equal protection claim against Bond.

### b.   McGann and Edwards

Because Plaintiffs have not sufficiently alleged Defendant Bond violated the Equal Protection Clause through gender discrimination, they cannot sufficiently allege that

---

[11]     The Court recognizes that these cases involve prisoner claims against state actors, but Plaintiffs have not provided the Court any case law or reasoning to show they do not equally apply in the non-prison context. *Cf. Mulvaney v. Cal. Highway Patrol*, No. 5:17-cv-01044-CAS (KSx), 2019 WL 1114549, at *7 (C.D. Cal. Feb. 26, 2018) (finding verbal harassment not sufficient to state constitutional claim outside prison context).

McGann and Edwards violated the Equal Protection Clause by responding with deliberate indifference to Bond's conduct such that they then subjected Decedent to gender discrimination. *See Johnson*, 588 F.2d at 743–44; *Walsh*, 827 F. Supp. 2d at 1116. Furthermore, the Second Amended Complaint contains no allegations that McGann or Edwards were personally involved in any intentional gender discrimination. The Court thus **GRANTS** Defendants' Motion and **DISMISSES** Plaintiffs' equal protection claim against McGann and Edwards.

### c. Qualified Immunity

Defendants also argue that they are entitled to qualified immunity because, even if Plaintiffs had alleged a constitutional violation, none of the constitutional rights were clearly established at the time of the alleged violation. (Bond Mem. at 19–21; REM Mem. at 23–24.) Plaintiffs counter that Defendants are not entitled to qualified immunity because at the time of the alleged discriminatory conduct, the law was clear that, under the Equal Protection Clause, individuals have "the right to be free from purposeful discrimination in education by state actors." (Opp'n REM at 23; *see* Opp'n Bond at 17–18.)

The applicability of qualified immunity should be decided as early as possible in litigation since it is a complete immunity from suit, not just a defense to liability. *See Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009); *but see O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) ("When, as here, defendants assert qualified immunity in a motion to dismiss under Rule 12(b)(6), 'dismissal is not appropriate unless [the court] can determine, based on the complaint itself, that qualified immunity applies.'" (citation omitted)). "Determining whether [state actors] are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the [state actor's] conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *O'Brien*, 818 F.3d at 936 (citation omitted); *see Pearson*, 555 U.S. at 232. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11

(2015) (citation omitted).  Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Id*. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  In addition, courts do not define "clearly established" at a high level of generality.  *Id*.  Instead, the "dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'"  *Id*. (citation omitted).

Here, even if the Court had found that the individual Defendants violated Decedent's equal protection rights, Defendants would nonetheless be entitled to qualified immunity.  As discussed above, *see supra* pp. 25, 28, as the law currently stands, verbal abuse alone is insufficient to state a constitutional violation.  And even if the Court had found Bond's verbal abuse to be particularly egregious such that the Court was inclined to find Bond's verbal abuse should be considered a violation of Decedent's constitutional rights, Bond, McGann, and Edwards were not on notice that verbal abuse would violate Decedent's constitutional rights.  In other words, existing precedent has not placed this constitutional question beyond debate.  As a result, Defendants Bond, McGann, and Edwards are entitled to qualified immunity.  The Court therefore **GRANTS** Defendants' Motion and **DISMISSES** Plaintiffs' equal protection claim against Bond, McGann, and Edwards **WITH PREJUDICE**.

### 2. *Deprivation of Substantive Due Process*

"To establish a substantive due process claim, a plaintiff must, as a threshold matter, show a government deprivation of life, liberty, or property."  *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998).  That deprivation must have a causal connection to the resulting adverse action.  *See id.* at 874.  The Ninth Circuit "has recognized that parents have a Fourteenth Amendment liberty interest in the companionship and society of their children."  *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).  "Official conduct that 'shocks the conscience' in depriving parents of that interest is cognizable as a violation of due process."  *Id*.; *see Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  "What state of mind shocks the conscience depends on the circumstances of a particular case."  *Walsh*,

827 F. Supp. 2d at 1119 (quoting *Provencio v. Vazquez*, 258 F.R.D. 626, 640 (E.D. Cal. 2009)). "Mere negligence" is not enough to shock the conscience. *Id.*; *see Bhandari v. National City*, No. 3:21-cv-01652-BTM-MDD, 2022 WL 1308034, at *5 (S.D. Cal. May 2, 2022) (noting the "shocks the conscience" standard is a "high bar" that "only the most egregious official conduct meets" (citation and internal quotation marks omitted)).

Further, to support a § 1983 claim, plaintiffs "must sufficiently allege proximate cause." *Walsh*, 827 F. Supp. 2d at 1120 (citing *Arnold*, 637 F.2d at 1355–56). "The touchstone of proximate cause under § 1983 is foreseeability." *Id*. In the context of suicide, if a decedent's suicide is "the result of a mental condition proximately caused by defendants' violation of his constitutional rights, which condition prevents him from realizing the nature of his act or controlling his conduct," the causal chain is not broken. *Soto v. City of Sacramento*, 567 F. Supp. 662, 694 (E.D. Cal. 1983). "On the other hand, if at the time of the . . . suicide [the decedent] was able to appreciate the nature of his act and able to control his conduct, but chose freely to [commit] suicide, defendants would not be liable for the injuries sustained by virtue of the . . . suicide." *Id*. The issue of causation is resolved on the basis of the decedent's state of mind at the time of the suicide. *Id*.; *see also Walsh*, 827 F. Supp. 2d at 1120 ("First, the proximate cause analysis turns on whether it is reasonably foreseeable that the claimed constitutional violation would cause a mental state that could negate the [decedent's] volition. Second, whether the [decedent's] mental state was actually such that he could not appreciate the nature of his acts upon committing suicide is often a question of fact. Third, if the facts establish that the [decedent] could not appreciate the nature of his acts, the suicide does not constitute a super[s]eding, intervening event, and the defendants may be held liable for injuries sustained as a result of the suicide.").

### a. Bond

Defendant Bond moves to dismiss Plaintiffs' substantive due process claim because (1) verbal harassment and abuse is not sufficient to state a constitutional violation; (2) the Second Amended Complaint does not allege any new or different allegations than the prior

complaint, which the Court already dismissed; and (3) Plaintiffs cannot establish causation. (Bond Mem. at 15–19.)  Plaintiffs "acknowledge that no new facts have been alleged in the [Second Amended Complaint] as to their substantive due process cause of action," but they contend they provide new arguments based on the same set of facts that show they have stated a claim.  (Opp'n Bond at 14.)  Plaintiffs argue that there is no specific test to determine what shocks the conscience, but it can be shown through "conduct intended to injure in some way unjustifiable by any government interest," (*id*. at 15 (quoting *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006))), or by showing Defendants "'either consciously or through complete indifference disregard[ed] the risk of an unjustifiable deprivation' of life or liberty, (*id*. (quoting *Jones v. Cate*, No. 2:12-cv-2181-TLN (CKD), 2015 WL 1440168, at *12 (E.D. Cal. Mar. 27, 2015))).  Plaintiffs also argue they allege more than just verbal abuse; instead, they allege that Bond encouraged Decedent to exert himself to the point of vomiting and "had a history of wildly inappropriate, unjustified abuse of his athletes through both verbal abuse and his conduct of deterring his athletes from seeking mental health treatment, getting/following the advice of their other physical trainers, or utilizing other support resources." (Opp'n Bond at 15–16.)  Plaintiffs further argue Bond had already been put on notice of the dangerousness of his conduct since he had already been ousted from UPenn after the rowers there raised concerns about his disregard of the mental health of the rowers.  (*Id*. at 16.)  Plaintiffs do not address Bond's argument regarding causation.  (*See id*. at 14–16.)

In its prior Order, the Court found that Bond's conduct did not meet the "conscience shocking" standard.  (*See* ECF No. 36 at 17.)  The Court again recognizes that Bond's conduct, as alleged, was inappropriate; however, with no added factual allegations in the Second Amended Complaint, the Court has nothing new to review and no reason to revisit its prior decision.  The Court understands that outside the sexual harassment context, Plaintiffs are alleging behavior beyond verbal abuse, but most of Bond's behavior is still categorized as verbal abuse.  And, as previously noted, *see supra* pp. 25, 28, as the law currently stands, verbal abuse is insufficient to state a claim for a constitutional deprivation.

The Court finds that the alleged verbal abuse combined with Plaintiffs other allegations is insufficient to state a claim for a constitutional deprivation.[12]   The Court therefore **GRANTS** Bond's Motion and **DISMISSES** Plaintiffs' substantive due process claim against Bond.

### b.   McGann and Edwards

Defendants McGann and Edwards move to dismiss Plaintiffs' substantive due process claim against them because their conduct did not shock the conscience and no allegations in the Second Amended Complaint suggest Defendant Edwards knew about Bond's conduct or was otherwise involved with the situation.  (REM Mem. at 22–23.) Plaintiffs argue McGann and Edwards shocked the conscience through doing nothing to address Bond's abusive behavior.  (Opp'n REM at 21–22.)

Defendants are correct.  First, because the allegations against Bond do not meet the conscience-shocking standard, McGann's response to that conduct could not have shocked the conscience.   Second, even if Bond's conduct shocked the conscience, Plaintiffs' allegations are insufficient to establish at what point McGann knew the severity of Bond's conduct.  At most, Defendant McGann acted negligently in not responding more quickly to Decedent's April 2020 survey.  But Plaintiffs' allegations against McGann do not meet the "conscience-shocking" standard.  Likewise, nothing in the Second Amended Complaint shows Defendant Edwards was aware of any of Bond's conduct.  Plaintiffs' allegation that Edwards was "presumably" aware of the information in the April 2020 survey because McGann had reviewed it, is insufficient to state a claim against Edwards.  (*See, e.g.*, SAC ¶ 209); *see Iqbal*, 556 U.S. at 678 (conclusory statements do not suffice to state a claim). The Court therefore **GRANTS** the Regents' Motion and **DISMISSES** Plaintiffs' substantive due process claim against McGann and Edwards.

/ / /

---

[12]     Because the Court finds the Second Amended Complaint does not sufficiently allege conscience-shocking behavior, the Court need not address the issue of proximate cause here.

21-CV-1703 TWR (MSB)

c.   Qualified Immunity

Even if the Court were to find Plaintiffs' allegations sufficient to state a substantive due process claim, the law in this area cannot be said to have been clearly established at the time of the events—existing precedent has not placed this constitutional question beyond debate.  *See Bhandari*, 2022 WL 1308034, at *5 (noting the "shocks the conscience" standard is a "high bar" that "only the most egregious official conduct meets" (citation and internal quotation marks omitted)).  As such, Defendants Bond, McGann, and Edwards are correct that they are entitled to qualified immunity.  (Bond Mem. at 19–21; REM Mem. at 23–24); *see Jones*, 2015 WL 1440168, at 12.  The Court therefore **GRANTS** Defendants' Motion and **DISMISSES** Plaintiffs' substantive due process claim against Bond, McGann, and Edwards **WITH PREJUDICE**.

## C.   *State Law Claims*

In addition to the federal claims discussed above, Plaintiffs also seek to bring a wrongful death claim against Bond, McGann, and Edwards, along with negligent hiring and negligent supervision claims against McGann and Edwards.  (SAC ¶¶ 311–58.) Defendant Bond moves to dismiss Plaintiffs' wrongful death claim for failure to state a claim, (*see* Bond Mem. at 21–23), and Defendants McGann and Edwards move to dismiss Plaintiffs' state law claims generally, (*see* REM Mem at 24–30).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

### 1.    *Wrongful Death*[13]

"The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs."  *Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1263 (2006) (emphasis omitted) (citation omitted).  "Wrongful act" as used in California Code of Civil Procedure § 377.60 "means any kind of tortious act."  *Barrett v. Super. Ct.*, 222 Cal. App. 3d 1176, 1191 (1990).  Federal district courts have also found that wrongful death can be premised on claims of deliberate indifference in violation of § 1983.  *See e.g.*, *Est. of Prasad ex rel. Prasad v. County of Sutter*, 958 F. Supp. 2d 1101, 1112, 1118 (E.D. Cal. 2017) (finding that wrongful death claim can be predicated on defendant county's deliberate indifference to pretrial detainee's serious medical needs—in other words, wrongful death claim can be predicated on violation of the Fourteenth Amendment); *Villarreal v. County of Monterey*, 254 F. Supp. 3d 1168, 1191 (N.D. Cal. 2017) (stating wrongful death claim may be premised on claim for deliberate indifference in violation of § 1983).

### a.    Bond

Defendant Bond moves to dismiss Plaintiffs' wrongful death claim for failure to state a claim, arguing Plaintiffs have failed to allege Bond had a legal duty to prevent Decedent's suicide.  (Bond Mem. at 22–23.)  In discussing Plaintiffs' federal causes of action, Bond argued Plaintiffs failed to establish proximate cause in that the facts alleged do not show

---

[13]    The caption page of the Second Amended Complaint states Plaintiffs are bringing a wrongful death cause of action under California Code of Civil Procedure § 377.30.  (*See* ECF No. 41 at 1.)  In their opposition papers, however, Plaintiffs rely on California Code of Civil Procedure § 377.60 to support their wrongful death claim.  (*See* Opp'n Bond at 19.)  California Code of Civil Procedure § 377.30 allows a decedent's personal representative to initiate a cause of action following his death—it is a survival cause of action, not a cause of action for wrongful death.  *See* Cal. Civ. Proc. Code § 377.30.  California Code of Civil Procedure § 377.60, on the other hand, establishes a wrongful death cause of action.  *See* Cal. Civ. Proc. Code § 377.60.  It appears Plaintiffs made a typographical error, so the Court construes Plaintiffs' wrongful death action as one arising under § 377.60.  (*See* ECF No. 58 (at the hearing, Plaintiffs stated they did not object to the Court's construction of this claim).)

Decedent had an uncontrollable impulse to commit suicide.  (*Id*. at 17–19.)  Defendant Bond does not make the same argument in the section of his Motion that discusses the wrongful death claim.  (*See id*. at 21–23.)  In any event, Plaintiffs argue that at the motion to dismiss stage, they do not need to establish proximate cause; they only need to allege proximate cause, which they have done.  (Opp'n Bond at 21.)  They also contend that Bond's arguments about a legal duty to prevent suicide are misplaced because "Plaintiffs' claim is predicated on Bond's *intentional*, tortious conduct in abusing and harassing Decedent to the point of creating serious mental distress which ultimately caused Decedent's suicide (and his *deliberate* indifference to Decedent's suffering)."  (*Id*. at 23.)

Plaintiffs are correct that a wrongful death claim can be premised on wrongful conduct other than negligence.  *See Barrett*, 222 Cal. App. 3d at 1191; *Tate v. Canonica*, 180 Cal. App. 2d 898, 904, 909 (1960); *see also Nally v. Grace Cmty. Church*, 47 Cal.3d 278, 301 (1988) ("[U]nder *Tate*, a plaintiff may resist a demurrer to a wrongful death action for intentional conduct leading to suicide if he can allege facts sufficient to show that defendant's conduct was outrageous and a substantial factor in the decedent's suicide."). Defendant Bond does not argue that Plaintiffs' wrongful death claim premised on conduct other than negligence should be dismissed—he only argues that Plaintiffs' wrongful death claim premised on negligence must be dismissed for failure to sufficiently show Bond owed Decedent a legal duty of care.  (*See* Bond Mem. at 21–23; Bond Reply at 7–8.)  In the absence of any argument from Bond, Plaintiffs' wrongful death claim against Defendant Bond for wrongful conduct other than negligence survives Bond's Motion.[14]

---

[14]    When asked at the hearing to clarify the legal theory underpinning their wrongful death claim against Defendant Bond, Plaintiff confirmed they are not alleging Bond had a "specific duty" to prevent Decedent's suicide under a negligence theory.  (*See* ECF No. 58.)  Instead, Plaintiffs' wrongful death claim against Bond "is predicated on Bond's *intentional*, tortious conduct in abusing and harassing Decedent to the point of creating serious mental distress which ultimately caused Decedent's suicide." (Opp'n Bond at 23.)  In addition, Defendant Bond does not discuss the "uncontrollable impulse" standard (which is discussed in more detail below, *see infra* at pp. 38–39), in the context of the wrongful death claim or explain its application in the context of an intentional tort.  In any event, the allegations in the Second Amended Complaint present too close of a factual issue for the Court to decide at the motion to

The Court thus **DENIES** Defendant Bond's Motion to the extent it seeks dismissal of Plaintiffs' wrongful death claim.

### b.   McGann and Edwards

Defendants McGann and Edwards move to dismiss Plaintiffs' wrongful death claim against them because they argue they had no legal duty to prevent Decedent's suicide and the Second Amended Complaint lacks allegations linking Decedent's suicide to any act or omission by McGann or Edwards.  (REM Mot. at 25–30.)  Plaintiffs argue Defendants McGann and Edwards did have a special relationship with Decedent as outlined in *Regents of University of California v. Superior Court*, 4 Cal. 5th 607 (2018), such that they were required to, "'at minimum, not increase' the risks to Decedent inherent in participating in sports."  (Opp'n REM at 24–25.)  Plaintiffs argue that the wrongful death claim is not brought "merely for their failure to prevent Decedent's suicide, but for creating, at first through their negligence but then knowingly and with deliberate indifference, the environment where sustained, repeated harassment and psychological (and physical) abuse ran unchecked," and ultimately caused Decedent's mental condition that resulted in Decedent's uncontrollable impulse to commit suicide.  (*Id*. at 25.)

"In any action for wrongful death resulting from negligence, the complaint must contain allegations as to all the elements of actionable negligence."  *Jacoves v. United Merch. Corp.*, 9 Cal. App. 4th 88, 105 (1992).  "Under California law, '[t]he elements of negligence are: (1) defendant's obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks (duty); (2) failure to conform to that

---

dismiss stage.  While the Court is not precluded from deciding whether Plaintiffs have adequately alleged that Decedent experienced an uncontrollable impulse to commit suicide, courts typically reserve close factual issues on the topic for a later stage in the proceedings.  *See Whooley v. Tamalpais Union High Sch. Dist.*, 399 F. Supp. 3d 986, 1000 (N.D. Cal. 2019) ("[W]hether [the decedent] suffered from an uncontrollable impulse to end his life appears to be a question of fact that is inappropriate to decide at the pleading stage."); *Walsh*, 827 F. Supp. 2d at 1120–21 (noting that whether a decedent's mental state was such that he could not appreciate the nature of his acts upon committing suicide is often a question of fact).  The Court therefore **DENIES** Bond's Motion to the extent it argues Plaintiffs' wrongful death claim must be dismissed for failure to allege Decedent had an uncontrollable impulse to commit suicide.

21-CV-1703 TWR (MSB)

standard (breach of the duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages).'" *Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009) (quoting *McGarry v. Sax*, 158 Cal. App. 4th 983, 994 (2008)); *see also Jacoves*, 9 Cal. App. 4th at 105 ("Negligence involves the violation of a legal duty imposed by statute, contract or otherwise, by the defendant to the person injured, *e.g.*, the deceased in a wrongful death action.").

Defendants McGann and Edwards conflate the two ways in which a plaintiff can bring a wrongful death cause of action based on a student's suicide. The question of whether Decedent had an uncontrollable impulse to commit suicide is a different question than whether Defendants had a specific duty to prevent a foreseeable suicide by one of their students. *See Whooley*, 399 F. Supp. 3d at 999.

i.    Uncontrollable Impulse Test

"Proximate cause, or legal cause, is absent where an intervening act or event breaks the chain of causation between the defendant's conduct and the plaintiff's injuries as a matter of law." *Whooley*, 399 F. Supp. 3d at 999. "In California, suicide has historically been viewed as an intervening event that always breaks the chain of causation, thereby precluding any tort liability for a suicide." *Id*. (citing *Tate*, 180 Cal. App. 2d at 901–03). "An exception is where the defendant's negligence causes the decedent to suffer from an uncontrollable impulse to commit suicide." *Id*. "The underlying rationale for this exception is that absent volition, the decedent's act of suicide is not independent from the defendant's original negligence." *Id*. "Therefore, in order to satisfy the uncontrollable impulse test, a plaintiff must show that a defendant's negligence causes the decedent to suffer a mental condition in which the decedent cannot control his or her suicidal impulses." *Id*. "On the other hand, if the decedent was able to control such impulses and had the ability to refrain from committing suicide, then it would be a superseding event that breaks the chain of causation between the defendant's negligence and the death." *Id*. Under the uncontrollable impulse test, the element of a duty owed to the decedent is the general duty each person has—to act with reasonable care under the circumstances—not

any special duty.  *See Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764, 771 (2011) ("The general rule in California is that [e]veryone is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person . . . .  In other words, each person has a duty to use ordinary care and is liable for injuries caused by his failure to exercise reasonable care in the circumstances." (citations and internal quotation marks omitted)).

Here, Defendants McGann and Edwards are correct that Plaintiffs do not sufficiently allege that McGann and Edwards were the ones responsible for any "uncontrollable impulse" by Decedent to commit suicide.  As to McGann, the Second Amended Complaint alleges that (1) she spoke on the phone with Decedent in February 2020, regarding his concerns about the allegations of sexual misconduct of Z.B. and Bond's treatment of him and she told Decedent an investigation takes time, (SAC ¶ 174); (2) at some point she reviewed Decedent's survey and knew that Decedent was struggling mentally, even to the point of thinking about suicide, due to Bond's conduct, (*id.* ¶¶ 207–08); and (3) she did not timely take appropriate action against Bond, (*id.* ¶¶ 210, 215).  But these allegations are insufficient to allege that McGann's conduct *caused* Decedent to have an uncontrollable impulse to commit suicide.  Instead, Plaintiffs seek to hold McGann liable for Bond's conduct—Plaintiffs in fact argue Bond's conduct caused Decedent's uncontrollable impulse to commit suicide.  (*See* Opp'n REM at 25.)  But "[e]xcept as otherwise provided by statute, a public employee is not liable for an injury caused by the act or omission of another person."  Cal. Gov't Code § 820.8; *see Regents of Univ. of Cal.*, 4 Cal. 5th at 619 ("A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act." (citation omitted)).[15]  To hold a third party liable for another's conduct, Plaintiffs must look to the "specific duty" test discussed below.

_____

[15]     Because Plaintiffs addressed their state law claims as a group in their opposition papers, the Court cannot determine under what theory Plaintiffs rest their wrongful death claim against McGann and

As to Edwards, the Second Amended Complaint is completely devoid of factual allegations as to what acts or omissions can be attributed to Edwards.  Instead, the Second Amended Complaint attributes all of McGann's acts or omissions to Edwards because Edwards "presumably" knew all the same information.  (*See, e.g.*, SAC ¶ 209.)  Such allegations devoid of any facts are insufficient to show Edwards caused Decedent to have an uncontrollable impulse to commit suicide.

### ii.    Specific Duty Test

Courts have recognized that a breach of a specific duty to prevent a foreseeable suicide due to the special relationship between the defendants and the decedent may result in tort liability, even if the suicide was volitional and does not satisfy the uncontrollable impulse test.  *See Walsh*, 997 F. Supp. 2d at 1085; *see also Barnett v. County of Los Angeles*, No. 2:20-cv-02530, 2021 WL 826413, at *6 (C.D. Cal. Mar. 4. 2021) (explaining that the "special relationship" theory is one of two ways to bring a wrongful death cause of action based on a suicide).  The California Supreme Court has found that "[c]olleges are in a special relationship with their enrolled students only in the context of school-sponsored activities over which the college has some measure of control."  *Regents of Univ. of Cal.*, 4 Cal. 5th at 626; *see id*. at 625–26 ("[W]e conclude postsecondary schools *do* have a special relationship with students while they are engaged in activities that are part of the school's curriculum or closely related to its delivery of educational services.").  As such,

---

Edwards.  (*See* Opp'n REM at 23–26.)  For example, neither their opposition papers nor the Second Amended Complaint make clear whether Plaintiffs seek to use their alleged negligent hiring and negligent supervision claims as the predicate negligent conduct that directly caused Decedent's alleged uncontrollable impulse to commit suicide.  Defendants McGann and Edwards also do not fully address this issue in their Motion.  (REM Mot. at 24–30.)

At the hearing, Plaintiffs clarified that they are alleging that the negligent hiring and negligent supervision claims are the predicate negligent conduct underlying their wrongful death claims against McGann and Edwards.  (*See* ECF No. 58.)  But the Second Amended Complaint does not rely on those theories to support the wrongful death claim.  The Court is thus unable to meaningfully analyze Plaintiffs' wrongful death claim based on Defendants' alleged negligent hiring and supervision.  (*See* SAC ¶¶ 311–21.)  In any subsequent complaint, Plaintiffs must clearly articulate their theory of liability.

"colleges generally owe a duty to use reasonable care to protect their students from foreseeable acts of violence in the classroom or during curricular activities." *Id*. at 627; *see id*. at 626 (finding that the college/student relationship "supports a duty of care only with respect to 'risks that arise within the scope of the school-student relationship'"). In addition, varsity athletics are school-sponsored events. *See id*. at 624 ("[R]ecognizing a duty to students in school-sponsored athletic events was 'plainly warranted by the relationship of the host school to all the student participants in the competitions it sponsors.'" (quoting *Avila v. Citrus Comm. Coll. Dist.*, 38 Cal. 4th 148, 393 (2006))).

Defendants McGann and Edwards reference *Regents* one time in their Motion, but they do not adequately explain why that case would not impute a special duty on McGann and Edwards to use reasonable care to protect UCSD's student-athletes from foreseeable acts of violence, including suicide, during, or as a result of, school-sponsored activities. *See Whooley*, 399 F. Supp. 3d at 1000 ("Since the alleged negligent acts occurred on school grounds, the fact that the suicide ultimately occurred elsewhere cannot shield Defendants from liability as a matter of law for their purported bad acts on campus."). Regardless, assuming without deciding that Defendants McGann and Edwards owed Decedent a special duty of care, the Second Amended Complaint does not adequately allege that Decedent's suicide was foreseeable such that McGann and Edwards breached their duty. As previously noted, *see supra* at p. 40, the Second Amended Complaint is devoid of any factual allegations as to what Defendant Edwards knew about Decedent. There are no allegations that Decedent and Edwards ever spoke or interacted. Plaintiffs' allegation that Edwards "presumably" knew about Decedent's survey is insufficient. (SAC ¶ 209.)

As for Defendant McGann, the only allegation touching on foreseeability is that in his survey, Decedent stated he had a "few fleeting thoughts of suicide" that did not "seem like a major threat to [him]." (*Id*. ¶ 208.) That lone statement is insufficient to allege that Decedent's suicide was foreseeable, particularly because the Second Amended Complaint does not allege McGann knew of the mental distress Decedent was experiencing once he went home to New York. *See Walsh*, 997 F. Supp. 2d at 1086–88 (noting under special

duty theory that school personnel must have known facts from which they could reasonably conclude that suicide was likely).  Even viewed in the light most favorable to Plaintiffs, these allegations do not allege that Decedent's suicide was foreseeable to McGann.

The Court therefore **GRANTS** Defendants' Motion and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' wrongful death claim against Defendants McGann and Edwards.

### 2.     *Negligent Hiring and Negligent Supervision*

In their Motion, Defendants McGann and Edwards generally seek to dismiss all of Plaintiffs' state law claims.  (REM Mem. at 24.)  Their arguments focus almost exclusively on Plaintiffs' wrongful death claim.  (*See id*. at 24–30.)  Defendants have expended no effort to dismiss Plaintiffs' negligent hiring and negligent supervision claims—they do not even recite the elements of those claims.  (*See id*.)  As such, the Court has no ability to meaningfully review Plaintiffs' negligent hiring and negligent supervision claims to determine if they meet the pleading requirements.  The Court thus **DENIES** Defendants McGann and Edwards' Motion to the extent it seeks dismissal of Plaintiffs' negligent hiring and negligent supervision claims.

### D.     **Punitive Damages**

Defendants McGann and Edwards also move to dismiss Plaintiffs' claim for punitive damages, arguing that there are insufficient facts regarding these individuals' conduct to show that they acted with oppression, malice, or fraud.  (REM Mem. at 31.)  Plaintiffs assert that it is premature to determine punitive damages because the evaluation requires a factual analysis.  (Opp'n REM at 26.)  "[E]ven where [a] claim formally sounds in negligence, if the plaintiff can make a showing that defendant's conduct goes beyond gross negligence and demonstrates a knowing and reckless disregard, punitive damages *may* be available.  *Simplicity Int'l v. Genlabs Corp.*, No. CV 09-6146 SVW (RCx), 2010 WL 11515296, at *2 (C.D. Cal. Apr. 21, 2010).  Because the Court is dismissing Plaintiffs' wrongful death claim against Defendants McGann and Edwards without prejudice, Plaintiffs' may still have a viable claim for punitive damages.  But it is too early in the proceedings to make that decision.  The Court therefore **DENIES WITHOUT**

**PREJUDICE** McGann and Edwards' Motion to the extent it seeks dismissal of Plaintiffs' claim for punitive damages.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant Bond's Request for Judicial Notice and **GRANTS IN PART AND DENIES IN PART** Defendants' Motions. Specifically, the Court **GRANTS** Defendants' Motions and **DISMISSES WITH PREJUDICE** Plaintiffs' § 1983 claims against Bond, McGann, and Edwards and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' Title IX claims against the Regents and Plaintiffs' wrongful death claim against McGann and Edwards. The Court otherwise **DENIES** Defendants' Motions. Finally, the Court **GRANTS** Plaintiffs leave to file a Third Amended Complaint addressing the above-enumerated deficiencies <u>within thirty (30) days of the date this Order is electronically docketed</u>. Plaintiffs are not permitted to reallege any claims dismissed with prejudice and may not add any claims or parties to the case without leave of Court. *Should Plaintiffs fail to file a timely amended complaint, this action will proceed as to their remaining causes of action.*

**IT IS SO ORDERED.**

Dated:  August 23, 2023

Honorable Todd W. Robinson
United States District Judge

43

21-CV-1703 TWR (MSB)