Valerie Garcia Hong, Esq., SBN 239755
Mark A. Simpliciano, Esq., SBN 331516
GARCIA HONG LAW APC
10680 Treena Street, Suite 160
San Diego, CA 92121
Telephone: (858) 255-0163
Facsimile: (858) 724-1438
valerie@garciahonglaw.com
mark@garciahonglaw.com

Attorneys for Plaintiffs
Brian Lilly, Sr. and Brenda Lilly, individually,
and on behalf of the Estate of Brian Lilly, Jr.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN LILLY, SR., and BRENDA LILLY, individually, and on behalf of the Estate of Brian Lilly, Jr., | Case No.: 3:21-cv-01703 (TWR) (MSB) |
| Plaintiffs, | **THIRD AMENDED COMPLAINT FOR DAMAGES:** |
| v. | **1) Violation of Title IX (Retaliation) against Defendant Regents of the University of California;** |
| UNIVERSITY OF CALIFORNIA-SAN DIEGO, BOARD OF REGENTS OF UNIVERSITY OF CALIFORNIA, GEOFF BOND, individually, KATIE MCGANN, individually and EARL W. EDWARDS, individually | **2) Violation of Title IX (Deliberate Indifference) against Defendant Regents of the University of California;** |
| Defendants. | **3) Wrongful Death against Defendant Geoff Bond pursuant to C.C.P. §377.60;** |
| | **4) Negligent Hiring, Supervision, and Retention against Defendant McGann** |
| | **JURY TRIAL DEMAND** |

# INTRODUCTION

1.      Plaintiffs BRIAN LILLY, Sr. and BRENDA LILLY (collectively referred to herein as "Plaintiffs"), individually, and on behalf of the Estate of Brian Lilly, Jr. ("Decedent") bring this action for: (1) retaliation for Decedent's report of discrimination and harassment in violation of Title IX of the Education Amendments of 1972 against Defendant Regents of the University of California ("UCSD")[1]; (2) deliberate indifference in violation of Title IX of the Educational Amendments of 1972 against UCSD; (3) wrongful death pursuant to Code of Civil Procedure § 377.60 against Defendant Geoff Bond ("Bond"); and (4) negligent hiring, supervision, and retention against Defendant Katie McGann ("McGann").

2.      This matter concerns the wrongful death of Decedent caused directly by the bullying, harassment, and psychological torment perpetrated by the abusive head coach Bond employed by UCSD men's rowing team, and the inaction by UCSD and its employees to protect their students. Bond subjected his student athletes, including Decedent, to abusive and offensive conduct. Bond's supervisor Katie McGann ("McGann") knew both about Decedent's grievances related to Bond's conduct, his repeated use of sexually inappropriate comments aimed at the male members of the rowing team, and Decedent's complaints that Bond and UCSD ignored his protests that a fellow rower was accused of sexual misconduct. Rather than take action, the Defendants ignored and/or enabled the wrongful conduct. Despite actual notice of Decedent's grievances about Bond's conduct and Decedent's protests of sexual misconduct by another rower, Defendants did nothing to protect the students, including Decedent.

3.      Decedent made several complaints to Bond about the sexual misconduct allegations as early as January of 2020. In retaliation for complaining about sexual misconduct, Bond subjected Decedent to repeated verbal and

---

[1]     Plaintiffs erroneously sued Defendant as Board of Regents of University of University of California, and University of California-San Diego.

psychological abuse, hostility, embarrassment, isolation, and demotion on the rowing team.

4.      By February 2020, Decedent contacted McGann about Bond's retaliatory conduct and advised her that Bond's verbal abuse, hostility, isolation, and demotion on the rowing team was a result of his complaints of sexual misconduct allegations and objections as to how UCSD has handling the investigation of his fellow rower. Despite their actual notice of Decedent's concerns and the retaliation by Bond, UCSD and McGann did nothing.

5.      By March 2020, Bond threatened Decedent that he needed to maintain harmony with his fellow rowers or face removal from the team. McGann, who was copied on the email to Decedent, was fully aware of the hostile relationship that Decedent faced in retaliation for objecting to how UCSD handled allegations of sexual misconduct by another athlete.

6.      By April 2020, Decedent had submitted a survey to UCSD where he complained again about Bond's retaliatory conduct, verbal abuse, hostility, isolation, and demotion on the rowing team. He complained that this abuse was triggered by his protest that UCSD was not properly handling the alleged sexual misconduct allegations and that Bond was repeatedly sexually harassing the men on the rowing team with berating comments about their weight and manliness.

7.      UCSD, via McGann, knew about the survey submitted by Decedent and other rowers because McGann personally reached out to Decedent and at least one other rower about the statements made in the survey by June 2020. When McGann reached out to Decedent, she specifically referenced the survey that was sent earlier. Despite their actual notice of Decedent's concerns and the retaliation by Bond, UCSD and McGann did nothing.

8.      For purposes of this action and under UCSD's Title IX policy, Defendants Bond and McGann are collectively referred to as "Responsible Employees." These Responsible Employees were required to immediately report

and/or investigate any sexual misconduct allegations to UCSD. They failed to do so.

9.     Bond's retaliatory conduct, verbal abuse, hostility, isolation, and demotion, along with UCSD's and McGann's knowing failure of the retaliation and deliberate difference caused Decedent's despair, paranoia, and confusion. Decedent suffered severe and extreme emotional distress, and was hospitalized for the first time in his life. After Decedent was released, he returned UCSD via online, while attending the Fall 2020 semester at home until he returned to the campus for the following Spring 2021 semester.

10.    Faced with Defendants' conduct and deliberate indifference, Decedent tragically took his own life on January 4, 2021 as a result of the abuse, retaliation, and deliberate indifference by Defendants. He simply could not control the impulse to commit suicide based on Defendants' conduct.

## JURISDICTION AND VENUE

11.    Jurisdiction of this Court is invoked pursuant to this Court's federal question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331; 1367 respectively because: (i) the federal law claim arises under the Constitution and statutes of the United States; and (ii) the state law claims are so closely related to the federal law claim as to form the same case or controversy under Article III of the United States Constitution. Further, this Court has diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest.

12.    Plaintiffs bring this action as administrators of the estate of Decedent, as Decedent's parents, the personal representatives of his estate and successors in interest.

13.    The events described herein occurred at the UCSD. UCSD is part of the University of California system. UCSD is located and conducts business within the Southern District of California.

14.　　This Court has personal jurisdiction over UCSD on the grounds that the Board of the Regents is the governing body of the University of California, including UCSD.

15.　　This Court has personal jurisdiction over Defendants Bond and McGann (collectively referred to as the "Responsible Employees") on the grounds that they were employed by UCSD during the relevant times described herein, and both the acts they committed which form the basis for this action as well as the Responsible Employees resided in the Southern District of California.

16.　　Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because UCSD is located in this judicial district and a substantial part of the events and omissions giving rise to the claim occurred within the Southern District of California.

## PARTIES

17.　　Plaintiffs are citizens of the United States and are residents of New York. Plaintiffs are the parents of Decedent.

18.　　Plaintiffs are the successors in interest of Decedent under California law because Decedent died with no surviving issue and Plaintiffs are therefore entitled to the property of the Decedent by intestate succession. Plaintiffs were also appointed Administrators of Decedent's Estate by the Surrogate Court of Westchester County in the State of New York on June 22, 2021.

19.　　Plaintiffs were the parents and natural guardians to Decedent, who was a male student and member of a protected class. Prior to his tragic death, Decedent resided in San Diego and enrolled at UCSD.

20.　　UCSD was and is a public university and recipient of federal funds located in San Diego, California where it maintains its principal offices and places of business.

21.　　Defendant Bond was employed as head coach of the men's rowing team by UCSD. Bond is being sued in his individual capacity.

-4-

22.     Defendant McGann was employed as associate athletic director by UCSD. McGann is being sued in her individual capacity.

## **FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

### A. UCSD Hires Bond With No Due Diligence

23.     On October 1, 2019, Bond secured the head coach position at UCSD. UCSD, including McGann, conducted a rushed search lacking in due diligence before they hired Bond. Bond was unfit, incompetent, risky, and a hazard to the people he coached. Had UCSD and McGann conducted any minimal due diligence prior to hiring Bond, they would have discovered the protest by several rowers at University of Pennsylvania ("UPenn") who complained of Bond's harassment, bullying, and abuse.

24.     Just months earlier, in June 2019, Bond's contract at UPenn expired. Plaintiffs are informed and believe that multiple individuals from UPenn's rowing team penned a letter to UPenn's administration, expressing concerns about Bond's abusive coaching and behavior, which took a toll on the rowers' mental health. Additionally, Plaintiffs are informed and believe that a number of rowers from the UPenn's rowing team threatened to quit unless Bond was removed from his coaching position and the program.

25.     Plaintiffs are informed and believe that the UPenn rowers refused to continue to row under Bond due to his mentally abusive coaching methods, unfair selection process, sexually charged insults, and ineffective training methods.

26.     Several years earlier, in June 2016, several UPenn rowers spoke up out their fear for the safety of their younger rowers. The UPenn rowers communicated with UPenn to inform them that Bond exhibited a disregard for responsible oversight of the mental health of the rowers. The UPenn rowers revealed that Bond stigmatized the use of appropriate resources for managing stress and mental health issues by publicly shaming rowers that utilized UPenn's psychological services. The

UPenn rowers raised these concerns because they worried the younger rowers were particularly susceptible to Bond's abuse and were concerned about the risk of student suicide as a cost of keeping Bond on as a coach. All of this information was easily ascertainable with due diligence.

27.     After being forced out of UPenn in 2019, UCSD and McGann hired Bond. UCSD had been without a coach for several months. Given UCSD's prior rowing coach had departed over the summer, UCSD and McGann rushed to locate a replacement in the month before the Fall 2019 quarter started. UCSD was entering the quarter and the season without a coach for the men's rowing team.

28.     UCSD and McGann failed to properly explore Bond's end at UPenn. UCSD and McGann did little to no independent research into Bond's background, prior positions, the reasons he left seemingly prestigious positions, or even a cursory review of online social media about Bond prior to hiring him. UCSD and McGann did not interview any of the UPenn rowers nor reach out to UPenn's administration regarding Bond.

29.     In October 2019, UCSD and McGann hired Bond to be the head coach and Bond's longtime assistant coach, Dameon Engblom ("Engblom").

30.     During the Fall 2019 quarter, Decedent was enrolled as a student at UCSD and joined the men's rowing team. Bond was his head coach.

**B.  UCSD's Policies and Procedures Require Investigation of Harassment and Discrimination**

31.     The Office for the Prevention of Harassment & Discrimination ("OPHD"), the UCSD Title IX Office, and the university in general, promotes itself as a safe space for people to report incidents of harassment and discrimination.

32.     OPHD identifies "Responsible Employees," i.e., any university employee, who is not a confidential resource, and who receives, in the course of their employment, information that prohibited conduct or retaliation has occurred,

1    are required to "promptly notify the Title IX Office (OPHD)" so that a proper

2    investigation can occur to address the safety of the students.

3        33.    UCSD's Sexual Violence and Sexual Harassment Policy (the "Policy")

4    touts an "atmosphere free of harassment, exploitation, or intimidation. Sexual

5    violence, sexual harassment, retaliation, and other behavior prohibited by this Policy

6    interfere with those goals."

7        34.    UCSD was required to respond promptly and effectively to reports of

8    harassment, exploitation, sexual violence, retaliation, or intimidation. This included

9    taking reasonable steps to stop, prevent, correct, and when necessary, discipline,

10   behavior that violates the Policy.

11       35.    According to OPHD and the Policy, Responsible Employees were

12   required to contact OPHD as soon as possible when they learned that any UCSD

13   student had potentially experienced an incident of sexual violence or sexual

14   harassment. Even if the student's allegations were unsubstantiated, Responsible

15   Employees were required to directly report it to OPHD.

16       36.    As Responsible Employees, Bond and McGann should have

17   understood and act in accordance with the Policy, OPHD, and UCSD's overall

18   policy of investigating complaints of harassment and abuse. And, yet, they failed to

19   abide by these policies to the detriment of Decedent.

20   **C. <u>Decedent's Student Life at UCSD</u>**

21       37.    Decedent enrolled at UCSD for the Fall 2019 quarter. He was a

22   scholar-athlete of the class of 2023 men's rowing team.

23       38.    Decedent was an accomplished athlete prior to enrolling at UCSD. He

24   was a leader of the Pelham Community Rowing Association (PCRA). Decedent won

25   the "most improved" rower award his junior year of high school, then led the boat as

26   team captain his senior year. He earned a bronze medal at the Philly Youth Regatta

27   8+ in 2018.

28       39.    Decedent overcame juvenile rheumatoid arthritis to mold himself into a

top-shelf athlete – competing in the Ironman Triathlon and finishing several marathons. As a result of his health condition, Decedent gained over thirty pounds from the condition in middle school, He shared his struggles with weight with his rowing team and coaches at UCSD. However, this did not stop Decedent from succeeding as a rower.

40.     Decedent had no mental health issues prior to his enrollment at UCSD. He had not sought any mental health treatment at any time prior to his encounter with Bond and time at UCSD.

41.     Although Decedent was a freshman, Decedent successfully secured his spot in one of the top three varsity boats on the UCSD rowing team.

**D. <u>Bond's Abuse and Harassment Targeted Decedent</u>**

42.     Bond's treatment of the UCSD rowers, at first, appeared to be of the run-of-the-mill "tough" variety, including challenges to the athletes' toughness and sexually inappropriate insults to challenge their "manliness."

43.     As the months progressed, Decedent and other UCSD rowers observed Bond's explosive behavior. Bond humiliated Decedent and other UCSD rowers by challenging their manhood or displaying aggravation at a rower's use of physical therapy or treatment from the trainers.

44.     Decedent and other UCSD rowers were subjected to sexually inappropriate comments, mocking their "testicular" insufficiencies, and labeling them as "flaccid" and weak. Bond assailed Decedent and other UCSD rowers with inappropriate insults, regularly using sexual terms, mocking them for their insufficient testosterone, "flaccid" manhood, small "testicles," and lack of "manliness." Bond routinely labeled Decedent and other UCSD rowers "pussies." He also would question his rowers' loyalty to the team, which could only be established by their complete submission to the coach. Bond's insults and inappropriate sexual references were offensive, harassing, and harmful to Decedent and other UCSD rowers. These sexual references also violated OPHD, the Policy,

and UCSD's general policy to protect their students from sexual harassment.

45.     Knowing about Decedent's weight struggles and obesity from middle school, Bond referred to Decedent as "Fat [Decedent's name]" in front of the rowing team to hurt and humiliate Decedent. Bond also yelled at Decedent's teammates, calling them "Fat [Decedent's name]" when the rowers were challenging the coach or going over his head with complaints.

46.     Decedent and other UCSD rowers lived in fear of Bond's constant, unprovoked rage-filled outbursts. Bond would intentionally target a single rower or coxswain to publicly humiliate the athlete in front of teammates, or pit them against each other.

47.     Bond frequently mocked the weight of Decedent and other UCSD rowers and demanded that they needed to stop eating because they were too fat, lazy, and unwilling to meet his extreme demands.

48.     Bond encouraged Decedent and other UCSD rowers to vomit during grueling workouts. Then, Bond ridiculed the rowers as "pussies" for vomiting.

49.     Plaintiffs are informed and believe that McGann observed several varsity practices of the rowing team beginning in January 2020, where she observed Bond's anger and hostility.

**E. Defendants' Notice and Awareness of Sexual Misconduct Allegations Against UCSD Rower and Bond's Harassment of Decedent**

50.     In or around January 2020, Decedent's fellow teammate, "Z.B."[2], was accused of sexual harassment and sexual assault. At the time, Bond was advised by team captains on the UCSD rowing team that several women had alleged that Z.B. was verbally inappropriate and sexually harassed them.

51.     Bond alleges that he immediately contacted UCSD and McGann about

---

[2] For purposes of this action and to protect the privacy of a student at UCSD, Plaintiffs refer to Decedent's fellow teammate as "Z.B." Plaintiffs refer this Court to the allegations made in Bond's state law complaint in *Bond v. The Regents of the University of California*, Case No. 22CV018094, for the full name of Z.B.

the allegations of sexual misconduct made against Z.B. in or around January 2020.[3]
Bond alleges that McGann met with the team captains about the allegations of
sexual misconduct made against Z.B.

52. Despite actual notice of allegations of sexual misconduct made against
a member of the UCSD rowing team, the Responsible Employees, including Bond
and McGann, failed to comply with their obligations under the OPHD, the Policy,
and UCSD's policy to protect the safety of the students.

53. In or around January 2020, Decedent learned of the accusations against
Z.B. by multiple female students at UCSD. Decedent learned that a UCSD student
alleged she was sexually assaulted, both verbally and physically, on multiple
occasions by Z.B. Decedent learned of additional allegations made by female
students about Z.B.'s sexual harassment and assault, and Z.B.'s refusal to stop his
behavior.

54. Decedent and other UCSD rowers were outraged by the allegations.
Bond alleges that he spoke with Decedent, team captains, and Engblom about
Decedent's concerns about how Bond, the rowing team, and UCSD was handling
allegations of sexual harassment and sexual assault. During this meeting, Bond
alleges that Decedent did not believe the matter was being handled appropriately.
Bond admits to at least another phone call in early 2020 where Decedent voiced his
concerns about how Bond, the rowing team, and UCSD was handling allegations of
sexual harassment and sexual assault. Decedent was deeply troubled by the
Responsible Employees' refusal to take action and their indifference to these
allegations of sexual misconduct against Z.B.

55. As of January 2020, the Responsible Employees had actual notice of
allegations of sexual harassment and sexual assault made against Z.B. and failed to
follow the protocol directed by the school policy, which was to report the allegations

---

[3] These allegations by Bond are made in Bond's state law complaint in *Bond v. The
Regents of the University of California*, Case No. 22CV018094.

1  promptly to OPHD, directly.

2     56.    On February 22, 2020, Decedent exchanged several text messages with

3  Bond about the sexual misconduct allegations. Decedent asked, "Why is Z.B. still

4  on the team?" despite the sexual misconduct allegations. Concerned about the sexual

5  misconduct allegations, Decedent replied, "I don't think it would reflect well on us

6  if it were discovered that [Z.B.] were still on the team after all this."

7     57.    In response to the Decedent's concerns, Bond warned, "As a son of an

8  attorney that sounds like a threat. I would be extremely careful with your next few

9  words. I am willing to work with you but don't communicate with me in that way."

10  Rather than address Decedent's concerns and the impact of keeping Z.B. on the

11  team, Bond dismissed Decedent to "calm down and speak with a therapist."

12     58.    Subsequent to Decedent's communications with Bond, Bond continued

13  to harass Decedent. To further alienate and isolate Decedent from the team, Bond

14  berated a coxswain for misstating a call the coach wanted. The furious coach

15  shouted, "[w]ho the fuck said that?  Whoever said that is a fat coxswain--someone

16  who goes over the coaches like [Decedent]! We already have a fat [Decedent]!

17  Don't be a fat [Decedent]! Fat [Decedent] goes above his coach's head and talks

18  shit!" This was one of many examples of Bond's pointed attacks aimed at

19  Decedent's sensitivity regarding his weight and Decedent's decision to reach out to

20  outside authorities at UCSD. Bond's conduct was to retaliate against Decedent.

21     59.    Bond alleges that he had several communications with McGann in

22  February 2020 discussing Decedent's objections as to how UCSD and the

23  Responsible Employees were handling the allegations of sexual misconduct against

24  Z.B. Bond failed to report alleged sexual misconduct by Z.B. to OPHD. Bond

25  alleges he told McGann that he had concerns that Decedent was acting erratically.

26     60.    By February 2020, McGann was aware that Decedent, Bond, and

27  Engblom had discussed Decedent's complaints of Z.B.'s sexual misconduct and

28  keeping Z.B. on the team. She had actual notice of Decedent's concerns that he was

1   reporting the sexual misconduct and was bothered that Bond was retaliating with

2   verbal abuse, hostility, and isolation. She had actual notice of the hostile

3   environment that Decedent was exposed to on the rowing team.

4       61.   Rather than to address Decedent's complaints of Z.B.'s sexual

5   misconduct or even Bond's alleged observations that Decedent was acting

6   erratically, McGann allegedly gave Bond a pretextual process so that Decedent

7   could be removed from the team, including documenting any violations of the

8   rowing team rules or student code of conduct. During this call, McGann allegedly

9   also advised Bond to tell Decedent and Z.B. that any further problematic behavior

10  would cause them both to be expelled from the team. McGann's advice to Bond was

11  to create a paper trial and was pretext to hide the true motivations of ignoring

12  Decedent's continued complaints of Z.B.'s sexual misconduct and retaliation.

13      62.   There was no indication that Decedent had violated any rowing team

14  rules or student code of conduct. The fact that McGann gave this pretextual advice

15  shows her actual notice of Decedent's continued complaints of Z.B.'s sexual

16  misconduct, and the hostile relationship between Decedent and Bond. Yet, rather

17  than address Decedent's continued complaints, McGann did not take any

18  appropriate action in violation of Title IX.

19      63.   In February 2020, McGann and Decedent spoke about Decedent's

20  continued complaints of Z.B.'s sexual misconduct, his concerns of keeping Z.B. on

21  the team, and the hostile relationship between Decedent and Bond in retaliation for

22  Decedent's complaints. Decedent told McGann about other witnesses of the alleged

23  sexual misconduct by Z.B. and learned that McGann never spoke with the

24  witnesses.

25      64.   During the call with McGann, Decedent also told McGann that he felt

26  he "was being psychologically abused" by Bond and the "people who had the power

27  to cut him from the team" as a result of his continued complaints of Z.B.'s sexual

28  misconduct. During this phone call on February 22, 2020, Decedent told McGann

Third Amended Complaint

about how Bond subjected Decedent to repeated verbal abuse, hostility, and isolation from the team after he raised his concerns of the alleged sexual misconduct by Z.B. Decedent told McGann about how the entire situation was "ruining [his] experience as a student athlete at UCSD." Decedent shared the substance of this phone call with family, friends, and prior coaches.

65.     During the call with Decedent, McGann ignored Decedent's concerns and dismissed him. McGann suggested that Decedent could report to OPHD himself, which was not the Policy, or see a therapist. McGann's advice shows she had actual notice of Bond's retaliation and acted with deliberate indifference of Decedent's concerns and the impact on his experience as a student athlete at UCSD.

66.     Knowing that Z.B. would remain on the team, McGann unreasonably told Decedent "[n]ot to conduct his own investigation" into the matter. She did not appropriately investigate Decedent's concerns that he was psychologically abused by Bond for complaining of Z.B.'s alleged sexual misconduct nor did she implement supportive measures for Decedent, who directly told her that he was facing psychological abuse. She ignored Decedent's complaints of psychological abuse and tried to quell his fears by telling him that it would just take time.

67.     McGann knew about the appropriate reporting mechanisms through OPHD of sexual misconduct and bullying. By February 2020, she had at least two conversations with Bond and Decedent about Decedent's concerns related to Z.B.'s alleged sexual misconduct, the retaliation that Decedent felt following his complaints, and the continued psychological abuse by Bond. These conversations gave her actual notice of the retaliation, and she deliberately did not address, investigate it further, or offer supportive measures for Decedent before it was too late.

68.     Decedent's mental health continued to deteriorate as Bond continued to harass and isolate him. He was further in despair because he had no support from UCSD and other Responsible Employees despite his prior communications with

them, including McGann.

69.    On March 3, 2020, Decedent received an email from Bond, with McGann copied, regarding Decedent and Z.B.'s conflicts at practice and Decedent's subsequent conversation with Bond. Bond stated that he was "advised to document in writing what we spoke about" and threatened that any additional conflict between Decedent and Z.B. would result in the removal of Decedent from the rowing team. The coach implored Decedent to "play nice" with Z.B., and that "any further conflict with [Z.B.] would result in removal of both of you from the team. I am sure you can bring courtesy and professionalism to any necessary interactions with [Z.B.] and expect you to do so." Based on this email, which McGann received, UCSD, McGann, and the Responsible Employees had actual notice that there was a continued hostile environment on the rowing team that was triggered by months of Decedent's complaints about Z.B.'s alleged sexual misconduct and Decedent's complaints of psychological abuse by Bond in retaliation for Decedent complaining about Z.B. and allegedly going above his coach's head.

70.    The adverse conduct persisted through the final month of in-person learning at UCSD. Bond threatened other team members, including Decedent's roommate ("P.K.") about associating with Decedent. Bond told P.K. that Decedent was "one foot out the fucking door!" Bond's communications to other team members, including P.K., about Decedent was only intended to harass and isolate Decedent further for his complaints about Z.B.'s alleged sexual misconduct.

71.    Decedent returned home to New York in March 2020 after UCSD shut down due to COVID-19 pandemic and continued his semester. During the rest of the Spring 2020 quarter, Bond organized team Zoom meetings weekly from April through June. Bond continued to bully, harass, and berate Decedent and other UCSD rowers during the meetings.

72.    In April of 2020, Decedent filled out an anonymous UCSD survey in response to UCSD's and McGann's request to receive feedback from the men's

rowing team. Decedent responded with twenty-three pages outlining Bond's misconduct, harassment, and retaliation in response to Decedent's complaints about the alleged sexual misconduct against Z.B.

73.     In the survey, Decedent also complained about Bond's failure to report the allegations to Title IX as Responsible Employees pursuant to UCSD policy. Decedent specifically communicated that he suffered psychological abuse out of retaliation by Bond. Decedent notified UCSD that he "had a few fleeting thoughts of suicide throughout the process but decided not to mention them because they didn't seem like a major threat to [him] and [he] was afraid of the implications of revealing them."

74.     None of the Responsible Employees at UCSD addressed Decedent's survey including his complaints that Bond failed to report the sexual misconduct allegations to Title IX, his concerns of abuse, isolation, retaliation, bullying, and harassment.

75.     Plaintiffs are informed and believe that other members of the rowing team completed the survey in or after April 2020. Plaintiffs are informed and believe that other members complained of Bond's mistreatment and abuse.

76.     McGann reviewed Decedent's survey at some time after Decedent submitted it in April 2020 and before June 4, 2020 because she responded to the post on realrecruit.com on June 4, 2020. In response to Decedent's survey, McGann assured Decedent that any issues reported to her were reported up the chain to OPHD properly.

**F.  Decedent's Tragic Death**

77.     Decedent told his close friends and former coaches of the abuse he suffered from Bond, but largely tried to handle the pain, confusion, and shame alone. With the help of treatment providers and his family, Decedent reached a stable place toward the end of 2020.

78.     Although Decedent returned to UCSD in late December 2020,

1   Decedent informed Bond that he was opting out of the upcoming rowing season.
2   The emotional exile and resultant loneliness enveloped Decedent as he entered
3   2021. The mental anguish and overwhelming sadness generated by Bond's
4   psychological abuse and mind games, and UCSD's and the Responsible Employees'
5   failure to address any of Decedent's reports of psychological abuse created an
6   uncontrollable impulse in Decedent to commit suicide. On January 4, 2021,
7   Decedent took his own life.

8                       **FIRST CAUSE OF ACTION**

9            **Violation of Title IX – Retaliation Against UCSD**

10       79.    Plaintiffs repeat and reallege each and every allegation hereinabove as
11   if fully set forth herein.

12       80.    Title IX of the Education Amendments of 1972 provides, in relevant
13   part: "No person in the United States shall, on the basis of sex, be excluded from
14   participation in, be denied the benefits of, or be subjected to discrimination under
15   any education program or activity receiving Federal financial assistance." 20 U.S.C.
16   §1681(a).

17       81.    Title IX of the Education Amendments of 1972 applies to all public and
18   private educational institutions that receive federal funding, including UCSD.

19       82.    UCSD receives federal funding in the form of federal student loans
20   given to students and is subject to the provisions of Title IX. Title IX is enforceable
21   through a private right of action.

22       83.    As reflected in such grievance procedures, and the law pertaining to
23   Title IX, retaliation against a person because they are asserting their rights under
24   Title IX, or otherwise reporting sexual misconduct, is also prohibited.

25       84.    Retaliation is any adverse action against a person based on their report
26   or other disclosure of alleged prohibited conduct under the UCSD sexual
27   misconduct policy to a university employee, or their participation in, refusal to
28   participate in, or assistance with the investigation, reporting, remedial, or

-16-

1  disciplinary processes provided for in the Policy. An adverse action is conduct that
2  would discourage a reasonable person from reporting prohibited sexual misconduct
3  or participating in a process provided for in the UCSD sexual misconduct policy,
4  such as threats, intimidation, harassment, discrimination, and coercion.

5          85.    After Decedent raised concerns about the alleged sexual misconduct,
6  including sexual harassment and sexual assault, by his teammate Z.B. to Bond,
7  Bond engaged in a series of adverse actions against Decedent. Decedent complained
8  that further inquiry and investigation was necessary, and that the Responsible
9  Employees needed to take the proper action.  From January 2020 through April
10  2020, Decedent raised his concerns with Bond, Engblom, and McGann through in-
11  person communications, text, and phone calls. Thus, UCSD and the Responsible
12  Employees had actual notice of alleged sexual harassment and misconduct as
13  defined under Title IX.

14         86.    Rather than to follow OPHD, the Policy, and UCSD's general policy to
15  protect the students, Bond admitted that he did not report allegations of sexual
16  misconduct even after the rowing team captains brought it to his attention in January
17  2020. Instead, Bond raised the issue with McGann, who did nothing to address it
18  immediately.

19         87.    Where UCSD and the Responsible Employees failed to properly
20  address the allegations of sexual misconduct, this allowed Bond to continue to
21  harass, bully, and psychologically torment Decedent as described in detail above in
22  the fact section of this pleading. This also allowed Bond, an employee of UCSD, to
23  retaliate against Decedent for whistleblowing on Bond's and McGann's failure to
24  address Z.B. and the psychological abuse that Bond was targeting at Decedent.

25         88.    After Decedent persisted in his objections to how the Responsible
26  Employees were handling serious allegations of sexual misconduct by Z.B. and the
27  "psychological abuse" that Decedent told McGann he was suffering at the hands of
28  Bond, Bond and Engblom lied that they had reported the allegations to OPHD.

-17-

89.     Bond, with the advice and suggestion by McGann, also threatened to kick Decedent off the team if he could not treat Z.B. with respect and professional courtesy. McGann, according to Bond, not only had knowledge of Bond's retaliation, but she advised him to keep a running list of rowing team violations by Decedent to create a pretext for his removal.

90.     Even after observing Bond's harassment of the rowing team on at least one practice and after a phone call with Decedent about the psychological abuse he suffered and the effect on his experience as a student athlete at UCSD, McGann failed to respond to, or intervene, in Bond's incessant abuse of Decedent.

91.     After Decedent returned the April 2020 survey to UCSD outlining Bond's retaliatory conduct, psychological abuse, Decedent's reference to suicidal ideation, McGann reviewed Decedent's and other UCSD rowers' survey at some time between April 2020 and June 4, 2020. By June 4, 2020, McGann had reached out to Decedent about the comments in the survey.

92.     In June 2020, McGann made the false representations that she forwarded all previous reports to OPHD in accordance with the Policy.

93.     Bond's malicious retaliation in union with the Responsible Employees' and UCSD's failure to properly address Decedent's concerns of harassment, the hostile environment that Bond created for the rowers, and Decedent's unequivocal statements to McGann during the February 22, 2020 phone call that she was responsible for reporting the allegations of sexual misconduct by Z.B., the names of other witnesses, and the "psychological abuse" by the "people who had the power to cut him from the team" caused Decedent to suffer serious emotional distress.

94.     Decedent suffered a severe deterioration of his mental health over months culminating in a psychotic episode and diagnosis of schizophrenic behavior, which necessitated intensive, in-patient mental health treatment. The targeted abuse and retaliation launched by Bond and the inaction by Responsible Employees,

Third Amended Complaint

1   including McGann, ultimately caused Decedent to experience an uncontrollable

2   impulse to tragically take his own life.

3          95.    As a direct and proximate result of Defendants' conduct, Decedent

4   suffered from immense sadness, paranoia, and disorientation, episodes of

5   schizophrenic behavior and psychosis, sleeplessness, low appetite, fear, delusions,

6   fear of persecution, suicidal ideation, extreme emotional distress for which he

7   required in-patient treatment and medication, and unthinkable anguish which

8   eventually caused an uncontrollable impulse in Decedent to tragically take his own

9   life.

10          96.    As a direct and proximate result of the above unlawful and retaliatory

11   conduct by Defendants, Plaintiffs sustained damages, including, without limitation,

12   pain, suffering, and loss of enjoyment of life, loss of companionship, and related

13   economic injuries and other direct and consequential damages. Decedent's Estate is

14   entitled to damages in an amount to be determined at trial, plus prejudgment

15   interest, attorneys' fees, expenses, costs, and disbursements.

16                          **SECOND CAUSE OF ACTION**

17          **Violation of Title IX– Deliberate Indifference Against UCSD**

18          97.    Plaintiffs repeat and reallege each and every allegation hereinabove as

19   if fully set forth herein.

20          98.    UCSD exercised substantial control over Bond, Engblom, and

21   McGann. It had full control over how the investigation and reporting of sexual

22   misconduct allegations against Z.B. and the harassment including sexual harassment

23   by Bond of Decedent and other UCSD rowers threatening them with epithets about

24   their manliness and testosterone levels, "flaccid" penises, comparisons to "pussies,"

25   body-shaming, and the dynamics of the rowing team.

26          99.    Decedent suffered harassment that was so severe, pervasive, and

27   offensive that it deprived Decedent of access to the educational opportunities or

28   benefits provided by UCSD.

100.   Responsible Employees, including but not limited to Bond and McGann, had the authority to address the alleged discrimination and to institute corrective measure on UCSD's behalf. Responsible Employees had actual notice and knowledge of the harassment beginning in January 2020 through April 2020. This was based on either their involvement in the harassment (Bond), their observation during practices, communications with Decedent and witnesses, and review of complaints in the survey sent in Spring 2020.

101.   UCSD acted with deliberate indifference to the harassment, so that UCSD's response to the harassment or lack thereof was clearly unreasonable in light of the known circumstances. Despite Decedent's reporting of the psychological abuse that he was suffering based on his whistleblowing of UCSD's failure to properly report and investigate the sexual misconduct by Z.B. and his own reporting of Bond's treatment to McGann that was affected his experience as a student athlete at UCSD, UCSD and the Responsible Employees did nothing to remedy the issue.

102.   Instead, Bond never reported the allegations to OPHD. McGann, on the other hand, advised Bond to create pretextual documentation to find ways to remove Decedent from the rowing team. Said conduct and deliberate indifference subjected Decedent to harassment.

103.   The above abuse, hostility, and sexually inappropriate attacks were known, and largely ignored by McGann, who was present for certain practices and rowing team events. She spoke in January and February 2020 with Bond and Decedent about Z.B.'s mounting sexual misconduct allegations, the insufficient response and slew of adverse actions that Bond and the team captains took towards Decedent. McGann reviewed the April 2020 surveys of multiple rowers, including Decedent, on or around April 26, 2020 and June 4, 2020.

104.   UCSD's Responsible Employees, including McGann, ignored the targeted bullying and abuse. Decedent repeated his pleas and struggles to McGann, who dismissed Decedent to "go see a therapist." UCSD's Responsible Employees,

1  including McGann, were deliberately indifferent.

2      105.   As a direct and proximate result of Defendants' conduct, Decedent

3  suffered from immense sadness, paranoia, and disorientation, episodes of

4  schizophrenic behavior and psychosis, sleeplessness, low appetite, fear, delusions,

5  fear of persecution, suicidal ideation, extreme emotional distress for which he

6  required in-patient treatment and medication, and unthinkable anguish which

7  eventually caused an uncontrollable impulse in Decedent to tragically take his own

8  life.

9      106.   As a direct and proximate result of the above deliberate indifference,

10  Plaintiffs sustained damages, including, without limitation, pain, suffering, loss of

11  enjoyment of life, loss of companionship, and related economic injuries and other

12  direct and consequential damages. Decedent's Estate is entitled to damages in an

13  amount to be determined at trial, plus prejudgment interest, attorneys' fees,

14  expenses, costs, and disbursements.

15                  **THIRD CAUSE OF ACTION**

16          **Wrongful Death Against Bond Pursuant to CCP § 377.60**

17      107.   Plaintiffs repeat and reallege each and every allegation hereinabove as

18  if fully set forth herein.

19      108.   Bond, an employee of UCSD, bullied, harassed, and psychologically

20  abused Decedent such that Decedent, who never suffered from mental health issues

21  before his freshman year, suffered from the worsening mental health, requiring

22  treatment and medication. Bond knew that Decedent had prior weight issues, but

23  continued to berate Decedent as "fat" and assault his weight. Decedent was unable

24  to recover from these mental health issues and sadly took his own life upon

25  returning to UCSD in January 2021.

26      109.   UCSD and its Responsible Employees had actual knowledge of and

27  failed to fire or punish Bond for his sexual harassment, psychological abuse, and

28  retaliatory conduct toward Decedent. Their inaction created a hostile environment

-21-

for Decedent despite Decedent's direct plea to McGann for help in the February 22, 2020 telephone call.

110.   UCSD had an obligation to conform to a certain standard of conduct to protect its students against unreasonable bullying, harassment, and abuse by its employees, including Bond. UCSD, by and through its Responsible Employees, failed to conform with that duty to properly investigate allegations of sexual misconduct, sexual harassment, bullying psychological abuse, and retaliatory conduct toward Decedent. UCSD, by and through its Responsible Employees, had a duty to use reasonable care to protect Decedent and its athletes from foreseeable acts of violence, including suicide, as a result of school-sponsored activities.

111.   Even after Decedent and other UCSD rowers reported Bond and its Responsible Employees' failure to properly handle the sexual misconduct allegations against Z.B., and the abusive environment that Bond created as disclosed in the surveys sent to the athletes in April 2020, UCSD and its Responsible Employees' inaction and continued employment of Bond reinforced Bond's offensive practices.

112.   As a direct and proximate result of Defendants' conduct, Decedent suffered from immense sadness, paranoia, and disorientation, episodes of schizophrenic behavior and psychosis, sleeplessness, low appetite, fear, and delusions, fear of persecution, suicidal ideation, extreme emotional distress for which he required in-patient treatment and medication, and unthinkable anguish which eventually caused an uncontrollable impulse in Decedent to tragically take his own life.

113.   As an employee of UCSD, Bond's incessant harassment and abuse of Decedent caused Decedent to suffered from an incontrollable impulse to commit suicide. UCSD, by and through its Responsible Employees, also caused Decedent to suffered from an incontrollable impulse to commit suicide because it ignored Decedent's desperate pleas about the hostile environment that Bond created.

Decedent's mental condition was so severe that he no longer had control of his suicidal impulses.

114.   As a direct and proximate result of Defendants' conduct, Plaintiffs sustained damages, including, without limitation, pain, suffering, loss of enjoyment of life, loss of companionship, and related economic injuries and other direct and consequential damages. Decedent's Estate is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## FOURTH CAUSE OF ACTION

### Negligent Hiring, Supervision, and/or Retention of Bond
### against McGann

115.   Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

116.   Bond was hired by UCSD as the head coach for the men's rowing team on October 1, 2019.

117.   McGann, an employee of UCSD, knew or should have known that Bond was unfit or incompetent to coach the rowing team at UCSD. McGann knew or should have known of Bond's prior employment history, including prior complaints of harassment and abuse by rowers at Penn. McGann knew or should have known that Bond posed a dangerous risk to every student athlete he coached. Yet, McGann, in her capacity as an employee of UCSD, negligently failed to ascertain and recognize this risk when they hired Bond, failed to supervise Bond despite several complaints, and continued to retain him as the rowing coach until the lawsuit and press exposed the full extent of Bond's misconduct. Defendants' misconduct and negligent hiring and supervision caused Decedent's wrongful death.

118.   Bond secured the head coach position at UCSD. McGann conducted a rushed search lacking in due diligence before they hired Bond. Bond was unfit, incompetent, risky, and a hazard to the people he coached. Had McGann conducted

1   any minimal due diligence prior to hiring Bond, they would have discovered the

2   protest by several rowers at UPenn who complained of Bond's harassment, bullying,

3   and abuse.

4       119.   McGann did little to no independent research into Bond's background,

5   prior positions or the reasons he left seemingly prestigious positions, or even a

6   cursory review of news publications and social media about Bond prior to hiring

7   him. McGann did not interview any of the UPenn rowers nor reach out to UPenn's

8   administration regarding Bond.

9       120.   After Bond was hired, McGann failed to discipline Bond and otherwise

10  permitted him to terrorize and abuse Decedent and other UCSD rowers. Although

11  she was aware of the hostile environment that Bond created, observed varsity

12  practices, and spoke to Decedent at least once on the phone about the psychological

13  abuse he faced from Bond, McGann's supervision (or lack of) of Bond harmed

14  Decedent.

15      121.   McGann's negligent hiring, supervision, and retention of Bond resulted

16  in the constant abuse and bullying of Decedent. This failure was a direct and

17  proximate cause of Decedent's severe mental health struggles, which caused

18  Decedent to seek intensive mental health treatment and further caused Decedent to

19  tragically take his own life.

20      122.   As a result of McGann's negligent hiring, supervision, and retention of

21  Bond, Decedent suffered tremendous harm, including loss of companionship, pain,

22  suffering and emotional anguish as well as other non-economic and economic

23  damages.

24      123.   As a direct and proximate result of Defendants' conduct, Decedent

25  suffered from immense sadness, paranoia, and disorientation, episodes of

26  schizophrenic behavior and psychosis, sleeplessness, low appetite, fear, delusions,

27  fear of persecution, suicidal ideation, extreme emotional distress for which he

28  required in-patient treatment and medication, and unthinkable anguish which

eventually caused an uncontrollable impulse in Decedent to tragically take his own life.

124.   As a direct and proximate result of the above conduct by Defendants, Plaintiffs sustained damages, including, without limitation, pain, suffering, loss of enjoyment of life, loss of companionship, and related economic injuries and other direct and consequential damages. Decedent's Estate is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## **PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons, Plaintiffs demand judgment against Defendants as follows:

1.      On the first cause of action for Violation of Title IX of the Education Amendments of 1972 (Retaliation), a judgment against UCSD;

2.      On the second cause of action for Violation of Title IX of the Education Amendments of 1972 (Deliberate Indifference), a judgment against UCSD;

3.      On the third cause of action for wrongful death, a judgment against Bond;

4.      On the fourth cause of action for negligent hiring, supervision, and retention against McGann, a judgment against McGann;

5.      Damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees (if permitted), expenses, costs and disbursements;

6.      Punitive damages if there is clear and convincing evidence that Defendants are guilty of oppression, fraud, or malice as provided under California Civil Code § 3294; and

7.      Such other relief as the Court deems just and proper.

///

///

///

1

## **JURY TRIAL DEMAND**

2    Plaintiffs request a jury trial on all questions of fact raised by their Complaint.

3

4    Dated: January 4, 2024                Respectfully Submitted,

5

                                           GARCIA HONG LAW
6                                          By: _/s/ Valerie Garcia Hong_
7                                          Valerie Garcia Hong, Esq.
                                           Mark A. Simpliciano, Esq.
8                                          Garcia Hong Law APC
9                                          Attorneys for Plaintiffs Brian Lilly,
                                           Sr., Brenda Lilly, and on behalf of the Estate
10                                         of Brian Lilly, Jr.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28