1
2
3
4
5
6
7

8          UNITED STATES DISTRICT COURT

9          SOUTHERN DISTRICT OF CALIFORNIA

10

11   BRIAN LILLY, Sr.; and BRENDA          Case No.:  21-CV-1703 TWR (MSB)
     LILLY, individually, and on behalf of the
12   Estate of Brian Lilly, Jr.,            **ORDER (1) GRANTING IN PART
13                                          AND DENYING IN PART THE
                              Plaintiffs,   REGENTS DEFENDANTS' MOTION
14   v.                                     TO DISMISS PLAINTIFFS' THIRD
                                            AMENDED COMPLAINT, (2)
15   UNIVERSITY OF CALIFORNIA-SAN           GRANTING THE REGENTS
16   DIEGO; BOARD OF REGENTS OF            DEFENDANTS' MOTION TO
     UNIVERSITY OF CALIFORNIA;            DISMISS PLAINTIFFS' REQUEST
17   GEOFF BOND; KATIE MCGANN, and         FOR PUNITIVE DAMAGES, AND (3)
     EARL W. EDWARDS,                       DENYING DEFENDANT BOND'S
18                                          MOTION TO DISMISS
19                            Defendants.   PLAINTIFFS' THIRD AMENDED
                                            COMPLAINT**
20
21
22                                          (ECF Nos. 74, 75, 76)

23          Presently before the Court are Defendants The Regents of the University of

24   California and Katie McGann's ("The Regents Defendants") Motion to Dismiss Plaintiffs'

25   Third Amended Complaint ("TAC") ("Mot. One," ECF No. 76-1), Plaintiffs Brian Lilly,

26   Sr., and Brenda Lilly's Opposition to The Regents Defendants' Motion to Dismiss ("Opp'n

27   One," ECF No. 81), The Regents Defendants' Reply in Support of their Motion to Dismiss

28   ("Reply One," ECF No. 84), The Regents Defendants' Motion to Dismiss Plaintiffs'

Request for Punitive Damages ("Mot. Two," ECF No. 75-1), Plaintiffs' Opposition to The Regents Defendants' Motion to Dismiss Plaintiffs' Request for Punitive Damages ("Opp'n Two," ECF No. 82), and The Regents Defendants' Reply in Support of their Motion to Dismiss Plaintiffs' Request for Punitive Damages ("Reply Two," ECF No. 85).

Also before the Court are Defendant Geoff Bond's Motion to Dismiss Plaintiffs' Third Amended Complaint ("Mot. Three," ECF No. 74-1), Plaintiffs' Opposition to Defendant Bond's Motion to Dismiss ("Opp'n Three," ECF No. 80), and Defendant Bond's Reply in Support of his Motion to Dismiss ("Reply Three," ECF No. 83).

The Court held a hearing on the Motions on August 22, 2024. (*See* ECF No. 90.) Having considered the Third Amended Complaint, the Parties' submissions and the applicable law, the Court **GRANTS IN PART AND DENIES IN PART** The Regents Defendants' Motion to Dismiss; **GRANTS** The Regents Defendants' Motion to Dismiss Plaintiffs' Request for Punitive Damages; and **DENIES** Defendant Bond's Motion to Dismiss, as follows.

## BACKGROUND

### I.    Factual Background[1]

Before coaching at the University of California San Diego ("UCSD"), Bond was a rowing coach at the University of Pennsylvania ("UPenn"). (TAC ¶¶ 24–27.) During his time at UPenn, multiple members of the UPenn rowing team expressed concerns about Bond's abusive coaching and behavior, which included having an unfair selection process, sexually charged insults, ineffective training methods, and stigmatization of the use of mental health services by publicly shaming rowers that utilized UPenn's psychological services. (*Id*. ¶¶ 24–26.) After being forced out of UPenn, UCSD hired Bond as its men's rowing team head coach in October 2019. (*Id*. ¶ 27.) Katie McGann, the associate athletic director in charge of Bond's hiring, allegedly rushed the process and did no independent

---

[1]    For purposes of Defendants' Motions to Dismiss, the facts alleged in Plaintiffs' Third Amended Complaint are accepted as true. *See Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007).

research into Bond's background or the reasons why he left "seemingly prestigious positions." (*Id.* ¶¶ 27–28.)

Decedent Brian Lilly, Jr. enrolled at UCSD in the Fall of 2019, joined its men's rowing team as a scholar-athlete, and successfully secured a spot in one of UCSD's top three varsity boats. (*Id.* ¶¶ 37, 41.) Decedent's ascent as a "top-shelf athlete" was not without any personal struggles. After being diagnosed with juvenile rheumatoid arthritis, Decedent gained thirty pounds in middle school and struggled with obesity, an issue he discussed with both his rowing team and coaches. (*Id.* ¶ 39.) Despite his health struggles, Decedent completed marathons and had no mental health issues before his enrollment at UCSD. (*Id.* ¶ 40.)

 Initially, Bond's treatment of the student-athletes appeared to be "run-of-the-mill tough variety," however, as months progressed, the rowers routinely witnessed Bond's "explosive behavior." (*Id.* ¶¶ 42, 43, 46.) Further, despite UCSD's general policy against sexual harassment, Bond would use sexually inappropriate comments—mocking Decedent and other UCSD rowers for their insufficient testosterone, "flaccid" manhood, small "testicles," and lack of "manliness," and routinely labeled Decedent and other UCSD rowers "pussies"—during his "unprovoked rage-filled outbursts." (*Id.* ¶ 44.) McGann observed several practices of the varsity rowing teams in January 2020, during which time she observed Bond's hostile behavior toward the athletes. (*Id.* 49.)

Early January 2020, several women accused Decedent's fellow teammate Z.B. of sexual harassment and assault (*id.* ¶ 50), and Bond immediately contacted UCSD and McGann about the allegations of sexual misconduct against Z.B.[2] (*Id.* ¶¶ 50–51.) Around January 2020, Decedent also learned about the accusations against Z.B. and contacted Bond because he was troubled by UCSD's refusal to take action and their indifference to

---

[2]     Plaintiffs incorporate into the Third Amended Complaint allegations made by Bond in the action, *Bond v. The Regents of the University of California*, Case No. 22CV18094, pending before the California Superior Court.

the sexual misconduct allegations against Z.B.  (*Id*. ¶¶ 53–54.)  During one meeting with Decedent, team captains, and the assistant coach Dameon Engblom, Bond addressed Decedent's concerns about how Bond, the rowing team, and UCSD were handling the allegations against Z.B.  (*Id*. ¶ 54.)  Subsequently, in early 2020, Decedent had a phone call with Bond, in which he reiterated his concerns about the ineffectual manner in which Bond, the team, and UCSD handled the Z.B. matter.  (*Id*.)  Dissatisfied with the responses he received, on February 22, 2020, Decedent exchanged several text messages with Bond about keeping Z.B. on the team.  (*Id*. ¶ 56.)  Bond told Decedent to "calm down and speak with a therapist" and warned "[a]s son of an attorney that sounds like a threat. I would be extremely careful with your next few words. I am willing to work with you but don't communicate with me in that way."  (*Id*. ¶ 57.)  Following Decedent's decision to contact others at UCSD concerning the Z.B. matter, Bond verbally attacked Decedent and attempted to alienate him from the team.  (*Id*. ¶ 58.)  For example, Bond once berated a coxswain for misstating a call by shouting "[w]ho the fuck said that? Whoever said that is a fat coxswain--someone who goes over the coaches like [Decedent]! We already have a fat [Decedent]! Don't be a fat [Decedent]! Fat [Decedent] goes above his coach's head and talks shit!"  (*Id*.)  Further, Bond "subjected Decedent to … demotion on the rowing team."  (*Id*. ¶ 3.)

By February 2020, Bond had several communications with McGann about Decedent's objections and erratic behaviors.  (*Id*. ¶ 59.)  Rather than addressing Decedent's complaints or Bond's concerns about Decedent's erratic behavior, McGann advised Bond to tell both Decedent and Z.B. that they would be expelled from the team for any further problematic behavior and told Bond to create a paper trail.  (*Id*. ¶ 61.)  On February 22, 2020, McGann also had a call with Decedent, during which he apprised McGann of additional witnesses to Z.B.'s sexual misconduct, Bond's verbal abuse in retaliation for raising concerns about the Z.B matter, Bond's psychological abuse, and how the situation was ruining his experience as a student-athlete.  (*Id*. ¶¶ 63, 64.)  McGann advised Decedent that he could either report directly to UCSD's Office for the Prevention of Harassment and

Discrimination ("OPHD") (which was not the University's policy) or see a therapist.  (*Id.* ¶ 65.)

Following a conflict between Decedent and Z.B., on March 3, 2020, Decedent received an email from Bond, with McGann copied, in which Bond threatened that any additional conflict with Z.B. would result in Decedent's removal from the rowing team and implored Decedent to play nice with Z.B.  (*Id.* ¶ 69.)  Further, Bond told Decedent's roommate P.K. that Decedent had "one foot out the fucking door."  (*Id.* ¶ 70.)

In March 2020, UCSD shut down in response to the COVID-19 pandemic, and Decedent returned home to New York.  (*Id.* ¶ 71.)  From April through June 2020, Bond organized weekly team Zoom meetings and continued to bully and harass Decedent and other rowers.  (*Id.*)  In the meantime, in response to UCSD and McGann's request for feedback from the men's rowing team, Decedent filled out and submitted an anonymous survey in April 2020, in which Decedent complained about Bond's failure to report allegations against Z.B. to UCSD, Bond's retaliatory conduct, and notified UCSD that he had "a few fleeting thoughts of suicide throughout the process" but did not reveal them because he was afraid of the implications.  (*Id.* ¶¶ 72–73.)  On June 4, 2020, McGann responded to Decedent's survey on realrecruit.com and assured him that "any issues reported to her were reported up the chain to OPHD properly."  (*Id.* ¶ 76.)

Although Decedent "handled the pain, confusion, and shame" created by Bond's abuse mostly alone, with the help of his family and treatment providers, Decedent reached a stable place towards the end of 2020 and returned to UCSD.  (*Id.* ¶¶ 77–78.)  In December 2020, Decedent informed Bond that he was opting out of the upcoming rowing season.  (*Id.* ¶ 78.)  On January 4, 2021, Decedent took his own life.  (*Id.*)

## II.   Procedural History

Plaintiffs initiated this action on September 30, 2021, against Defendants The Regents, Earl Edwards, McGann, and Bond.  (*See* ECF No. 1.)  Plaintiffs later filed a First Amended Complaint alleging the following causes of action: (1) retaliation in violation of Title IX (against The Regents); (2) violation of the Fourteenth Amendment for denial of

equal protection under 42 U.S.C. § 1983 (against Bond, McGann, and Edwards); (3) violation of the Fourteenth Amendment for deprivation of substantive due process under § 1983 (against Bond, McGann, and Edwards); (4) wrongful death under California Code of Civil Procedure § 377.30 (against Bond, McGann, and Edwards); (5) negligent hiring (against McGann and Edwards); and (6) negligent supervision (against McGann and Edwards). (*See* ECF No. 14.) Defendants The Regents, Edwards, McGann, and Bond then moved to dismiss Plaintiffs' First Amended Complaint and The Regents, Edwards, and McGann moved to strike Plaintiffs' claim for punitive damages. (ECF Nos. 17, 18.) On October 19, 2022, the Court dismissed Plaintiffs' Title IX and § 1983 claims (claims 1, 2, and 3) and held that it was premature to decide both whether to exercise supplemental jurisdiction over Plaintiffs' state law claims and to dismiss Plaintiffs' claims for punitive damages. ("October 2022 Order," ECF No. 36 at 8–19.) The Court then gave Plaintiffs leave to file an amended complaint. (*Id*. at 22.)

Plaintiffs filed a timely Second Amended Complaint ("SAC") wherein they realleged claims one through six and added a seventh claim for deliberate indifference in violation of Title IX against The Regents. (*See generally* SAC, ECF No. 41.) The Regents, Edwards, and McGann again moved to dismiss Plaintiffs' Second Amended Complaint and to strike Plaintiffs' request for punitive damages. (*See generally* ECF No. 47.) Bond also separately moved to dismiss Plaintiffs' Second Amended Complaint. (ECF No. 46.) On August 23, 2023, the Court dismissed Plaintiffs' § 1983 claims (claims 2 and 3) with prejudice and their Title IX claims against The Regents (claims 1 and 7) and the wrongful death claim (claim 4) against McGann and Edwards without prejudice. (*See generally* "August 2023 Order," ECF No. 59.) The Court otherwise denied Defendants' motions and reiterated that it was premature to decide whether to dismiss Plaintiffs' claims for punitive damages. (*Id*. at 42.) The Court again gave Plaintiffs leave to amend their complaint. (*Id*. at 43.)

On January 4, 2024, Plaintiffs filed their Third Amended Complaint alleging the following four causes of action: (1) retaliation in violation of Title IX (against The

Regents); (2) deliberate indifference in violation of Title IX (against The Regents); (3) wrongful death (against Bond); and (4) negligent hiring, supervision, and retention (against McGann). (*See generally* TAC.) On February 8, 2024, The Regents and McGann filed their Motion to Dismiss Plaintiffs' Third Amended Complaint and Motion to Dismiss Plaintiffs' claim for punitive Damages. (*See generally* Mots. One and Two.) On the same day, Bond also filed his Motion to Dismiss Plaintiffs' Third Amended Complaint. (*See generally* Mot. Three.)

## LEGAL STANDARD FOR MOTION TO DISMISS

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). "A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Id.* at 1242 (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

"If a complaint is dismissed for failure to state a claim, leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)). "A district court does not err in denying leave to amend where the amendment would be futile." *Id.*

## THE REGENTS DEFENDANTS' MOTION TO DISMISS

The Regents Defendants seek to dismiss Plaintiffs' claims for retaliation and deliberate indifference in violation of Title IX (against The Regents) and negligent hiring, supervision, and retention (against McGann).

## I. Title IX

### A. *Retaliation*

"Title IX prohibits sex discrimination by recipients of federal education funding." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). Actionable "sex discrimination" includes "when a funding recipient retaliates against a person because he complains of sex discrimination." *Id.* at 173; *see also Emeldi v. Univ. of Oregon*, 698 F.3d 715, 725 (9th Cir. 2012) (speaking out against sex discrimination is a protected activity). The plaintiff's burden for establishing a prima facie case of retaliation is low. *See Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 867 (9th Cir. 2014) ("Only a minimal threshold showing of retaliation is required.") To prevail on a Title IX retaliation claim, a plaintiff lacking "direct evidence of retaliation must first make out a prima facie case of retaliation by showing (a) that he or she was engaged in protected activity, (b) that he or she suffered an adverse action, and (c) that there was a causal link between the two." *Emeldi*, 698 F.3d at 724.

8

"Protected activity is protesting or otherwise opposing unlawful discrimination, including speaking out against sex discrimination." *Doe 1 v. Univ. of San Francisco*, 685 F. Supp. 3d 882, 901 (N.D. Cal. 2023) (citing *Emeldi*, 698 F.3d at 725) (cleaned up).  The Third Amended Complaint, (¶¶ 53–56; 63–64), sufficiently alleges that Decedent engaged in a protected activity—complaining about the alleged sexual harassment claim against Z.B.  *See Doe 1*, 685 F. Supp. 3d 901–2 (concluding that complaining about or at least pushing back on sex discrimination constitutes protected activity.)

Second, an adverse action exists when "'a reasonable [person] would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable [person] from making or supporting a charge of discrimination.'" *Emeldi*, at 698 F.3d at 726 (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006)).  The Third Amended Complaint alleges the following adverse actions taken by Bond—demotion on the rowing team (*id*. ¶ 3); Bond's warnings in response to Decedent's text messages (*id*. ¶¶ 56–57); Bond's pointed attacks aimed at Decedent's sensitivity regarding his weight following his decision to reach out to outside authorities (*id*. ¶ 58); Bond's March 3, 2020 email threatening to remove Decedent from the rowing team (*id*. at 69); and Bond's conversation with Decedent's roommate with the intent to isolate Decedent (*id*. ¶ 70).  Accordingly, Plaintiff has plausibly alleged adverse actions.  *See Doe 1*, 685 F. Supp. 3d at 901–2 (finding that retaliating against players who tried to stop the misconduct, running players off the team, and explicitly or implicitly threatening players with harm constitute adverse action.).

Third, the Ninth Circuit found that proximity between a protected complaint and an adverse action can be "strong circumstantial evidence of causation." *Emeldi*, 698 F.3d at 726.  Here, the timeline of events shows that Bond took adverse actions immediately after Decedent raised concerns about the way Bond and UCSD were handling the Z.B. matter.  Around January 2020, Decedent learned about the accusations against Z.B. and contacted Bond.  (*Id*. ¶¶ 53–54.)  Around February 22, 2020, Decedent received Bond's warnings in response to Decedent's text messages (*id*. ¶¶ 56–57); on March 30, 2020, Decedent

21-CV-1703 TWR (MSB)

received Bond and McGann's email about removal from the team (*id.* at 69).  These allegations show a causal connection between the protected activity and the adverse action.  *See Swan v. San Joaquin Valley Coll., Inc.,* No. 13-CV-1073-LJO, 2015 WL 300628, at *6 (E.D. Cal. Jan. 22, 2015) (finding causal connection from events spaced over two months).  Accordingly, the Court concludes that Plaintiff has plausibly alleged a protected activity, an adverse action, and a causal connection between the alleged protected activity and adverse action.

In its prior Orders, however, the Court noted that when the alleged adverse action is taken by a university employee, The Regents cannot be liable for retaliation under Title IX unless Plaintiffs' allegations also support the inference that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf ha[d] actual knowledge of discrimination in the recipient's programs" and was deliberately indifferent to the complaints of discrimination.  *See Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 290 (1998); (October 2022 Order at 10; August 2023 Order at 16, 19–20.)  Accordingly, the Court next turns to the question of whether UCSD had actual knowledge of Decedent's complaints about Bond's retaliation and responded with deliberate indifference.

The Regents is deemed to have the requisite knowledge if an "appropriate person" under Title IX at UCSD knew about Bond's alleged adverse actions.  *Kesterson v. Kent State Univ.*, 967 F.3d 519, 529 (6th Cir. 2020) (an appropriate person "is someone high enough up the chain-of-command that her decision constitutes the school's decision.")  An "appropriate person is 'an official of the recipient entity with authority to take corrective action to end the discrimination.'"  *Stevens v. Brigham Young Univ. - Idaho*, 588 F. Supp. 3d 1117, 1128 (D. Idaho 2022) (quoting *Gebser*, 524 U.S. at 290) (finding a supervisor who had the authority to remedy misconduct an appropriate person).  This includes officials with the authority to stop misconduct even if they lack the power to terminate the offender's employment.  *Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1255 (11th Cir. 2010) (finding a school principal an "appropriate person" because he could initiate corrective

action or place other restrictions on an offending teacher in response to a sexual harassment complaint, even if he could not take final adverse employment actions such as terminating the teacher); *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1247 (10th Cir. 1999) (appropriate officials are those who have "authority to halt known abuse, perhaps by measures such as transferring the harassing student to a different class, suspending him, curtailing his privileges, or additional supervision").

Plaintiffs identify McGann as the "appropriate person" to receive notice of the alleged discrimination because she had the authority to address the wrongful conduct and to institute corrective measures as the associate athletic director and Bond's supervisor. (TAC ¶¶ 8, 22, 29; Opp'n One at 15.)  The Regents Defendants do not appear to dispute Plaintiffs' designation of McGann as the "appropriate person."  (*See generally* Mot. One at 14.)  Accordingly, the Court concludes that the factual allegations suggest that McGann is the "appropriate person" to receive notice because, as Bond's supervisor, McGann had the authority to take corrective actions.  *See Chapman v. Seuffert*, ---F. Supp. 3d---, 2024 WL 310093, at *6 (N.D. Ohio Jan. 26, 2024)  (observing that determining who qualifies as the "appropriate person" under Title IX is a fact-based inquiry because official roles vary among school districts, and at the motion to dismiss stage, a court must accept the factual allegations in the plaintiffs' complaint as true and construe them in the plaintiffs' favor.).

"Although the actual knowledge standard has been applied repeatedly by courts since *Gebser v. Lago Vista [Independent. School District*,] [524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998)] its contours have yet to be fully defined."  *Roe ex rel. Callahan v. Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008, 1029 (E.D. Cal. 2009) (second alteration in original); *see also Doe v. St. Helens Sch. Dist.*, No. 3:19-CV-01728-SB, 2023 WL 2647534, at *8 (D. Or. Mar. 27, 2023) ("The Ninth Circuit has not yet resolved the precise boundaries of the actual notice component of a Title IX claim.")  Ultimately, the analysis focuses on whether the institution possessed enough knowledge "of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based."  *Crandell v. New York*

21-CV-1703 TWR (MSB)

*Coll. of Osteopathic Med.*, 87 F. Supp. 2d 304, 320 (S.D.N.Y. 2000).

In the August 2023 Order, the Court noted that it could not infer from the allegations in the Second Amended Complaint that UCSD officials knew about Bond's retaliation because Plaintiffs had not alleged that Decedent discussed Bond's retaliatory conduct during his February 22, 2020 telephone call with McGann or from the April 2020 survey Decedent submitted to UCSD because of its anonymous nature. (August 2023 Order at 20.) Plaintiffs now contend McGann had actual notice based on the following allegations in the Third Amended Complaint: by February 2020, Bond had several communications with McGann about Decedent's objections to UCSD's handling of the Z.B. matter and his erratic behaviors. (TAC ¶ 59.) On February 22, 2020, McGann also had a call with Decedent, during which he apprised McGann of Bond's verbal abuse in retaliation for raising concerns about the Z.B matter, Bond's psychological abuse, and how the situation was ruining his experience as a student-athlete. (*Id*. ¶¶ 63, 64.) These events occurred before the April 2020 anonymous survey outlining Bond's misconduct, harassment, and retaliation. (*Id*. ¶ 72). Further, unlike in prior Complaints, Plaintiffs now allege that McGann reviewed Decedent's survey because she responded on June 4, 2020, to Decedent's post through realrecruit.com that "any issues reported to her were reported up the chain to OPHD properly." (*Id*. ¶ 76.) Accordingly, Plaintiffs have cured the deficiencies noted in the Court's prior orders. These allegations, taken in the light most favorable to Plaintiffs, support the inference that UCSD had sufficient "actual notice" through McGann to enable it to address Bond's retaliatory conduct against Decedent.

Once a plaintiff shows that a funding recipient had actual knowledge of Title IX discrimination, he must show that the institution responded with deliberate indifference. An institution is deliberately indifferent if its "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis v. Monroe County Bd. Of Educ.*, 526 U.S. 629, 630 (1999). The deliberate indifference must either "subject" the students to harassment or make them vulnerable to it. *Id*. at 644. Further, to be actionable, the plaintiff must show the harassment was "so severe, pervasive, and objectively offensive

that it can be said to deprive the victim [ ] of access to educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650.  The Supreme Court has instructed the courts not to second-guess the disciplinary decisions made by funding recipients and observed that Title IX does not require that administrators respond with a particular type of disciplinary action.  *Davis*, 526 U.S. at 648.

Plaintiffs argue that UCSD acted with deliberate indifference because they did not effectively remediate Decedent's complaints and failed to comply with the school's policy, which required them to notify the Title IX office promptly. (Opp'n One at 18.)  "In the educational setting, … a school [is] deliberately indifferent to … harassment where it had notice of the … harassment, and either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective." *Porto v. Town of Tewksbury*, 488 F.3d 67, 73–74 (1st Cir. 2007) (cleaned up) (first through fourth alterations in original).

During the February 22, 2020 call with McGann, Decedent informed her of Bond's psychological abuse and retaliation.  (*Id*. ¶¶ 63, 64.)  Instead of investigating Decedent's complaints further, McGann asked Decedent to report his complaints to OPHD directly or see a therapist.  (*Id*. ¶ 65.)   Recommending self-help is not a reasonable response to complaints of harassment.  *See generally Annamaria M v. Napa Valley Unified Sch. Dist.*, No. CV 3-0101-VRW, 2006 WL 1525733, at *8 (N.D. Cal. May 30, 2006) (concluding that instructing the plaintiff to ignore harassment was not a step calculated to end harassment. Instead, the school's response was, in essence, "no action.").   Here, the allegations support the inference that UCSD either took no action or their purported responses were unreasonable under the circumstances.  *Id*.

Further, McGann's June 4, 2020 response to Decedent's survey that "any issues reported to her were reported up the chain to OPHD properly" does not constitute a reasonable remedial measure.  (*Id*. ¶ 76.)   This communication only suggests that in addition to McGann, other administrators in the management chain had notice and actual knowledge of the issue.  Viewing the allegations in the light most favorable to Plaintiffs, it

appears that the Regents Defendants failed to take any responsive measures to address Decedent's complaints between June 2020, when McGann advised Decedent she had "reported up the chain," and December 2020, when Decedent advised Bond he would not be participating in the upcoming rowing season. *See Myles v. W. Contra Costa Unified Sch. Dist.*, No. 23-CV-01369-AGT, 2024 WL 1354440, at *7 (N.D. Cal. Mar. 28, 2024) (finding that simply reporting sexual assault to law enforcement was not dispositive of a lack of deliberate indifference at the pleading stage.)

Finally, The Regents Defendants' argument that Plaintiffs' retaliation claim fails in the absence of any allegations of harassment after the COVID school closure is also without merit. (Mot. One at 15.) The issue here is whether a student must be harassed a second time before the institution's non-responsiveness becomes actionable. In *Davis*, the Supreme Court held that a funding recipient's deliberate indifference must either subject the students to harassment or make them vulnerable to it. 526 U.S. at 644–45. The Court defined "subject" as "'to cause to undergo the action of something specified; expose' or 'to make liable or vulnerable; lay open'" *Id.* (quoting Random House Dictionary of the English Language 1415 (1966)). There is a circuit split regarding whether a funding recipient's deliberate indifference must cause the plaintiff to experience an additional incident of misconduct. *Barnett v. Kapla*, No. 20-CV-03748-JCS, 2020 WL 6737381, at *9 (N.D. Cal. Sept. 28, 2020). The Sixth Circuit has held that the deliberate indifference must cause the plaintiff to experience an additional incident of misconduct that is independently actionable. *See Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 622 (6th Cir. 2019). The First, Tenth, and Eleventh Circuits, on the other hand, have held that it is sufficient for the deliberate indifference to make the plaintiff vulnerable to further harassment or assault. *See Farmer v. Kan. State Univ.*, 918 F.3d 1094, 1103–04 (10th Cir. 2019); *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 173 (1st Cir. 2007), rev'd on other grounds, 555 U.S. 246 (2009); *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1297 (11th Cir. 2007). At least two district courts in California have agreed with the First, Tenth, and Eleventh Circuits. *See Barnett*, 2020 WL 6737381, at *9; *Takla*

21-CV-1703 TWR (MSB)

*v. Regents of the Univ. of Cal.*, No. 2:15-cv-04418-CAS, 2015 WL 6755190, at *4–5 (C.D. Cal. Nov. 2, 2015).

The Ninth Circuit has not decided the issue one way or another. *See Karasek*, 956 F.3d at 1093, n.2. In *Karasek*, which involved an allegation of a student-on-student sexual assault, the district court, however, concluded that a student must not be harassed or assaulted a second time before the school's unreasonable response to the initial incident becomes actionable. *Karasek v. Regents of the Univ. of California*, No. 15-CV-03717-WHO, 2015 WL 8527338, at *12 (N.D. Cal. Dec. 11, 2015). Though the Ninth Circuit did not affirmatively state whether a student must or must not be harassed a second time, it observed that the university was not deliberately indifferent by failing to preclude the possibility that the aggressor could harass the plaintiff again because the plaintiff never interacted with—aside from seeing him from afar on one occasion—or regularly saw her aggressor after the assault. 956 F.3d at 1108. Thus, the Court concluded that the university had no reason to know that any further preventative measures were necessary to protect the plaintiff from future harassment, "especially in light of the context and nature of her assault." *Id*.

Unlike the plaintiff in *Karasek,* who rarely had any contacts with her aggressor after the initial assault, the dynamics of a team sport demanded that Decedent interact with Bond regularly and was, thus, exposed to the possibility of Bond's future harassment. Indeed, after the school's closure, Decedent met with Bond over Zoom; and despite Decedent's submission of a 23-page response in April 2020 outlining Bond's misconduct and retaliation, in the absence of any corrective measures from UCSD, Bond continued to berate Decedent and other rowers during these Zoom meetings. Even if Plaintiffs do not provide specific examples of any derogatory comments directed to Decedent in these Zoom meetings, as they have otherwise done throughout the Third Amended Complaint, the allegations concerning Bond's unchecked behavior during the Zoom meeting further support the inference that Decedent remained vulnerable to future harassment. In the end,

Bond's continued harassment and Defendants' failure to take any corrective actions convinced Decedent to opt out from the rowing team.

In light of the above, the Court concludes that UCSD had sufficient actual notice and responded with deliberate indifference to Decedent's complaints about Bond's retaliatory conduct. Thus, Plaintiff alleges a plausible Title IX retaliation claim. Accordingly, the Court **DENIES** The Regents Defendants' Motion to Dismiss Plaintiffs' first cause of action.

### B.    *Sexual Harassment*

"To ensure that a funding recipient is liable 'only for its own misconduct,' a plaintiff alleging a Title IX claim against a school that arises from student-on-student or faculty-on-student sexual harassment or assault must establish five elements." *Karasek*, 956 F.3d at 1105 (quoting *Davis*, 526 U.S. at 640).

> First, the school must have "exercise[d] substantial control over both the harasser and the context in which the known harassment occur[red]." Second, the plaintiff must have suffered harassment "that is so severe, pervasive, and objectively offensive that it can be said to deprive the [plaintiff] of access to the educational opportunities or benefits provided by the school." Third, a school official with "authority to address the alleged discrimination and to institute corrective measures on the [school's] behalf" must have had "actual knowledge" of the harassment. Fourth, the school must have acted with "deliberate indifference" to the harassment, such that the school's "response to the harassment or lack thereof [was] clearly unreasonable in light of the known circumstances." This is a fairly high standard—a "negligent, lazy, or careless" response will not suffice. Instead, the plaintiff must demonstrate that the school's actions amounted to "an official decision . . . not to remedy" the discrimination. And fifth, the school's deliberate indifference must have "subject[ed the plaintiff] to harassment." Put differently, the school must have "cause[d the plaintiff] to undergo harassment or ma[d]e [the plaintiff] liable or vulnerable to it."

*Id*. (citation omitted).

The Third Amended Complaint also states a Title IX deliberate indifference to sexual harassment claim against The Regents based on Bond's persistent sexually-themed remarks to Decedent and other rowers. (*See* TAC ¶¶ 97–106.)   The Regents Defendants

do not dispute that a coach's use of sexually themed remarks constitutes sexual harassment. (Mot. One at 16.)  Thus, the Court finds, as it did in its prior order, that a coach's routine use of sexually inappropriate comments aimed at male members of the team constitutes sexual harassment.  (August 2023 Order at 22–23, citing *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007).)  Further, at this stage in the proceedings, the Court finds that Plaintiffs sufficiently allege severe and pervasive sexual harassment such that it could be said to deprive Decedent of the benefits of UCSD, namely participating on the rowing team.  Plaintiffs' allegations that Bond "regularly" and "routinely" ridiculed rowers for not being "man enough," for their "lack of testosterone," their "testicular" problems, and being "flaccid" are sufficient to meet that standard.  (TAC ¶ 44.)

The Regents Defendants primarily take issue with the notice/knowledge element of Plaintiffs' claim and argue that Plaintiffs' sex discrimination claim fails unless they allege deliberate indifference in response to actual notice. (Mot. One at 15–16.)  Plaintiffs allege McGann had notice of sexual harassment because (1) in January 2020 McGann observed Bond's hostile behavior toward the athletes during several practices of the varsity rowing teams, (*id*. ¶ 49), (2) during the February 22, 2020 call, Decedent complained to McGann about Bond's "repeated verbal abuse, hostility, and isolation," (*id*. ¶¶ 63–64), and (3) Decedent outlined Bond's "misconduct, harassment, and retaliation" in the anonymous survey in April 2020, the receipt of which McGann acknowledged by posting a response on June 4, 2020.  (*Id*. ¶¶ 72–73.)

The allegations in the Third Amended Complaint do not support the inference that McGann was on notice regarding sexual harassment.  First, McGann's observation of Bond's hostile behavior during team practices does not constitute actual notice of sexual harassment.  *See Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 739-740 (9th Cir. 2000) (rejecting a similar assertion of actual notice).  Further, Plaintiffs appear to conflate their retaliation and sexual harassment claims.  During the February 22, 2020 call Decedent informed McGann about Bond's "repeated verbal abuse, hostility and isolation" (TAC ¶ 64) and in the anonymous survey he informed McGann about Bond's "misconduct,

harassment, and retaliation in response to Decedent's complaints" about the Z.B. matter. (*Id*. ¶¶ 72–73.)   These general allegations do not support the inference that Decedent discussed Bond's sexually harassing behavior (i.e., sex-focused comments) with McGann. Thus, McGann did not have notice of Bond's alleged sexual harassment.

Accordingly, the Court concludes that Plaintiffs fail to state a plausible claim for deliberate indifference to sexual harassment.   Accordingly, the Court **GRANTS** The Regents Defendants' Motion and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' second cause of action.

## II.   Negligent Hiring, Supervision, and Retention Claim Against McGann

Under the California law, "to establish a cause of action for negligence, the plaintiff must show that the defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 213 (2021).  However, "[r]ecovery for negligence depends as a threshold matter on the existence of a legal duty of care," which is "a question of law to be resolved by the court." *Id*.  Although the general duty of care embodied in California Civil Code Section 1714 does not impose an affirmative duty on a defendant to protect a plaintiff from harm at the hands of a third party, there are exceptions—one being the "special relationship" doctrine. *Id*. at 215.  The "special relationship" doctrine "generally ha[s] an aspect of dependency in which one party relies to some degree on the other for protection and the other has superior control over the means of protection, and they create a duty of care owed to a limited community, not the public at large." *Thomas v. Regents of Univ. of Cal.*, 97 Cal. App. 5th 587, 624, *reh'g denied* (Dec. 29, 2023), *review denied* (Feb. 28, 2024) (cleaned up).   The doctrine, thus, imposes an affirmative duty on a defendant to warn or protect a plaintiff from foreseeable risk of harm created by a third party. *Brown*, 11 Cal. 5th at 216.

The Regents Defendants argue that, as a public employee, McGann is not vicariously liable for Bond's misconduct and enjoys immunity for her discretionary decisions.  (Mot. One at 17–18 (citing Cal. Gov't Code §§ 820.8, 820.2).)  However, the prohibition against

the imposition of vicarious liability under California Government Code § 820.8[3] does not apply when the supervisor's own negligence causes the alleged injury.  Cal. Gov't Code § 820.8.[4]  Here, Plaintiffs' claim against McGann is premised on her failure to discover Bond's history of abuse before hiring him, to discipline or address Bond's psychological abuse and sexual harassment, and to investigate Decedent's complaints in his April 2020 survey.  (Opp'n One at 19.)  Further, the California Supreme Court in *C.A. v. William S. Hart Union High School District* recognized a cause of action against individual supervisory employees of a public entity for negligent hiring and supervision when they stand in a special relationship with a plaintiff.  53 Cal. 4th 861, 877 (2012).

### A.  Special Relationship

The Regents Defendants contend that Plaintiffs' negligence claim fails because the "special relationship" giving rise to a duty to take precautions to prevent suicide exists only if the Decedent's act of suicide was foreseeable and occurred in a custodial setting, which is not the case here.  (Mot. One at 19–22.)  Plaintiffs, on the other hand, contend that their negligence claim "is not predicated on a specific duty to prevent [Decedent's] suicide," (Opp'n One at 22–23); instead McGann owed a duty to protect Decedent from "serious mental harm," which occurred when she negligently failed to discover Bond's history of abuse and to discipline or investigate Bond after learning about the psychological abuse of Decedent and the sexual harassment of the rowing team.  (*Id*. at 20.)

In *Regents of University of California v. Superior Court*, the California Supreme Court recognized that universities "do have a special relationship with students while they

---

[3]   California Government Code Section 820.8 provides that "[e]xcept as otherwise provided by statute, a public employee is not liable for an injury caused by the act or omission of another person, except for "injury proximately caused by his own negligent or wrongful act or omission."

[4]   The Court need not address The Regents Defendants assertion of immunity under California Government Code Section 820.2 because they fail to provide any reasoning to support their claim.  For example, they have not explained whether McGann's decisions are basic policy decisions made at the planning stage or routine duties incident to her office or position.  *See generally Taylor v. City of Los Angeles Dept. of Water & Power*, 144 Cal. App. 4th 1216 (2006).

are engaged in activities that are part of the school's curriculum or closely related to its delivery of educational services." 4 Cal. 5th 607, 625–27 (2018).   Accordingly, in *Thomas*, the court concluded that there exists a college-student special relationship in the athletic team setting because "'[a]thletic competition is often an important part of the college environment, benefiting both the students who participate and the schools they represent.'" 97 Cal. App. 5th at 625 (quoting *Regents*, 4 Cal. 5th at 624).   Thus, UCSD, and by extension McGann, had a special relationship with Decedent.

The existence of a "special relationship," however, does not necessitate a finding that UCSD must protect Decedent from all foreseeable injury.  *Id*. at 625.   Thus, the next question is whether California law recognizes a special duty to protect Decedent from "serious mental harm."   In *Thomas*, a student-athlete who was subjected to her coach's "tirades" and body shaming comments alleged a negligence claim against the university's athletic director for his failure to intervene and protect her from the psychological and emotional harm that resulted from the hostile environment created by the coach. *Id*. at 601, 623.   After an in-depth analysis of the scope of the duty contemplated by the special relationship between a university and student, the court concluded that existing California case law does not impose a duty on a university to protect students from non-physical harm. *Id*. at 627.  Because the *Thomas* court did not foreclose the possibility of a university having a duty to protect students from non-physical harm, on July 10, 2024, the Court ordered the Parties to submit supplemental briefings to address whether the California Supreme Court would impose such a duty on a university.  ("Jul. 2024 Order," ECF No. 87.)   The Parties submitted their briefs on July 17, 2024, and July 24, 2024, respectively.  (*See generally* Plaintiffs' Supplemental Brief ("Pltfs.' Supp. Br."), ECF No. 88; The Regents Defendants' Supplemental Brief ("The Regents Defs.' Supp. Br."), ECF No. 89.)

/ / /

/ / /

### B.      Duty to Protect Students from Non-physical Harm

"Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it."  *Hayes v. Cnty. of San Diego*, 658 F.3d 867, 871 (9th Cir. 2011) (cleaned up).

> In undertaking this analysis, a federal court is not free to reject a state judicial rule of law merely because it has not received the sanction of the state's highest court.  An intermediate state appellate court decision is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.

*Id*. at 871–72 (cleaned up).  In *Brown*, the California Supreme Court clarified that courts must use a two-step framework to determine whether a defendant has a duty to protect a plaintiff from third-party harm.

> First, the court must determine whether there exists a special relationship between the parties or some other set of circumstances giving rise to an affirmative duty to protect.  Second, if so, the court must consult the factors described in *Rowland* to determine whether relevant policy considerations counsel limiting that duty.

11 Cal. 5th at 209.  Regarding the first step in the framework, as discussed *supra* (page 20) the *Thomas* decision supports the finding that a college-student special relationship exists in the athletic team setting.  97 Cal. App. 5th at 625 (quoting *Regents*, 4 Cal. 5th at 624). The *Rowland* factors in the second step "fall into two categories.  The first group involves foreseeability and the related concepts of certainty and the connection between plaintiff and defendant. The second embraces the public policy concerns of moral blame, preventing future harm, burden, and insurance availability."[5]  *Regents*, 4 Cal. 5th at 629.

---

[5]      The specific *Rowland* factors are: [1] the foreseeability of harm to the plaintiff, [2] the degree of certainty that the plaintiff suffered injury, [3] the closeness of the connection between the defendant's conduct and the injury suffered, [4] the moral blame attached to the defendant's conduct, [5] the policy of preventing future harm, [6] the extent of the burden to the defendant and consequences to the community

Plaintiff relies on an unreported intermediate appellate case, *Matthes v. Rodgers*, Case No. B322759, 2024 WL 2123279, at \*8–9 (May 13, 2024), which recognized a host parent's duty to protect an au pair from emotional distress based on a special relationship between the two.  (Pltfs.' Supp. Br. at 4–8.)  Because this case does not involve an employment relationship, the reasoning in *Matthes* does not apply.

The Regents Defendants argue that claims advanced on a theory of purely emotional distress generally fail (citing *Thing v. La Chusa*, 48 Cal. 3d 644, 664 (1989)), and that the *Rowland* foreseeability factors should play a limited role in this Court's analysis.  (The Regents Defs.' Supp. Br. at 5.)  In *Thing*, the California Supreme Court revoked reasonable foreseeability as the measure of responsibility for pure emotional harm and observed that

> [F]oreseeability proves too much ... Although it may set tolerable limits for most types of physical harm, it provides virtually no limit on liability for nonphysical harm. It is apparent that reliance on foreseeability of injury alone ... is not adequate when the damages sought are for an intangible injury. In order to avoid limitless liability out of all proportion to the degree of a defendant's negligence, and against which it is impossible to insure without imposing unacceptable costs on those among whom the risk is spread, the right to recover for negligently caused emotional distress must be limited.

48 Cal. 3d at 663–64 (cleaned up).  Further, in *Nally v. Grace Community Church*, the court concluded that imposing a duty based on foreseeability alone is imprudent.  47 Cal. 3d 278, 297 (1988).  Thus, even if emotional injury is certainly foreseeable in light of a university administrator's decision to hire a head coach with a history of psychological and sexual harassment and subsequent failure to investigate athletes' claims of abuse, the *Rowland* policy factors (four through seven) could still counsel against finding a duty, as they do here.

The "moral blame" factor (factor 4) weighs against finding a duty to protect against emotional distress because the *Thomas* court indicated that, in the context of negligent

---

of imposing a duty to exercise care with resulting liability for breach, and [7] the availability, cost, and prevalence of insurance for the risk involved.  *Brown*, 11 Cal. 5th at 217.

hiring and retention, moral blame attaches only to a risk that manifest in physical injury. 97 Cal. App. 5th at 626–27 (citing *C.A.*, 97 Cal. 53 Cal. 4th at 878).  Similarly, factors 5 (policy of preventing future harm) and 6 (burden on defendants and community), which examine the broader policy concern of extending liability also weigh against imposing on a university a duty to prevent students' emotional distress.  *Nally*, 47 Cal. 3d at 298.

Highlighting the changes in the legal significance of the college-student relationship, the *Regents* court observed that, when it comes to regulating student conduct, universities no longer stand in "loco parentis;" instead, the legal landscape in university liability has shifted to a "bystander" era where the privacy and autonomy rights of adult students outweigh the college administrators' authority to control student behavior.  4 Cal. 5th at 622.  Thus, the Court agrees with The Regents Defendants' assessment that imposing a duty on a university administrator to prevent emotional distress could threaten the independence and autonomy students seek because such a policy might prompt university employees to make repeated inquiries of the student or, worse yet, force all students complaining of harassment to seek mental health treatment when there are other less intrusive resources available to address the harm—which include rules against harassment, avenues to report complaints to OPHD, and accessible mental health services.  (The Regents Defs.' Supp. Br. at 13–14.)  In the context of alcohol-related injuries, some courts have refused to impose a duty of care on universities when it could encroach on university students' privacy interests.  *See, e.g.*, *Tanja H. v. Regents of Univ. of California*, 228 Cal. App. 3d 434, 438 (1991) (refusing to impose a duty on colleges to prevent alcohol-related crimes because it would require them to "impose onerous conditions on the freedom and privacy of resident students" and it is inconsistent with the modern view that adult students are generally responsible for their welfare).

Although this case does not concern alcohol-related crimes, given the statutory schemes already established by California (*see* California Education Code §§ 220, 66270) to compensate victims of harassment, the Court concludes that requiring a university to do more would encroach on university students' privacy interests, which in turn militates

against finding that a university has a duty to protect its students from emotional harm. Further, the *Thomas* court's reasoning strongly indicates that the California Supreme Court is unlikely to find such a duty on a university. *See Thomas*, 97 Cal. App. 5th at 626–27 (examining nine California cases that considered school- or college-student relationships before concluding that under the current jurisprudence, a university does not have a duty to protect students from harm of a non-physical nature.).

Regarding the final policy factor, the Regents Defendants argue that the imposition of a duty to protect students from intangible harm has the downside of increasing the cost of secondary education because a university might need to raise tuition to cover the increased risk of liability for intangible harms, as commercial general liability insurance excludes allegations of emotional distress unaccompanied by physical injury.  (*Id*. at 16, citing *McLaughlin v. Nat'l Union Fire Ins. Co.*, 23 Cal. App. 4th 1132, 1150 (1994)).  Thus, the final factor also weighs against imposing on universities a duty to prevent students' emotional distress.

For the reasons above, the Court concludes that the California Supreme Court is less likely to impose on a university a duty to protect its students from non-physical harm. Further, because UCSD, and by extension McGann, had no duty to protect Decedent from emotional harm, Plaintiffs fail to state a plausible negligence claim against McGann.

## C.   *Conclusion*

Accordingly, the Court **GRANTS** The Regents Defendants' Motion and **DISMISSES** Plaintiffs' third cause of action **WITH PREJUDICE**.  *See Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988) (finding that granting leave to amend a pleading is futile "if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense").

## III.   CONCLUSION

In light of the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** The Regents Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint. Specifically, the Court **GRANTS** The Regents Defendants' Motion and **DISMISSES**

**WITHOUT PREJUDICE** Plaintiff's second cause of action and **DISMISSES WITH PREJUDICE** Plaintiffs' third cause of action.  The Court otherwise **DENIES** The Regents Defendants' Motion.

**MOTION TO DISMISS PLAINTIFFS' REQUEST FOR PUNITIVE DAMAGES**

The Regents Defendants seek to dismiss Plaintiffs' claim for punitive damages as inappropriate under Title IX and California law and further argue Plaintiffs fail to state sufficient facts to support such a claim against McGann.  (*See generally* Mot. Two.)

**I.    Legal Standard**

A Rule 12(b)(6) or Rule 56 motion serves as the preferred procedural means to procure dismissal of damages claims in this circuit.  *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010) (holding that to interpret Rule 12(f) as authorizing dismissal of some or all claims in a complaint would create redundancies within the Federal Rules because a Rule 12(b)(6) motion to dismiss or a Rule 56 summary judgment motion serves the same purpose.)  Although The Regents Defendants appear to rely on Rule 12(f) in addition to Rule 12(b)(6) for relief, the Court construes the Motion as one under Rule 12(b)(6).

**II.    Analysis**

Although Plaintiffs withdrew their punitive damages claim as to Title IX against The Regents, (Opp'n Two at 3), they argue that their request may apply to The Regents under California Government Code § 3294(b) as McGann's and Bond's employer at the time of the alleged wrongful acts.  (*Id*. at 4.)

California Government Code § 818 states that "[n]otwithstanding any other provision of law, a public entity is not liable for damages awarded under Section 3294 of the Civil Code or other damages imposed primarily for the sake of example and by way of punishing the defendant."  Cal. Gov't Code § 818; *see also Westlands Water Dist. v. Amoco Chem. Co.*, 953 F.2d 1109, 1113 (9th Cir. 1992) (under California law, public entities are immune from punitive damages).

Although Plaintiffs withdrew their punitive damages claim as to Title IX, they seek to maintain a claim indirectly against The Regents based on its employer status under California Government Code § 3294(b).  (Opp'n Two at 3.)  Plaintiffs, however, do not identify any case law that authorizes such a claim against a public entity despite the absolute immunity provided in § 818 against an award under § 3294.  *L. A. Unified Sch. Dist. v. Superior Ct.*, 14 Cal. 5th 758, 767 (2023) (finding that section § 818 immunizes public entities from damages awarded under Civil Code section 3294 and from other damages that would function, in essence, as an award of punitive or exemplary damages).  Nonetheless, the Court already has determined that Plaintiffs cannot state a plausible negligence claim against McGann, so any punitive damages claim against The Regents premised on its status as her employer is inappropriate.  (*See supra* pages 18–24.)  To the extent Plaintiffs seek punitive damages against Bond in his personal capacity, that claim will remain unaffected by the provision in California Government Code § 818.  *See C.N. v. Wolf*, 410 F. Supp. 2d 894, 904 (C.D. Cal. 2005) (finding that California statute barring punitive damages against public entities do not bar punitive damages claims against individual defendants in their personal capacities.).

## III.   Conclusion

For the reasons stated above, the Court **GRANTS** The Regents Defendants' Motion and **DISMISSES WITH PREJUDICE** Plaintiffs' Request for Punitive Damages from The Regents and McGann.

## BOND'S MOTION TO DISMISS

The Third Amended Complaint alleges a wrongful death claim pursuant to California Code of Civil Procedure § 377.60 against Decedent's head coach, Bond, premised on his intentional and negligent conduct.  (TAC ¶¶ 107–14; Opp'n Three at 12–22.)  Bond challenges both bases of liability.  (*See generally* Mot. Three.)

## I.   Legal Standard

"The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss

suffered by the heirs." *Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1263 (2006) (emphasis and citation omitted). "Wrongful act" as used in California Code of Civil Procedure § 377.60 "means any kind of tortious act." *Barrett v. Super. Ct.*, 222 Cal. App. 3d 1176, 1191 (1990). Thus, a defendant's negligent or intentional wrongful conduct can give rise to a wrongful death claim. *See Walsh v. Tehachapi Unified Sch. Dist.*, 997 F. Supp. 2d 1071, 1085 (E.D. Cal. 2014) (discussing liability based on negligent conduct); *Nally v. Grace Cmty. Church*, 47 Cal. 3d 278, 301 (1988) (observing that "under *Tate*, a plaintiff may resist a demurrer to a wrongful death action for intentional conduct leading to suicide if he can allege facts sufficient to show that defendant's conduct was outrageous and a substantial factor in the decedent's suicide."). Here, Plaintiffs seek to impose liability premised on negligent and intentional conduct.[6] (Opp'n Three at 12–22.)

## II.   Analysis

### A.   *Negligence*

In establishing liability for negligence that contributes to suicide, a plaintiff can proceed under one or more of the following theories—(1) a plaintiff can show that because of a special relationship with the decedent, the defendant owed a duty to prevent a foreseeable suicide, which the defendant breached, or (2) a plaintiff can establish that a defendant's negligent conduct caused "a mental condition in the decedent that proximately resulted in an uncontrollable impulse to commit suicide, or prevented the decedent from realizing the nature of his act" ("uncontrollable impulse theory"). *See generally Walsh*, 997 F. Supp. 2d at 1078–88. When a plaintiff seeks to impose liability for suicide premised on a special relationship, the element of duty emerges from the special relationship that existed between the suicidal individual and the defendant or its agents, *Nally*, 47 Cal.3d at

---

[6]    Bond's argument that the Court foreclosed Plaintiffs' ability to assert a wrongful death claim based on negligence in its August 2023 Order is meritless. (Opp'n at 16.) Instead of foreclosing Plaintiffs from asserting both the theories of liability, the Court provided a reason for denying Bond's Motion to Dismiss Plaintiffs' Second Amended Complaint—i.e., he failed to adequately address Plaintiffs' alternative theory of liability premised on intentional conduct. (August 2023 Order at 36.)

293–94, whereas under the uncontrollable impulse theory, the duty owed to the decedent is the general duty each person has to act with reasonable care under the circumstances—not any special duty. *See Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764, 771 (2011). Accordingly, even in the absence of a special relationship between the suicidal individual and the defendant, a plaintiff can state a plausible negligence claim if he can show that the defendant's negligent conduct caused an uncontrollable impulse to commit suicide. *See generally Whooley v. Tamalpais Union High School Dist.*, 399 F. Supp. 3d. 986, 999 (2019). The Court, thus, disagrees with Bonds' suggestion that Plaintiffs' negligence claim is not plausible, absent a special relationship between him and Decedent. (Mot. Three at 14–16.)

### i.   Special Relationship

California law imposes "a duty to prevent a foreseeable suicide only when a special relationship existed between the suicidal individual and the defendant or its agents." *Nally*, 47 Cal. 3d at 293. "Courts generally [] impose[] a duty to prevent suicide only where the defendant has physical custody and substantial control over a person, or where the defendant has special training or expertise in mental illness and has sufficient control over a person to prevent the suicide." *Walsh*, 997 F. Supp. 2d at 1085 (collecting cases).

Relying on *Regents*, discussed *supra* (page 20), Plaintiffs contend that UCSD and Bond had a duty to protect Decedent from harm because, as a student and participant in a school-sponsored activity, a special relationship existed between Decedent and UCSD/Bond. (Opp'n Three at 18.) Bond counters that, even though universities are in a special relationship with their students, such a relationship obligates them to prevent suicide only in the context of school-sponsored activities over which they have some measure of control. (Reply Three at 12.) The *Regents* court concluded that the college-student relationship fits within the paradigm of a special relationship because "colleges have a superior ability to provide safety with respect to the activities they sponsor or facilities they control." 4 Cal. 5th at 625–26. The court further observed that it would be unrealistic for students to rely on their college for protection outside these settings. *Id.*

Here, Decedent's suicide occurred off UCSD's campus and after he informed Bond that he would not be participating in the next rowing season. (TAC ¶¶ 77–78.) Thus, the college-student special relationship does not impose on Bond a duty to prevent Decedent's suicide.

Plaintiffs also argue that their claim is viable under *Ortiz v. Royal Maccabees Life Insurance Company*, 32 Fed. Appx. 934 (9th Cir. 2002). (Mot. Three at 15.) In *Ortiz,* the plaintiff brought a wrongful death action against an insurer for an insured's suicide following the insurer's denial of disability benefits on the ground that the insured decedent was not in his physician's regular care. 32 Fed. Appx. at 935. The Ninth Circuit concluded that triable facts remained as to whether the decedent was in the physician's regular care at the time of his suicide because the decedent took the valium his physician prescribed until the time of his death. *Id.* at 936. Plaintiffs argue that, like in *Ortiz*, Bond's "care, custody and coaching extended beyond the physical location of the UCSD campus" because Bond continued to coach rowers off-campus through Zoom meetings. (Opp'n Three at 19). Even if Bond's influence extended beyond the physical location of the UCSD campus, a college-student relationship is not comparable to a physician-patient relationship. *Regents*, 4 Cal. 5th at 625–26 (articulating reasons why the college-student relationship fits within the paradigm of a special relationship). Further, at the time of his suicide, Decedent had opted out of UCSD's rowing team, extinguishing any lingering control Bond had over Decedent. (TAC ¶¶ 77–78.)

Plaintiffs seek to circumvent the factual and legal deficiencies identified above by arguing, like in their negligent hiring claim discussed *supra* (pages 18–24), that Bond and UCSD had a "duty to use reasonable care to protect [Decedent] from foreseeable act[s] of violence, namely Bond's abuse," that occurred during the rowing practices. (Opp'n Three at 20.) To the extent Plaintiffs seek to impose a duty on Bond to prevent the intangible injury of verbal abuse, their claim fails because, as discussed above, the California Supreme Court is less likely to impose on a university a duty to protect its students from non-physical harm. (*See supra*, pages 22–24.) Accordingly, Plaintiffs fail to allege a plausible wrongful death claim under the special relationship theory.

1

   *ii. Uncontrollable Impulse*

2

  "In California, suicide has historically been viewed as an intervening event that

3

always breaks the chain of causation, thereby precluding any tort liability for a suicide."

4

*Whooley*, 399 F. Supp. 3d at 999 (citing *Tate*, 180 Cal. App. 2d at 901–3).  "An exception

5

is where the defendant's negligence causes the decedent to suffer from an uncontrollable

6

impulse to commit suicide." *Id*.  "The underlying rationale for this exception is that absent

7

volition, the decedent's act of suicide is not independent from the defendant's original

8

negligence." *Id*.  "Therefore, in order to satisfy the uncontrollable impulse test, a plaintiff

9

must show that a defendant's negligence cause[d] the decedent to suffer a mental condition

10

in which the decedent cannot control his or her suicidal impulses." *Id*.  "On the other hand,

11

if the decedent [could] control such impulses and [could] refrain from committing suicide,

12

then it would be a superseding event that breaks the chain of causation between the

13

defendant's negligence and the death."[7]  *Id*.

14

  Bond does not claim that Decedent was able to control his "suicidal impulses or had

15

the ability to refrain from committing suicide."  (*See generally* Mot. Three at 16.)  He,

16

however, argues that despite admitting in the Second Amended Complaint that Decedent

17

had a diagnosis of schizophrenia (a genetic disorder), in the Third Amended Complaint

18

Plaintiffs allege that Decedent had a diagnosis of schizophrenic behavior.  (Mot. Three at

19

7, 11.)  The Court cannot resolve this factual dispute at the motion to dismiss stage.

20

---

21

22

   [7]  Plaintiffs contend that Bond, by engaging "in conduct that is reckless in the sense that it is

23

'totally outside the range' of competitive coaching," caused the Decedent "to suffer from a mental illness, which led to an uncontrollable impulse to commit suicide."  *Id*. (citing *Kahn v. East Side Union High Sch. Dist.*, 31 Cal. 4th 990, 996 (2003)).  The California Supreme Court promulgated the rule Plaintiffs

24

recite from *Kahn* while defining the scope of tort liability for harm that results when an athletic instructor demands a student-athlete perform beyond his capacity or without providing adequate instruction.  *Kahn*,

25

31 Cal.4th at 1011.  The *Kahn* court observed that any resulting injury to the student-athlete is actionable if the instructor "acted with intent to cause a student's injury" or he "acted recklessly in the sense that the

26

instructor's conduct was 'totally outside the range of the ordinary activity' involved in teaching or coaching the sport." *Id*. (citing *Knight v. Jewett*, 3 Cal. 4th 296 (1992)).  Because Plaintiffs fail to explain

27

how this case concerning the doctrine of assumption of the risk is relevant to their wrongful death action, the Court assumes they intended to highlight the egregiousness of Bond's conduct through *Kahn*.

28

Further, the Court's review is limited to the allegations in the operative complaint, which is the Third and not the Second Amended Complaint. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 927 (9th Cir. 2012) (en banc) (recognizing "the general rule ... that an amended complaint supersedes the original complaint and renders it without legal effect").

In the Third Amended Complaint, Plaintiffs allege that Bond's incessant harassment and abuse (TAC ¶¶ 42–49; 108; 113) caused Decedent to suffer an uncontrollable impulse to commit suicide. (*Id*. ¶ 113.)   The Court can reasonably infer from this allegation that Decedent's mental anguish from Bond's harassment created the "uncontrollable impulse" to commit suicide. *See Whooley*, 399 F. Supp. 3d at 1000 (concluding that in the absence of "any sort of warning or pronouncement from the decedent regarding his suicidal ideation," allegations that "repeated negligence of the district's employee in accommodating the decedent's disability caused his extreme anxiety and mental harm" is sufficient to state a claim.)   Further, unlike a detailed suicide note, which would indicate that Decedent thought out in advance his decision to commit suicide, thus negating an "irresistible impulse" claim, Decedent's statement in the 2020 anonymous survey that "he had a few fleeting thoughts of suicide throughout the process," (TAC ¶ 73), is concise and devoid of factual details regarding his plans to take his own life. *See Whooley*, 399 F. Supp. 3d at 1000 (identifying facts that could negate the inference that a defendant suffered an uncontrollable impulse).   Accordingly, the Court concludes that Plaintiffs have a plausible wrongful death claim against Bond under the uncontrollable impulse theory.

### B.    *Intentional Conduct*

 A cause of action for wrongful death premised on intentional conduct exists "where the defendant intended, by his conduct, to cause serious mental distress or serious physical suffering, and does so, and such mental distress is shown by the evidence to be a substantial factor in bringing about the suicide." *Tate v. Canonica*, 180 Cal. App. 2d 898, 909 (1960) (cleaned up).

Plaintiffs argue the following allegations in the Third Amended Complaint support the inference that Bond intended to cause Decedent serious mental distress:

21-CV-1703 TWR (MSB)

after [Decedent] complained of Z.B. to Bond, Bond continued to harass [Decedent] by increasingly targeting and fat-shaming him in front of his teammates. TAC ¶ 58. Bond degraded [Decedent] by calling him "fat Brian" and threatening his teammates not to be like [Decedent] because it was a negative association. TAC ¶¶ 45, 47. The [Plaintiffs] allege that Bond knew of [Decedent's] prior struggles with his health, weight, and body image. Despite Bond's knowledge of [Decedent's] struggles with his weight, … Bond called [Decedent] "fat" or likened him to the dead weight of a coxswain. TAC ¶ 39. The [Plaintiffs] allege Bond's conduct was intentional and meant to humiliate [Plaintiffs] by targeting him in front of his other teammates. TAC ¶¶ 43-46.

(Opp'n Three at 14.)   Bond counters that, although these allegations show he acted intentionally, they do not support the inference that through these actions he intended to cause Decedent serious mental distress.  (Reply at 4–5 (citing *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989, 1006 (1988)).  In *McCollum*, the plaintiffs brought a wrongful death claim against the musical performer, producers, and distributors of an album for the suicide of one of the album's listeners.  *Id.* at 994–997.  The court observed that the plaintiffs failed to adequately allege any intentional conduct beyond the defendants' intentional composition, performance, production, and distribution of the recorded music because they failed to assert that the defendants had any knowledge of, or intent with respect to the decedent himself or any other particular listener.  *Id.* n.12 (cleaned up).  Thus, the court noted that to state a claim the plaintiffs must "allege that defendants intended to cause [the decedent's] (or some other listener's) suicide and made the subject recorded music available for that purpose."[8]  *Id.* at 1006.

Unlike in *McCollum*, the Third Amended Complaint makes more than mere conclusory allegations.  Plaintiffs claim that despite knowing Decedent's prior struggles with body image, Bond called him "fat or likened him to the dead weight of a coxswain." (Opp'n Three at 14, citing TAC ¶ 39.)  This and Plaintiffs' other allegations referenced

---

[8]     The relevant inquiry under *Tate* is whether defendant intended to cause "serious mental distress," and not whether a defendant intended to cause suicide. 180 Cal. App. 2d at 909.

above support the inference that Bond intended to cause serious mental distress because he had knowledge of a particular vulnerability and acted to exploit that vulnerability. Further, while it may be harder to infer intentionality in *McCollum* from the distant relationship between a musician and his listeners, Bond maintained a direct and close relationship with Decedent. Further, Plaintiffs allege that after Decedent complained about Z.B., Bond subjected him to continuous verbal harassment. (TAC ¶ 58.) Thus, the Third Amended Complaint supports the inference that Bond intended to cause serious mental distress through his verbal harassment. Accordingly, the Court must next determine if the mental distress was a "substantial factor" in bringing about the suicide.

It is not true that "in every case where the actor intentionally causes serious mental distress or physical suffering, and this is followed by suicide, the actor is necessarily liable for the suicide." *Tate*, 180 Cal. App. 2d at 909. The mental distress or physical injury may not be, in the particular case, as a matter of fact, a substantial factor in bringing about the suicide." *Id*.

Bond argues that it is implausible that the mental stress about training under him was a substantial factor that contributed to Decedent's suicide because (1) the first two amended complaints allege that Decedent developed mental health issues after he returned to New York and underwent treatments for schizophrenia, which is a genetic disorder; (2) any fear and paranoia Decedent suffered during in-person training with Bond subsided during his time away from the campus following the school shutdown due to COVID; (3) although Decedent opted out of the winter quarter training, Decedent emailed Bond that he "hoped to return" to practice for the spring quarter; and (4) The Third Amended Complaint alleges that before returning to San Diego, Decedent's mental health had become stable and under control with treatments he received while in New York. (Mot. Three at 20; Reply Three at 6.) Plaintiffs counter that Decedent's fear and paranoia did not vanish when he moved away from the campus; instead, they persisted because Decedent "shared his fears with close friends, family and psychiatrist" (Opp'n Three at 17 (citing TAC ¶ 77)), and the Court should infer that the mental distress is the substantial factor from Decedent's own statement

in the anonymous survey that he had suicidal thoughts because of the traumatic ordeal he endured with Bond.  (*Id.* at 16 (citing TAC ¶ 73).)  Moreover, Plaintiffs assert that it is improper for the Court to consider at the pleading stage Bond's conjecture that other factors may have contributed to Decedent's suicide.  (*Id.* at 17.)

California courts have adopted the "substantial factor" test for cause in fact determination.  *Tate*, 180 Cal. App. 2d at 909.  "The substantial factor standard generally produces the same results as does the 'but for' rule of causation which states that a defendant's conduct is a cause of the injury if the injury would not have occurred 'but for' that conduct."  *Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 969, as modified on denial of reh'g (1997) (cleaned up).

> The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical. Thus, a force which plays only an infinitesimal or theoretical part in bringing about injury, damage, or loss is not a substantial factor, but a very minor force that does cause harm is a substantial factor. This rule honors the principle of comparative fault.

*People v. Lockwood*, 214 Cal. App. 4th 91, 102 (2013) (cleaned up).

Here, the Parties dispute the degree to which the mental stress contributed to Decedent's final decision to take his own life.  For wrongful death claims premised on intentional torts, "proof of the substantial causation will usually be based on expert testimony."  *Mayer v. Town of Hampton*, 127 N.H. 81, 87, 497 A.2d 1206, 1211 (1985); *see also McKay v. Hageseth*, No. C-06-1377 MMC, 2007 WL 2669934, at *4 (N.D. Cal. Sept. 7, 2007) (relying on expert testimony to determine the cause of suicide.)  Thus, at this stage in the litigation, the Court need not resolve factual disputes between the Parties regarding the exact cause of Decedent's suicide.  The allegations in paragraphs 73 and 77, taken in the light most favorable to Plaintiffs, support the inference that Decedent's mental stress caused by Bond's verbal harassment played more than an "infinitesimal or theoretical part" in the ultimate injury.  *Lockwood*, 214 Cal. App. 4th at 102.  Thus, Plaintiffs have plausibly alleged a wrongful death claim premised on intentional conduct.

**III.   Conclusion**

In light of the foregoing, the Court concludes that Plaintiffs have a plausible wrongful death claim based on Bond's negligent (under the uncontrollable impulse theory) and intentional conduct.   Accordingly, the Court **DENIES** Bond's Motion to Dismiss Plaintiffs' Third Amended Complaint.

**CONCLUSION**

To summarize, for the reasons stated above, the Court

- **GRANTS IN PART AND DENIES IN PART** The Regents Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint, (ECF No. 76). Specifically, the Court **GRANTS** The Regents Defendants' Motion and **DISMISSES WITHOUT PREJUDICE** Plaintiff's second cause of action and **DISMISSES WITH PREJUDICE** Plaintiffs' third cause of action.  The Court otherwise **DENIES** The Regents Defendants' Motion;

- **GRANTS** The Regents Defendants' Motion, (ECF No. 75), and **DISMISSES WITH PREJUDICE** Plaintiffs' Request for Punitive Damages from The Regents and McGann;

- **DENIES** Bond's Motion to Dismiss Plaintiffs' Third Amended Complaint (ECF No. 74);

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

- **GRANTS** Plaintiffs leave to file a Fourth Amended Complaint addressing the above-enumerated deficiencies <u>within thirty (30) days of the date this Order is electronically docketed</u>.  Plaintiffs are not permitted to reallege any claims dismissed with prejudice and may not add any claims or parties to the case without leave of Court.  Should Plaintiffs fail to file a timely amended complaint, this action will proceed as to their remaining causes of action.

**IT IS SO ORDERED.**

Dated:  September 30, 2024

_____

Honorable Todd W. Robinson
United States District Judge

21-CV-1703 TWR (MSB)